# EXHIBIT A

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 35451800
Date:  Jan 19 2011  3:34PM
Mark Harper, Clerk

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
Civil Division

**CIVIL ACTION FILE NO. 11EV011779G**
*** ATTORNEYS NOTE-- DESIGNATED E-FILED CASE ***
CONTACT THE COURT AT 404.730.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT 1.888.529.7587

| TYPE OF SUIT | AMOUNT OF SUIT |
| --- | --- |
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [X] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | |
| ************ | |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

FEDERAL HOME LOAN BANK OF ATLANTA,

    Plaintiff,

vs.

COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF
AMERICA HOME LOANS); COUNTRYWIDE SECURITIES
CORPORATION; COUNTRYWIDE HOME LOANS, INC; BANK OF
AMERICA CORPORATION (as successor to the COUNTRYWIDE
Defendants); J.P. MORGAN SECURITIES, LLC (f/k/a J.P. MORGAN
SECURITIES, INC. and BEAR STEARNS & CO., INC.);
UBS SECURITIES, LLC; and JOHN DOE DEFENDANTS 1-50,

    Defendants

## SUMMONS

Bank of America Corporation
c/o Registered Agent
CT Corporation System
1201 Peachtree Street, N.E.
Atlanta, Georgia 30361

TO THE ABOVE NAMED-DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

**H. LAMAR MIXSON, DAVID G.H. BRACKETT, RONAN P. DOHERTY, BRET R. HOBSON, MARY W. PYRDUM, NAVEEN RAMACHANDRAPPA, Bondurant, Mixson & Elmore, LLP, 1201 W. Peachtree Street, NW, Suite 3900, Atlanta, GA  30309; (404) 881-4100**

an answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do  so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, if desired, in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This January 19, 2011                                            **Angela Dash-Winfre, Chief Deputy Clerk**

If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

*SERVICE INFORMATION:*

Served , this _____ day of _____, 2011.        _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

14-014-1094

**State Court of Fulton County**
***E-FILED***
LexisNexis Transaction ID: 35451800
Date: Jan 19 2011  3:34PM
Mark Harper, Clerk

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
Civil Division

CIVIL ACTION FILE NO. 11EV011779G
*** ATTORNEYS NOTE-- DESIGNATED E-FILED CASE ***
CONTACT THE COURT AT 404.730.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT 1.888.529.7587

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [  ] ACCOUNT | PRINCIPAL $_____ |
| [  ] CONTRACT | |
| [X] NOTE | INTEREST $_____ |
| [X] TORT | |
| [  ] PERSONAL INJURY | ATTY. FEES $_____ |
| [  ] FOREIGN JUDGMENT | |
| [  ] TROVER | COURT COST $_____ |
| [  ] SPECIAL LIEN | |
| ************ | |
| [  ] NEW FILING | |
| [  ] RE-FILING:  PREVIOUS CASE NO. _____ | |

FEDERAL HOME LOAN BANK OF ATLANTA,

Plaintiff,

vs.

COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF AMERICA HOME LOANS); COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE HOME LOANS, INC; BANK OF AMERICA CORPORATION (as successor to the COUNTRYWIDE Defendants); J.P. MORGAN SECURITIES, LLC (f/k/a J.P. MORGAN SECURITIES, INC. and BEAR STEARNS & CO., INC.); UBS SECURITIES, LLC; and JOHN DOE DEFENDANTS 1-50,

Defendants

## SUMMONS

Countrywide Financial Corporation
c/o Registered Agent
CT Corporation System
818 W 7th Street
Los Angeles, CA  90017

TO THE ABOVE NAMED-DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

**H. LAMAR MIXSON, DAVID G.H. BRACKETT, RONAN P. DOHERTY, BRET R. HOBSON, MARY W. PYRDUM, NAVEEN RAMACHANDRAPPA, Bondurant, Mixson & Elmore, LLP, 1201 W. Peachtree Street, NW, Suite 3900, Atlanta, GA  30309; (404) 881-4100**

an answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do  so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, if desired, in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This January 19, 2011                                    **Angela Dash-Winfre, Chief Deputy Clerk**

If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

*SERVICE INFORMATION:*

Served , this _____ day of _____, 2011.       _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

14-014-1094

**GEORGIA, FULTON COUNTY**                                    DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**                    CIVIL ACTION FILE NO. 11EV011779G
**Civil Division**                                        *** ATTORNEYS NOTE-- DESIGNATED E-FILED CASE ***
                                                   CONTACT THE COURT AT 404.730.5040 AND
                                                   LEXISNEXIS CUSTOMER SUPPORT AT 1.888.529.7587

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|

FEDERAL HOME LOAN BANK OF ATLANTA,

    Plaintiff,

vs.

COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF AMERICA HOME LOANS); COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE HOME LOANS, INC; BANK OF AMERICA CORPORATION (as successor to the COUNTRYWIDE Defendants); J.P. MORGAN SECURITIES, LLC (f/k/a J.P. MORGAN SECURITIES, INC. and BEAR STEARNS & CO., INC.); UBS SECURITIES, LLC; and JOHN DOE DEFENDANTS 1-50,

    Defendants

**TYPE OF SUIT**

[  ] ACCOUNT             PRINCIPAL $_____
[  ] CONTRACT
[  ] NOTE                 INTEREST $_____
[X] TORT
[  ] PERSONAL INJURY    ATTY. FEES $_____
[  ] FOREIGN JUDGMENT
[  ] TROVER          COURT COST $ _____
[  ] SPECIAL LIEN

       ************

[  ] NEW FILING
[  ] RE-FILING:  PREVIOUS CASE NO. _____

## SUMMONS

Countrywide Home Loans, Inc.
c/o Registered Agent
CT Corporation System
1201 Peachtree Street, N.E.
Atlanta, Georgia 30361

TO THE ABOVE NAMED-DEFENDANT:

    You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

    **H. LAMAR MIXSON, DAVID G.H. BRACKETT, RONAN P. DOHERTY, BRET R. HOBSON, MARY W. PYRDUM, NAVEEN RAMACHANDRAPPA, Bondurant, Mixson & Elmore, LLP, 1201 W. Peachtree Street, NW, Suite 3900, Atlanta, GA  30309; (404) 881-4100**

an answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do  so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, if desired, in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This January 19, 2011                  **Angela Dash-Winfre, Chief Deputy Clerk**

    If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

    If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

***SERVICE INFORMATION:***

    Served , this _____ day of _____, 2011.   _____

                                          DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

14-014-1094

**State Court of Fulton County**
***E-FILED***
LexisNexis Transaction ID: 35459360
Date:  Jan 19 2011  5:10PM
Mark Harper, Clerk

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
Civil Division

CIVIL ACTION FILE NO. 11EV011779G
*** ATTORNEYS NOTE-- DESIGNATED E-FILED CASE ***
CONTACT THE COURT AT 404.730.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT 1.888.529.7587

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [  ] ACCOUNT | PRINCIPAL $_____ |
| [  ] CONTRACT | |
| [  ] NOTE | INTEREST $_____ |
| [X] TORT | |
| [  ] PERSONAL INJURY | ATTY. FEES $_____ |
| [  ] FOREIGN JUDGMENT | |
| [  ] TROVER | COURT COST $ _____ |
| [  ] SPECIAL LIEN | |
| ************ | |
| [  ] NEW FILING | |
| [  ] RE-FILING:  PREVIOUS CASE NO. _____ | |

FEDERAL HOME LOAN BANK OF ATLANTA,

    Plaintiff,

vs.

COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF
AMERICA HOME LOANS); COUNTRYWIDE SECURITIES
CORPORATION; COUNTRYWIDE HOME LOANS, INC; BANK OF
AMERICA CORPORATION (as successor to the COUNTRYWIDE
Defendants); J.P. MORGAN SECURITIES, LLC (f/k/a J.P. MORGAN
SECURITIES, INC. and BEAR STEARNS & CO., INC.);
UBS SECURITIES, LLC; and JOHN DOE DEFENDANTS 1-50,

    Defendants

## SUMMONS

| Countrywide Securities Corporation | Countrywide Securities Corporation | Countrywide Securities Corporation | Countrywide Securities Corporation |
|---|---|---|---|
| c/o Registered Agent | c/o Registered Agent | c/o President | c/o Registered Agent |
| CT Corporation System | Prentice Hall Corp System, Inc. | | Corporation Service Company |
| 818 W 7th St. | 66 Luckie St. | Countrywide Securities Corporation | 327 Hillsborough St |
| Los Angeles, CA 90017 | Atlanta, GA 30303 | 401 N. Tryon St., NC1-021-02-20 | Raleigh, NC 27603 |
| | | Charlotte, NC 28255 | |

TO THE ABOVE NAMED-DEFENDANT:

    You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

**H. LAMAR MIXSON, DAVID G.H. BRACKETT, RONAN P. DOHERTY, BRET R. HOBSON, MARY W. PYRDUM, NAVEEN RAMACHANDRAPPA, Bondurant, Mixson & Elmore, LLP, 1201 W. Peachtree Street, NW, Suite 3900, Atlanta, GA  30309; (404) 881-4100**

an answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do  so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, if desired, in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This January 19, 2011                                                **Angela Dash-Winfre, Chief Deputy Clerk**

    If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

    If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

*SERVICE INFORMATION:*

    Served , this _____ day of _____, 2011.    _____

                                              DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

14-014-1094

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 35451800
Date: Jan 19 2011 3:34PM
Mark Harper, Clerk

**GEORGIA, FULTON COUNTY**                                      **DO NOT WRITE IN THIS SPACE**

**STATE COURT OF FULTON COUNTY**                    **CIVIL ACTION FILE NO. 11EV011779G**
Civil Division                                       *** ATTORNEYS NOTE-- DESIGNATED E-FILED CASE ***
                                                     **CONTACT THE COURT AT 404.730.5040 AND**
                                                     **LEXISNEXIS CUSTOMER SUPPORT AT 1.888.529.7587**

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [X] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | |
| ************ | |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

FEDERAL HOME LOAN BANK OF ATLANTA,

    Plaintiff,

vs.

COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF AMERICA HOME LOANS); COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE HOME LOANS, INC; BANK OF AMERICA CORPORATION (as successor to the COUNTRYWIDE Defendants); J.P. MORGAN SECURITIES, LLC (f/k/a J.P. MORGAN SECURITIES, INC. and BEAR STEARNS & CO., INC.); UBS SECURITIES, LLC; and JOHN DOE DEFENDANTS 1-50,

    Defendants

## SUMMONS

**J.P. MORGAN SECURITIES, LLC**
**c/o Registered Agent**
**CT Corporation System**
**1201 Peachtree Street, N.E.**
**Atlanta, Georgia 30361**

TO THE ABOVE NAMED-DEFENDANT:

    You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

    **H. LAMAR MIXSON, DAVID G.H. BRACKETT, RONAN P. DOHERTY, BRET R. HOBSON, MARY W. PYRDUM, NAVEEN RAMACHANDRAPPA, Bondurant, Mixson & Elmore, LLP, 1201 W. Peachtree Street, NW, Suite 3900, Atlanta, GA  30309; (404) 881-4100**

an answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do  so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, if desired, in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This January 19, 2011                                      **Angela Dash-Winfre, Chief Deputy Clerk**

    If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

    If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

***SERVICE INFORMATION:***

    Served , this _____ day of _____, 2011.     _____
                                                              DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

14-014-1094

**State Court of Fulton County**
***E-FILED***
LexisNexis Transaction ID: 35451800
Date:  Jan 19 2011  3:34PM
Mark Harper, Clerk

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
Civil Division

CIVIL ACTION FILE NO. 11EV011779G
*** ATTORNEYS NOTE-- DESIGNATED E-FILED CASE ***
CONTACT THE COURT AT 404.730.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT 1.888.529.7587

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [  ] ACCOUNT | PRINCIPAL $_____ |
| [  ] CONTRACT | |
| [  ] NOTE | INTEREST $_____ |
| [X] TORT | |
| [  ] PERSONAL INJURY | ATTY. FEES $_____ |
| [  ] FOREIGN JUDGMENT | |
| [  ] TROVER | COURT COST $ _____ |
| [  ] SPECIAL LIEN | |
| ************ | |
| [  ] NEW FILING | |
| [  ] RE-FILING:  PREVIOUS CASE NO. _____ | |

FEDERAL HOME LOAN BANK OF ATLANTA,

    Plaintiff,

vs.

COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF
AMERICA HOME LOANS); COUNTRYWIDE SECURITIES
CORPORATION; COUNTRYWIDE HOME LOANS, INC; BANK OF
AMERICA CORPORATION (as successor to the COUNTRYWIDE
Defendants); J.P. MORGAN SECURITIES, LLC (f/k/a J.P. MORGAN
SECURITIES, INC. and BEAR STEARNS & CO., INC.);
UBS SECURITIES, LLC; and JOHN DOE DEFENDANTS 1-50,

    Defendants

## SUMMONS

**UBS Securities, LLC**
**c/o Registered Agent**
**Corporation Service Company**
**40 Technology Parkway South, No. 300**
**Norcross, Georgia 30092**

TO THE ABOVE NAMED-DEFENDANT:

    You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

    **H. LAMAR MIXSON, DAVID G.H. BRACKETT, RONAN P. DOHERTY, BRET R. HOBSON, MARY W. PYRDUM, NAVEEN RAMACHANDRAPPA, Bondurant, Mixson & Elmore, LLP, 1201 W. Peachtree Street, NW, Suite 3900, Atlanta, GA  30309; (404) 881-4100**

an answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do  so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, if desired, in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This January 19, 2011        **Angela Dash-Winfre, Chief Deputy Clerk**

    If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

    If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

*SERVICE INFORMATION:*

    Served , this _____ day of _____, 2011.    _____

                                              DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

14-014-1094

State Court of Fulton County
***FILED***
LexisNexis Transaction ID: 35434716
Date:  Jan 18 2011  7:13PM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF ATLANTA, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF AMERICA HOME LOANS); COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE HOME LOANS, INC; BANK OF AMERICA CORPORATION (as successor to the COUNTRYWIDE Defendants); J.P. MORGAN SECURITIES, LLC (f/k/a J.P. MORGAN SECURITIES, INC. and BEAR STEARNS & CO., INC.); UBS SECURITIES, LLC; and JOHN DOE DEFENDANTS 1-50. | : Civil Action : File No. _____ : : JURY TRIAL DEMANDED |
| Defendants. | : |

## COMPLAINT FOR DAMAGES

H. Lamar Mixson
David G.H. Brackett
Ronan P. Doherty
BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia 30309
Telephone:  (404) 881-4100

Attorneys for the Federal Home Loan Bank of Atlanta

# TABLE OF CONTENTS

Nature of the Action...........................................................................................1

The Parties.......................................................................................................4

    A.    The Federal Home Loan Bank of Atlanta ..............................4

    B.    The Defendants...................................................................5

        1.    The Countrywide Defendants .......................................5

        2.    The J.P. Morgan Defendants........................................7

        3.    Defendant UBS Securities, LLC..................................7

        4.    The John Doe 1-50 Defendants...................................11

Jurisdiction and Venue.................................................................................12

I.    Background.........................................................................................13

    A.    The Bank ...........................................................................13

    B.    Creating Private Label Mortgage-Backed
        Securities ..........................................................................15

    C.    Selling PLMBS Certificates to Investors ...........................19

II.    The Operative Facts ..........................................................................27

    A.    The Bank's PLMBS Purchases ..........................................27

    B.    The Offering Documents.....................................................29

    C.    The Defendants' Misrepresentations of Fact ......................33

1.     The Defendants Falsely Represented That the Mortgage Loans in the Collateral Pools Were Originated in Accordance with the Disclosed Underwriting Standards ............................................34

     a.     The Defendants Knew the Loans in the Collateral Pools did not Conform to the Stated Underwriting Standards..................................39

     b.     Emerging Evidence Confirms Defendants Knew the Originators Abandoned Underwriting Standards......................................................................48

          i.     Countrywide's Senior Executives Knew that Countrywide Had Abandoned Its Stated Underwriting Standards ..............................................49

          ii.     J.P. Morgan Knew that Underwriting Standards had been Ignored ..................................54

          iii.     Countrywide and UBS Knew That Wells Fargo Abandoned its Underwriting Standards.......................................56

          iv.     Countrywide Knew That First Horizon Had Abandoned Its Underwriting Standards ..............58

2.     The Offering Documents Falsely Represented That the Appraisals Were Neutral and Independent .........................60

     a.     The Defendants Knew That the Appraisals Were Neither Independent Nor Neutral .........................63

     b.     Biased Appraisals Rendered the Offering Documents Representations about Loan-to-Value Ratios False and Misleading .................................66

ii

c.    The LTVs for the Loans in the Collateral Pools Backing the Bank's PLMBS Investments Were Systematically Biased and Therefore False and Misleading ....................................................69

3.    The Offering Documents Misrepresented the Use of the Properties Used to Secure the Mortgages..................................................................73

4.    The Offering Documents Falsely Represented that the Certificates Would not be Issued Unless they Earned AAA Ratings ......................................74

5.    The Defendants Falsely Stated that they had Effectively Transferred and Assigned the Notes and Mortgages to the Trusts as Part of the Securitization Process......................................82

D.    The Defendants' Misrepresentations and Omissions of Facts Were Material..........................................................89

E.    The Defendants Knew Their Offering Documents Were False and Misleading and Intended to Defraud Investors, Including the Bank ..............................92

F.    The Bank Reasonably Relied on the Defendants' Misrepresentations..................................................................94

G.    The Mortgages Backing the Banks' PLMBS Certificates Have Experienced Significant Delinquencies, Foreclosures and Credit Losses..................................95

III.    Tolling of the Statute of Limitations ............................................99

Count One – Violation of the Georgia RICO Act Against Countrywide Financial and Countrywide Securities (O.C.G.A. § 16-14-4(a) and (c)) ...............................................100

The Countrywide Enterprise ...................................................................100

The Pattern of Racketeering.................................................................104

    a.    Theft by Taking (O.C.G.A. § 16-8-2) ................................105

    b.    Theft by Deception (O.C.G.A. § 16-8-3) ..........................106

    c.    Residential Mortgage Fraud (O.C.G.A. § 16-8-102) ........107

    d.    Violations of the Georgia Securities Act of 1973 .............108

    e.    False Statements to a Federal Home Loan
        Bank (18 U.S.C. § 1014) ..................................................109

    f.    Bank Fraud (18 U.S.C. § 1344)........................................110

Countryside's Acts of Racketeering Activity are Related .....................111

Countrywide's Violations of the Georgia RICO Statute .......................113

Countrywide's Georgia RICO Violations Proximately
Caused Injury to the Bank.....................................................................114

Count Two – Violation of the Georgia RICO Act Against
J.P. Morgan Securities, Inc. (O.C.G.A. § 16-14-4(a) and (c))...............114

The J.P. Morgan Enterprise ..................................................................115

The Pattern of Racketeering Activity ...................................................118

    a.    Theft By Taking (O.C.G.A. § 16-8-2) ..............................118

    b.    Theft By Deception (O.C.G.A. § 16-8-3) .........................119

    c.    Residential Mortgage Fraud (O.C.G.A. § 16-8-102) ........120

    d.    Violations of the Georgia Securities Act of 1973 .............121

    e.    False Statements to a Federal Home Loan
        Bank (18 U.S.C. § 1014) ..................................................122

f.      Bank Fraud (18 U.S.C. § 1344)..............................................................123

J.P. Morgan Acts of Racketeering Activity Are Related......................................124

J.P. Morgan Violations of the Georgia RICO Statute ...........................................125

J.P. Morgan's Georgia RICO Violations Proximately
Caused Injury to the Bank..................................................................................126

Count Three – Fraud and Deceit.........................................................................127

Count Four – For Punitive Damages (O.C.G.A. § 51-12-5.1) .............................130

Count Five – Negligent Misrepresentation.........................................................131

Count Six – For Successor Liability Against
Bank of America Corporation..............................................................................134

Count Seven – For Expenses of Litigation Against
All Defendants (O.C.G.A. § 13-6-11) ..................................................................138

Jury Demand .....................................................................................................139

Prayer for Relief................................................................................................139

Plaintiff the Federal Home Loan Bank of Atlanta (hereinafter the "Bank") alleges the following in support of its claims:

## NATURE OF THE ACTION

1.      The Bank is a cooperative bank created to promote housing finance opportunities for Americans of all income levels.  For more than 75 years, the Bank has pursued that public mission by loaning money at competitive rates to member financial institutions, which helps those members make home loans available to prospective homebuyers.

2.      This action concerns the Bank's investment in more than $6 billion in Private Label Mortgage-Backed Securities ("PLMBS").  Although the details of those securities can be complex, the misconduct that gives rise to this case is not. Simply stated, the defendants that created and offered these securities for sale did not tell the truth in the documents they used to sell their securities to the Bank and other investors.

3.      In light of its public mission, the Bank has a very conservative investment philosophy.  The Bank made the investments at issue here on the basis of factual representations designed to convince the Bank that these securities were safe, prudent, and highly-rated investments.  The Bank could not and would not have purchased the PLMBS at issue in this Complaint if the Offering Documents (which include Registration Statements, Prospectuses, credit stipulations, and other

information) had disclosed the truth about those securities and the mortgage loans that backed them.

4.      For example, the Offering Documents represented that the PLMBS the Bank purchased were backed by mortgages that had been originated according to specific "underwriting standards."  In other words, the defendants represented that the mortgages had been screened to determine whether the borrowers were credit-worthy and that the properties securing the mortgages provided sufficient collateral for the loans.

5.      It has now become evident, however, that those representations were false because the underwriting standards described in the Offering Documents were abandoned.  For example, the Securities and Exchange Commission has released documents and testimony that show defendant Countrywide repeatedly ignored its underwriting standards to originate any mortgage that Countrywide thought it could sell to investors like the Bank as part of a mortgage-backed security.

6.      Moreover, the investment banks responsible for the Offering Documents used to sell these PLMBS—defendants Countrywide Securities, J.P. Morgan Securities, and UBS Securities—knew that those documents were false at the time they presented them to investors, including the Bank.  In the course of conducting their own due diligence, the investment bank defendants learned that

nearly half the mortgages used to back the securities they were selling did not adhere to the underwriting standards represented in the Offering Documents. Nevertheless, the investment bank defendants proceeded to sell the Bank the more than $6 billion of PLMBS at issue in this Complaint on the basis of factual representations they knew were false and misleading.

7.     Accordingly, this is not a case in which the Bank blames the defendants for failing to predict the future performance of the housing market. Instead, this is a case in which the Bank alleges the defendants knowingly sold PLMBS on the basis of representations that they knew were false.

8.     As a direct and proximate result of this misconduct, the Bank has suffered significant losses on the PLMBS certificates at issue in this Complaint.

9.     The Countrywide and J.P. Morgan defendants' misconduct constitutes a pattern of racketeering activity that violates the Georgia RICO Act.  Accordingly, the Bank brings this action to recover statutory treble damages, punitive damages, and attorneys' fees pursuant to that Georgia statute.  In addition, the Bank brings this action for fraud to recover its damages, as well as punitive damages and attorneys' fees from Countrywide, J.P. Morgan, and UBS.  Finally, and in the alternative, the Bank seeks to recover damages for negligent misrepresentation against all the defendants.

## THE PARTIES

**A.      The Federal Home Loan Bank of Atlanta**

10.     The Federal Home Loan Bank of Atlanta (referred to herein as "the Bank") is a cooperative bank that has its headquarters in Fulton County at 1475 Peachtree Street, N.E., Atlanta, Georgia 30309.  The Bank is owned by its members, which are in turn private commercial banks, credit unions, thrifts, community development financial institutions, and insurance companies located in Alabama, Florida, Georgia, Maryland, North Carolina, South Carolina, Virginia, and the District of Columbia.

11.     The Bank is not an agency of the United States.  It performs no governmental function.  No tax dollars are used to operate the Bank, and the federal government does not own any of the Bank's stock.  To the contrary, the Bank is privately owned and funded, and the Bank's members are the owners of any retained earnings and/or profits.  The Bank's Board of Directors—not the government—has the exclusive authority to manage the Bank's operations.  The government does not have the power to appoint directors of the Bank.  Moreover, the Bank's employees are not civil servants.

12.     In addition, the Bank is not a citizen of any State.  The Bank's Organization Certificate provides that the Bank is to operate in Federal Home Loan Bank District No. 4, which includes the States of Alabama, Florida, Georgia,

Maryland, North Carolina, South Carolina, and Virginia, as well as the District of Columbia.  The Bank conducts operations in each of those States and the District of Columbia.

**B.     The Defendants**

### *The Countrywide Defendants*

13.     Defendant Countrywide Financial Corporation ("Countrywide Financial") is a Delaware corporation with its executive offices in Calabasas, California and New York, New York.  Countrywide Financial is the parent company of the following wholly-owned subsidiaries, which were all involved in Countrywide's mortgage-backed securitization assembly-line:  Countrywide Home Loans, Inc., CWALT, Inc., CWMBS, Inc., Countrywide Home Loans Servicing LP, Countrywide Capital Markets, LLC, and Countrywide Securities. Countrywide Financial supervised the creation and sale of 16 of the securitizations at issue in this Complaint.  Until July 1, 2008, Countrywide Financial was a publicly traded company whose shares traded on the New York Stock Exchange. Through its various subsidiaries, Countrywide Financial has conducted substantial business and derived substantial revenue in Fulton County and the State of Georgia.

14.     Defendant Countrywide Securities Corporation ("Countrywide Securities") served as the investment bank responsible for the Offering Documents

on 18 of the securitizations at issue in this Complaint.  Countrywide Securities is a California corporation registered to do business in Georgia.  Countrywide Securities is an indirect, wholly-owned subsidiary of defendant Countrywide Financial.  Countrywide Securities may be served at the Fulton County offices of its registered agent, Prentice Hall Corporation System, Inc., at 66 Luckie Street in Atlanta, Georgia.

15.     Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a New York corporation registered to do business in Georgia.  Countrywide Home Loans originated many of the mortgages that were securitized into the PLMBS at issue in this Complaint.  Countrywide Home Loans may be served at the Fulton County offices of its registered agent, CT Corporation System, at 1201 Peachtree Street, N.E. in Atlanta, Georgia.

16.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation registered to do business in Georgia.  On or about July 1, 2008, Bank of America acquired Countrywide Financial and all its subsidiaries. As alleged in more detail below, Bank of America has successor liability for Countrywide Financial, which is now known as Bank of America Home Loans. Bank of America may be served at the Fulton County offices of its registered agent, CT Corporation System, 1201 Peachtree Street, N.E. in Atlanta, Georgia.

### *The J.P. Morgan Defendants*

17.     Bear, Stearns & Co., Inc. ("Bear Stearns") served as the investment bank responsible for the Offering Documents for one of the PLMBS certificates at issue in this Complaint.  On or about October 1, 2008, Bear Stearns merged with JPMSI, and the surviving entity was named J.P. Morgan Securities, Inc.  Since the date of the merger, JPMSI has continued the operations of Bear Stearns and assumed responsibility for the duties and liabilities of Bear Stearns.  Upon information and belief, therefore, JPMSI is the successor-in-interest to Bear Stearns and its liabilities.

18.     In addition, J. P. Morgan Securities, Inc. ("JPMSI") served as the investment bank responsible for the Offering Documents for eight of the PLMBS certificates at issue in this Complaint.  JPMSI is now known as J.P. Morgan Securities, LLC, which was formed under Delaware law and is registered to do business in Georgia.  J.P. Morgan Securities, LLC may be served at the Fulton County offices of its registered agent, CT Corporation System, at 1201 Peachtree Street, N.E. in Atlanta, Georgia.  For ease of reference, Bear Stearns, JPMSI, and/or J.P. Morgan Securities, LLC hereinafter will be referred to as "J.P. Morgan."

### *Defendant UBS Securities, LLC*

19.     Defendant UBS Securities, LLC ("UBS") served as the underwriter

responsible for the Offering Documents for three of the PLMBS certificates at issue in this Complaint.  UBS is a limited liability company organized under Delaware law.  UBS is registered to do business in Georgia and may be served at the offices of its registered agent, Corporation Service Company, at 40 Technology Parkway South, No. 300, Norcross, Georgia 30092.

20.     Unless otherwise noted, any subsequent reference to "**the Defendants**" hereinafter refers to Countrywide Financial, Countrywide Securities, Countrywide Home Loans, J.P. Morgan, Bear Stearns, and UBS, but not Bank of America, which is sued only as a successor to the Countrywide Defendants.  The following chart identifies the 30 specific securitizations on which the Bank brings its claims and identifies the specific defendants against whom the Bank asserts its claims:

| Sec. No. | Name | CUSIP | Defendants |
|---|---|---|---|
| 1. | CWHL 2004-15 4A | 12669FL50 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 2. | CWHL 2004-HYB5 8A1 | 12669F3K7 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 3. | CWHL 2005-HYB5 1A1, 2A1 | 12669GX97 (tranche 1A1), 12669GY47 (tranche 2A1) | Countrywide Financial Countrywide Securities Countrywide Home Loans |

| Sec. No. | Name | CUSIP | Defendants |
|---|---|---|---|
| 4. | CWHL 2005-HYB6 1A1, 2A1 | 126694BE7 (tranche 1A1), 126694BH0 (tranche 2A1) | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 5. | CWALT 2005-58 A1 | 12668AWH4 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 6. | CWHL 2005-HYB10 3A1A | 126694VM7 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 7. | CWHL 2006-HYB2 2A1A | 126694C97 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 8. | CWHL 2006-HYB3 3A1B, 4A1A | 1266944F2 (tranche 3A1B), 1266944J4 (tranche 4A1A) | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 9. | CWHL 2007-HYB1 4A1 | 22239EAK2 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 10. | CWHL 2007-HYB2 4A1 | 125438AQ4 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 11. | CWALT 2007-12T1 A16 | 02150LAR8 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 12. | CWHL 2007-17 4A1 | 12544KAM5 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 13. | CWHL 2005-J2 2A1 | 12669GU25 | Countrywide Financial Countrywide Securities Countrywide Home Loans |

EXHIBIT A
Page 22

| Sec. No. | Name | CUSIP | Defendants |
|---|---|---|---|
| 14. | CWHL 2007-HY6 2A1, 3A1, 4A1 | 17025MAC0 (tranche 2A1), 17025MAE6 (tranche 3A1), 17025MAG1 (tranche 4A1) | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 15. | CWHL 2007-HY7 A1 | 12544HAY6 | Countrywide Financial Countrywide Securities Countrywide Home Loans |
| 16. | FHASI 2006-AR4 2A1 | 32053AAE6 | Countrywide Securities |
| 17. | WFMBS 2006-8 A3 | 94983SAE2 | Countrywide Securities |
| 18. | WFMBS 2007-9 1A1 | 94986BAA4 | Countrywide Securities |
| 19. | BSARM 2004-12 2A2 | 07384M6K3 | J.P. Morgan (Bear Stearns) Countrywide Financial |
| 20. | CHASE 2005-A1 3A1 | 16162WPJ2 | J.P. Morgan |
| 21. | JPMMT 2005-A6 5A1 | 466247UA9 | J.P. Morgan Countrywide Financial |
| 22. | JPMMT 2006-A3 4A1 | 46628KAN0 | J.P. Morgan |
| 23. | JPMMT 2006-A4 4A1 | 46628LAQ1 | J.P. Morgan Countrywide Financial |
| 24. | JPMMT 2006-A5 4A1 | 46629CAP2 | J.P. Morgan |
| 25. | JPMMT 2007-A5 4A1 | 46632BAP9 | J.P. Morgan |
| 26. | JPMMT 2008-R1 1A1 | 46632GAA1 | J.P. Morgan |
| 27. | JPMMT 2008-R1 2A1 | 46632GAC7 | J.P. Morgan |

| Sec. No. | Name | CUSIP | Defendants |
|---|---|---|---|
| 28. | WFMBS 2006-AR14 3A1 | 94984MAR5 | UBS |
| 29. | WFMBS 2006-AR18 2A1 | 94984SAE1 | UBS |
| 30. | CWHL 2007-HY1 2A1 | 12544EAC1 | UBS<br>Countrywide Financial<br>Countrywide Home Loans |

Additional details on each of these securitizations are alleged in Item 20 of Schedules 1-30, which correspond to the Securitization Numbers listed above. The Bank incorporates those allegations into this Paragraph.

21.     As alleged in more detail below and in the attached Schedules, additional parties (often related to the Defendants) played a role in assembling and selling these PLMBS certificates. Those parties and the role that they played in the securitization processes at issue in this Complaint are identified below and in Item 21 of Schedules 1-30. The Bank incorporates those allegations into this Paragraph of the Complaint.

### *The John Doe 1-50 Defendants*

22.     At the time of this Complaint, the Bank is unaware of the true names and capacities of additional defendants sued herein as John Does 1-50, inclusive, and, therefore, sues these defendants by such fictitious names. The Bank will amend this Complaint to allege the true names and capacities of these defendants when they are ascertained. The Bank is informed and believes that each of the

fictitiously named defendants is responsible for the occurrences alleged herein and for proximately causing the Bank's damages.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to art. 6, § 3, ¶ 1 of the Constitution of the State of Georgia and O.C.G.A. § 15-7-4(a)(2).  This case is not one of the actions over which the Georgia Constitution grants the Superior Courts exclusive jurisdiction.

24.     Venue and personal jurisdiction are proper in this Court because defendants Countrywide Securities, Countrywide Home Loans, Bank of America, and J.P. Morgan Securities, LLC each maintains a registered office in Fulton County, and the Bank's claims arise from its transaction of business with the Defendants within Fulton County, Georgia.  *See* O.C.G.A. § 14-2-510; O.C.G.A. §§ 9-10-91 & 9-10-93.  All the Defendants are subject to suit in this Court because they offered and sold the PLMBS certificates to the Bank in Fulton County, Georgia and because the violations of law alleged in this Complaint, including the making of material untrue and misleading statements, took place in this County.  In addition, the Bank purchased the PLMBS and has suffered damages in this County as a direct and proximate result of the Defendants' misconduct.

25.     This action cannot be removed to federal court because the parties are not diverse.  The Bank is not a citizen of any State within the meaning of 28 U.S.C.

EXHIBIT A
Page 25

§ 1331 or Article III of the United States Constitution. *See, e.g., Fed. Home Loan Bank of Seattle v. Deutsche Bank Sec., Inc.*, No. C10-0140, 2010 WL 3512503 (W.D. Wash. Sept. 1, 2010).

26.     In addition, this Complaint asserts no claim under federal law.  In fact, no federal statute referenced in this Complaint affords the Bank any private right of action.

27.     This Complaint asserts no claim against any entity that has filed for bankruptcy protection.

## I.     BACKGROUND

### A.     The Bank

28.     The Federal Home Loan Bank system was created in 1932 to promote home ownership in the wake of the Great Depression.  The Bank raises funds in the global financial markets and distributes the proceeds to members and local communities.  The Bank offers competitively priced financing, community development grants, and other banking services to help member financial institutions make affordable home mortgages and provide economic development credit to neighborhoods and communities.

29.     To further promote home ownership, the Bank sets aside 10% of its annual net income to provide grants for affordable housing and to help first-time homebuyers with down payments and closing costs.  For example, the Bank funds

an Affordable Housing Program, which provides a flexible source of grants and loans designed to help the Bank's member financial institutions and their community partners develop affordable owner-occupied and rental housing for very low- to moderate-income families and individuals.  Since 1990, the Bank has awarded over $407 million to the Affordable Housing Program to help construct or rehabilitate more than 63,000 homeownership and rental units.

30.     The Bank has also established a First-time Homebuyer Program that has helped more than 9,700 families and individuals purchase homes since the program's inception in 1997.  The program provides matching funds for down-payment and closing-cost assistance to low- and moderate-income homebuyers. Participation in the program offers the Bank's members a way to access a wider customer base and originate new mortgages.  The program also benefits individual homebuyers who meet eligibility guidelines and apply for funds through a participating member financial institution.

31.     The Bank has also established a Community Investment Program and an Economic Development Program.  Through those programs, the Bank gives its members access to affordable funds at discounted rates so that the Bank's members can, in turn, make loans to fund community investment economic development. The Community Investment Program supports affordable housing, and the

Economic Development Program supports public and private infrastructure projects, like roads, utilities, and sewers.

32.     One of the ways in which the Bank has generated revenue to support its work is by investing in safe, conservative, AAA-rated investments.[1]  For several years, those investments have included PLMBS.  The Bank has now discovered that many of those PLMBS were based on fraudulent representations about the securities and the mortgages that backed them.  As a direct and proximate result, the Bank has suffered hundreds of millions of dollars in losses on the PLMBS certificates identified at Paragraph 20, and the Bank brings this action to recover those damages.

**B.     Creating Private Label Mortgage-Backed Securities**

33.     PLMBS are created by pooling large numbers of residential mortgage loans.  PLMBS are mortgage pass-through certificate securities that provide the investor—in this case the Bank—with the right to the payments on pools of mortgage loans.  In other words, PLMBS investors receive the right to be paid a portion of the interest and principal payments that the borrowers on those pooled mortgages pay over time.

---

[1] Throughout this Complaint, the Bank uses the phrases "AAA-rated" and "AAA" to refer, generally, to the highest possible rating the Nationally Recognized Statistical Rating Organizations ("the Rating Agencies") can confer on a long-term investment.  The highest ratings at issue in this Complaint include Standard & Poor's Financial Services, LLC's AAA rating, Moody's Investor Service, Inc.'s Aaa rating, and Fitch, Inc.'s AAA rating.

34.     The securities at issue here are called "private-label" securities to distinguish them from the mortgage-backed securities issued by government-sponsored entities like the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Unlike those entities (and the Defendants), the Bank is not an issuer of mortgage-backed securities.

35.     As illustrated below, the securitization process begins with borrowers taking out mortgage loans to purchase or refinance homes and concludes when investment banks offer the resulting PLMBS certificates to investors like the Bank.



36.     This process of securitizing mortgages into PLMBS involves a series of transactions among different—but often related—companies that tend to play the same role over and over again.

37.     *First*, the lender or **Originator** originates mortgages by making loans to borrowers.  The process by which the lender decides whether to issue the loan to

the borrower is known as "underwriting" the loan.  In the loan underwriting process, the lender screens—or is supposed to screen—mortgage applications by applying various criteria to ensure that the borrower is able to repay the loan and is therefore qualified for the mortgage.  For example, the lender typically requires an application and a credit check on the borrower to determine whether he or she represents a good credit risk.  In addition, the lender typically requires an appraisal of the property that will secure the mortgage to confirm that it will provide adequate security in the event of a default.

38.     *Second*, each securitization typically has a **Sponsor and Seller** that has primary responsibility for creating the security.  The Sponsor can be the Originator of loans in the collateral pool, collecting its own mortgages to be sold through the securitization process.  In other cases, the Sponsor may acquire loans for the collateral pool by buying them from other lenders.  In either case, the Sponsor is typically responsible for aggregating the mortgage loans into collateral pools, and as illustrated below, the Sponsor then sells the mortgages to a Depositor.



39.     *Third*, the Depositor deposits the mortgages to a **Trust**, which is a separate legal entity.  The Trust raises the money to pay for the loans by issuing certificates that will give investors the right to collect principal and interest payments on the mortgages in the collateral pool.  The Trust is managed by a **Trustee**, which is yet another separate company.

40.     *Fourth*, **Servicers** monitor the mortgages in the collateral pool and collect the borrowers' monthly payments on the loans.  Every month, the Servicer remits money to the Trust, which will in turn distribute it to the investors that purchase PLMBS certificates.  The Trustee is responsible for supervising this process for the benefit of the investors.

18



Countrywide and UBS included similar depictions in some of the Offering Documents they used to sell the Bank certain of the certificates at issue in this Complaint.  *See* Exhibit A to the Complaint.

### C.    Selling PLMBS Certificates to Investors

41.    *Fifth*, the Trust sells PLMBS certificates to investors with the help of **Investment Banks** like the Defendants Countrywide Securities, J.P. Morgan and UBS.  The Investment Banks purchase the securities from the Trust and then offer them to investors using Offering Documents that include information about the certificates and their expected return.

42.     Each certificate entitles the investor—in this case the Bank—to part of the cash flow from the mortgage loans in the collateral pool.  Because the cash flow from the borrowers on the mortgages in the collateral pool is the only source of funds to pay the investors, the credit quality of the PLMBS certificates depends directly on the quality of the mortgages in the collateral pool.  As a result, the Offering Documents' representations about the credit quality of those loans, the priority of payments to investors, and the certificates' credit support are among the most important—or material—representations for investors.

43.     The most important information about the credit quality of the mortgages is collected when the lender underwrites the loan and develops a **loan file** on the borrower, the mortgage, and the property used to secure the loan.  As noted above, underwriting a mortgage loan involves screening the mortgage application to investigate the borrower's creditworthiness and whether the property subject to the mortgage affords adequate security for the loan.  For residential mortgages of the type at issue here, the loan file generated during the underwriting process typically includes the borrower's mortgage application, along with any supporting documents, including income and asset verifications, any credit report on the borrower, and an appraisal of the property used to secure the loan.

44.     Because the collateral pool for any given mortgage-backed security typically includes thousands of residential loans, investors do not receive access to

or have an opportunity to review the loan files for all those mortgages at the time the PLMBS are offered for sale.  Instead, the entities in the securitization process described above are responsible for collecting and presenting that information to investors.

45.    The Investment Banks present this information in Offering Documents, which typically include a Registration Statement, a Prospectus, and a Prospectus Supplement, which includes statistical tables that describe the material characteristics of the mortgage loans in the collateral pool.  Among the other matters addressed in the Offering Documents are representations about: (a) the structure of the PLMBS; (b) the underwriting standards that the Originators used when they issued the mortgages in the collateral pools; and (c) statistics concerning the credit quality of the mortgages in the collateral pool.

46.    The information in the Offering Documents may be generated, collected, and reported by all the various participants in the securitization process. But because the Investment Banks are legally responsible for communicating accurate information in the Offering Documents, they typically conduct "due diligence" to ensure that the representations they are making about the PLMBS certificates and the underlying collateral pool are true and not misleading.

47.    In addition, the Offering Documents describe the priority of payments and losses on the PLMBS.  PLMBS are typically divided into different tranches (or

slices) that have different payment rights and credit risks. These tranches typically establish a waterfall system of payment priorities, whereby more senior investors are the first to receive payments on the mortgages in the collateral pool. More junior certificate holders are paid only if (and after) the Trust receives sufficient funds to pay the more senior certificate holders.

48.     Credit losses flow in the opposite direction. If the Trust does not receive enough money to cover the payments owed to all the certificate holders, the most junior certificate holders are the first to incur the loss. Losses then flow upwards to the intermediate investors, and only then to the more senior investors. As a result of this structure, the senior investment should only be at risk after credit losses on the mortgages in the collateral pool wipe out the junior and intermediate investments.

49.     The PLMBS at issue here were structured to provide for multiple tranches of senior certificates. To make those senior certificates attractive to conservative investors, like insurance companies, pension plans, and the Bank, the Defendants designed the transaction to obtain the highest possible credit ratings from at least one of the Rating Agencies, including Standard & Poor's Financial Services, LLC ("S&P"), Moody's Investor Service, Inc. ("Moody's), and Fitch, Inc. ("Fitch").

50.    To rate the certificates, the Rating Agencies evaluated the quality of the collateral pool and the credit support provided by the PLMBS structure to determine the overall risk that an investor would not receive full payment on the senior PLMBS certificates.  According to the Rating Agencies, their ratings provide investors with a system of grading the creditworthiness of securities.  And over the years, credit ratings have achieved wide investor acceptance as tools to differentiate credit quality of debt securities and other financial instruments.

51.    The Investment Banks were responsible for designing and structuring the PLMBS with enough credit support and enough collateral so that the Rating Agencies would grant AAA ratings to the senior certificates.  The Investment Banks were also responsible for obtaining the AAA credit ratings from the Rating Agencies.  Indeed, the Offering Documents represented that the PLMBS would not be issued unless the senior certificates received AAA ratings from at least one Rating Agency.  As depicted below, therefore, the Investment Banks purchase the PLMBS certificates from the Trust, obtain information on the loans, conduct due diligence, and obtain ratings from the Rating Agencies.



52.    The Investment Banks then offer the PLMBS certificates to investors based on the Offering Documents.

53.    Thus, as illustrated below, securitizing mortgages into PLMBS typically involved the following players, playing their particular roles to accomplish the following steps:

a.      The Sponsor originated or acquired the mortgage loans;

b.      The Sponsor sold the mortgage loans to a Depositor;

c.      The Depositor deposited the mortgage loans in the Trust;

d.      The Trust issued certificates that entitled the investor to an agreed portion of the interest and principal payments on the mortgages in the collateral pool;

e.      The Trust sold the certificates to an Investment Bank, like defendants Countrywide Securities, J.P. Morgan, or UBS;

f.      The Investment Banks offered and sold the certificates to investors— like the Bank—with the aid of AAA ratings and Offering Documents;

g.      Over the PLMBS' life, the Servicer collects the borrowers' payments and remits them to the Trust; and

h.      The Trustee is responsible for making the appropriate payments to the investor.



## II.   THE OPERATIVE FACTS

### A.   The Bank's PLMBS Purchases

54.   The PLMBS certificates at issue here were generally created, packaged, and sold to the Bank in the manner alleged above.  Although the Bank purchased those certificates based on Offering Documents prepared by different defendants—Countrywide, J.P. Morgan, and UBS—all of the certificates at issue in this Complaint were the product of similar PLMBS securitization assembly lines.  Accordingly, all of the various participants in those PLMBS enterprises participated in generating, gathering, or presenting the information in the Offering Documents.  Those entities and the roles they played in the securitizations identified in Paragraph 20 are identified at Item 21 of Schedules 1-30.

55.   To adhere to its own investment criteria, the Bank only purchased PLMBS certificates that received AAA ratings from at least two of the major Rating Agencies.  These ratings were important to the Bank because they indicated that the Bank's investment was safe and that the Bank could expect to be paid all the interest and principal due on the securities.  Even if one Rating Agency gave the certificate a AAA-rating but another gave a AA rating, the Bank would not purchase the security.  Without a AAA rating from at least two Rating Agencies that rated the security, the Bank could not and would not have purchased these certificates.

56.     Moreover, the Bank only purchased certificates in the most senior tranche of any particular PLMBS to maintain the security of its investment and take advantage of the credit protection afforded by junior and other subordinate certificates providing support to the most senior tranches.

57.     In addition to these precautions, the Bank sought to buy PLMBS that were primarily backed by prime loans.  Prime loans are loans made to well-qualified borrowers who have a strong credit score, who have significant assets, and/or who can demonstrate a strong debt-to-income ratio because their debts do not consume a high portion of their monthly income.  Prime loans also include mortgages on which the borrower has made a substantial down payment (*i.e.*, 15% or more) and, therefore, has substantial equity in the collateral property.

58.     The Bank took care to avoid securities backed by the so-called subprime loans that have dominated the headlines for the past several years. Subprime loans are those loans for which the borrower lacks certain qualifications for the loan (*e.g.*, poor credit history).  Because of the higher risks involved, subprime loans typically carry higher interest rates and fees than prime mortgages. But because the Bank was only interested in the safest of investments, the Bank avoided PLMBS for which the Offering Documents disclosed borrowers with low credit (or FICO) scores, borrowers with very little equity in the property securing the mortgage, or loans with predatory terms or features.

59.     The Bank further avoided purchasing securities backed by loans

generated by originators that had proven themselves unreliable in the past.

60.     By 2004, therefore, the Bank had an established track record of being

a large but extremely careful PLMBS buyer.  Given this track record, the

Defendants' representatives would call on the Bank's buyers here in Fulton

County, Georgia to offer PLMBS certificates that they represented were consistent

with the Bank's conservative investment objectives.

**B.     The Offering Documents**

61.     In connection with those sales efforts, the Defendants provided the

Bank with documents and other information that purported to describe the

certificates and the characteristics of the mortgage loans in the deal (the "Offering

Documents").  With two exceptions, the certificates that the Bank purchased were

all registered with the Securities and Exchange Commission ("SEC") and sold with

the aid of Offering Documents, including but not limited to a Registration

Statement, Prospectus and Prospectus Supplement, credit stipulations, and tables of

information concerning the loans in the collateral pools for the securities.[2]  The

---

[2] The Bank purchased Securitization Nos. 26-27 in a private placement that J.P.
Morgan did not register with the SEC.  As detailed in Schedules 26-27, that
PLMBS repackaged other J.P. Morgan securities that J.P. Morgan had registered
with the SEC and that J.P. Morgan had offered for sale with similar Offering
Documents.  J.P. Morgan, therefore, offered and sold Securitization Nos. 26-27
with the aid of Offering Documents prepared and distributed in connection with
the previous, underlying securitizations.

Defendants sent these Offering Documents to the Bank at its offices in Fulton County, Georgia, typically by e-mail or Bloomberg mail.

62.     In these Offering Documents, the Defendants made statements of material fact about the certificates that the Bank purchased.  True and correct copies of the Prospectus and Prospectus Supplement for each securitization are available at the Securities and Exchange Commission's website.[3]  The Bank has included a URL link to each Prospectus Supplement for each securitization at Item 20 of Schedules 1-30.[4]

63.     The Offering Documents included detailed statistics on the mortgages in the collateral pools for the PLMBS certificates.  For example, the Defendants provided the Bank statistics and representations about:

- the FICO scores of the borrowers;

- the borrowers' equity in the mortgaged property, expressed as Loan-To-Value ratios ("LTVs") for the mortgages;

- the number and percentage of mortgages within each PLMBS that were issued for primary residences, second homes, or investment properties; and

- the distribution of the underlying mortgages among the states.

_____

[3] The Prospectus and Prospectus Supplement for Securitization No. 22 is not available on the SEC website, as explained in Schedule 22.  However, if the Court or any defendant needs a copy, the Bank can provide an electronic or hard copy.

[4] Item 20 for Schedules 26-27 provides a link to the Offering Documents J.P. Morgan used to offer the original PLMBS that were repackaged into Securitization Nos. 26-27.

64.     The Bank read and relied on the information the Defendants provided when it made its PLMBS purchases.  In fact, the Bank established a protocol to confirm that the Bank reviewed the Offering Documents to ensure each PLMBS investment the Bank made was consistent with the Bank's investment criteria.

65.     Moreover, the Bank exercised reasonable diligence before purchasing these PLMBS by carefully reviewing the data provided by the Defendants.  On some occasions, the Bank asked the Defendants to confirm certain characteristics of the PLMBS in question and the individual loans in the mortgage pool.  On other occasions, the Bank would request that a defendant offer an alternative security or remove mortgages in the collateral pool that did not meet the Bank's investment criteria before the Bank would purchase the certificate.

66.     The Bank also compared public statistics on the final loans included in their PLMBS with the Defendants' initial tables to confirm that the characteristics of the loans in the collateral pools were materially the same as the description the Defendants gave when marketing the PLMBS.  In other words, the Bank took reasonable precautions and examined the reasonably available information to ensure that the Defendants were delivering PLMBS securities that conformed to the representations made in the Offering Documents.

67.     But the Defendants were the Bank's only source of information about the PLMBS at issue here and the characteristics of the mortgage loans actually

included in the collateral pools for those securities.  The Defendants did not

provide the Bank with direct access to the loan files or any other information

concerning the mortgage loans in any of the collateral pools.

68.     By necessity, therefore, the Bank was forced to rely on the

Defendants' representations that the mortgages in the collateral pools were

originated according to the standards described in the Offering Documents and in

other public filings.  The Bank similarly relied on representations that the

Originators and other participants in the PLMBS securitization assembly lines had

performed their own due diligence to ensure that the mortgage loans included in

the collateral pool adhered to the underwriting standards and the other

representations in the Offering Documents.  These representations gave the Bank

additional comfort that the certificates it was buying were consistent with the

representations in the Offering Documents.

69.     The Bank further relied on the Defendants' representations about the

characteristics of the mortgage loans in the pool.  In particular, the Bank sought to

invest in certificates backed by mortgages where the vast majority of borrowers

had at least a 15% equity interest in the property securing the mortgage.

Accordingly, the Bank relied on the Defendants' representations about the

borrowers' equity in the mortgage properties, expressed as Loan-to-Value ratios

("LTVs") of the loan amounts compared to the appraised values of the properties

that secured the mortgages.  And the Bank further relied on the Offering

Documents' representations that the appraisals used to generate those LTVs were

independent, honest, and unbiased appraisals of the property securing the loans.

70.    To further reduce risk, the Bank sought out certificates backed by

loans on properties the borrower would use as a residence rather than as an

investment property.  As a result, the Bank relied on the Defendants'

representations about the use to which the borrower intended to put the property.

71.    In addition, the Bank relied in particular on the Defendants'

representations that the certificates would not be issued unless they earned

investment grade ratings from the Rating Agencies.  The Bank understood and

believed that the Rating Agencies were actually rating the securities based on a

rigorous evaluation of their credit quality.  Moreover, at the time the Bank

purchased the certificates at issue here, the Bank understood that the Defendants

were obtaining AAA ratings based on the actual structure of the security and the

quality of all the loans in the pool.

72.    But as alleged in more detail below, the Offering Documents

misrepresented all of these critical facts and omitted critical additional information

that might have disclosed the truth about the PLMBS at issue here.

**C.    The Defendants' Misrepresentations of Fact**

73.    The Defendants Countrywide Financial, Countrywide Securities,

Countrywide Home Loans, J.P. Morgan, and UBS were responsible for the false representations of fact and omissions made to sell the Bank the certificates at issue in this Complaint.  In addition, those Defendants knew that their Offering Documents and other public statements were false and misleading at the time they offered the certificates for sale to the Bank.  And those Defendants made the misrepresentations alleged below with the intent to defraud the Bank and other PLMBS investors.

> **1.    The Defendants Falsely Represented That the Mortgage Loans in the Collateral Pools Were Originated in Accordance with the Disclosed Underwriting Standards.**

74.    Among the most significant and material representations in the Offering Documents were claims that the loans in the mortgage pool were issued in accordance with the disclosed underwriting standards.

75.    The process of underwriting a mortgage loan involves some level of investigation and confirmation as to whether a proposed loan represents an appropriate credit risk.  As explained in Countrywide's Offering Documents, for example:  "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral."  Similar representations were made in the other Offering Documents, as detailed at Item 75 on the Schedules 1-30.

76.     To assess the borrower's credit standing and repayment ability, the Defendants represented that the Originators obtained a loan application with information about the borrower's credit information, financial condition, assets, and liabilities, and a statement of income and expenses.  And to assess the value and the adequacy of the mortgaged property as collateral for the loan, the Defendants further represented that the Originators required an independent appraisal of the property.

77.     The Offering Documents represented that after gathering the relevant information, the Originators applied the disclosed underwriting standards to determine whether the loan represented an acceptable credit risk and whether the borrower should be approved for the loan.  As further described in Countrywide's Offering Documents:

> Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance.

As detailed at Item 77 on Schedules 1-30, the Offering Documents for all the certificates at issue in this Complaint included the same or similar representations about the Originators' adherence to the underwriting standards.

78.     For instance, the Offering Documents represented that the Originators applied underwriting standards to ensure credit quality based on standards for acceptable FICO credit scores, which are designed to assess a borrower's creditworthiness and likelihood to default based on the borrower's credit history.

79.     In addition, the Offering Documents represented that the loans had been made to borrowers with acceptable debt-to-income ratios and who had enough cash on hand to fund the property purchase.  Once again, Countrywide's Offering Documents stated:

> Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) *are within acceptable limits*.  The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower.  In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. (emphasis added)

As detailed at Item 77 on Schedules 1-30, the Offering Documents for all the certificates at issue in this Complaint included the same or similar representations about the Originators' adherence to the underwriting standards disclosed in the Offering Documents.

80.     The various Offering Documents described a number of different underwriting standards and documentation programs.  But the Offering Documents represented that, regardless which standards had been applied and which documentation had been reviewed, the Originators had evaluated the borrowers' ability to repay the loan and the value and adequacy of the collateral property.  For example, Countrywide's Offering Documents provided that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  As detailed at Item 75 on Schedules 1-30, the Offering Documents for all the certificates at issue in this Complaint included the same or similar representations about the Originators' adherence to the underwriting standards disclosed in the Offering Documents.

81.     Although the Offering Documents noted that the Originators could make exceptions to the underwriting standards, the Offering Documents generally represented that those exceptions would only be made if the borrower demonstrated compensating factors to otherwise qualify for the loan.  For instance, Countrywide's Offering Documents represented that "[e]xceptions to Countrywide Home Loans' underwriting guidelines may be made *if compensating factors are demonstrated by a prospective borrower.*"  (emphasis added).  As detailed at Item

81 on Schedules 1-16, 19-27, and 30, the Offering Documents for all the certificates at issue in this Complaint included the same or similar representations about the Originators' adherence to the underwriting standards disclosed in the Offering Documents.

82.     As described in more detail below, however, the Defendants knew that the Originators had effectively abandoned their underwriting standards. Rather than maintaining their underwriting standards and making limited exceptions to credit-worthy borrowers, the Defendants knew that the (often related) parties originating the loans had stopped enforcing underwriting standards to maintain the volume of their loan sales into the secondary market.  As a result, all the Offering Documents' representations about compliance with and adherence to the stated underwriting standards were false and misleading.

83.     The Bank did not intend to purchase mortgage-backed securities with significant credit risk.  Indeed, the Bank took care to avoid purchasing certificates tied to subprime or other risky loans.  Accordingly, the Defendants' assurances that the mortgages in the collateral pools had been screened for credit-worthy borrowers and securely collateralized mortgages according to the disclosed underwriting standards were material to the Bank's decision to purchase the certificates.

84.     The Bank did not know that these representations were false at the time the Bank purchased the certificates because the Bank was not permitted to review the loan files for compliance with the stated underwriting standards. Instead, the Bank reasonably relied on the Defendants' representations when the Bank decided to purchase the certificates.

>    **a.     The Defendants Knew the Loans in the Collateral Pools Did Not Conform to the Stated Underwriting Standards.**

85.     The large majority of the certificates at issue in this Complaint were generated by defendants that relied on their own affiliated entities to originate the loans in the collateral pools for the PLMBS in which the Bank invested.  For example, Countrywide Home Loans originated most of the loans included in the collateral pools for the PLMBS certificates that the Bank purchased from Countrywide Securities.  Countrywide Home Loans and Countrywide Securities were members of the same corporate family, headed by Countrywide Financial. As a result of those relationships, the Countrywide Defendants knew that the loans they were purchasing had not been originated in accordance with the relevant underwriting standards.

86.     Similarly, J.P. Morgan sold PLMBS backed largely by mortgages originated by its own affiliates J.P. Morgan Chase Bank N.A. and Chase Home Finance, LLC.  J.P. Morgan, J.P. Morgan Chase Bank N.A., and Chase Home Finance, LLC were (and still are) members of the same corporate family, headed

EXHIBIT A
Page 52

by JPMorgan Chase & Co.  As a result of those relationships, the J.P. Morgan defendants knew that the loans they were purchasing had not been originated in accordance with the relevant underwriting standards.

87.    To the extent the Sellers acquired loans from other sources, the Defendants represented that representative samples of those loans were reviewed for compliance with the relevant underwriting standards before they were included in the collateral pools for the PLMBS.  For example, Countrywide's Offering Documents represented that Countrywide Home Loans conducted due diligence on the loans it purchased from correspondent lenders, mortgage brokers, or other third parties:

> Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans.  The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.

As detailed at Item 87 on the Schedules, the same or similar representations appear in the Offering Documents for Securitization Nos. 1-19, 21, 23, and 28-30.

88.    More importantly, the investment bank defendants were responsible for conducting their own due diligence to ensure the accuracy of the representations they made in the Offering Documents for the PLMBS they were selling.  The Defendants, therefore, examined at least some of the mortgages that were to be included in the collateral pools to determine whether those loans

conformed to the relevant underwriting standards and other standards disclosed in the Offering Documents.

89.     The Defendants outsourced at least some of this work to third-party firms, paying those firms to review samples of the loans that the Defendants were securitizing and selling to investors like the Bank.  Those third-party firms received access to information about at least some of the individual loans in the collateral pool and were allowed to review a sample of the loan files for compliance with the applicable underwriting standards.

90.     Among the third-party firms that most of the large investment banks—including Countrywide, J.P. Morgan, and UBS—hired to perform this work was Clayton Holdings, Inc. ("Clayton"), a firm that advertises high-quality due diligence on mortgage-backed securities.  According to its website, Clayton's services allow its clients to determine whether the individual loans have been underwritten to the applicable standards:

> As the market leader in independent, loan level due diligence, Clayton is your QC [Quality Control] outsource solution to confirm whether loans have been underwritten to risk tolerances, to guideline and program requirements (including FHA), and/or whether they comply with federal and state regulations.  By outsourcing to Clayton, you'll get an independent and objective assessment on the quality or inherent risk of your loans and conformance to internal guidelines, policies and procedures.

91.     According to public testimony before the Financial Crisis Inquiry Commission ("FCIC") in 2010, Clayton's clients typically hired Clayton to assess

a sample of the loans the client was purchasing to place in a residential mortgage-backed security.  Clayton then performed a credit and compliance review to determine whether the sampled loans met the underwriting criteria and other objectives.

92.     During 2006 and the first half of 2007, Clayton reviewed more than 911,000 sample loans in securitizations issued by most of the large investment banks, including the Defendants here.  For each of those clients, Clayton reviewed a sample of the loans in different mortgage-backed securities and reported the results to its client.  Clayton's representative told the FCIC that these clients typically had Clayton perform this review for 5-10% of the loans they purchased for inclusion in mortgage-backed securities.

93.     As part of this 2010 testimony, Clayton disclosed that its 2006-2007 analysis had revealed that only 54% of the loans in the 900,000 loan sample met the underwriting guidelines provided.  Clayton further revealed that 28% of the loans in Clayton's samples were outright failures in the sense that they had major violations of the underwriting standards for which no compensating factors were provided.  **Standing alone, those findings belie the Defendants' representations that loans in the collateral pools were originated according to the underwriting standards described in the Offering Documents**.

94.     Instead, the findings that Clayton shared with the FCIC establish that the Defendants knew the Originators in their respective PLMBS pipelines had abandoned any meaningful adherence to the underwriting standards.  In the face of Clayton's findings, the Defendants could not have actually believed that the loans in the collateral pools were originated in conformance with the underwriting standards described in the Offering Documents the Defendants used to sell PLMBS to investors like the Bank.

95.     Because Clayton provided these results to the Defendants, they were on notice that significant percentages of the loans in the collateral pools did not meet the governing underwriting standards.  Accordingly, the Defendants knew that their representations about the application of the underwriting standards in the Offering Documents were false and misleading.

96.     And although Clayton offered its services as a means of identifying and correcting problems in connection with acquiring loans that do not meet specified standards, Clayton's representatives testified that the Defendants did not use Clayton's reports for that purpose.  Instead, one of Clayton's representatives testified that the investment banks used Clayton's findings to negotiate better pricing on the loans they were purchasing and securitizing and subsequently selling as PLMBS to investors like the Bank.

97.     In addition, after Clayton identified these departures from the underwriting guidelines, the Defendants elected to waive many of the deficiencies. Clayton's representatives testified that its clients waived an average of 39% of the underwriting guideline defects that Clayton identified.  Clayton disclosed documents that show the rates at which (a) Clayton rejected the sampled loans for major violations of the underwriting standards and (b) the Defendants in this action subsequently waived those defects:

| Defendant | Percentage of Mortgages that Clayton Rejected | Percentage of Clayton Rejected Mortgages that Client Waived |
|---|---|---|
| Bear Stearns | 16% | 42% |
| Countrywide | 26% | 12% |
| J.P. Morgan | 27% | 51% |
| UBS | 20% | 33% |

98.     By contrast, Clayton's representatives testified that its clients were far more vigilant about rejecting loans for which Clayton had identified a potential violation of state or federal law.  Clayton's former president testified that its clients generally would not purchase any loans flagged as potential regulatory violations because they expected that they would be held liable for those violations.

99.     But Clayton's representatives testified that their clients were less concerned about the underwriting and other credit violations in Clayton's findings.

Clayton's representatives testified that their clients never asked Clayton to expand the scope of its due diligence review to the balance of the loans in the security. They similarly testified that they did not believe Clayton's clients used its findings to reject loans outside the 5-10% sample that Clayton had reviewed.

100.   In plainer terms, Clayton told these Defendants that the loans they were securitizing and selling to investors did not comply with the underwriting standards the Defendants were using to sell the securities.  Rather than stop selling securities on the basis of false and misleading information, however, the Defendants elected to include large numbers of those defective loans in their securities.  Even worse, the Defendants continued to sell these PLMBS to investors on the basis of factual representations plainly contradicted by Clayton's findings.

101.   For example, Clayton informed defendant J.P. Morgan that nearly one-third of the loans in Clayton's sampling did not meet the basic underwriting standards that J.P. Morgan was using to sell its securities.  Rather than stop the process and at least try to correct the problem, J.P. Morgan waived Clayton's warnings and included more than half of the loans Clayton had flagged for underwriting violations in securities that J.P. Morgan then sold to investors like the Bank.  As detailed in the Clayton testimony and documents, Countrywide and UBS were guilty of the same misconduct.

102.   Furthermore, J.P. Morgan sold those securities while assuring investors that the loans in the collateral pool backing the Bank's certificates were underwritten substantially in accordance with the underwriting criteria described in the Offering Documents.  Countrywide and UBS made the same or similar assurances in their Offering Documents even though their own due diligence efforts confirmed those representations were not true.

103.   Additional third-party firms including CoreLogic's Bohan Group, Fidelity Information Services' Watterson Prime unit, 406 Partners, Allonhill, American Mortgage Consultants, Opus Capital Markets Consultants, and RR Donnelly provided similar services to investment bank clients, including the Defendants.

104.   Moreover, upon information and belief, the Defendants own due diligence and quality control efforts during the time period relevant here similarly revealed that the loans in the collateral pools did not adhere to the relevant underwriting standards.

105.   The Defendants have not publicly released the results of their own due diligence and quality control efforts.  Moreover, the Defendants and their affiliates have resisted the efforts of investors, regulators, and government officials to gain access to the loan files on the loans in the collateral pools.

106.   On the basis of its investigation to date and the available information, therefore, the Bank alleges that discovery is reasonably likely to produce additional evidence that the Defendants knew that the loans in the collateral pools for the PLMBS they were selling did not conform to the underwriting standards represented in the Offering Documents for the time period at issue here.

107.   None of the Offering Documents revealed that the Defendants, Clayton, or anyone else had found substantial deviations from the applicable underwriting standards in the loans in the collateral pools.  Nor did any of the Offering Documents reveal that the Defendants waived the defects that Clayton had flagged and instead elected to include those loans in the securities they sold to investors.

108.   Moreover, none of the Offering Documents revealed that the Defendants had failed to pursue the obvious implications of their own due diligence efforts and Clayton's findings by conducting a more comprehensive review of the loans in the collateral pools.  And none of the Offering Documents included any attempt to warn investors that the Defendants knew of these comprehensive failures in the mortgage underwriting process.

109.   Accordingly, none of the Offering Documents revealed that the Defendants sold these certificates to the Bank with knowledge that significant

numbers of the loans in the collateral pool were not—in fact—originated in accordance with the underwriting standards.

110.   Instead, the Offering Documents all affirmatively represented that the mortgages backing the securities the Bank purchased were issued according to the underwriting standards described in the Offering Documents.  Those representations were not true, and the Defendants' failure to include this additional information rendered the Offering Documents materially false and misleading.

111.   The Defendants made these false statements with the purpose and intent of inducing the Bank and other investors to purchase the certificates.  And the Bank reasonably relied on those misrepresentations of fact when it purchased the certificates at issue in this Complaint.

112.   Upon information and belief, the Defendants engaged in this conduct because they earned substantial fees from creating and selling PLMBS.  Rather than jeopardize those revenues, the Defendants elected to sell PLMBS to investors, including the Bank, based on representations that they knew were untrue at the time they were made.

### b.    *Emerging Evidence Confirms the Defendants Knew the Originators Abandoned Underwriting Standards.*

113.   Clayton's 2010 disclosures reveal that the Defendants have long known what the rest of the world has been discovering over the past two years. As a result of government investigations, public hearings, SEC actions, and other

litigation, the emerging evidence now demonstrates that many of the Originators who underwrote the loans in the collateral pools for the Bank's PLMBS certificates had effectively abandoned their underwriting standards.

       *i.*       ***Countrywide's Senior Executives Knew That Countrywide Had Abandoned Its Stated Underwriting Standards.***

114.   The Securities and Exchange Commission (the "SEC") has compiled and publicly disclosed direct evidence that Countrywide Financial's most senior executives knew that Countrywide had abandoned its underwriting standards for originating the loans that were sold to investors like the Bank.

115.   In *SEC v. Mozilo,* No. CV09-03994 (C.D. Cal. filed June 4, 2009), the SEC brought a civil action alleging securities fraud against three top-level Countrywide executives. In that case, the SEC introduced testimony and documents confirming that from 2003 to 2007, Countrywide had effectively ceded its underwriting standards by adopting a secret program to match the loan products offered by any competitor in the marketplace. As a result of that undisclosed matching strategy, senior Countrywide employees acknowledged that "Countrywide's underwriting 'guidelines' would end up as a composite of the most aggressive guidelines in the market."

116.   Countrywide Financial's securities filings and the Offering Documents that the Countrywide Defendants used to sell Countrywide's PLMBS

did not disclose that Countrywide had deliberately adopted the most aggressive underwriting standards in the market.  Instead, those securities filings and Offering Documents falsely represented that Countrywide was adhering to its own, disclosed underwriting standards and making exceptions only on the basis of compensating factors.

117.   The SEC also introduced testimony and documents that Countrywide had a tiered system of review that allowed Countrywide to approve loan applications rejected by Countrywide's underwriting software.  Ultimately, Countrywide's Secondary Markets Structured Lending Desk was allowed to determine whether to approve loans that did not meet Countrywide's underwriting standards.  In the SEC action, Countrywide executives admitted that this decision *was based solely on whether the loan could be sold on the secondary market as part of a mortgage-backed security*.

118.   Unknown to the Bank, therefore, the only underwriting standards in effect at Countrywide were (a) is another mortgage company doing it? and (b) can we sell the mortgage to investors?  And ultimately, the standard devolved to simply, can we sell the mortgage to investors?  Indeed, the widespread disregard for Countrywide's stated underwriting standards led one of Countrywide's executives to write an email asking whether Countrywide intended to "make Production's *theoretical* requirement to underwrite a reality."  (emphasis added).

119.   Countrywide's internal documents revealed that, as a result, more than 20% of Countrywide's loans were issued in violation of Countrywide's underwriting standards.  Internal documents confirmed that Countrywide's own internal quality control processes found that large numbers of Countrywide loans "were rated severely unsatisfactory or high risk, and that one of the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside Countrywide's underwriting guidelines."

120.   In the words of the federal district court that denied the Countrywide executives' summary judgment motions:  "In light of this evidence, a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines, that Countrywide would originate any loan it could sell and therefore that the statements regarding the quality of Countrywide's underwriting and loan production [in Countrywide's statements to its own investors] were misleading."

121.   As detailed in the district court's order denying summary judgment in *SEC v. Mozilo*, the SEC presented sufficient evidence for a reasonable jury to conclude that Countrywide Financial and its executives committed fraud when they made the following representations:

> [I]n Countrywide's Forms 10-K 2005, 2006 and 2007, Countrywide stated that it "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touted Countrywide's "proprietary

underwriting systems … that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud."

In Countrywide's Form 10-K for 2005, Countrywide also stated:  "We ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages….  We make significant investments in personnel and technology to ensure the quality of our mortgage loan production."  A nearly identical representation appears in Countrywide's 2006 Form 10-K.

In addition, … [Countrywide's then CEO, Angelo] Mozillo made numerous public statements from 2005 through 2007, praising the quality of Countrywide's underwriting and distinguishing Countywide from subprime lenders, stating, for example:

- "[w]e don't see any change in our protocol relative to the quality of loans that we're originating;"

- he "was not aware of any change of substance in [Countryside's] underwriting policies;"

- "Countrywide had not taken any steps to reduce the quality of its underwriting regimen;"

- Countrywide "backed away from the subprime area because of our concern over credit quality;" and

- it would be a "mistake" to compare monoline subprime lenders to Countrywide.

122.   After the denial of summary judgment, Countrywide's executives paid millions of dollars to settle the case and avoid trial on the SEC's claims of securities fraud.

123.   Countrywide's underwriting practices, therefore, were directly at odds with the underwriting standards represented in Countrywide Financial's own

securities filings, the public statements made by Countrywide Financial's CEO, and the Offering Documents Countrywide used to sell its PLMBS to investors, including the Bank.  Those Offering Documents did not disclose that Countrywide would underwrite any loan it could sell on the secondary market regardless of whether the loan complied with Countrywide's stated underwriting standards.  Instead, the Offering Documents represented that Countrywide was adhering to the underwriting guidelines and only making exceptions where the borrower demonstrated compensating factors.

124.   In addition to the SEC, numerous other buyers of Countrywide PLMBS and other Countrywide stakeholders have filed suit alleging that Countrywide abandoned its underwriting standards.  For example MBIA Insurance Corporation filed suit against Countrywide after gaining access to Countrywide loan files and discerning evidence of systematic underwriting failures in Countrywide securitizations from 2004 to 2007.  In a review of 19,000 Countrywide loan files, MBIA found that 91% of the defaulted or delinquent loans contained material deviations from Countrywide's underwriting standards.

125.   Given this evidence, it is clear that the Countrywide Defendants knew that Countrywide had abandoned its underwriting standards and that the representations in the Countrywide Offering Documents and Countrywide's other public filings and statements were false and misleading.

126.   Defendant UBS similarly knew that Countrywide had abandoned its underwriting standards because, as alleged above, UBS was conducting at least some due diligence on the loans in the collateral pools for the PLMBS that UBS purchased from Countrywide and offered for sale to the Bank.  As a result of that due diligence, UBS learned that large percentages of those sampled loans did not meet the Countrywide underwriting standards that UBS was using to sell Countrywide's PLMBS.

### ii.   *J.P. Morgan Knew That Underwriting Standards Had Been Ignored.*

127.   In addition to the evidence that J.P. Morgan was ignoring the results and obvious implications of its own due diligence efforts, J.P. Morgan has been forced to admit that the entities originating mortgages were not adhering to proper underwriting standards.

128.   In fact, J.P. Morgan's employees actually circulated a memorandum coaching loan originators on how they could circumvent Chase's in-house automated loan underwriting system to get loans approved.  Rather than enter accurate information into the underwriting system, called "Zippy," the memo instructs loan originators to falsify the borrower's income, credit score, and employment history on stated-income loans.  The memo, titled "ZIPPY Cheats and Tricks," further urges loan originators that if at first they don't succeed, to try and try again by repeatedly re-submitting the application after inflating the borrower's

income by $500 on each iteration until Zippy approved the loan. When this memorandum was released, J.P. Morgan's spokesman admitted that putting false information into a loan application as the Zippy memo advocates was "lying and committing fraud." But J.P. Morgan included these stated-income loans in its securities, including the PLMBS J.P. Morgan sold the Bank.

129. In testimony submitted to the Financial Crisis Inquiry Commission ("FCIC") on January 13, 2010, J.P. Morgan Chase & Co. CEO Jamie Dimon admitted that "the underwriting standards in our mortgage business, for example, should have been higher." Dimon further admitted that J.P. Morgan had "made mistakes in the mortgage business." And he testified that "new and poorly underwritten mortgage products were a significant contributor [to the mortgage market meltdown] that proved costly for consumers, the entire financial system and our economy." At the FCIC hearing, Dimon further acknowledged "bad behavior of our underwriter banks."

130. Dimon's testimony, however, suggested that the securitization process relieved all the participants in the PLMBS machine from responsibility for the underwriting and ratings failures that have now come to light:

> As the housing bubble grew, new and poorly underwritten mortgage products helped fuel asset appreciation, excessive speculation and far higher credit losses. Mortgage securitization had two major flaws that added risk: nobody along the chain had ultimate responsibility for the results of

the underwriting for many securitizations, and the poorly constructed tranches converted a large portion of poorly underwritten loans into Triple A-rated securities.

That testimony is directly at odds with the Offering Documents J.P. Morgan used to sell the Bank its certificates, which represented (a) that the loans in the collateral pools for the PLMBS that J.P. Morgan sold the Bank were originated in accordance with prudent, generally accepted underwriting guidelines and (b) that the certificates the Bank purchased would not be issued unless they merited and received AAA ratings.

### iii. Countrywide and UBS Knew That Wells Fargo Had Abandoned Its Underwriting Standards.

131. Wells Fargo has been the subject of similar charges of abandoning its underwriting standards in order to maintain and grow its volume of loan originations. For example, the plaintiffs in *In re Wells Fargo MBS Litigation*, No. 5:09-CV-1376 (N.D. Cal. filed Mar. 27, 2009), filed a complaint alleging that a series of former Wells Fargo employees had confirmed that Wells Fargo had systematically abandoned critical underwriting standards. The complaint alleges that one former Wells Fargo underwriter claimed that 25-30% of the loans that Wells Fargo originated or acquired did not meet underwriting standards, most commonly for violating minimum requirements for the LTV and the borrower's debt-to-income ratios. The complaint alleges that another former underwriter stated Wells Fargo made indiscriminate exceptions to any and all of the

underwriting guidelines, including loan amounts, LTV, and income, to get loans approved.

132.   In another suit, two appraisal firms alleged that Wells Fargo systematically pressured appraisers into falsely inflating appraisal values to close mortgage loans.  In *Sound Appraisal & Savage Appraisal Services, Inc. v. Wells Fargo Bank, N.A.,* No. 09-CV-01630 CW (N.D. Cal. filed Apr. 14, 2009), the named plaintiffs alleged that Wells Fargo punished them for failing to increase property valuations at the request of Wells Fargo representatives.

133.   Securitizations 17-18 and 28-29 were backed by loans that Wells Fargo originated and then securitized.  But Wells Fargo used Countrywide Securities and UBS as the investment banks that underwrote these PLMBS offerings.  Accordingly, the Bank purchased the certificates in Securitization Nos. 17-18 based on the representations made in Countrywide Securities Offering Documents, and the Bank purchased the certificates in Securitization Nos. 28-29 based on the representations made in UBS Offering Documents.

134.   Although the Bank did not know that Wells Fargo, Countrywide, Chase, and other mortgage originators had abandoned their underwriting standards, the evidence now shows that Countrywide and UBS knew those facts full well before they offered their PLMBS certificates to the Bank and other investors.  By virtue of their access to information available in their own PLMBS pipelines, their

quality control efforts, and their due diligence efforts, Countrywide Securities and UBS knew that large numbers of the Wells Fargo loans in the collateral pools for the PLMBS they were selling did not adhere to the underwriting standards represented in the Offering Documents.

### iv.   Countrywide Knew That First Horizon Had Abandoned Its Underwriting Standards.

135.   First Horizon National Corporation ("First Horizon") was one of the largest mortgage originators in the nation from 2000 to 2008.  It operated through two subsidiaries: First Horizon Home Loan Corporation (which focused on nation-wide origination) and First Tennessee Bank N.A. (which focused on Tennessee origination).  During that time, First Tennessee Bank was the direct parent of First Horizon Home Loan, and it relied heavily on the mortgage support resources of First Horizon Home Loan.

136.   First Horizon has been charged with abandoning its underwriting standards in order to maintain and grow its volume of loan originations.  In January 2010, the Department of Housing and Urban Development ("HUD") began an investigation of First Tennessee Bank because it found "indicators of fraud" in loans insured by the Federal Housing Administration ("FHA").  HUD noticed "a significant number of claims, a certain loan underwriting volume, a high ratio of defaults and claims compared to the national average, and claims that occurred earlier in the life of the mortgage."  According to HUD, "[t]hese are key indicators

of problems at the origination or underwriting stages."  In October 2010, HUD released the findings of its investigation.  Among other things, HUD found excessive debt-to-income ratios without adequate compensating factors, inadequate documentation, unverified assets, and incorrect certifications.  HUD has recommended civil enforcement actions to recover damages.

137.   Within the next month, it became clear that First Horizon was the subject of another government investigation into its underwriting standards.  In November 2010, First Horizon disclosed to its shareholders that it had been subpoenaed by the Federal Housing Finance Agency, as part of an investigation into whether First Horizon made misrepresentations regarding loans that were securitized and sold to Fannie Mae and Freddie Mac.

138.   In addition to the government, a former employee has charged First Horizon with abandoning its underwriting standards and failing to disclose these risks.  In *Sims v. First Horizon National Corp.*, No. 2:08-cv-02293-STA-cgc (W.D. Tenn. filed May 9, 2008), the former employee alleged that "First Horizon touted its growth in its drive to become a national financial institution, but it failed to adequately disclose that this growth came at the expense of sound banking practices, and, instead, was based on lax underwriting and the issuance of loans on terms which created an unacceptably high likelihood of non-payment."

139. Securitization 16 was backed by loans that First Horizon originated and then securitized. But First Horizon used Countrywide Securities as the underwriter of this PLMBS offering. Accordingly, the Bank purchased Securitization 16 based on the representations made in Countrywide Securities Offering Documents.

140. Although the Bank did not know that First Horizon had abandoned its underwriting standards, the information now available shows that Countrywide knew those facts full well before it offered its PLMBS certificates to the Bank and other investors. By virtue of its access to information available in its own PLMBS pipelines, its quality control efforts, and its due diligence efforts, Countrywide Securities knew that large numbers of First Horizon loans in the collateral pools for the PLMBS it was selling did not adhere to the underwriting standards represented in the Offering Documents.

### 2. The Offering Documents Falsely Represented That the Appraisals Were Neutral and Independent.

141. One of the most significant criteria for underwriting or approving a mortgage loan is whether the property used to secure the loan provides adequate security for the loan. Not surprisingly, therefore, the Offering Documents represented that the mortgages included in the collateral pools were subjected to underwriting guidelines to confirm "the value and adequacy of the related Property as collateral."

142.   To assess the value and the adequacy of the mortgaged property as collateral for the loan, the Defendants represented that the Originators would require an appraisal of the property.  The Offering Documents represented that those appraisals were generally based on the market value of comparable homes, the estimated rental value, and the cost to replace the home.  For example, the UBS Offering Documents represented that:

> The appraisal of any Mortgaged Property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost.

As detailed at Item 142 on Schedules 1-30, the Offering Documents for all the certificates at issue in this Complaint included the same or similar representations.

143.   A fair and independent appraisal is required by law and is critical to the decision to grant or deny a mortgage, because if the appraisal on the property securing a mortgage is deliberately inflated, the resulting mortgage will be under-secured.  As a result, the lender will face a significant and undisclosed risk of loss in the event of a default.

144.   For the same reason, the representation that the appraisals on thousands of mortgages in a collateral pool are fair and independent is material to a PLMBS investor.  If the appraisals on the mortgages in the collateral pool have been systemically inflated, then the PLMBS investor faces a significant risk of loss in the event of a default on the loans.

145.   Most of the Offering Documents further represented that the collateral properties securing the mortgage loans were subjected to an independent property appraisal that conformed to Fannie Mae and Freddie Mac standards.  For example, Countrywide's Offering Documents represented that Countrywide affiliate Countrywide Home Loans obtained independent appraisals:

> Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans.  The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

As detailed at Item 142 on the Schedules, the same or similar representations appear in the Offering Documents for Securitization Nos. 1-16, 19-27, and 30.

146.   In order to conform to Fannie Mae and Freddie Mac standards, however, appraisals must adhere to the Uniform Standards of Professional Appraisal Practice ("USPAP") promulgated by the Appraisals Standards Board to ensure the integrity of the appraisal process.  With respect to real estate appraisals, USPAP requires:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.
>
> * * * *
>
> An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

* * * *

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment that is contingent on any of the following:

1.  the reporting of a predetermined result (e.g., opinion of value);
2.  a direction in assignment results that favors the cause of the client;
3.  the amount of a value opinion;
4.  the attainment of a stipulated result; or
5.  the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

147.  Once again, the Defendants' representations that the properties were appraised according to USPAP standards was critical because systemically inflated appraisals undermine the PLMBS investors' credit protection and increase the risk of loss in the event of defaults.

**a.  The Defendants Knew That the Appraisals Were Neither Independent nor Neutral.**

148.  Upon information and belief, the appraisals used to underwrite the mortgage loans included in the collateral pools at issue here did not conform to those USPAP standards.  As a result, the Defendants representations that the appraisals used in the underwriting process conformed to Fannie Mae or Freddie Mac appraisal standards were false and misleading.

149.  In June 26, 2007 testimony to the U.S. Senate, Alan Hummel, Chair of the Appraisal Institute, testified that the appraisal process in real estate had been afflicted by a "terrible conflict of interest."  He said that appraisers "experienced

systemic problems of coercion" and would be ordered to doctor their appraisals if they wanted to continue working as appraisers.

150.   A 2007 survey of appraisers conducted by October Research Corporation found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to allow deals to close.  The study further reported that 75% of appraisers reported suffering "negative ramifications" if the appraiser did not cooperate, alter the appraisal, and provide a higher valuation.

151.   In 2007, the New York Attorney General filed a suit alleging that Washington Mutual pressured appraisers into inflating the value of their appraisals. At the time the suit was filed, the President of the Appraisal Institute commented that the allegations were not confined to Washington Mutual:

> I wish I could say I am shocked by the discoveries made by the Attorney General and his staff. Sadly, what allegedly happened between First American and Washington Mutual is not an isolated incident. Rather, it is symbolic of a problem that has plagued the appraisal industry for years. As the allegations against First American show, the mortgage industry's dirty secret has been that banks exert tremendous pressure to extort appraisers.

152.   By representing that the appraisals used to underwrite the mortgages in the collateral pools were independent or that they conformed to Fannie Mae and Freddie Mac standards, the Offering Documents falsely represented that the appraisals were performed without systematic pressure or bias to inflate the appraised value.

153.   In addition, evidence has now come to light that the Defendants and their affiliates knew that the appraisals they were obtaining or receiving to support mortgage applications were biased and inflated.  For example, Mark Zachary, a former Countrywide employee has claimed that he informed Countrywide executives that appraisers were being encouraged to inflate appraisals on KB Homes to allow Countrywide borrowers to finance their closing costs in addition to the purchase price of the property.  According to Zachary, Countrywide performed an audit that verified his claims and that the results of that audit were similarly presented to Countrywide executives.

154.   In addition, various appraisal firms have charged the Defendants and their affiliates with directly and indirectly pressuring appraisers to inflate their valuations to close mortgage transactions.  According to Capitol West Appraisals, LLC, for example, Countrywide Financial and Countrywide Home Loans sought to pressure Capitol West to increase appraisal values for loan transactions.  Capitol West further claimed that from 2004 to 2008, Countrywide maintained a "Field Review List" database of appraisers whose reports Countrywide would not accept without a second appraisal.  In practice, this list operated as a black list; because no mortgage broker or borrower would volunteer to pay for a second appraisal, the brokers instead hired an appraiser not listed in the database.  Capitol West claimed

EXHIBIT A
Page 78

that Countrywide placed it on the Field Review List after Capitol West refused

Countrywide's pressure to modify appraisals.

155.   As noted above, Sound Appraisal and Savage Appraisal Services, Inc.

made similar allegations against Wells Fargo, which originated loans in the

collateral pools for Securitizations Nos. 17-18 and 28-29.

> **b.      Biased Appraisals Rendered the Offering Documents'**
> **Representations About Loan-To-Value Ratios False**
> **and Misleading.**

156.   In addition, these misrepresentations of fact regarding appraisals

rendered the Offering Documents' representations about the loan-to-value ratios

("LTVs") on the loans in the collateral pools false and misleading.

157.   The LTV of a mortgage loan compares the amount of the mortgage

loan on the property to the property's appraised value or sales price.  Expressed as

a ratio, the LTV indicates what percentage of the home's value the owner has

borrowed and how much remaining equity the borrower has in the property.

158.   For example, consider two identical, neighboring properties, each

purchased for $100,000.  Borrower A takes out a $90,000 mortgage loan, which

produces an LTV of 90% (*i.e.*, $90,000/$100,000).  Borrower B takes out a

$75,000 mortgage, which produces an LTV of 75% (i.e., $75,000/$100,000).

Borrower A's equity in the property is 10% (100% minus the 90% LTV), while

Borrower B has a much larger 25% equity stake in her property (100% minus the 75% LTV).

159.   The LTV is an important measure of both the risk of default on a loan and the severity of the consequences in the event of default.  First, the LTV measures the consequences to the borrower from default.  As demonstrated above, the lower the LTV, the greater the borrower's equity stake in the property and the greater the borrower's potential loss in the event of default.  For example, if Borrower A defaults on his property, he stands to lose $10,000.  But if Borrower B defaults, she stands to lose significantly more.  Accordingly, a lower LTV gives borrowers a significantly stronger incentive to pay their mortgage on time.

160.   The LTV is also an important measure of whether a default will produce a loss on the mortgage for the lender and ultimately the PLMBS investor. The borrower's equity in the property protects against that loss upon foreclosure. For example, if both Borrowers A and B default and their properties produce $80,000 upon sale or foreclosure, those same results produce strikingly different results for the lenders.  The lender to Borrower A will suffer a $10,000 loss because that borrower will only receive $80,000 to cover a $90,000 debt.  By contrast Borrower B's lender will be made whole because the $80,000 recovery will fully cover the $75,000 loan.  Accordingly, the lower the LTV, the greater protection the lender has against a loss on the mortgage.

161.   An LTV with an overstated property value, therefore, misrepresents and masks the true risks for a particular mortgage.  For example, if the properties in the example above are not really worth $100,000 but are really only worth $85,000, the actual LTV for Borrower A would be 106% ($90,000/$85,000) and the LTV for Borrower B would be 88% ($75,000/$85,000).  These LTVs reveal loans that are far riskier for the lender and the PLMBS investor.  Borrower A's loan is revealed to be a particularly risky loan because the Borrower has received more in loan proceeds than the underlying property is worth, and Borrower A therefore has an incentive to default on the loan.  Moreover, because the property's value will not cover the loss on the loan, the lender has no chance to be made whole in the event of a default.

162.   As noted above, the Offering Documents represented that the loans in the collateral pools had been appropriately screened to ensure that the collateral property afforded adequate security for the loan.  The Offering Documents represented, therefore, that as part of the underwriting process, the loans in the collateral pool had certain maximum LTVs.

163.   In addition to representations about maximum LTVs, the Offering Documents included tables that gave the investors detailed statistics on the LTVs of the loans in the collateral pools, often including representations and statistics describing the range and distribution of LTVs, as well as statistics describing the

weighted average LTVs for the loans in the pool.  For all the certificates at issue in this Complaint, the Defendants' various misrepresentations in the Offering Documents about LTVs are detailed at Item 163 on Schedules 1-30.

164.   Because LTVs are important indicators about the risk associated with a mortgage, they were critical to the Bank's decision to purchase the securities at issue in this Complaint.  The Bank paid careful attention to and justifiably relied on the information the Defendants provided the Bank about the LTVs on the loans that backed the Bank's securities.

> **c.      The LTVs for the Loans in the Collateral Pools Backing the Bank's PLMBS Investments Were Systematically Biased and Therefore False and Misleading.**

165.   As part of its pre-suit investigation, the Bank has tested the LTVs represented in the Offering Documents for the PLMBS that the Bank purchased. To perform this analysis, the Bank engaged a third party to perform an automated valuation model ("AVM") that calculates the value of the identified property at the time the mortgage was originated from a broad range of publicly available and proprietary data.  Recalculating the LTVs based on the AVM results and comparing the recalculated LTVs to the LTVs the Defendants represented in the Offering Documents reveals a systemic bias towards overvaluing the properties used to secure the mortgages in the collateral pools for the PLMBS at issue here.

166.    Based on the Bank's AVM analysis, the Bank compared the number of loans for which the appraised property value had been overstated by 5% or more with the number of loans for which the appraised value had been understated by 5% or more to determine whether the appraisals (and, therefore, the LTVs) were biased in either direction.  The Bank was able to match and compare an AVM value with the appraised property values the Defendants used to sell the securities at issue here on a sample of more than 21,000 loans included in the collateral pools.  The Bank's sample included loans in multiple securities, including securities sold by each of the Defendants.

167.    The results were eye-opening.  The Bank's analysis demonstrated that over 58% of the appraised property values in this sample were overstated by 5% or more.  By contrast, the Bank's AVM analysis showed that less than 12% of the appraisals were understated by 5% or more.  The Bank's analysis further revealed the following:

(a)    Of the approximately 21,100 loans analyzed, more than 12,300 had appraisals that overstated property values by more than 5%.

(b)    The sum by which the appraisal values (which are a basis for the LTVs stated in the Offering Documents) exceed the AVM values for the more than 12,300 loans referenced above is over $1,790,000,000.

(c)     In contrast, of that same set of loans, only approximately 2,400 had an

appraisal that understated the property value by more than 5%.

(d)     Of the approximately 2,400 loans referenced above, the sum by which

the AVM values exceed the appraisal values is $270,430,000.

168.   This analysis confirms that the Offering Documents the Defendants

used to sell the certificates at issue in this case were false and misleading in at least

two different respects.  First, the appraisals used to underwrite the loans in the

collateral pools were systemically and intentionally biased towards overvaluing the

property.  That result cannot be reconciled with the legal requirement that

appraisals be insulated from bias.  It is also inconsistent with the Offering

Documents' representations that the appraisals used in the underwriting process

were independent, and with any representations that appraisals conformed to

USPAP as required by Fannie Mae and Freddie Mac.

169.   Second, the analysis demonstrates that the Offering Documents'

representations about LTVs and all the statistics the Offering Documents included

about the breakdown of the LTVs for the loans in the collateral pool were false and

misleading.

170.   For example, before purchasing any of the certificates at issue here,

the Bank closely examined how many of the loans in the collateral pool had an

LTV of 85% or greater.  Of the PLMBS deals included in the Bank's analysis, the

Offering Documents represented that less than 6% of the loans in the collateral pool had an LTV of 85% or more.  Recalculating those LTVs based on the AVM valuations, however, revealed that 31-59% of the loans in the collateral pools for the affected deals had an LTV greater than 85%.

171.   Furthermore, the Offering Documents for the PLMBS in the Bank's analysis all represented that the security contained no loans with an LTV at origination over 100%.  Yet, of the more than 21,000 loans the Bank analyzed, over 2,490 had an AVM value (at the time of origination) that was less than the amount of the original mortgage (*i.e.*, an LTV over 100%).

172.   These misrepresentations of fact were critical to the Bank's decision to purchase the certificates.  The Bank actually and reasonably relied on the Offering Documents' representations concerning the integrity of the methods used to appraise the collateral properties as part of the underwriting process.  The Bank further relied on the integrity of those appraisals when it reviewed and relied on the Offering Documents' representations about the LTVs for the loans in the collateral pool.

173.   As a result of these misrepresentations and omissions, the Offering Documents fundamentally misrepresented the security of the certificates and the risk the Bank was undertaking by purchasing them.

### 3.     The Offering Documents Misrepresented the Use of the Properties Used to Secure the Mortgages.

174.   Another critical underwriting standard that was evidently abandoned in the process of originating the loans in the collateral pools at issue here is the use to which the borrower intended to put the property securing the mortgage.

175.   For mortgage lending purposes, residential real estate is typically assigned to one of three occupancy categories.  The borrower may use the property as a (i) primary residence; (ii) a secondary residence or vacation home; or (iii) an investment property.  Mortgages on residences tend to carry less risk of default than mortgages on investment properties.

176.   As a result, the occupancy status for the property securing a mortgage is an important and material indicator of the risk of default on the mortgage.  For the same reason, representations about the occupancy status for the mortgages that support a mortgage-backed security are material to an investor's decision to purchase the security.

177.   The Offering Documents used to sell the Bank the certificates at issue here each made representations about the number of loans in the collateral pools that were secured by primary residences versus secondary residences and investment properties.  The Bank carefully reviewed and reasonably relied on those representations when the Bank elected to purchase the certificates at issue in this Complaint.  For all the certificates at issue in this Complaint, the Defendants'

73

various misrepresentations in the Offering Documents about the use of the

properties backing the certificates are detailed at Item 177 on Schedules 1-30.

178.   The Bank has now discovered, however, that these representations

about the occupancy status of these properties in the Offering Documents were not

true.  As part of its pre-suit investigation, the Bank has tested the occupancy

representations made in the Offering Documents against publicly available records

that indicate whether the borrower uses the property as a primary residence.  For

example, the Bank investigated to find out whether: (a) the borrower's tax bills

were sent to the property; (b) a homestead exemption applies to the mortgaged

property; (c) the borrower's other creditors sent their bills to the mortgaged

property or another address; and (d) the borrowers owned other properties of

record and, if so, how the amount of the mortgages on those properties compare to

the mortgage at issue here.

179.   The Bank's analysis of this information reveals that that the Offering

Documents systematically and significantly overstated the number of loans secured

by the borrowers' primary residences.

### 4. The Offering Documents Falsely Represented That the Certificates Would Not Be Issued Unless They Earned AAA Ratings.

180.   In addition to making false representations about the underwriting

standards used to screen the loans in the collateral pools, the Offering Documents

falsely represented that the certificates the Bank purchased would only be issued if

they earned and received AAA ratings from the major Rating Agencies.  For

example, Countrywide's Offering Documents represented that:

> It is a condition to the issuance of the securities of each series offered hereby
> and by the prospectus supplement that they shall have been rated in one of
> the four highest rating categories by the nationally recognized statistical
> rating agency or agencies (each a "Rating Agency") specified in the related
> prospectus supplement.

As detailed at Item 180 of Schedules 1-30, all the Offering Documents the

Defendants used to sell the Bank the certificates at issue in this Complaint made

the same or similar representations of fact.

181.   In addition, the Offering Documents represented that the Rating

Agencies actually evaluated the securities to determine the likelihood that the

investors would receive the interest and principal payments on their investment

before rating the certificates.  For example, Countrywide's Offering Documents

represent:

> The ratings would be based on, among other things, the adequacy of the
> value of the Trust Fund Assets and any credit enhancement with respect to
> the class and will reflect the Rating Agency's assessment solely of the
> likelihood that the holders of a class of securities of the class will receive
> payments to which the securityholders are entitled under the related
> Agreement.

As detailed at Item 181 of Schedules 1-30, all the Offering Documents the

Defendants used to sell the Bank the certificates at issue in this Complaint made

the same or similar representations of fact.

182.   Historically, investments with AAA ratings had an expected loss rate of less than 0.05%.  The default rate on investment grade corporate bonds (*i.e.*, bonds rated AAA, AA, and A) from 1981 to 2008, for example, averaged about 0.106%, with no year showing defaults greater than 0.41%.  The Rating Agencies applied the same ratings labels to PLMBS and represented that their ratings were intended to convey the same type of substantive ratings information for those securities.

183.   Given this track record, the Bank reasonably believed that the PLMBS certificates it was buying carried very little risk of loss.  And the Bank reasonably relied on the Offering Documents' representations that the certificates the Bank purchased would not be issued unless they earned those AAA ratings.

184.   In fact, the Bank only bought AAA-rated certificates.  Accordingly, it was critical for the Defendants' representatives calling on the Bank to be able to represent that the securities they were offering the Bank merited and would receive AAA ratings.

185.   But the Defendants knew that the certificates they were selling the Bank did not have the credit quality to merit AAA ratings.  In April 2010, the *New York Times* reported that the investment banks had access to the Rating Agencies' models and used them to reverse engineer PLMBS and other asset-backed securities so that they would be sure to receive the AAA ratings necessary to sell

them to investors like the Bank.  The investment banks worked closely with the Rating Agencies to structure PLMBS to attain the highest rating with the least amount of credit protection possible.  The same article reported that the investment banks were able to manipulate the data they provided to the Rating Agencies in order to ensure the required ratings.

186.   In addition, the Defendants were able to shop their PLMBS between the different Rating Agencies.  Because the Defendants paid for the ratings, they could withhold business from any Rating Agency that did not provide the expected rating or an Agency that made attaining that rating too difficult or expensive.  As a result, the Defendants were able to play the Rating Agencies off against each other to ensure that they could attain the required AAA ratings without having to restructure the security to add more credit support and thus reduce their own profit.

187.   Moreover, as alleged above, the Defendants knew that the loans in the collateral pools did not conform to basic underwriting standards but did not share that information with the Rating Agencies.  For example, the Defendants did not give the Rating Agencies full access to the loan files for the mortgages in the collateral pools.  Nor did the Defendants provide the Rating Agencies with the results of their own due diligence efforts.  And even though Clayton's former president testified that he had offered Clayton's due diligence services to the Rating Agencies, none of the Rating Agencies engaged those services.

188.   Accordingly, the Defendants knew that the Rating Agencies were making their ratings based on materially misleading information that substantially understated the credit risk on the mortgages in the collateral pools.  The Defendants, therefore, knew that the PLMBS certificates they were selling did not have the credit quality required for an accurate AAA rating.  And the Defendants could not have honestly believed that the AAA ratings they procured for the certificates they sold the Bank were an accurate reflection of the credit risk on those certificates.

189.   As a result, the Offering Documents' representations that the certificates would not be issued unless they received AAA ratings were false and misleading.  For the same reasons, the Offering Documents' representations that the ratings would provide any meaningful assessment of the credit quality of the security or the likelihood that investors would receive all the payments on their certificates were false and misleading.

190.   As the Defendants' misconduct has come to light, the Rating Agencies have conceded that the AAA ratings they originally awarded the certificates were not merited.  Most of the PLMBS at issue in this Complaint have now been severely downgraded and many of those securities are presently rated as junk bonds, with a rating lower than BBB.  As of November 30, 2010, the securities had the following ratings:

| Sec. No. | Name | Original Ratings | Ratings as of Nov. 30, 2010 | |
|---|---|---|---|---|
| 1. | CWHL 2004-15 4A | Moody's: Aaa S&P: AAA | Moody's: B3/*-[5] S&P:  B+ | |
| 2. | CWHL 2004-HYB5 8A1 | Moody's: Aaa S&P: AAA | Moody's: Baa1/*- S&P: BB+ | |
| 3. | CWHL 2005-HYB5 1A1, 2A1 | Moody's: Aaa S&P: AAA | 1A1 | Moody's: Caa3 S&P: CCC |
| | | | 2A1 | Moody's: Caa2 S&P: B |
| 4. | CWHL 2005-HYB6 1A1, 2A1 | Moody's: Aaa S&P: AAA | 1A1 | Moody's: Ca S&P: CCC |
| | | | 2A1 | Moody's: Caa3 S&P: CCC |
| 5. | CWALT 2005-58 A1 | Moody's: Aaa S&P: AAA | Moody's: Caa3 S&P: CCC | |
| 6. | CWHL 2005-HYB10 3A1A | Moody's: Aaa S&P: AAA | Moody's: Caa3 S&P: CCC | |
| 7. | CWHL 2006-HYB2 2A1A | Moody's: Aaa S&P: AAA | Moody's: Caa3 S&P: CCC | |
| 8. | CWHL 2006-HYB3 3A1B, 4A1A | Moody's: Aaa S&P: AAA | 3A1B | Moody's: Ca S&P: CCC |
| | | | 4A1A | Moody's: Caa3 S&P: CCC |
| 9. | CWHL 2007-HYB1 4A1 | Moody's: Aaa S&P: AAA | Moody's: Ca S&P: CCC | |
| 10. | CWHL 2007-HYB2 4A1 | Moody's: Aaa S&P: AAA | Moody's: Ca S&P: CCC | |
| 11. | CWALT 2007-12T1 A16 | Moody's: Aaa S&P: AAA Fitch: AAA | Moody's: Caa3 S&P: CCC Fitch: C | |
| 12. | CWHL 2007-17 4A1 | Fitch: AAA S&P: AAA | Fitch: AAA/*- S&P: BB | |
| 13. | CWHL 2005-J2 2A1 | Moody's: Aaa Fitch: AAA | Moody's: B3 Fitch: CCC | |

---

[5]  The designation "*-" indicates that a security has been placed on watch for a possible downgrading.

| Sec. No. | Name | Original Ratings | Ratings as of Nov. 30, 2010 | |
|---|---|---|---|---|
| 14. | CWHL 2007-HY6 2A1, 3A1, 4A1 | Moody's: Aaa S&P: AAA | 2A1 | Moody's: Caa3 S&P: CCC |
| | | | 3A1 | Moody's: Caa3 S&P: CCC |
| | | | 4A1 | Moody's: Caa2 S&P: CCC |
| 15. | CWHL 2007-HY7 A1 | Moody's: Aaa S&P: AAA | Moody's: Caa3 S&P: CCC | |
| 16. | FHASI 2006-AR4 2A1 | S&P: AAA Fitch: AAA | S&P: CCC Fitch: A/*- | |
| 17. | WFMBS 2006-8 A3 | Moody's: Aaa Fitch: AAA | Moody's: B3 Fitch: B | |
| 18. | WFMBS 2007-9 1A1 | Moody's: Aaa Fitch: AAA | Moody's: Ba2 Fitch: AAA | |
| 19. | BSARM 2004-12 2A2 | Moody's: Aaa S&P: AAA | Moody's: A3/*- S&P: A- | |
| 20. | CHASE 2005-A1 3A1 | S&P: AAA Fitch: AAA | Fitch: BBB S&P: CCC | |
| 21. | JPMMT 2005-A6 5A1 | S&P: AAA Fitch: AAA | S&P: B+ Fitch: BBB | |
| 22. | JPMMT 2006-A3 4A1 | Moody's: Aaa Fitch: AAA | Moody's: Caa1 Fitch: CC | |
| 23. | JPMMT 2006-A4 4A1 | Moody's: Aaa Fitch: AAA | Moody's: Caa1 Fitch: CCC | |
| 24. | JPMMT 2006-A5 4A1 | Moody's: Aaa Fitch: AAA | Moody's: Caa1 Fitch: CCC | |
| 25. | JPMMT 2007-A5 4A1 | S&P: AAA Fitch: AAA | S&P: BB Fitch: B | |
| 26. | JPMMT 2008-R1 1A1 | Fitch: AAA Moody's: Aaa | Fitch: B Moody's: B3/*- | |
| 27. | JPMMT 2008-R1 2A1 | S&P: AAA Fitch: AAA | S&P: CCC Fitch: B | |
| 28. | WFMBS 2006-AR14 3A1 | Moody's: Aaa Fitch: AAA | Moody's: B3 Fitch: CCC | |
| 29. | WFMBS 2006-AR18 2A1 | Moody's: Aaa Fitch: AAA | Moody's: Caa2 Fitch: CCC | |

| Sec. No. | Name | Original Ratings | Ratings as of Nov. 30, 2010 |
|---|---|---|---|
| 30. | CWHL 2007-HY1 2A1 | Fitch: AAA S&P: AAA | Fitch: C S&P: CCC |

191.    In the words of the SEC, these downgrades raise significant questions about the accuracy of the credit ratings awarded at the time the Defendants sold their PLMBS certificates to investors including the Bank:

> As the performance of these securities continued to deteriorate, the three rating agencies most active in rating these instruments downgraded a significant number of their ratings.  The rating agencies performance in rating these structured finance products raised questions about the accuracy of their credit ratings generally as well as the integrity of the ratings process as a whole.

192.    Unlike the Bank, the Defendants knew that the PLMBS certificates they sold the Bank did not merit the AAA ratings they received at the time of purchase.  Unlike the Bank, the Defendants knew that much of the information and many of the statistics they were providing the Bank and the Rating Agencies about the loans in the collateral pools were false and misleading.

193.    As a result, the Defendants knew that the Offering Documents' representations that the certificates would not be issued unless they earned AAA ratings were false and misleading.  Moreover, the Defendants' failure to disclose that they were manipulating the Rating Agencies to secure favorable ratings that would dramatically understate the risk of non-payment further renders the Offering Documents false and misleading.

**5.      The Defendants Falsely Stated That They Had Effectively Transferred and Assigned the Notes and Mortgages to the Trusts as Part of the Securitization Process.**

194.   All of the Defendants represented that they were selling the Bank certificates in mortgage-backed securities.  To that end, the Offering Documents represented that title to the loans in the collateral pool, including the note and the accompanying mortgage, had been (or soon would be) duly transferred and assigned to the trust for each mortgage-backed security.

195.   The Offering Documents represented that the original mortgage notes had been endorsed and transferred to the trustee on the respective mortgage-backed securities.  For example, Countrywide's Offering Documents represented that the Countrywide Depositor would assign and physically transfer and deliver both the mortgage note and the mortgage itself to the trustee, typically the Bank of New York:

> [O]n the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each mortgage loan . . . .
>
> In connection with the transfer and assignment of a mortgage loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things,
>
> - the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, . . .

- the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument;

- an assignment in recordable form of the mortgage or a copy of such assignment; …

- if applicable, all recorded intervening assignments of the mortgage or copies thereof . . . .

As alleged in more detail at Item 195 on Schedules 1-30, similar representations appear in the prospectuses and prospectus supplements for each of the securitizations at issue in this Complaint.

196.   Upon information and belief, these representations in the Offering Documents are false and misleading.

197.   In particular, a representative of Countrywide and its successor, Bank of America, recently admitted that Countrywide's practice was not to assign or physically transfer the notes on the mortgage loans to the Trustee in accordance with the representations in the Offering Documents.

198.   In *Kemp v. Countrywide Home Loans, Inc.*, No. 08-02448, (Bankr. D.N.J. filed Oct. 16, 2008), an adversary proceeding in the New Jersey Bankruptcy Court, the debtor contested Countrywide's right to foreclose on a mortgage loan on behalf of the trustee.  According to the Bankruptcy Court's November 16, 2010 Order, the mortgage in question had been included in a mortgage-backed security that required Countrywide to transfer the mortgage to the Bank of New York as the

trustee.  In this respect, the mortgage-backed security at issue in *Kemp* was the same or similar to the Countrywide securities at issue in this case.

199.   Countrywide's designated representative, however, testified that (a) the note had not been endorsed from Countrywide to the trustee and (b) Countrywide had maintained possession of the note, never delivering it to the trustee.  Moreover, Countrywide's witness "testified further that it was customary for Countrywide to maintain possession of the original note."  As a consequence of these failures, the Bankruptcy Court held that neither the Bank of New York nor Countrywide as its agent could enforce the note against the borrower.

200.   Regardless of whether *Kemp* was correctly decided, Countrywide's admitted practice of not physically transferring the mortgage note to the Trustee conflicts with the representations that the Countrywide Defendants made in the Offering Documents they used to sell their mortgage-backed securities to investors like the Bank.

201.   Allegations of similar failures to properly assign and transfer the notes and mortgages for the loans included in mortgage-backed securities have now been widely reported concerning all the parties that created the other PLMBS at issue in this Complaint.

202.   In 2010, Bank of America (which acquired Countrywide), J.P. Morgan Chase, and Wells Fargo announced that they were suspending mortgage

foreclosures because they had discovered significant problems in their ability to locate and document the ownership of mortgage notes. All of these entities were forced to admit that their representatives had submitted false affidavits regarding the ownership, location, and availability of mortgage notes to courts all over the country.

203. The evidence of misconduct in this regard has been so severe and pervasive that the Attorneys General of all 50 states have announced an investigation into the Defendants' practices.

204. In addition, on November 28, 2010, the *New York Times* reported that the United States Trustee Program, a division of the Department of Justice, has begun taking the unusual step of intervening in bankruptcy cases to force the mortgage companies to prove that they own or otherwise have the standing required to enforce the mortgages on which they are seeking to foreclose. The report noted the Trustee's intervention in two Atlanta bankruptcy cases, in which Wells Fargo and J.P. Morgan Chase had failed to produce evidence that they were entitled to foreclose on the mortgages at issue.

205. And on January 7, 2011, the Massachusetts Supreme Judicial Court issued an opinion in *U.S. Bank N.A. v. Ibanez*, documenting the failure of U.S. Bank N.A. and Wells Fargo Bank, N.A. to document the timely assignment of two mortgages that they had foreclosed on as servicers for mortgages included in

PLMBS.  The inability of these Trustees—which also serve as Servicers on the

Bank's PLMBS—strongly suggests that the Offering Documents' representations

about the effective assignment and delivery of the loans and mortgages that are

supposed to secure the Bank's PLMBS are false and misleading.

206.   In light of these developments, the Bank has conducted a pre-suit

investigation to determine whether there was any public record that the mortgages

that back the PLMBS at issue in this Complaint have been assigned in the manner

described in the Offering Documents.  Once again, the results were eye-opening.

207.   The Bank analyzed the data available for the loans that back a sample

of the PLMBS at issue in this Complaint to determine the number of mortgages for

which an assignment had not been recorded to one of the following: the Trust

created for the PLMBS, the Trustee, or the Mortgage Electronic Registration

System (MERS).  Given the substantial protections the law affords to parties that

record these assignments, the absence of any record of an assignment to at least

one of these parties tends to indicate that the assignment has not yet been

completed or documented as described in the Offering Documents.

208.   The Bank's analysis revealed that for several securities, large numbers

of loans had no public record of any such assignment.  For example, J.P. Morgan

Securities served as dealer for the Securitization No. 20 (Chase 2005-A1).  That

PLMBS was composed of approximately 3,000 loans, of which the Bank was able

to obtain assignment data for approximately 2,300 loans.  This data revealed that 1,744 of these loans had no recorded assignment to the Trust, the Trustee, or MERS.  This number reveals no record of an assignment for 77% of the loans for which the Bank was able to obtain data and 56% of all of the loans in the security.

209.   J.P. Morgan's other PLMBS had lower, but still significant percentages of loans with no recorded assignment to the Trust, Trustee, or MERS. For example, for Securitization No. 22 (JPMMT 2006-A3), the Bank's analysis reveals that at least 33% of the loans have no publicly recorded assignment. Similarly, 20% of the loans in Securitization No. 25 (JPMMT 2007A5) show no such publicly recorded assignment.

210.   Although the UBS Offering Documents represented that all the mortgages in those securitizations would be properly assigned, a similar analysis revealed that no assignment had been recorded for approximately half of the loans in the UBS securitizations.  For example, the Bank's analysis revealed no record that the Originator had assigned the mortgage for 52% of the loans in Securitization No. 28 (WFMBS 2006-AR 14 3A1) or 47% of the loans in Securitization No. 29 (WFMBS 2006-AR 18 2A1).

211.   Upon information and belief, therefore, the Bank alleges that the Defendants' representations about properly and timely assigning and delivering the notes and mortgages in the respective collateral pools to the respective Trustees

were false and misleading.  To be clear, however, the Bank does not allege that the failure to publicly record the assignment of any particular mortgage is at odds with the Offering Documents' representations.  Instead, the Bank alleges that the evidence showing the public recording of some but not all assignments suggests that the Defendants failed to actually assign all the mortgages as described in the Offering Documents.

212.   The Defendants' representations about properly assigning and transferring the notes and the mortgages to the respective Trustees were material to the Bank's decision to purchase the certificates at issue in this Complaint.  After all, the Bank was led to believe that it was purchasing certificates that were actually and effectively backed by the mortgage loans described in the Offering Documents.  The Bank actually and reasonably relied on the Defendants' representations that they had effectively transferred the mortgage notes to the Trusts as described in the Offering Documents.

213.   By their conduct, the Defendants and the other members of their PLMBS securitization assembly lines have raised significant questions about the propriety and effectiveness of the transfers of these mortgages in the collateral pools that back the Bank's certificates.  Even if those questions ultimately are resolved in the Defendants' favor, the Defendants' misrepresentations have caused

delay, expense, and uncertainty about the Trusts' ability to enforce the mortgage loans that back the PLMBS at issue here.

214.   The Defendants' failure to transfer the mortgage notes to the Trusts, therefore, has significantly undercut the value of the Bank's certificates, directly and proximately harming the Bank.

### D.   The Defendants' Misrepresentations and Omissions of Fact Were Material.

215.   As alleged above, the Defendants' misrepresentations were material to the Bank's investment decision because they concerned critical facts about the manner in which the mortgages that backed the securities had been screened and originated.  Because the borrowers' payments on those mortgages are the only assets available to pay investors, information about the credit quality of the loans and about the likely credit risks was material—or important—to any reasonable investor, and it was material to the Bank's decision to purchase the certificates at issue in this Complaint.

216.   **Underwriting Standards**:  The Defendants' misrepresentations that the loans were originated to the disclosed underwriting guidelines were material to the Bank's decision to purchase these certificates.  Without those representations, the Bank would not have purchased the certificates.  Moreover, if the Offering Documents truthfully had disclosed that significant numbers of the loans did not

conform to the represented underwriting standards, the Bank would not have purchased these certificates.

217.   Similarly, the Defendants' misrepresentations that the properties securing the mortgages had been subjected to an honest, independent, and unbiased appraisal were material to the Bank's investment decision.  Without those representations, the Bank would have had no assurance that the mortgages were supported with enough collateral to induce the borrowers to repay the loan and to avoid any loss in the event of a default.  Without those representations in the Offering Documents, therefore, the Bank would not have purchased the certificates.   By the same token, if the Offering Documents had revealed that the appraisals were systemically inflated, the Bank would not have purchased the certificates.

218.   The Defendants' misrepresentations about the LTVs on the mortgages in these PLMBS were similarly material to the Bank's investment decision.  Once again, information concerning the borrowers' equity in the properties securing the mortgages provides critical assurance concerning the borrowers' incentive to pay their loans and the investor's ability to avoid a loss in the event of a default.  The Bank would not have invested in these certificates absent the Defendants' misrepresentations about the LTVs.  Nor would the Bank have purchased these certificates if the Offering Documents had disclosed accurate LTVs that revealed

that many of the borrowers had little or no equity in the properties securing the mortgages.

219.   The Defendants' misrepresentations about the intended use of the properties securing the mortgages similarly were material to the Bank's decision to invest in these PLMBS.  Once again, the Bank sought to invest in securities backed by loans on residences rather than investment properties.  The Bank would not have purchased these certificates absent the Defendants' misrepresentations about the use to which these properties would be put.  Nor would the Bank have purchased these certificates if the Offering Documents had truthfully disclosed that many of the properties would not be used as the borrowers' residences.

220.   **AAA Ratings**:  The Defendants' misrepresentations that the securities would not be issued unless they received AAA ratings from the Rating Agencies also were material to the Bank's investment decision.  Because those ratings were an important measure of the investments' safety, they were critical to the Bank's decision to invest.  Given the Bank's investment criteria, the Bank could not and would not have invested in these certificates absent these representations and AAA ratings.

221.   **Effective Assignment of the Loans and Mortgages**: Finally, the Defendants' misrepresentations that they had effectively assigned and physically delivered the loans and mortgages for these PLMBS were material to the Bank's

investment decision.  After all, the Bank believed that it was purchasing securities that were actually and effectively backed by the mortgages in question.  The Bank would not have purchased these certificates without the Defendants' representations that they had effectively transferred the mortgages from the Originators to the Trusts.  Nor would the Bank have purchased these certificates if the Offering Documents had disclosed that the loans and mortgages had not actually and effectively been assigned to the Trusts.

> **E.   The Defendants Knew Their Offering Documents Were False and Misleading and Intended to Defraud Investors, Including the Bank.**

222.   As alleged above, the Defendants knew that their Offering Documents were false and misleading at the time they offered these certificates for sale to investors, including the Bank.  Rather than disclose the truth in their Offering Documents, however, the Defendants offered and sold these certificates on the basis of false and misleading information.  The Defendants engaged in this conduct because they earned literally billions of dollars when they sold these PLMBS to investors, including the Bank.

223.   **Underwriting Standards**:  As alleged above, the Defendants knew that the loans in their PLMBS did not conform to the represented underwriting standards.  In fact, the Defendants' quality control and due diligence efforts confirmed that the mortgages did not conform to the underwriting guidelines.

Nevertheless, the Offering Documents falsely represented that the loans had been originated according to those underwriting standards, all so that the Defendants could continue selling their PLMBS to investors, including the Bank.

224.   **AAA Ratings**:  The Defendants similarly knew that their representations that the securities would not be issued unless they received AAA ratings from the Rating Agencies were false and misleading.  As alleged above, the Defendants were able to game the ratings process, and they did not tell the Rating Agencies that large numbers of the mortgages in their PLMBS did not meet the stated underwriting standards.  Nevertheless, the Offering Documents falsely represented that the certificates would not be issued unless they earned AAA ratings, all so that the Defendants could continue selling their PLMBS to investors, including the Bank.

225.   **Effective Assignment of the Loans and Mortgages**: Finally, the Defendants knew that their representations that they had effectively assigned and physically delivered the loans and mortgages for these PLMBS were false.  As alleged above, the evidence now shows that the Defendants' practice and procedures did not conform to the representations in the Offering Documents. Nevertheless, the Offering Documents falsely represented that the loans and mortgages were (or would be) effectively assigned and physically delivered to the

Trust, all so that the Defendants could continue selling their PLMBS to investors, including the Bank.

> **F.** **The Bank Reasonably Relied on the Defendants' Misrepresentations.**

226.   As alleged above, the Bank reasonably and justifiably relied on the Defendants' misrepresentations when the Bank purchased these certificates.

227.   **<u>Underwriting Standards</u>**:  As alleged above, the Defendants' representations about the credit quality and risks on the mortgages backing these PLMBS were critical to the Bank's decision to purchase these securities.  Because the Bank did not have access to the Defendants' due diligence materials or the underlying loan files, the Bank was forced to rely on the representations in the Offering Documents.  Accordingly, the Bank reasonably and justifiably relied on the Defendants' representations that the loans had been originated according to the represented underwriting standards.

228.   **<u>AAA Ratings</u>**:  Similarly, the Defendants' representations that the securities would not be issued unless they received AAA ratings from the Rating Agencies were material to the Bank's investment decision.  Once again, because the Bank did not have access to the Defendants' due diligence materials or the underlying loan files, the Bank was forced to rely on the representations in the Offering Documents.  Accordingly, the Bank reasonably relied on the Defendants'

representations that the certificates would not be issued unless they earned AAA ratings.

229. **Effective Assignment of the Loans and Mortgages**: Finally, the Defendants' representations that they had effectively assigned and physically delivered the loans and mortgages for these PLMBS were material to the Bank's investment decision.  But because the Bank did not have access to information on the Defendants' actual practice of failing to effectively assign and deliver the loans and mortgages to the Trust, the Bank was forced to rely on the Offering Documents' representations.  Accordingly, the Bank reasonably relied on the Defendants' representations that they had or would effectively assign and deliver the loans and mortgages to the Trust.

**G.   The Mortgages Backing the Banks' PLMBS Certificates Have Experienced Significant Delinquencies, Foreclosures, and Credit Losses.**

230. Even though the PLMBS certificates that the Bank purchased were supposed to be long-term, stable investments, they have already begun to show serious performance deficiencies that cannot be reconciled with the representations the Defendants made in the Offering Documents.  Significant percentages of the mortgages that back the Bank's securities are delinquent or have already resulted in foreclosure.  The following chart reflects the percentages of the loans in the Bank's tranche, the groups providing credit support for the Bank's tranche, and

other tranches that share credit support with the Bank:  (a) that are over 90 days

delinquent, (b) for which foreclosure has commenced, (c) for which the collateral

real estate is now owned by the Trust, and (d) for which the borrower has filed for

bankruptcy (as of January 14, 2011).

| Sec. No. | Name | Loans 90+ days delinquent | Foreclosures | REO | Bankrupt |
|---|---|---|---|---|---|
| 1. | CWHL 2004-15 4A | 7.18% | 10.33% | 3.38% | 1.52% |
| 2. | CWHL 2004-HYB5 8A1 | 11.32% | 9.02% | 0.76% | 3.10% |
| 3. | CWHL 2005-HYB5 1A1, 2A1 | 9.36% | 9.76% | 1.56% | 1.64% |
| 4. | CWHL 2005-HYB6 1A1, 2A1 | 14.79% | 9.07% | 0.76% | 1.87% |
| 5. | CWALT 2005-58 A1 | 30.68% | 15.18% | 2.35% | 4.07% |
| 6. | CWHL 2005-HYB10 3A1A | 16.60% | 13.30% | 2.76% | 3.40% |
| 7. | CWHL 2006-HYB2 2A1A | 13.07% | 16.69% | 1.74% | 4.11% |
| 8. | CWHL 2006-HYB3 3A1B, 4A1A | 16.84% | 12.07% | 1.06% | 2.01% |
| 9. | CWHL 2007-HYB1 4A1 | 19.41% | 16.88% | 3.11% | 4.40% |
| 10. | CWHL 2007-HYB2 4A1 | 19.15% | 15.72% | 2.19% | 3.69% |

| Sec. No. | Name | Loans 90+ days delinquent | Foreclosures | REO | Bankrupt |
|---|---|---|---|---|---|
| 11. | CWALT 2007-12T1 A16 | 16.95% | 11.79% | 1.92% | 2.08% |
| 12. | CWHL 2007-17 4A1 | 9.10% | 4.60% | 0.58% | 1.03% |
| 13. | CWHL 2005-J2 2A1 | 7.61% | 3.91% | 0.26% | 0.88% |
| 14. | CWHL 2007-HY6 2A1, 3A1, 4A1 | 16.04% | 8.85% | 1.57% | 1.80% |
| 15. | CWHL 2007-HY7 A1 | 11.15% | 14.25% | 2.20% | 3.53% |
| 16. | FHASI 2006-AR4 2A1 | 3.00% | 11.75% | 0.72% | 3.14% |
| 17. | WFMBS 2006-8 A3 | 2.12% | 4.38% | 1.29% | 0.86% |
| 18. | WFMBS 2007-9 1A1 | 0.45% | 1.94% | 0.24% | 0.20% |
| 19. | BSARM 2004-12 2A2 | 6.32% | 7.89% | 0.57% | 2.94% |
| 20. | CHASE 2005-A1 3A1 | 5.30% | 5.51% | 0.47% | 1.06% |
| 21. | JPMMT 2005-A6 5A1 | 3.75% | 3.66% | 1.11% | 0.69% |
| 22. | JPMMT 2006-A3 4A1 | 8.58% | 7.47% | 2.10% | 2.55% |
| 23. | JPMMT 2006-A4 4A1 | 6.39% | 7.26% | 0.94% | 1.60% |
| 24. | JPMMT 2006-A5 4A1 | 7.99% | 6.82% | 1.52% | 0.94% |

| Sec. No. | Name | Loans 90+ days delinquent | Foreclosures | REO | Bankrupt |
|---|---|---|---|---|---|
| 25. | JPMMT 2007-A5 4A1 | 9.57% | 6.64% | 0.75% | 1.62% |
| 26. | JPMMT 2008-R1 1A1[6] | 5.04% | 8.33% | 0.81% | 1.14% |
| 27. | JPMMT 2008-R1 2A1 | 9.28% | 3.42% | 0.00% | 0.00% |
| 28. | WFMBS 2006-AR14 3A1 | 3.05% | 5.12% | 1.56% | 0.78% |
| 29. | WFMBS 2006-AR18 2A1 | 3.97% | 6.11% | 0.89% | 1.25% |
| 30. | CWHL 2007-HY1 2A1 | 14.10% | 7.95% | 2.08% | 2.17% |

231.   The significant percentages of delinquencies and foreclosures noted above indicate that the mortgages in the collateral pools for the Bank's PLMBS certificates were not issued in accordance with the representations in the Offering Documents.  In particular, the significant percentages of delinquencies and foreclosures of these loans strongly indicate that these loans were not issued in accordance with the underwriting standards represented in those Offering Documents.

232.   Moreover, this poor credit performance has dramatically undercut the value of the Bank's PLMBS investments.  In short, it has now become clear that

---

[6]  The data for JPMMT 2008-R1, 1A1 and 2A2 are limited to the loans in the Bank's tranches and the loans that provide credit support for those tranches.

the Bank did not receive what it paid for when it purchased these PLMBS certificates on the basis of the Defendants' misrepresentations of fact and that the Bank has suffered hundreds of millions of dollars in damages as a result of the Defendants' conduct alleged herein.  The Bank brings this action to recover those damages.

## III.    Tolling of the Statute of Limitations

233.   All the claims asserted in this Complaint are filed within the relevant statutes of limitations under Georgia law.  Indeed, the Bank did not discover any injury on the certificates at issue here until 2008, well within any applicable limitations period.

234.   In addition, the Defendants' fraud prevented the Bank from earlier discovering and asserting its claims.  Accordingly, the Bank's statute of limitations has been tolled in accordance with O.C.G.A. § 9-3-96

235.   Upon information and belief, the Bank is a member of one or more putative class actions filed against these same Defendants for the same or similar misconduct.  The Bank alleges that, with the aid of discovery from the Defendants, the Bank will be able to amend this Complaint to further allege the tolling of any applicable statutes of limitations.

**Count One**
**Violations of the Georgia RICO Act by the Countrywide Defendants**
**(O.C.G.A. § 16-14-4(a) and (c))**

| Against Defendants: | In connection with Securitization Nos. |
|---|---|
| Countrywide Financial Countrywide Home Loans | 1-15, and 30 |
| Countrywide Securities | 1-15 |

236.   The Bank hereby incorporates the allegations of Paragraphs 1 to 235 as if repeated herein.  For the purpose of this Count One, however, the Bank alleges that Countrywide Financial, Countrywide Securities, and Countrywide Home Loans (the "Countrywide Defendants") (a) acted with the knowledge and intent required to violate the criminal statutes identified as racketeering activity below and/or (b) were willfully blind to or deliberately ignorant of the falsity of the information they conveyed to the Bank.

237.   The Countrywide Defendants violated the Georgia RICO statute by committing, conspiring to commit, or endeavoring to commit a pattern of racketeering activity.

### *The Countrywide Enterprise*

238.   The Countrywide Defendants have committed a pattern of racketeering activity through their participation in an association-in-fact enterprise comprised of the persons and entities that acquired thousands of mortgage loans and then processed them into mortgage-backed securities (the "Countrywide

Enterprise"), all so that Countrywide Securities could sell PLMBS certificates to investors on the basis of false and fraudulent Offering Documents.

239.   The members of the Countrywide Enterprise played specific roles in the process of originating and then securitizing mortgage loans into PLMBS, as described above.  Many of those roles were played by the same entities—including Countrywide Financial, Countrywide Securities, Countrywide Home Loan Servicing LP, and Countrywide Home Loans—over and over again.  Other roles were played by one of a few entities—including the Rating Agencies, Bank of New York, CWALT, and CWMBS—that played their own defined roles in many but not all of Countrywide's securitizations.  Countrywide Financial created many of the corporations and other entities that were members of the Countrywide Enterprise for the express purpose of fulfilling a specific role in the securitization process.  And Countrywide Financial (or its subsidiaries) had the power to select which third-party Rating Agencies, Trustees, and property appraisers would be permitted to play a role (and thus earn fees) in the creation and sale of any particular PLMBS.  Accordingly, Countrywide Financial had the ability to direct and did direct the other members of the Countrywide Enterprise.

240.   Regardless of the specific entity that played any particular role in any particular securitization, these roles were well defined, established, and accepted by the members of the Countrywide Enterprise.  As alleged above, each of these

roles was essential to the securitization process, and the Countrywide Enterprise

maintained this structure and hierarchy to issue hundreds of Countrywide

PLMBS—including those at issue here—over a period of many years.

241.   The Countrywide Enterprise included at least the following persons or

individuals that typically played the following roles in Countrywide's

securitization process:

(a) Countrywide Home Loans, which typically originated or acquired

mortgage loans and acted as the Sponsor and Seller of the Countrywide mortgage-

backed securities at issue here;

(b) CWALT, Inc. and CWMBS, Inc., Delaware corporations with their

principal place of business in Calabasas, California, which typically served as the

Depositor;

(c) the various trusts to which the loans were deposited, including but not

limited to: Alternative Loan Trust 2007-12T1, CHL Mortgage Pass-Through Trust

2004-15, CHL Mortgage Pass-Through Trust 2004-HYB5, CHL Mortgage Pass-

Through Trust 2005-HYB5, Alternative Loan Trust 2005-58, CHL Mortgage Pass-

Through Trust 2005-HYB10, CHL Mortgage Pass-Through Trust 2006-HYB2,

CHL Mortgage Pass-Through Trust 2005-HYB6, CHL Mortgage Pass-Through

Trust 2006-HYB3, CHL Mortgage Pass-Through Trust 2007-HYB1, CHL

Mortgage Pass-Through Trust 2007-HYB2, CHL Mortgage Pass-Through Trust

2007-17, CHL Mortgage Pass-Through Trust 2005-J2, CHL Mortgage Pass-Through Trust 2007-HY6, CHL Mortgage Pass-Through Trust 2007-HY7, and CHL Mortgage Pass-Through Trust 2007-HY1;

(d) The Bank of New York, which typically served as the Trustee for Countrywide PLMBS;

(e) Countrywide Home Loans Servicing LP, which typically serviced the loans in the collateral pools for Countrywide PLMBS;

(f) Countrywide Financial, which formed the other Countrywide entities to perform specific tasks required to originate mortgages, securitize those mortgages, and then sell PLMBS;

(g) the Rating Agencies, including but not limited to S&P, Moody's, and/or Fitch, that rated the securities and gave the Bank's certificates AAA ratings at the time of purchase; and

(h) Countrywide Securities, which typically sold the Bank and other investors mortgage-backed securities on the basis of false and fraudulent representations of fact.

242. The Countrywide Defendants and the other members of the Countrywide Enterprise shared the common purpose of obtaining pecuniary gain, including money, in connection with the fraudulent sale of mortgage-backed securities to investors, including the Bank.

243.   Countrywide Financial formed the Countrywide Enterprise and has participated in and directed its subsidiaries to generate loans and then securitize them for sale on the basis of fraudulent Offering Documents.  In short, Countrywide Financial controlled the entire mortgage origination and securitization process that produced the Countrywide PLMBS and then sold them to investors like the Bank.

244.   Countrywide Home Loans originated and acquired thousands of mortgage loans for the purpose of selling them for securitization into Countrywide PLMBS that were sold on the basis of false Offering Documents.

245.   Countrywide Securities participated in the Countrywide Enterprise by, among other things, purchasing and then fraudulently selling certificates in the mortgage-backed securities generated by or in association with the other members of the Countrywide Enterprise.

246.   The association in fact between the members of the Countrywide Enterprise constitutes an association-in-fact enterprise pursuant to O.C.G.A. § 16-14-3(6).

### *The Pattern of Racketeering Activity*

247.   The Countrywide Defendants engaged in a pattern of racketeering activity consisting of two or more separate and distinct acts of racketeering activity.  The Countrywide Defendants committed this pattern of racketeering

activity over several years and in connection with but not limited to Securitization

Nos. 1-15, and 30.  The acts of racketeering activity include, but are not limited to,

those set forth below:

### a.    Theft By Taking (O.C.G.A. § 16-8-2)

248.   On more than two occasions the Countrywide Defendants,

individually and as parties to the crime, committed, attempted to commit, solicited

another to commit, or engaged in acts involving theft by taking of the Bank's

property.

249.   As alleged above and specified in Schedules 1-15 and 30, the

Countrywide Defendants repeatedly used false and misleading Offering

Documents, Countrywide's securities filings, and other public representations of

fact to induce the Bank to purchase the certificates identified in Securitization Nos.

1-15 and 30.

250.   The Bank's money constitutes property within the meaning of

O.C.G.A. § 16-1-3(13).  The Countrywide Defendants unlawfully took the Bank's

money with the intention of depriving the Bank of that property.

251.   The Countrywide Defendants' violations of O.C.G.A. § 16-8-2

constitute racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(ix) and

O.C.G.A. § 16-14-3(9)(B).

### b.  Theft By Deception (O.C.G.A. § 16-8-3)

252.  On more than two occasions, the Countrywide Defendants, individually and as parties to the crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving theft by deception, by obtaining property by deceitful means and artful practices with the intention of depriving the Bank of its property.

253.  As alleged above and specified in Schedules 1-15 and 30, the Countrywide Defendants repeatedly used false and misleading Offering Documents, Countrywide's securities filings, and other public representations of fact to induce the Bank to purchase the Certificates identified in Securitization Nos. 1-15 and 30.  By this conduct, the Countrywide Defendants created or confirmed the Bank's impression of existing facts, which the Countrywide Defendants knew or believed to be false.

254.  The Countrywide Defendants also prevented the Bank from acquiring information pertinent to the disposition of its funds, including information that would have contradicted the false representations of fact in the Offering Documents.

255.  The Countrywide Defendants' violations of O.C.G.A. § 16-8-3 constitute racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(ix) and 16-14-3(9)(B).

### c.   Residential Mortgage Fraud (O.C.G.A. § 16-8-102)

256.   On more than two occasions, the Countrywide Defendants, individually and as parties to the crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving residential mortgage fraud.

257.   As alleged above, the Countrywide Defendants repeatedly and knowingly used and facilitated the use of deliberate misrepresentations and omissions of fact in the mortgage lending process, including but not limited to fraudulent loan applications and deliberately inflated property appraisals on properties within the State of Georgia, for the purpose of closing residential mortgage loans that were sold to investors like the Bank.

258.   The Countrywide Defendants also knowingly used and facilitated the use of deliberate misrepresentations and omissions of fact in the mortgage lending process, including but not limited to fraudulent loan applications and deliberately inflated property appraisals on properties within the State of Georgia, for the purpose of generating and selling mortgage-backed securities, including the certificates at issue in this Complaint.

259.   The Countrywide Defendants committed this conduct with the purpose and intent that investors like the Bank would purchase Countrywide PLMBS.

260.   The Countrywide Defendants' violations of O.C.G.A. § 16-8-102(2) and (3) constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(A)(xl).

### d.   Violations of the Georgia Securities Act of 1973

261.   Countrywide Financial, Countrywide Securities, CWALT, and CWMBS are "persons" within the meaning of O.C.G.A. § 10-5-2(22) (Georgia Securities Act of 1973).

262.   As alleged more specifically above and detailed in the Exhibits hereto, Countrywide Financial, Countrywide Securities, CWALT, and/or CWMBS, individually and as parties to the crime, made numerous material misstatements of fact in the Offering Documents used to sell the Bank the certificates for Securitization Nos. 1-15 and 30 as well as in Countrywide Financial's securities filings and other public statements.  In addition, Countrywide Financial, Countrywide Securities, CWALT, and/or CWMBS made numerous material omissions of fact that rendered the Offering Documents, Countrywide Financial's securities filings, and other public statements false and misleading.  Countrywide Financial, Countrywide Securities, CWALT, and/or CWMBS made these untrue statements and misleading omissions in violation of O.C.G.A. §§ 10-5-12(a)(2) (Georgia Securities Act of 1973).

263.   Countrywide Financial, Countrywide Securities, CWALT, and/or CWMBS knew that the Offering Documents, Countrywide Financial's securities

filings, and other public statements included these untrue statements of fact and misleading omissions.

264.   Countrywide Financial, Countrywide Securities, CWALT, and/or CWMBS made these misrepresentations and omissions with the purpose and intent of convincing the Bank to purchase the certificates.

### e.   False Statements to a Federal Home Loan Bank (18 U.S.C. § 1014)

265.   On more than two occasions, the Countrywide Defendants, individually and as parties to the crime, committed, attempted to commit, solicited another to commit, or engaged in acts in violation of 18 U.S.C. § 1014.

266.   As alleged above, on more than two occasions, the Countrywide Defendants made false statements and reports to the Bank in the Offering Documents used to sell the Bank the certificates at issue in this Complaint.

267.   As alleged above, on more than two occasions, the Countrywide Defendants willfully overvalued land, property, or security in the Offering Documents used to sell the Bank the certificates at issue in this Complaint.

268.   The Countrywide Defendants solicited the Bank to purchase the certificates at issue in this Complaint with the aid of Offering Documents that included false information and reports and willful overvaluations of land, property, or security.

269.   As alleged above, the Countrywide Defendants knew that the information they provided the Bank was false and misleading.  The Countrywide Defendants nevertheless conveyed this false information to the Bank with the purpose of influencing and inducing the Bank to purchase the certificates at issue in this Complaint.

270.   The false information and overvaluations that the Countrywide Defendants provided to the Bank were of the type and character likely to influence the Bank's mortgage-backed securities purchases.  And the false information and overvaluations that the Countrywide Defendants provided to the Bank did in fact influence the Bank's purchases of Countrywide PLMBS in Securitization Nos. 1-15 and 30.

271.   The Countrywide Defendants' violations of 18 U.S.C. § 1014 constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(B).

### f.     Bank Fraud (18 U.S.C. § 1344)

272.   On more than two occasions, the Countrywide Defendants, individually and as parties to the crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving bank fraud in violation of 18 U.S.C. § 1344.

273.   The Bank is a financial institution within the meaning of 18 U.S.C. § 20(3) and as used in 18 U.S.C. § 1344.

274.   As detailed above and in the attached Schedules, the Countrywide Defendants knowingly executed or attempted to execute a scheme or artifice to defraud the Bank and to obtain the Bank's money by means of false or fraudulent pretenses, representations, or promises.

275.   In executing this scheme to defraud the Bank, the Countrywide Defendants intended to and did deceive the Bank into investing hundreds of millions of dollars in PLMBS certificates on the basis of false and fraudulent Offering Documents.

276.   As detailed above and in the attached Exhibits, the Countrywide Defendants' misrepresentations of fact concerned matters that were material to PLMBS investors and were material to the Bank's decision to purchase the certificates at issue in this Complaint.

277.   It was reasonably foreseeable that this conduct would cause economic harm to the Bank, and the Bank did in fact suffer economic harm as a result.

278.   The Countrywide Defendants' violations of 18 U.S.C. § 1344 constitute racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(xxix) and 16-14-3(9)(B).

***Countrywide's Acts of Racketeering Activity Are Related***

279.   The incidents of racketeering activity committed by the Countrywide Defendants had, among other things, the same or similar intents, results, victims,

and methods of commission.

280.   The acts of racketeering activity committed by the Countrywide Defendants involve transactions or purported transactions with or affecting the Bank.

281.   The acts of racketeering activity committed by the Countrywide Defendants have the same or similar intents in that they sought to obtain property, including but not limited to the Bank's money, through illegal means.

282.   The acts of racketeering activity committed by the Countrywide Defendants have the same or similar results, in that the Countrywide Defendants actually obtained personal property, including but not limited to the Bank's money, through illegal means.

283.   The acts of racketeering activity committed by the Countrywide Defendants have the same or similar victims: investors in Countrywide PLMBS certificates, including the Bank.

284.   The methods by which the Countrywide Defendants committed the incidents of racketeering activity were the same or similar, including by way of example and not limitation, inducing the Bank to pay Countrywide hundreds of millions of dollars to purchase PLMBS certificates on the basis of false Offering Documents.

285.   The acts of racketeering activity committed by the Countrywide Defendants are interrelated by distinguishing characteristics and are not isolated incidents.  The acts involve the same or similar methods of commission, the same or similar benefits to the Countrywide Defendants, the same or similar injuries to the Bank, and the same or similar efforts to conceal the Countrywide Defendants' misconduct.

### *Countrywide's Violations of the Georgia RICO Statute*

286.   The Countrywide Defendants violated O.C.G.A. § 16-14-4(a) by obtaining, directly or indirectly, an interest in or control of the Bank's personal property, including but not limited to money, through a pattern of racketeering activity.

287.   The Countrywide Defendants violated O.C.G.A. § 16-14-4(b) by associating with an enterprise and conducting or participating, directly or indirectly, in that enterprise through a pattern of racketeering activity.

288.   The Countrywide Defendants also violated O.C.G.A. § 16-14-4(c) by conspiring with others, including but not limited to one or more of the persons and entities listed at Paragraph 241 to violate O.C.G.A. § 16-14-4(a) or (b).  In furtherance of that conspiracy, the Countrywide Defendants committed overt acts that include but are not limited to the racketeering activity alleged above.

289.   The Countrywide Defendants violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) or (b).

### *Countrywide's Georgia RICO Violations*
### *Proximately Caused Injury to the Bank*

290.   The Countrywide Defendants' behavior directly targeted the Bank. The Bank purchased all the certificates at issue in Securitizations Nos. 1-15 and 30 based on the false and fraudulent representations in Countrywide's Offering Documents, and Countrywide's other public filings and public statements.  As a result, the Bank's injuries flow directly from acts of racketeering activity committed by the Countrywide Defendants that constitute part of the pattern of racketeering activity.

291.   The Bank has been injured by reason of these violations of O.C.G.A. § 16-14-4 and is entitled to recover three times the actual damages it has sustained pursuant to O.C.G.A. § 16-14-6(c).

292.   Pursuant to O.C.G.A. § 16-14-6(c), the Bank is also entitled to recover its attorneys' fees in the trial and appellate courts, and its costs of investigation and litigation reasonably incurred.

### Count Two
### Violations of the Georgia RICO Act by J.P. Morgan Securities
### (O.C.G.A. § 16-14-4(a) and (c))

| Against Defendants: | In connection with Securitization Nos. |
| --- | --- |
| J.P. Morgan | 19-27 |

293.   The Bank hereby incorporates the allegations of Paragraphs 1 to 235 as if repeated herein.  For the purpose of this Count Two, however, the Bank alleges that J.P. Morgan (a) acted with the knowledge and intent required to violate the criminal statutes identified as racketeering activity below and/or (b) was willfully blind to or deliberately ignorant of the falsity of the information it conveyed to the Bank.

294.   Defendant J.P. Morgan violated the Georgia RICO statute by committing, conspiring to commit, or endeavoring to commit a pattern of racketeering activity.

### The J.P. Morgan Enterprise

295.   J.P. Morgan has committed a pattern of racketeering activity through its participation in an association-in-fact enterprise comprised of the persons and entities that acquired thousands of mortgage loans and then processed them into mortgage-backed securities (the "J.P. Morgan Enterprise"), all so that J.P. Morgan could sell PLMBS certificates to investors on the basis of false and fraudulent Offering Documents.

296.   The members of the J.P. Morgan Enterprise played specific roles in the process of originating and then securitizing mortgage loans into PLMBS, as described above.  Many of those roles were played by the same entities—including J.P. Morgan Chase Bank N.A., Chase Home Finance, and J.P. Morgan Securities—

over and over again.  Other roles were played by one of a few entities—including the Rating Agencies, HSBC Bank USA, N.A., Wells Fargo Bank, N.A., and U.S. Bank N.A.—that played their own defined roles in many but not all of J.P. Morgan's securitizations.  J.P. Morgan created many of the corporations and other entities that were members of the J.P. Morgan Enterprise for the express purpose of fulfilling a specific role in the securitization process.  And J.P. Morgan (or its subsidiaries) had the power to select which third-party Rating Agencies, Trustees, and property appraisers would be permitted to play a role (and thus earn fees) in the creation and sale of any particular PLMBS.  Accordingly, J.P. Morgan had the ability to direct and did direct the other members of the J.P. Morgan Enterprise.

297.   Regardless of the specific entity that played any particular role in any particular securitization, these roles were well defined, established, and accepted by the members of the J.P. Morgan Enterprise.  As alleged above, each of these roles was essential to the securitization process, and the J.P. Morgan Enterprise maintained this structure and hierarchy to issue hundreds of J.P. Morgan PLMBS—including those at issue here—over a period of many years.

298.   The J.P. Morgan Enterprise includes at least the following persons or individuals associated in-fact with J.P. Morgan, which typically played the following roles in J.P. Morgan's securitization process:

(a) J.P. Morgan Chase Bank N.A. and Chase Home Finance, LLC, which originated or acquired mortgage loans and acted as the Sponsor or Seller of the J.P. Morgan mortgage-backed securities at issue here;

(b) J.P. Morgan Acceptance Corp. I, which typically served as the Depositor;

(c) the various Trusts to which the loans were deposited, including but not limited to: Chase Mortgage Finance Trust Series 2005-A1, J.P. Morgan Mortgage Trust 2005-A6, J.P. Morgan Mortgage Trust 2006-A3, J.P. Morgan Mortgage Trust 2006-A4, J.P. Morgan Mortgage Trust 2006-A5, J.P. Morgan Mortgage Trust 2007-A5, and J.P. Morgan Mortgage Trust 2008-R1;

(d) HSBC Bank USA, N.A., which typically served as the Trustee for J.P. Morgan PLMBS;

(e) Wells Fargo Bank, N.A. or U.S. Bank N.A., which typically serviced the loans in the collateral pools for J.P. Morgan PLMBS;

(f) the Rating Agencies, including but not limited to S&P, Moody's, and/or Fitch, that rated the securities and gave the Bank's certificates AAA ratings at the time of purchase; and

(g) J.P. Morgan, which typically sold the Bank and other investors mortgage-backed securities on the basis of false and fraudulent representations of fact.

299.   Defendant J.P. Morgan and the other members of the J.P. Morgan Enterprise shared the common purpose of obtaining pecuniary gain, including money, in connection with the fraudulent sale of mortgage-backed securities to investors, including the Bank.

300.   Defendant J.P. Morgan participated in the J.P. Morgan enterprise by, among other things, purchasing and then fraudulently selling certificates in the mortgage-backed securities generated by or in association with the other members of the J.P. Morgan Enterprise.

301.   The association in fact between the members of the J.P. Morgan Enterprise constitutes an association-in-fact enterprise pursuant to O.C.G.A. § 16-14-3(6).

### *The Pattern of Racketeering Activity*

302.   J.P. Morgan engaged in a pattern of racketeering activity consisting of two or more separate and distinct acts of racketeering activity.  J.P. Morgan committed this pattern of racketeering activity over several years and in connection with but not limited to Securitization Nos. 19-27.  The acts of racketeering activity include, but are not limited to, those set forth below:

### a.   Theft By Taking (O.C.G.A. § 16-8-2)

303.   On more than two occasions, J.P. Morgan, individually and as a party to the crime, committed, attempted to commit, solicited another to commit, or

engaged in acts involving theft by taking of the Bank's property.

304.   As alleged above and specified in Schedules 19-27, J.P. Morgan repeatedly used false and misleading Offering Documents to induce the Bank to purchase the Certificates identified in Securitization Nos. 19-27.

305.   The Bank's money constitutes property within the meaning of O.C.G.A. § 16-1-3(13).  J.P. Morgan unlawfully took the Bank's money with the intention of depriving the Bank of that property.

306.   J.P. Morgan's violations of O.C.G.A. § 16-8-2 constitute racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(ix) and O.C.G.A. § 16-14-3(9)(B).

### b.      Theft By Deception (O.C.G.A. § 16-8-3)

307.   On more than two occasions, J.P. Morgan, individually and as a party to the crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving theft by deception, by obtaining property by deceitful means and artful practices with the intention of depriving the Bank of its property.

308.   As alleged above and specified in Schedules 19-27, J.P. Morgan repeatedly used false and misleading Offering Documents to induce the Bank to purchase the Certificates identified in Securitization Nos. 19-27.  By this conduct, J.P. Morgan created or confirmed the Bank's impression of existing facts that J.P. Morgan knew or believed to be false.

309.   J.P. Morgan also prevented the Bank from acquiring information pertinent to the disposition of its funds, including information that would have contradicted the false representations of fact in the Offering Documents.

310.   J.P. Morgan's violations of O.C.G.A. § 16-8-3 constitute racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(ix) and 16-14-3(9)(B).

### c.    Residential Mortgage Fraud (O.C.G.A. § 16-8-102)

311.   On more than two occasions, J.P. Morgan, individually and as a party to the crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving residential mortgage fraud.

312.   As alleged above, J.P. Morgan repeatedly and knowingly used and facilitated the use of deliberate misrepresentations and omissions of fact in the mortgage lending process, including but not limited to fraudulent loan applications and deliberately inflated property appraisals on properties within the State of Georgia, for the purpose of closing residential mortgage loans that were sold to investors like the Bank.

313.   J.P. Morgan also knowingly used and facilitated the use of deliberate misrepresentations and omissions of fact in the mortgage lending process, including but not limited to fraudulent loan applications and deliberately inflated property appraisals on properties within the State of Georgia, for the purpose of

generating and selling mortgage-backed securities, including the certificates at issue in this Complaint.

314.   J.P. Morgan committed this conduct with the purpose and intent that investors like the Bank would purchase J.P. Morgan PLMBS.

315.   J.P. Morgan's violations of O.C.G.A. § 16-8-102(2) and (3) constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(A)(xl).

### d.   Violations of the Georgia Securities Act of 1973

316.   J.P. Morgan and J.P. Morgan Acceptance Corp. I are "persons" within the meaning of O.C.G.A. § 10-5-2(22) (Georgia Securities Act of 1973).

317.   As alleged more specifically above and detailed in the Exhibits hereto, J.P. Morgan and J.P. Morgan Acceptance Corp. I, individually and as parties to the crime, made numerous material misstatements of fact in the Offering Documents used to sell the Bank the certificates for Securitization Nos. 19-27.  In addition, J.P. Morgan and J.P. Morgan Acceptance Corp. I made numerous material omissions of fact that rendered the Offering Documents false and misleading.  J.P. Morgan and J.P. Morgan Acceptance Corp. I made these untrue statements and misleading omissions in violation of O.C.G.A. §§ 10-5-12(a)(2) (Georgia Securities Act of 1973).

318.   J.P. Morgan and J.P. Morgan Acceptance Corp. I knew that the Offering Documents included these untrue statements of fact and misleading omissions.

319.   J.P. Morgan and J.P. Morgan Acceptance Corp. I made these misrepresentations and omissions with the purpose and intent of convincing the Bank to purchase the certificates.

**e.    False Statements to a Federal Home Loan Bank (18 U.S.C. § 1014)**

320.   On more than two occasions, J.P. Morgan individually and as a party to the crime, committed, attempted to commit, solicited another to commit, or engaged in acts in violation 18 U.S.C. § 1014.

321.   As alleged above, on more than two occasions, J.P. Morgan made false statements and reports to the Bank in the Offering Documents used to sell the Bank the certificates at issue in this Complaint.

322.   As alleged above, on more than two occasions, J.P. Morgan willfully overvalued land, property, and security in the Offering Documents used to sell the Bank the certificates at issue in this Complaint.

323.   J.P. Morgan solicited the Bank to purchase the certificates at issue in this Complaint with the aid of Offering Documents that included false information and reports and willful overvaluations of land, property, or security.

324.   As alleged above, J.P. Morgan knew that the information it provided the Bank was false and misleading.  J.P. Morgan nevertheless conveyed this false information to the Bank with the purpose of influencing and inducing the Bank to purchase the J.P. Morgan certificates at issue in this Complaint.

325.   The false information and overvaluations that J.P. Morgan provided to the Bank were of the type and character likely to influence the Bank's PLMBS purchases.  And the false information and overvaluations that J.P. Morgan provided the Bank did in fact influence the Bank's purchases of the J.P. Morgan certificates at issue in this Complaint.

326.   J.P. Morgan's violations of 18 U.S.C. § 1014 constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(B).

### f.   Bank Fraud (18 U.S.C. § 1344)

327.   On more than two occasions, J.P. Morgan, individually and as a party to the crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving bank fraud in violation of 18 U.S.C. § 1344.

328.   The Bank is a financial institution within the meaning of 18 U.S.C. § 20(3) and as used in 18 U.S.C. § 1344.

329.   As detailed above and in the attached Exhibits, J.P. Morgan knowingly executed or attempted to execute a scheme or artifice to defraud the

Bank and to obtain the Bank's money by means of false or fraudulent pretenses, representations, or promises.

330.   In executing this scheme to defraud the Bank, J.P. Morgan intended to deceive the Bank into investing hundreds of millions of dollars in PLMBS certificates on the basis of false and fraudulent Offering Documents.

331.   As detailed above and in the attached Schedules 19-27, J.P. Morgan's misrepresentations of fact concerned matters that were material to PLMBS investors and were material to the Bank's decision to purchase the J.P. Morgan certificates at issue in this Complaint.

332.   It was reasonably foreseeable that this conduct would cause economic harm to the Bank, and the Bank did in fact suffer economic harm as a result.

333.   J.P. Morgan's violations of 18 U.S.C. § 1344 constitute racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(xxix) and 16-14-3(9)(B).

### *J.P. Morgan's Acts of Racketeering Activity Are Related*

334.   The incidents of racketeering activity committed by J.P. Morgan had, among other things, the same or similar intents, results, victims, and methods of commission.

335.   The acts of racketeering activity committed by J.P. Morgan involve transactions or purported transactions with or affecting the Bank.

336.   The acts of racketeering activity committed by J.P. Morgan have the same or similar intents in that they sought to obtain property, including but not limited to the Bank's money, through illegal means.

337.   The acts of racketeering activity committed by J.P. Morgan have the same or similar results, in that J.P. Morgan actually obtained personal property, including but not limited to the Bank's money, through illegal means.

338.   The acts of racketeering activity committed by J.P. Morgan have the same or similar victims: investors in J.P. Morgan PLMBS certificates, including the Bank.

339.   The methods by which J.P Morgan committed the incidents of racketeering activity were the same or similar, including by way of example and not limitation, inducing the Bank to pay J.P. Morgan hundreds of millions of dollars to purchase PLMBS certificates on the basis of false Offering Documents.

340.   The acts of racketeering activity committed by J.P. Morgan are interrelated by distinguishing characteristics and are not isolated incidents.  The acts involve the same or similar methods of commission, the same or similar benefits to J.P. Morgan, the same or similar injuries to the Bank, and the same or similar efforts to conceal J.P. Morgan's misconduct.

### *J.P. Morgan's Violations of the Georgia RICO Statute*

341.   J.P. Morgan violated O.C.G.A. § 16-14-4(a) by obtaining, directly or

indirectly, an interest in or control of the Bank's personal property, including but not limited to money, through a pattern of racketeering activity.

342.   J.P. Morgan violated O.C.G.A. § 16-14-4(b) by associating with an enterprise and conducting or participating in, directly or indirectly, that enterprise through a pattern of racketeering activity.

343.   J.P. Morgan also violated O.C.G.A. § 16-14-4(c) by conspiring with others, including but not limited to one or more of the persons and entities listed at Paragraph 298, to violate O.C.G.A. § 16-14-4(a) or (b).  In furtherance of that conspiracy, J.P. Morgan committed overt acts that include but are not limited to the racketeering activity alleged above.

344.   J.P. Morgan violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) or (b).

### *J.P. Morgan's Georgia RICO Violations*<br>*Proximately Caused Injury to the Bank*

345.   J.P. Morgan's behavior directly targeted the Bank.  The Bank purchased all the certificates at issue in Securitization Nos. 19-27 based on the false and fraudulent representations J.P. Morgan made in its Offering Documents. As a result, the Bank's injuries flow directly from acts of racketeering activity committed by J.P. Morgan that constitute part of the pattern of racketeering activity.

346.   The Bank has been injured by reason of J.P. Morgan's violation of O.C.G.A. § 16-14-4 and is entitled to recover three times the actual damages it has sustained pursuant to O.C.G.A. § 16-14-6(c).

347.   Pursuant to O.C.G.A. § 16-14-6(c), the Bank is also entitled to recover its attorneys' fees in the trial and appellate courts, and its costs of investigation and litigation reasonably incurred.

## Count Three
## Fraud and Deceit

| Against Defendants: | In connection with Securitization Nos. |
|---|---|
| Countrywide Financial | 1-15, 19, 21, 23, and 30 |
| Countrywide Securities | 1-18 |
| J.P. Morgan | 19-27 |
| UBS | 28-30 |

348.   The Bank incorporates the allegations of Paragraphs 1 to 235 as if fully set forth herein.

349.   As alleged above and detailed in the Schedules hereto, the Bank purchased the securities at issue in this Complaint based on representations made by Defendants.  The Bank and the respective Defendants both had a pecuniary interest in these transactions.

350.   In connection with those sales, the Defendants made certain representations of fact concerning the securities that they sold the Bank.  The Defendants made those representations of fact in the Offering Documents that they

provided or made available to the Bank before or at the time of the sale of the securities.  In addition, Countrywide and its executives made misrepresentations of fact in their public filings and public statements.

351.   As detailed above and in the attached Schedules, the Defendants communicated false and misleading information to the Bank in these Offering Documents, other public filings, and statements.

352.   As alleged above, the Bank was a careful and conservative PLMBS investor.  The Bank took reasonable precautions available under the circumstances and exercised its own due diligence before investing in these securities.

353.   The Defendants, however, had access to significantly more information concerning these matters than the Bank.  The Defendants knew the representations of fact in their Offering Documents, other public filings, and statements were false and misleading at the time they made their representations to the Bank.

354.   By making these false representations of existing facts, the Defendants intended to mislead the Bank and induce the Bank into purchasing the securities at issue in this Complaint.  Alternatively, the Defendants were reckless as to the truth of the facts represented in the Offering Documents.

355.   Unlike the Defendants, the Bank did not have access to the truth of the matters above.  Unlike the Defendants, the Bank did not have access to the

underlying loan files and did not have access to the internal workings of the loan originators and/or issuers of the securities at issue in this Complaint.  Unlike the Defendants, the Bank had no reasonable means of discovering that the representations in the Offering Documents, other public filings, and statements were false and misleading.  Accordingly, the Bank was forced to rely on the representations of the Defendants with respect to these securities.

356.   The Bank believed the Defendants' representations of fact in the Offering Documents, other public filings, and statements to be true and accurate.

357.   In addition, the Bank reasonably and justifiably relied on these representations in the Offering Documents, other public filings, and statements when the Bank made the decision to purchase the securities.  Indeed, the Bank would not have purchased these securities if the Defendants had provided the Bank with accurate information about the manner in which the mortgage loans were originated and the manner in which the Defendants were actually securitizing the PLMBS in which the Bank purchased its certificates.

358.   As a direct and proximate result of the foregoing conduct, the Bank has suffered and continues to suffer damages.

**Count Four**
**For Punitive Damages**
**(O.C.G.A. § 51-12-5.1)**

| Against Defendants: | In connection with Securitization Nos. |
|---|---|
| Countrywide Financial Countrywide Home Loans | 1-15, 19, 21, 23, and 30 |
| Countrywide Securities | 1-18 |
| J.P. Morgan | 19-27 |
| UBS | 28-30 |

359.   The Bank incorporates the allegations of Paragraphs 1-358 as if fully set forth herein except for any allegation that can be construed to allege the Defendants acted negligently rather than intentionally.

360.   In committing the fraud and other misconduct alleged above, the Defendants have demonstrated willful misconduct, fraud, wantonness, or that entire want of care that gives rise to a presumption of conscious indifference as to the consequences to the investors to whom they sold their PLMBS, including the Bank.  Because the Defendants acted with a specific intent to cause harm to the Bank and other PLMBS investors, there is no limit to the amount of punitive damages for which the Defendants are liable.

361.   Pursuant to O.C.G.A. §§ 51-12-5.1(d)(1) and 51-12-5.1(f), the Bank therefore prays for an additional award of punitive damages because of the aggravating circumstances alleged herein and to punish and deter the Defendants from the same or similar misconduct in the future.

## Count Five
## Negligent Misrepresentation

| Against Defendants: | In connection with Securitization Nos. |
|---|---|
| Countrywide Financial | 1-15, 19, 21, 23, and 30 |
| Countrywide Securities | 1-18 |
| J.P. Morgan | 19-27 |
| UBS | 28-30 |

362.   In the alternative, the Bank brings this claim for negligent

misrepresentation against the foregoing Defendants.

363.   The Bank incorporates the allegations of Paragraphs 1 to 235 as if

fully set forth herein, but for the purpose of this Count Five, the Bank alleges that

the Defendants did not act with reasonable care and that the Defendants knew or

should have known that their representations to the Bank were false and

misleading.

364.   The Defendants named in this Count Five are in the business of

originating mortgages, securitizing them, and/or selling PLMBS, including the

securities at issue in this Complaint.  As alleged above, the Defendants are in the

business or profession of making representations of fact concerning those

securities to offer and sell the securities to investors like the Bank.  In addition, the

Defendants have a pecuniary interest in providing the information in the Offering

Documents to investors like the Bank because the Defendants were each paid in

connection with the sale of those securities with the aid of the Offering

Documents.

365.   As alleged above, the Defendants knew or should have known that the

representations in the Offering Documents were false and misleading.  The

Defendants had access to information—from their own affiliates and as a result of

their own due diligence efforts—that should have alerted the Defendants that their

Offering Documents were materially false, incorrect, and misleading.

366.   In violation of that duty of care, the Defendants negligently supplied

false information to the Bank in the Offering Documents.  In violation of that duty

of care, Countrywide Financial further negligently supplied false information to the

Bank in its public filings and the public statements of its executives to investors.

367.   As alleged above, the Defendants knew or should have known that the

representations they made in the Offering Documents, public filings, and other

public statements would be communicated to investors like the Bank.  In fact, the

Defendants gathered the information at issue here precisely so that this information

could be communicated to investors, including the Bank, in the Offering

Documents, public filings and other public statements.

368.   And as alleged above, the Defendants knew or should have known

that the Bank would rely on the representations in the Offering Documents, public

filings, and other public statements before deciding whether to purchase the

securities.  In fact, the Offering Documents typically instruct investors that the statements in the Offering Documents are the only representations the investor should consider before purchasing the security.

369.   As alleged above, these representations of fact are material to any reasonable purchaser of PLMBS, and they were material to the Bank's decision to purchase the securities at issue here.

370.   As alleged above, the Bank reasonably relied on these representations of fact in connection with the Bank's decision to purchase these securities.

371.   As alleged above, the Bank exercised reasonable diligence in connection with its purchase of these securities.  But the Bank was forced to rely on the Defendants for the truth of these representations because the Bank did not have access to the same information as the Defendants.

372.   As a direct and proximate result of the Defendants' negligence, the Bank has suffered and will continue to suffer significant economic damage.  The Bank brings this claim to any and all pecuniary loss suffered as a consequence of the Bank's reliance on the Defendants' negligent misrepresentations, including but not limited to the difference between (a) the purchase price the Bank paid for the securities based on the Underwriter and Issuer Defendants' misrepresentations and (b) the significantly lower actual value of the securities.

## Count Six
## For Successor Liability Against Defendant Bank of America Corporation

373.   The Bank incorporates the foregoing allegations of Paragraphs 1-126, 131-292, and 348-372 as if fully set forth herein.  [Excludes the JPM allegations at 129-132 and 285-339]

374.   On or about July 1, 2008, defendant Bank of America acquired all of the stock of Countrywide Financial in a merger transaction.  As consideration for the merger, Countrywide Financial's shareholders received stock in Bank of America.

375.   At the time of the transaction, Bank of America announced that it intended to combine Countrywide's operations with its own and re-brand those combined operations with the Bank of America name.  Bank of America further announced that Barbara Desoer would run the combined mortgage and consumer real estate operations from Calabasas, California, where Countrywide Financial had its headquarters, and that Countrywide Financial's incumbent president, David Sambol, would remain for at least some time to work on the transition.

376.   On October 16, 2008, Bank of America announced that Countrywide Financial would no longer publicly report its own financial results and that Bank of America was transferring "substantially all of the assets and operations of Countrywide Financial Corporation and Countrywide Home Loans, Inc. to other subsidiaries of Bank of America."

377.   On November 10, 2008, Bank of America publicly filed an 8-K report announcing the integration of Countrywide Financial with Bank of America's other businesses and operations.  That filing once again disclosed that Bank of America had transferred substantially all of Countrywide Financial's assets to Bank of America.

378.   On April 27, 2009, Bank of America announced that it was retiring the Countrywide name and that the combined operations of Countrywide and Bank of America would do business as Bank of America Home Loans.  Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans name.  Bank of America Home Loans is not registered as a corporation licensed to do business in Georgia, North Carolina, Delaware, or California.  Upon information and belief, Bank of America Home Loans is a brand name that Bank of America now uses for the Countrywide Financial mortgage origination and securitization operations that Bank of America has absorbed and consolidated with its own operations.  The Form 10-K that Bank of America filed on February 26, 2010 lists both Countrywide Securities and its direct parent corporation Countrywide Capital Markets, LLC as Bank of America subsidiaries.

379.   Bank of America entered into this transaction with full knowledge that it was assuming substantial Countrywide liabilities.  In a February 22, 2008

interview, Bank of America spokesman Scott Silvestri told *Corporate Counsel* that

Bank of America had not overlooked Countrywide's legal expenses and liabilities

when it decided to merge with Countrywide:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country.  Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations.  "We bought the company and all of its assets and liabilities," spokesman Scott Silvestri says.  "We are aware of the claims and potential claims against the company and have factored these into the purchase."

381.   A January 23, 2008 *New York Times* article similarly quotes former

Bank of America Chairman and CEO Kenneth D. Lewis acknowledging that Bank

of America had thought long and hard about acquiring Countrywide's liabilities:

> We did extensive due diligence.  We had 60 people inside the company for almost a month.  It was the most extensive due diligence we have ever done. So we feel comfortable with the valuation.  We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a good price.

381.   On November 16, 2010, Bank of America's Chief Executive Officer,

Brian Moynihan, publicly admitted that Bank of America had accepted liability for

investors' claims concerning Countrywide's mortgage-backed securities:  "There's

a lot of people out there with a lot of thoughts about how we should solve this

[investor demands for refunds over faulty mortgages], but at the end of the day,

we'll pay for the things that Countrywide did."

382.   And in a December 12, 2010 *New York Times* profile, Moynihan again publicly admitted that Bank of America would be responsible for Countrywide's liabilities:

> But what about Countrywide?
>
> "A decision was made; I wasn't running the company," Mr. Moynihan says, although he was obviously a top bank official at the time. "Our company bought it and we'll stand up; we'll clean it up."

383.   Bank of America's securities filings echo this position.  In addition to significantly increased revenues due to Countrywide's contributions, Bank of America has reported its payment on claims for defective legacy Countrywide mortgages and announced a $4.4 billion reserve fund to pay for similar claims in the future.

384.   In October 2008, Bank of America agreed to pay $8.4 billion to settle predatory lending lawsuits that various state Attorneys General had filed against Countrywide.  Although Countrywide originated the mortgages and was alleged to have committed the misconduct in question long before Bank of America's acquisition, Bank of America assumed financial responsibility for the settlement.

385.   On January 3, 2011, Bank of America similarly announced that it had agreed to pay $2.8 billion to settle claims to repurchase mortgage loans that Fannie Mae and Freddie Mac had purchased from Countrywide Financial or its subsidiaries.  In its press releases and presentation concerning the settlement, Bank

of America admitted that it was paying to resolve claims concerning "alleged breaches of selling representations and warranties related to loans sold by legacy Countrywide."

386.   Upon information and belief, therefore, Bank of America has completed a *de facto* merger with Countrywide Financial and its subsidiaries by absorbing Countrywide Financial into its own operations.  Bank of America has expressly or impliedly assumed successor liability for the torts of Countrywide Financial and its subsidiaries.

387.   Accordingly, the Bank seeks to recover any damages it recovers against Countrywide from Bank of America.

## Count Seven
### For Expenses of Litigation Against All Defendants
### (O.C.G.A. § 13-6-11)

388.   The Bank incorporates all of the foregoing allegations as if fully set forth herein.

389.   By their actions in these matters, defendants Countrywide Financial, Countrywide Securities, Countrywide Home Loans, Bank of America, J.P. Morgan, and UBS have acted in bad faith, have been stubbornly litigious, and have caused the Bank significant unnecessary trouble and expense.

390.   Accordingly, the Bank is entitled to recover its attorneys' fees and other reasonable expenses incurred in connection with this litigation pursuant to O.C.G.A. § 13-6-11.

391.   The Bank is entitled to prejudgment interest in the amount afforded by law.  In addition, the Bank may be entitled to prejudgment interest in accordance with O.C.G.A. § 51-12-14.

## JURY DEMAND

The Bank demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, the Bank respectfully prays that this Court grant relief against the Defendants and in favor of the Bank as follows:

(a)   Award the Bank actual, treble, and punitive damages;

(b)   Award the Bank its expenses of litigation, including reasonable attorneys' fees and costs of investigation and litigation incurred in this matter;

(c)   Award the Bank pre-judgment and post-judgment interest; and

(d)   Grant the Bank such other and further legal relief as may be just and proper.

This 18th day of January 2011.

Respectfully submitted


/s/ Ronan P. Doherty
H. Lamar Mixson
Georgia Bar No. 514012
*mixson@bmelaw.com*
David G.H. Brackett
Georgia Bar No. 068353
*brackett@bmelaw.com*
Ronan P. Doherty
Georgia Bar No. 224885
*doherty@bmelaw.com*
Bret R. Hobson
Georgia Bar No. 882520
*hobson@bmelaw.com*
Mary W. Pyrdum
Georgia Bar No. 940420
*pyrdum@bmelaw.com*
Naveen Ramachandrappa
Georgia Bar No. 422036
*ramachandrappa@bmelaw.com*

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia 30309
Tel:   (404) 881-4100
Fax:   (404) 881-4111

Attorneys for the Federal Home Loan Bank of Atlanta

**State Court of Fulton County**
***E-FILED***
LexisNexis Transaction ID: 35434716
Date:  Jan 18 2011  7:13PM
Mark Harper, Clerk

# EXHIBIT A

Depositor

# Wells Fargo Bank, N.A.

Sponsor and Master Servicer

# Wells Fargo Mortgage Backed Securities 2006-8 Trust

Issuing Entity

# $1,393,279,582

(Approximate)

# Mortgage Pass-Through Certificates, Series 2006-8

Principal and interest payable monthly, commencing in July 2006

**You should carefully consider the risk factors beginning on page S-17 of this prospectus supplement.**

Neither the offered certificates nor the underlying mortgage loans are insured or guaranteed by any governmental agency or instrumentality or any other entity.

The offered certificates will represent interests in the assets deposited with the issuing entity only and will not represent interests in or obligations of the depositor, the sponsor or any other entity.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

**The Issuing Entity Will Issue—**

• Twenty-one classes of senior certificates.

• Six classes of subordinated certificates, all of which are subordinated to, and provide credit enhancement for, the senior certificates. Each class of subordinated certificates is also subordinated to each class of subordinated certificates, if any, with a lower number.

The classes of offered certificates are listed and their sizes and basic payment characteristics are described under the heading "Offered Certificates" in the table beginning on page S-6.

**The Assets of the Issuing Entity Will Include—**

• A pool of fully amortizing, one- to four-family, fixed interest rate, non-relocation, residential first mortgage loans (excluding the fixed retained yield described in this prospectus supplement), substantially all of which have original terms to stated maturity of approximately 30 years. Certain of the mortgage loans will require only payments of interest for a term specified in the related mortgage note.

**Credit Enhancement Will Consist Of—**

• Subordination of the subordinated certificates to the senior certificates for the distributions of principal and interest and the allocation of losses.

• Shifting interest in prepayments through the allocation, subject to certain exceptions, of most principal collections to the senior certificates for the first five years and a lesser, but still disproportionately large, allocation of these collections to the senior certificates during the following four years.

• In the case of each class of super senior certificates, the subordination of the related class of super senior support certificates for losses if the subordinated certificates are no longer outstanding.

**Interest Rate Support Will be Provided for—**

• The Class A-7 Certificates through a yield maintenance agreement with Bear Stearns Financial Products Inc., as counterparty.

**Neither the SEC nor any state securities commission has approved the certificates offered by this prospectus supplement or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

Countrywide Securities Corporation will purchase the Class A Certificates from the depositor and offer them to investors at varying prices to be determined at the time of sale. Banc of America Securities LLC will purchase the Class B Certificates offered by this prospectus supplement from the depositor and offer them to investors at varying prices to be determined at the time of sale. The offered certificates will be available for delivery to investors on or about June 29, 2006. Classes in book-entry form will be made available through The Depository Trust Company, Clearstream International or the Euroclear System. Total proceeds to the depositor for the offered certificates will be approximately $1,366,094,550 before deducting expenses estimated at $295,000 plus accrued interest from June 1, 2006 to June 29, 2006.

# Countrywide Securities Corporation   Banc of America Securities LLC

The date of this prospectus supplement is June 27, 2006.



**PROSPECTUS SUPPLEMENT**
**(To Prospectus dated April 26, 2007)**

**$855,728,140**
**(Approximate)**

**CWALT, INC.**
**Depositor**



**HOME LOANS**
**Sponsor and Seller**

**Countrywide Home Loans Servicing LP**
**Master Servicer**

**Alternative Loan Trust 2007-12T1**
**Issuing Entity**

**Mortgage Pass-Through Certificates, Series 2007-12T1**

**Distributions payable monthly, beginning May 25, 2007**
_____

The issuing entity will issue 60 classes of certificates, 57 of which are offered pursuant to this prospectus supplement and the accompanying prospectus. The classes of offered certificates and the other certificates issued by the issuing entity, together with their initial class certificate balances or notional amounts, pass-through rates and initial ratings, are listed in the tables beginning on page S-6 in this prospectus supplement.

The certificates represent interests in a pool consisting primarily of 30-year conventional, fixed rate mortgage loans secured by first liens on one-to-four family residential properties.

The credit enhancement for each class of certificates varies. Not all credit enhancement is available for every class. The credit enhancement for the certificates is described in more detail in this prospectus supplement.

Credit enhancement and other support for the transaction will consist of:

- Subordination.

The Class A-7 Certificates will also have the benefit of an interest rate corridor contract.

> **Consider carefully the risk factors beginning on page S-22 in this prospectus supplement and on page 2 in the prospectus.** The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWALT, Inc., Countrywide Home Loans, Inc. or any of their affiliates. This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

**These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus supplement or the prospectus. Any representation to the contrary is a criminal offense.**

Countrywide Securities Corporation will offer the Class A, Class M, Class B-1 and Class B-2 Certificates to the public at varying prices to be determined at the time of sale. The proceeds to the depositor from the sale of these classes of certificates are expected to be approximately $848,071,795, plus accrued interest, before deducting expenses. The Class PO and Class X Certificates will not be purchased by Countrywide Securities Corporation. They will be transferred to Countrywide Home Loans, Inc. on or about April 30, 2007 as partial consideration for the sale of the mortgage loans to the depositor. See "Method of Distribution" in this prospectus supplement.

**Countrywide Securities Corporation**

April 27, 2007

**Summary of Transaction Parties**



**Corridor Contract Counterparty**
Bank of America, N.A.

*Corridor Contract Payments*

**Supplemental Interest Trust**

*Yield Supplement Amounts*

**Sponsor and Seller**
Countrywide Home Loans, Inc.

*Mortgage Loans*

**Depositor**
CWALT, Inc.

*Mortgage Loans*

**Issuing Entity**
Alternative Loan Trust 2007-12T1

**Trustee**
The Bank of New York

*Mortgage Loans*

**Other Sellers**
Special Purpose Entities

*Mortgage Loans*

*Mortgage Loan Servicing*

**Master Servicer and Servicer**
Countrywide Home Loans Servicing LP

**Certificateholders**

*Distributions*

S-21

**State Court of Fulton County**
***FILED***
LexisNexis Transaction ID: 35434716
Date:  Jan 18 2011  7:13PM
Mark Harper, Clerk

# SCHEDULE 1

## SCHEDULE 1 TO THE COMPLAINT

**Item 20**    **Details About the Securitization**

(a)    **Dealer**: Countrywide Securities Corporation

(b)    **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2004-15 issued Mortgage Pass-Through Certificates, Series 2004-15, which was a securitization in June 2004 of 1,047 loans divided into 5 loan groups.

(c)    **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Senior/Variable Pass-Through Rate) in this securitization, in tranche 4-A, for which the Bank paid $110,945,887.50 in principal plus accrued interest of $417,440.90.  The Bank received the certificates on June 30, 2004. Tranche 4-A contains loans in Loan Group 4.

(d)    **CUSIP**: 12669fl50

(e)    **Ratings of the certificate(s) at the time of the Bank's purchase**:
     (i)     Moody's: Aaa
     (ii)    S&P: AAA

(f)    **Ratings of the certificate(s) as of November 30, 2010**:
     (i)     Moody's: B3/*-
     (ii)    S&P: B+

(g)    **SEC's URL of prospectus and prospectus supplement for this securitization**:
     http://sec.gov/Archives/edgar/data/906410/000119312504111557/d424b5.htm

**Item 21**    **Details About the Parties**

(a)    **Dealer**: Countrywide Securities Corporation

(b)    **Originator(s)**:
     (i)     Countrywide Home Loans, Inc.
     (ii)    American Mortgage Network

      (iii)    Sierra Pacific Mortgage Company, Inc.
      (iv)    Quicken Loans, Inc.

(c)    **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)    **Depositor**: CWMBS, Inc.

(e)    **Trustee**: The Bank of New York

(f)    **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**    **Untrue or Misleading Statements About General Underwriting Standards**

(a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus at 27.)

(b)    "All of the Mortgage Loans in the trust fund were originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-55.)

(c)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-56.)

(d)    "Quicken's Underwriting Standards are intended to evaluate the prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgaged property as collateral." (Prospectus Supplement at S-59.)

(e)    "Quicken's Underwriting Standards generally follow prudent and generally accepted mortgage industry underwriting standards." (Prospectus Supplement at S-59.)

(f)  "The Mortgage Loans that will be transferred to the trust fund other than those originated or acquired by Countrywide Home Loans or Quicken have been originated or acquired in accordance with the procedures set forth in the prospectus under '*Mortgage Loan Program – Underwriting Process.*'"  (Prospectus Supplement at S-59.)

**Item 77      Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)  "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 27-28.)

(b)  "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits."  (Prospectus Supplement at S-56.)

(c)  "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-56.)

(d) "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-57.)

**Item 81      Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-56.)

**Item 87      Untrue or Misleading Statements About Quality Control**

(a) "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-56.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the mortgaged property as collateral, an appraisal may be made of each property considered for financing. In instances where an appraisal is required, the appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."  (Prospectus at 27.)

(b)     "Generally, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans, except with respect to selected borrowers that are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect."  (Prospectus Supplement at S-56 – S-57.)

(c)     "In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. The appraiser may be required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property. Quicken's Underwriting Standards require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values."  (Prospectus Supplement at S-59.)

**Item 163      Untrue or Misleading Statements About LTVs**

(a)      (For data charts regarding Loan Group 4, see Prospectus Supplement at S-40.)

(b)      In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

   (i)      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 4 was approximately 75.04%." (Prospectus Supplement at S-40 n.1.)

(c)      "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 95.00%." (Prospectus Supplement at S-14.)

(d)      "Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%." (Prospectus Supplement at S-56.)

(e)      "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000." (Prospectus Supplement at S-57.)

(f)      "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% is covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac." (Prospectus Supplement at S-14.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts regarding Loan Group 4, see Prospectus Supplement at S-43.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

        (i)     425 (or 85.86%) of the 495 Mortgage Loans in Loan Group 4 were for primary residences.  Those 425 loans represented 90.58% of the Stated Principal Balance of the Mortgage Loans in Loan Group 4 as of the cut-off date. (Prospectus Supplement at S-43.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "It is a condition to the issuance of the certificates of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (Prospectus at 110.)

(b)     "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('***S&P'***) and Aaa by Moody's Investors Service, Inc. ('***Moody's***')."  (Prospectus Supplement at S-96.)

**Item 181     Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "Ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with the certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any."  (Prospectus at 110.)

(b)     "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the

agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-96.)

(c)     "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-96.)

**Item 195     Untrue or Misleading Statements About Effective Securitization**

(a)     "The depositor will cause the mortgage loans comprising each mortgage pool to be assigned to the trustee named in the related prospectus supplement for the benefit of the certificateholders of the related series." (Prospectus at 17.)

(b)     "At the time of issuance of the certificates of a series, the depositor will cause the mortgage loans comprising the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the certificates to the depositor in exchange for the mortgage loans." (Prospectus at 52-53.)

(c)     "In addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan
            • the mortgage note endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or

cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost,

• the mortgage, deed of trust or similar instrument with evidence of recording indicated on it (except for any mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the recording office or some other arrangement will be provided for),

• an assignment of the mortgage to the trustee in recordable form and

• any other security documents specified in the related prospectus supplement or the related pooling and servicing agreement."

(Prospectus at 53.)

(d)     "The applicable prospectus supplement may provide other arrangements for assuring the priority of the assignments, but if it does not, then the depositor will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which in the opinion of counsel recording is not required to protect the trustee's interest in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans." (Prospectus at 53.)

(e)     "The depositor . . . will cause the mortgage loans delivered to the trustee on the closing date to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-11.)

(f)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2004-15, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date."  (Prospectus Supplement at S-54.)

(g)     "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller or a transferor, as the case may be." (Prospectus Supplement at S-54.)

EXHIBIT A
Page 168

# SCHEDULE 2

## SCHEDULE 2 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2004-HYB5 issued Mortgage Pass-Through Certificates, Series 2004-HYB5, which was a securitization in August 2004 of 4,112 loans divided into 8 loan groups.

(c)     **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Senior/Variable Pass-Through Rate) in this securitization, in tranche 8-A-1, for which the Bank paid $58,561,391.44 in principal plus accrued interest of $240,626.80.  The Bank received the certificates on September 30, 2004.  Tranche 8-A-1 contains loans in Loan Group 8.

(d)     **CUSIP**: 12669f3k7

(e)     **Ratings of the certificate(s) at the time of the Bank's purchase**:
     (i)     Moody's: Aaa
     (ii)    S&P: AAA

(f)     **Ratings of the certificate(s) as of November 30, 2010**:
     (i)     Moody's: Baa1/*-
     (ii)    S&P: BB+

(g)     **SEC's URL of prospectus and prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/906410/000119312504148533/d424b5.htm

**Item 21**      **Details About the Parties**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Originator(s)**:
     (i)     Countrywide Home Loans, Inc.
     (ii)    National City Mortgage Co.

      (iii)    Quicken Loans, Inc.

      (iv)    RBC Mortgage Company or its affiliates

   (c)    **Sponsor/Seller**: Countrywide Home Loans, Inc.

   (d)    **Depositor**: CWMBS, Inc.

   (e)    **Trustee**: The Bank of New York

   (f)    **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**    **Untrue or Misleading Statements About General Underwriting Standards**

   (a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus at 27.)

   (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-111.)

   (c)    "The National City mortgage loans have been originated or purchased by National City and were generally underwritten in accordance with the standards described herein." (Prospectus Supplement at S-114.)

   (d)    "The National City underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations." (Prospectus Supplement at S-114.)

   (e)    "Quicken's Underwriting Standards are intended to evaluate the prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgaged property as collateral." (Prospectus Supplement at S-116.)

(f)     "Quicken's Underwriting Standards generally follow prudent and generally accepted mortgage industry underwriting standards." (Prospectus Supplement at S-116.)

(g)     "The RBC Mortgage Underwriting Guidelines generally follow but are less strict than standard Fannie Mae Guidelines for documentation and LTV/CLT, Credit Score and appraisals, and are designed to evaluate the borrower's ability to repay the loan, their prior credit history, and availability of funds required for closing and cash reserves, as well as to evaluate the acceptability of the property to be mortgaged as collateral."  (Prospectus Supplement at S-117.)

(h)     "The Mortgage Loans that will be transferred to the trust fund other than those originated or acquired by Countrywide Home Loans, National City, Quicken and RBC Mortgage have been originated or acquired in accordance with the procedures set forth in the prospectus under *'Mortgage Loan Program – Underwriting Process.'*" (Prospectus Supplement at S-117.)

## Item 77     Untrue or Misleading Statements About Evaluation of Borrower Information

(a)     "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 27.)

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and

mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits."  (Prospectus Supplement at S-111.)

(c)   "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-111.)

(d)   "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-112.)

(e)   "In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, National City generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income. Such ratios vary depending on a number of underwriting criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis."  (Prospectus Supplement at S-115.)

(f)   "The RBC Mortgage Underwriting Guidelines generally follow but are less strict than standard Fannie Mae Guidelines for documentation and LTV/CLT, Credit Score and appraisals, and are designed to evaluate the borrower's ability to repay the loan, their prior credit history, and availability of funds required for closing and cash reserves, as well as to evaluate the acceptability of the property to be mortgaged as collateral."  (Prospectus Supplement at S-117.)

(g)   "The underwriter will further review the application to evaluate whether the prospective borrower has sufficient liquid assets to apply

toward the down payment, closing costs, prepaid items, and cash reserves, in accordance with applicable guidelines."  (Prospectus Supplement at S-117.)

(h)     "Before a loan can be approved, the underwriter will evaluate the intent and willingness of a borrower to repay the mortgage loan in a timely manner."  (Prospectus Supplement at S-117.)

**Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-111.)

(b)     "Exceptions to the underwriting standards are permitted where compensating factors are present."  (Prospectus Supplement at S-114 (National City's underwriting standards).)

(c)     "RBC Mortgage may consider a loan to have met its guidelines where specific criteria are not met if, after evaluation of the relevant information available, acceptable compensating factors exist." (Prospectus Supplement at S-117.)

**Item 87     Untrue or Misleading Statements About Quality Control**

(a)     "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by

Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself." (Prospectus Supplement at S-111.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the mortgaged property as collateral, an appraisal may be made of each property considered for financing. In instances where an appraisal is required, the appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 27.)

(b)     "Generally, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans, except with respect to selected borrowers that are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-112.)

(c)     "Each National City mortgaged property has been appraised by a qualified independent appraiser. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice

adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used." (Prospectus Supplement at S-115.)

(d)   "In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. The appraiser may be required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property. Quicken's Underwriting Standards require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values." (Prospectus Supplement at S-116.)

(e)   "In order to determine the marketability of a property, a property valuation must be obtained from an approved appraiser or approved valuation vendor. Generally, for loans of $1,000,000 or more, two appraisals may be required from two different certified appraisers. The loan-to-value ('*LTV*') is then based upon the lower of the two appraisals. Eligible properties include 1-4 family, attached and detached condominiums and planned unit developments for use as the prospective borrower's primary residence and second home." (Prospectus Supplement at S-117 (RBC Mortgage's underwriting standards).)

**Item 163      Untrue or Misleading Statements About LTVs**

(a)     (For data charts regarding Loan Group 8, see Prospectus Supplement at S-82.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

      (i)     "The weighted average original Loan-to-Value Ratio of the mortgage loans in Loan Group 8 was approximately 66.3%."  (Prospectus Supplement at S-82 n.1.)

(c)     "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 96.86%."  (Prospectus Supplement at S-19.)

(d)     "Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%."  (Prospectus Supplement at S-111.)

(e)     "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-112.)

(f)     "With respect to purchase money or rate/term refinance loans secured by single-family and two-family residences, loan- to-value ratios at origination of up to 95% for mortgage loans with original principal balances of up to $400,000 and up to 85% for mortgage loans secured by three-to-four family, primary residences with original principal balances of up to $300,000 are generally allowed. Mortgage loans

with principal balances exceeding $1,000,000 ('super jumbos') are allowed if the loan is secured by the borrower's primary residence. The loan-to- value ratio for super jumbos generally may not exceed 70% when subordinate financing exists. If the loan is not subject to subordinate financing, the LTV generally may not exceed 80%." (Prospectus Supplement at S-114 (National City's underwriting standards).)

(g)     "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% is covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac." (Prospectus Supplement at S-19.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts regarding Loan Group 8, see Prospectus Supplement at S-83.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

        (i)     81 (or 77.88%) of the 104 Mortgage Loans in Loan Group 8 were to be owner occupied.  Those 81 loans represented 84.87% of the Stated Principal Balance of the Mortgage Loans in Loan Group 8 as of the cut-off date. (Prospectus Supplement at S-83.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "It is a condition to the issuance of the certificates of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (Prospectus at 110.)

(b)     "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('**S&P**') and Aaa by Moody's Investors Service, Inc. ('**Moody's**')."  (Prospectus Supplement at S-169.)

**Item 181**  **Untrue or Misleading Statements About Rating Agencies'
Evaluation of the Certificates**

(a)  "Ratings on mortgage pass-through certificates address the likelihood
of receipt by certificateholders of all distributions on the underlying
mortgage loans. These ratings address the structural, legal and issuer-
related aspects associated with the certificates, the nature of the
underlying mortgage loans and the credit quality of the credit
enhancer or guarantor, if any."  (Prospectus at 110.)

(b)  "The ratings assigned by Moody's to mortgage pass-through
certificates address the likelihood of the receipt of all distributions on
the Mortgage Loans by the related certificateholders under the
agreements pursuant to which the certificates are issued. Moody's
ratings take into consideration the credit quality of the related
mortgage pool, including any credit support providers, structural and
legal aspects associated with the certificates, and the extent to which
the payment stream on the mortgage pool is adequate to make the
payments required by the certificates."  (Prospectus Supplement at S-
169.)

(c)  "The ratings assigned by S&P to mortgage pass-through certificates
address the likelihood of the receipt of all distributions on the
Mortgage Loans by the related certificateholders under the agreements
pursuant to which the certificates are issued. S&P's ratings take into
consideration the credit quality of the related mortgage pool, including
any credit support providers, structural and legal aspects associated
with the certificates, and the extent to which the payment stream on
the mortgage pool is adequate to make the payments required by the
certificates."  (Prospectus Supplement at S-169.)

**Item 195**  **Untrue or Misleading Statements About Effective Securitization**

(a)  "The depositor will cause the mortgage loans comprising each
mortgage pool to be assigned to the trustee named in the related
prospectus supplement for the benefit of the certificateholders of the
related series."  (Prospectus at 17.)

(b)     "Assignment of the Mortgage Loans. At the time of issuance of the certificates of a series, the depositor will cause the mortgage loans comprising the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the certificates to the depositor in exchange for the mortgage loans."  (Prospectus at 53.)

(c)     "In addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan
   • the mortgage note endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost,
   • the mortgage, deed of trust or similar instrument with evidence of recording indicated on it (except for any mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the recording office or some other arrangement will be provided for),
   • an assignment of the mortgage to the trustee in recordable form and
   • any other security documents specified in the related prospectus supplement or the related pooling and servicing agreement."
(Prospectus at 53.)

(d)     "The applicable prospectus supplement may provide other arrangements for assuring the priority of the assignments, but if it does not, then the depositor will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which in the opinion of counsel recording is not required to protect the trustee's interest in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans."
(Prospectus at 53.)

(e)     "The depositor . . . will cause the mortgage loans delivered to the trustee on the closing date to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-16.)

(f)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2004-HYB5, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date."  (Prospectus Supplement at S-109.)

(g)     "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller or a transferor, as the case may be." (Prospectus Supplement at S-109.)

# SCHEDULE 3

## SCHEDULE 3 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)   **Dealer**: Countrywide Securities Corporation

(b)   **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2005-HYB5 issued Mortgage Pass-Through Certificates, Series 2005-HYB5, which was a securitization in July 2005 of 1,716 loans divided into 4 loan groups.

(c)   **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Super Senior Certificates (Super Senior/Variable Pass-Through Rate) in this securitization, in tranches 1-A-1 and 2-A-1, for which the Bank paid $203,061,255.00 in principal plus accrued interest of $785,010.41 and $203,966,760.00 in principal plus accrued interest of $822,440.38, respectively. The Bank received the certificates on July 29, 2005. Tranche 1-A-1 contains loans in Loan Group 1, and tranche 2-A-1 contains loans in Loan Group 2.

(d)   **CUSIP**: 12669gx97 (tranche 1-A-1) and 12669gy47 (tranche 2-A-1)

(e)   **Ratings of the certificate(s) at the time of the Bank's purchase**:
      (i)    Moody's: Aaa for both tranches 1-A-1 (12669gx97) and 2-A-1 (12669gy47)
      (ii)   S&P: AAA for both tranches 1-A-1 (12669gx97) and 2-A-1 (12669gy47)

(f)   **Ratings of the certificate(s) as of November 30, 2010**:
      (i)    Moody's: Caa3 and Caa2, respectively, for tranches 1-A-1 (12669gx97) and 2-A-1 (12669gy47)
      (ii)   S&P: CCC and B, respectively, for tranches 1-A-1 (12669gx97) and 2-A-1 (12669gy47)

(g)   **SEC's URL of prospectus and prospectus supplement for this securitization**:
      http://sec.gov/Archives/edgar/data/906410/000089109205001441/e22216_424b5.txt

**Item 21**      **Details About the Parties**

(a)   **Dealer**: Countrywide Securities Corporation

(b)   **Originator(s)**:
      (i)   Countrywide Home Loans, Inc.
      (ii)  HSBC Mortgage Corporation (USA)

(c)   **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)   **Depositor**: CWMBS, Inc.

(e)   **Trustee**: The Bank of New York

(f)   **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**      **Untrue or Misleading Statements About General Underwriting Standards**

(a)   "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus at 27.)

(b)   "Approximately 89.57%, 95.16%, 94.12% and 51.22% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, in each case by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-62.)

(c)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-63.)

(d)    "HSBC utilizes automated underwriting systems that take into account the relevant variables that predict the likelihood of default. These systems evaluate each prospective borrower's credit profile, their monthly income available to meet monthly obligations on the proposed mortgage loan, monthly housing expenses and other financial obligations, their liquid financial assets and other characteristics of the property, including the loan-to-value ratio." (Prospectus Supplement at S-66.)

(e)    "In respect of mortgage loans purchased by HSBC in the secondary market, each entity from which HSBC purchased the mortgage loans has represented and warranted that each of the mortgage loans sold by such entity was underwritten in accordance with standards utilized by HSBC or the applicable originator in originating mortgage loans generally comparable to such mortgage loans during the period of origination." (Prospectus Supplement at S-67.)

(f)    "The Mortgage Loans that will be transferred to the trust fund other than those originated or acquired by Countrywide Home Loans and HSBC Mortgage Corporation (USA) have been originated or acquired in accordance with the procedures set forth in the prospectus under 'Mortgage Loan Program – Underwriting Process.'" (Prospectus Supplement at S-67.)

**Item 77**    **Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)." (Prospectus at 27.)

(b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and

adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." (Prospectus Supplement at S-63.)

(c)     "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-63.)

(d)     "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-64.)

## Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." (Prospectus Supplement at S-63.)

(b)     "HSBC's methodology includes analyzing all relevant risk factors inherent in the loan file. From time to time, exceptions to underwriting policies may be made on a loan by loan basis, at the discretion of HSBC's underwriter and with management approval. Exceptions are made only after careful consideration of certain mitigating factors such as the borrower's liquidity, capacity and repayment history, employment and collateral stability as well as local market economic conditions." (Prospectus Supplement at S-67.)

**Item 87**        **Untrue or Misleading Statements About Quality Control**

(a)     "Periodically the data used by Countrywide Home Loans to complete
        the underwriting analysis may be obtained by a third party,
        particularly for mortgage loans originated through a loan
        correspondent or mortgage broker. In those instances, the initial
        determination as to whether a mortgage loan complies with
        Countrywide Home Loans' underwriting guidelines may be made by
        an independent company hired to perform underwriting services on
        behalf of Countrywide Home Loans, the loan correspondent or
        mortgage broker. In addition, Countrywide Home Loans may acquire
        mortgage loans from approved correspondent lenders under a program
        pursuant to which Countrywide Home Loans delegates to the
        correspondent the obligation to underwrite the mortgage loans to
        Countrywide Home Loans' standards. Under these circumstances, the
        underwriting of a mortgage loan may not have been reviewed by
        Countrywide Home Loans before acquisition of the mortgage loan
        and the correspondent represents that Countrywide Home Loans'
        underwriting standards have been met. After purchasing mortgage
        loans under those circumstances, Countrywide Home Loans conducts
        a quality control review of a sample of the mortgage loans. The
        number of loans reviewed in the quality control process varies based
        on a variety of factors, including Countrywide Home Loans' prior
        experience with the correspondent lender and the results of the quality
        control review process itself."  (Prospectus Supplement at S-63.)

**Item 142**       **Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the mortgaged property as collateral,
        an appraisal may be made of each property considered for financing.
        In instances where an appraisal is required, the appraiser is required to
        inspect the property and verify that it is in good repair and that
        construction, if new, has been completed. The appraisal is based on
        the market value of comparable homes, the estimated rental income (if
        considered applicable by the appraiser) and the cost of replacing the
        home."  (Prospectus at 27.)

(b)     "Generally, Countrywide Home Loans obtains appraisals from
        independent appraisers or appraisal services for properties that are to
        secure mortgage loans, except with respect to selected borrowers that

are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-64.)

**Item 163    Untrue or Misleading Statements About LTVs**

(a)    (For data charts regarding Loan Group 1, see Prospectus Supplement at S-21.  For data charts regarding Loan Group 2, see Prospectus Supplement at S-31.)

(b)    In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

   (i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 1 was approximately 75.64%." (Prospectus Supplement at S-21 n.1.)

   (ii)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 2 was approximately 74.45%." (Prospectus Supplement at S-31 n.1.)

(c)    "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 95.00%." (Prospectus Supplement at S-16.)

(d)    "Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%." (Prospectus Supplement at S-63.)

(e)     "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-64.)

(f)     "The underwriting standards of HSBC generally allow a loan-to-value ratio at origination of (i) up to 95% for mortgage loans with original principal balances of up to $400,000, (ii) up to 90% for mortgage loans with original principal balances of up to $500,000, (iii) up to 80% for mortgage loans with original principal balances of up to $1,000,000, and (iv) up to 70% for mortgage loans with original principal balances of up to $1,500,000."  (Prospectus Supplement at S-66.)

(g)     "The underwriting standards of HSBC Alt A products generally allow a loan-to-value ratio at origination of  (i) up to 95% for mortgage loans with original principal balances of up to $500,000, (ii) up to 90% for mortgage loans with original principal balances of up to $650,000, (iii) up to 80% for mortgage loans with original principal balances of up to $1,000,000, (iv) up to 75% for mortgage loans with original principal balances of up to $1,500,000, and (v) up to 70% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-66.)

(h)     "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% is covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-16.)

**Item 177      Untrue or Misleading Statements About Use of the Properties**

(a)      (For data charts regarding Loan Group 1, see Prospectus Supplement at S-22.  For data charts regarding Loan Group 2, see Prospectus Supplement at S-33.)

(b)      In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

   (i)      400 (or 81.97%) of the 488 Mortgage Loans in Loan Group 1 were for primary residences.  Those 400 loans represented 84.77% of the Stated Principal Balance of the Mortgage Loans in Loan Group 1 as of the cut-off date. (Prospectus Supplement at S-22.)

   (ii)     427 (or 86.79%) of the 492 Mortgage Loans in Loan Group 2 were for primary residences.  Those 427 loans represented 87.18% of the Stated Principal Balance of the Mortgage Loans in Loan Group 2 as of the cut-off date. (Prospectus Supplement at S-33.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

(a)      "It is a condition to the issuance of the certificates of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (Prospectus at 108-109.)

(b)      "It is a condition to the issuance of the senior certificates (other than the Class 1-A-2, Class 2-A-2 and Class 4-A-2 Certificates) that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Aaa by Moody's Investors Service, Inc. ('Moody's')."  (Prospectus Supplement at S-104.)

**Item 181     Untrue or Misleading Statements About Rating Agencies'
Evaluation of the Certificates**

   (a)    "Ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with the certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any."  (Prospectus at 109.)

   (b)    "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-105.)

   (c)    "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-105.)

**Item 195     Untrue or Misleading Statements About Effective Securitization**

   (a)    "The depositor will cause the mortgage loans comprising each mortgage pool to be assigned to the trustee named in the related prospectus supplement for the benefit of the certificateholders of the related series."  (Prospectus at 17.)

(b)      "Assignment of the Mortgage Loans. At the time of issuance of the certificates of a series, the depositor will cause the mortgage loans comprising the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the certificates to the depositor in exchange for the mortgage loans."  (Prospectus at 53.)

(c)      "In addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan
          • the mortgage note endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost,
          • the mortgage, deed of trust or similar instrument with evidence of recording indicated on it (except for any mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the recording office or some other arrangement will be provided for),
          • an assignment of the mortgage to the trustee in recordable form and
          • any other security documents specified in the related prospectus supplement or the related pooling and servicing agreement."
(Prospectus at 53.)

(d)      "The applicable prospectus supplement may provide other arrangements for assuring the priority of the assignments, but if it does not, then the depositor will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which in the opinion of counsel recording is not required to protect the trustee's interest in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans."
(Prospectus at 53.)

(e)   "The depositor . . . will cause the mortgage loans delivered to the trustee on the closing date to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-13.)

(f)   "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2005-HYB5, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date."  (Prospectus Supplement at S-61.)

(g)   "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller or a transferor, as the case may be." (Prospectus Supplement at S-61.)

EXHIBIT A
Page 193

# SCHEDULE 4

## SCHEDULE 4 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)   **Dealer**: Countrywide Securities Corporation

(b)   **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2005-HYB6 issued Mortgage Pass-Through Certificates, Series 2005-HYB6, which was a securitization in August 2005 of 2,800 loans divided into 5 loan groups.

(c)   **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Super Senior Certificates (Super Senior/Variable Pass-Through Rate) in this securitization, in tranches 1-A-1 and 2-A-1.  The Bank paid $55,171,875.00 in principal plus accrued interest of $224,592.48 for certificates in tranche 1-A-1, and it received the certificates on August 30, 2005.  The Bank purchased certificates in tranche 2-A-1 in two separate transactions, first paying $256,035,511.28 in principal plus accrued interest of $1,093,942.99 and receiving the certificates on August 30, 2005, and next paying $99,449,522.24 in principal plus accrued interest of $427,116.60 and receiving the certificates on December 30, 2005.  Tranche 1-A-1 contains loans in Loan Group 1, and tranche 2-A-1 contains loans in Loan Group 2.

(d)   **CUSIP**: 126694be7 (tranche 1-A-1) and 126694bh0 (tranche 2-A-1)

(e)   **Ratings of the certificate(s) at the time of the Bank's purchase**:
   (i)    Moody's: Aaa for both tranches 1-A-1 (126694be7) and 2-A-1 (126694bh0)
   (ii)   S&P: AAA for both tranches 1-A-1 (126694be7) and 2-A-1 (126694bh0)

(f)   **Ratings of the certificate(s) as of November 30, 2010**:
   (i)    Moody's: Ca and Caa3, respectively, for tranches 1-A-1 (126694be7) and 2-A-1 (126694bh0)
   (ii)   S&P: CCC for both tranches 1-A-1 (126694be7) and 2-A-1 (126694bh0)

    (g)    **SEC's URL of prospectus and prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/906410/000089109205001708/e22383_424b5.txt

## Item 21   Details About the Parties

    (a)    **Dealer**: Countrywide Securities Corporation

    (b)    **Originator(s)**:
        (i)    Countrywide Home Loans, Inc.
        (ii)    GreenPoint Mortgage Funding, Inc.
        (iii)    Aegis Mortgage Corporation
        (iv)    E-LOAN, Inc.

    (c)    **Sponsor/Seller**: Countrywide Home Loans, Inc.

    (d)    **Depositor**: CWMBS, Inc.

    (e)    **Trustee**: The Bank of New York

    (f)    **Master Servicer**: Countrywide Home Loans Servicing LP

## Item 75   Untrue or Misleading Statements About General Underwriting Standards

    (a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus at 27.)

    (b)    "Approximately 7.99%, 62.43%, 48.50%, 82.37% and 53.97% of the Mortgage Loans in loan groups 1, 2, 3, 4 and 5, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-71.)

(c)     "Countrywide Home Loans' underwriting standards are applied by or
on behalf of Countrywide Home Loans to evaluate the prospective
borrower's credit standing and repayment ability and the value and
adequacy of the mortgaged property as collateral."  (Prospectus
Supplement at S-72.)

(d)     "Approximately 67.02%, 2.30%, 5.40%, 2.90% and 1.00% of the
Mortgage Loans in loan groups 1, 2, 3, 4 and 5, respectively, in each
case by aggregate Stated Principal Balance of the Mortgage Loans in
that loan group as of the cut-off date, were originated or acquired in
the ordinary course of business by GreenPoint Mortgage Funding, Inc.
('GreenPoint') generally in accordance with the underwriting
guidelines described in this prospectus supplement (the 'GreenPoint
Underwriting Guidelines')."  (Prospectus Supplement at S-74—S-75.)

(e)     "The GreenPoint Underwriting Guidelines are generally not as strict
as Fannie Mae or Freddie Mac guidelines. Generally, the GreenPoint
Underwriting Guidelines are applied to evaluate the prospective
borrower's credit standing and repayment ability and the value and
adequacy of the mortgaged property as collateral."  (Prospectus
Supplement at S-75.)

(f)     "Approximately 4.12%, 5.35%, 33.93% and 4.52% and of the
Mortgage Loans in loan groups 1, 2, 3 and 5, respectively, by
aggregate Stated Principal Balance of the Mortgage Loans in that loan
group as of the cut-off date, were originated in the ordinary course of
business by Aegis Mortgage Corporation ('Aegis') generally in
accordance with the underwriting guidelines described in this
prospectus supplement.'"  (Prospectus Supplement at S-75.)

(g)     "Approximately 0.64%, 5.14%, 1.95%, 2.48% and 30.08% of the
Mortgage Loans in loan groups 1, 2, 3, 4 and 5, respectively, in each
case by aggregate Stated Principal Balance of the Mortgage Loans in
that loan group as of the cut-off date, were originated or acquired in
the ordinary course of business by E-LOAN, Inc. ('E-LOAN')
generally in accordance with the underwriting guidelines described in
this prospectus supplement (the 'E-LOAN Underwriting
Guidelines')."  (Prospectus Supplement at S-78.)

(h)     "E-LOAN's Underwriting Standards for underwriting conventional conforming mortgage loans generally comply with the underwriting criteria employed by Fannie Mae and/or Freddie Mac. E-LOAN's Underwriting Standards and property standards for all other non-conforming mortgage loans are based on either general or investor specific guidelines that are established to satisfy the criteria of the ultimate purchasers of the mortgage loans."  (Prospectus Supplement at S-78.)

(i)     "The Mortgage Loans that will be transferred to the trust fund other than those originated or acquired by Countrywide Home Loans, GreenPoint Mortgage Funding, Inc., Aegis Mortgage Corporation and E-LOAN, Inc. have been originated or acquired in accordance with the procedures set forth in the prospectus under 'Mortgage Loan Program - Underwriting Process.'"  (Prospectus Supplement at S-80.)

## Item 77      Untrue or Misleading Statements About Evaluation of Borrower Information

(a)     "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 27.)

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-

income' ratios) are within acceptable limits."  (Prospectus Supplement at S-72.)

(c)     "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-72.)

(d)     "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-73.)

(e)     "In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers, when required by the applicable documentation program, the ratio of those amounts to the proposed borrower's monthly gross income. These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios and are determined on a loan-by-loan basis." (Prospectus Supplement at S-75.)

(f)     "Aegis's underwriting of the related mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:
   •     the creditworthiness of a borrower based on both a credit score and credit history which includes the mortgage history,
   •     the income sufficiency of a borrower's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and
   •     the adequacy of the mortgaged property expressed in terms of loan-to-value ratio, to serve as the collateral for a mortgage loan." (Prospectus Supplement at S-76.)

(g)     "E-LOAN considers the following general underwriting criteria in determining whether to approve a mortgage loan application:
- o   Employment and income,
- o   Credit history,
- o   Property value and characteristics and
- o   Available assets."

(Prospectus Supplement at S-78.)

## Item 81   Untrue or Misleading Statements About Exceptions to Underwriting Standards

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-72.)

(b)     "Exceptions to the GreenPoint Underwriting Guidelines are permitted where compensating factors are present."  (Prospectus Supplement at S-75.)

(c)     "Aegis's underwriting standards, as well as any other underwriting standards that may be applicable to any first lien mortgage loans, generally include a set of specific criteria pursuant to which the underwriting evaluation is made. However, the application of those underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan substantially complies with the underwriting standards. For example, a mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards."  (Prospectus Supplement at S-76.)

## Item 87   Untrue or Misleading Statements About Quality Control

(a)     "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan

correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself." (Prospectus Supplement at S-72.)

**Item 142    Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the mortgaged property as collateral, an appraisal may be made of each property considered for financing. In instances where an appraisal is required, the appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 27.)

(b)     "Except with respect to the Mortgage Loans originated pursuant to its Streamlined Documentation Program and 0.02%, 0.06% and 0.48% of the Mortgage Loans in loan groups 2, 4 and 5, respectively, in each case by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure

Mortgage Loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect."  (Prospectus Supplement at S-73.)

(c)     "In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser is required to verify that the property is in good condition and that construction, if new, has been completed. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements. Additionally, a risk analysis may be ordered on an appraisal from a third party vendor and all high risk appraisals are reviewed by staff appraisers." (Prospectus Supplement at S-77 (Aegis underwriting standards).)

(d)     "E-LOAN requires an appraisal on all first lien purchase and refinance mortgage loans originated. The level of appraisal inspection required (full, limited or drive by) is determined by the product type/investor guideline.  E-LOAN orders its appraisals from nationally recognized appraisal vendors. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practices adopted by the Appraisal Standards Boards of the Appraisal Foundation and are prepared on forms acceptable to Fannie Mae and Freddie Mac. Every appraisal is reviewed for property information specific to neighborhood information, description of improvements, review of at least three comparable sales as well as specific appraiser comments." (Prospectus Supplement at S-79.)

**Item 163     Untrue or Misleading Statements About LTVs**

(a)     (For data charts regarding Loan Group 1, see Prospectus Supplement at S-22.  For data charts regarding Loan Group 2, see Prospectus Supplement at S-33.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

    (i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 1 was approximately 78.40%."  (Prospectus Supplement at S-22 n.1.)

    (ii)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 2 was approximately 76.29%."  (Prospectus Supplement at S-33 n.1.)

(c)     "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100.00%."  (Prospectus Supplement at S-17.)

(d)     "Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%."  (Prospectus Supplement at S-72.)

(e)     "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-73.)

(f)     "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% is covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-17.)

**Item 177      Untrue or Misleading Statements About Use of the Properties**

(a)      (For data charts regarding Loan Group 1, see Prospectus Supplement at S-24.  For data charts regarding Loan Group 2, see Prospectus Supplement at S-35.)

(b)      In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

      (i)      309 (or 92.79%) of the 333 Mortgage Loans in Loan Group 1 were for primary residences.  Those 309 loans represented 93.46% of the Stated Principal Balance of the Mortgage Loans in Loan Group 1 as of the cut-off date.  (Prospectus Supplement at S-24.)

      (ii)      1,376 (or 87.14%) of the 1,579 Mortgage Loans in Loan Group 2 were for primary residences.  Those 1,376 loans represented 88.75% of the Stated Principal Balance of the Mortgage Loans in Loan Group 2 as of the cut-off date.  (Prospectus Supplement at S-35.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

(a)      "It is a condition to the issuance of the certificates of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (Prospectus at 108-109.)

(b)      "It is a condition to the issuance of the senior certificates (other than the Class 1-A-2, Class 2-A-2, Class 4-A-1C and Class 5-A-2 Certificates) that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Aaa by Moody's Investors Service, Inc. ('Moody's')."  (Prospectus Supplement at S-118.)

**Item 181    Untrue or Misleading Statements About Rating Agencies'
Evaluation of the Certificates**

(a)     "Ratings on mortgage pass-through certificates address the likelihood
of receipt by certificateholders of all distributions on the underlying
mortgage loans. These ratings address the structural, legal and issuer-
related aspects associated with the certificates, the nature of the
underlying mortgage loans and the credit quality of the credit
enhancer or guarantor, if any."  (Prospectus at 109.)

(b)     "The ratings assigned by Moody's to mortgage pass-through
certificates address the likelihood of the receipt of all distributions on
the Mortgage Loans by the related certificateholders under the
agreements pursuant to which the certificates are issued. Moody's
ratings take into consideration the credit quality of the related
mortgage pool, including any credit support providers, structural and
legal aspects associated with the certificates, and the extent to which
the payment stream on the mortgage pool is adequate to make the
payments required by the certificates."  (Prospectus Supplement at S-
119.)

(c)     "The ratings assigned by S&P to mortgage pass-through certificates
address the likelihood of the receipt of all distributions on the
Mortgage Loans by the related certificateholders under the agreements
pursuant to which the certificates are issued. S&P's ratings take into
consideration the credit quality of the related mortgage pool, including
any credit support providers, structural and legal aspects associated
with the certificates, and the extent to which the payment stream on
the mortgage pool is adequate to make the payments required by the
certificates."  (Prospectus Supplement at S-119.)

**Item 195    Untrue or Misleading Statements About Effective Securitization**

(a)     "The depositor will cause the mortgage loans comprising each
mortgage pool to be assigned to the trustee named in the related
prospectus supplement for the benefit of the certificateholders of the
related series."  (Prospectus at 17.)

(b)     "Assignment of the Mortgage Loans. At the time of issuance of the certificates of a series, the depositor will cause the mortgage loans comprising the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the certificates to the depositor in exchange for the mortgage loans."  (Prospectus at 53.)

(c)     "In addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan
            • the mortgage note endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost,
            • the mortgage, deed of trust or similar instrument with evidence of recording indicated on it (except for any mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the recording office or some other arrangement will be provided for),
            • an assignment of the mortgage to the trustee in recordable form and
            • any other security documents specified in the related prospectus supplement or the related pooling and servicing agreement."
(Prospectus at 53.)

(d)     "The applicable prospectus supplement may provide other arrangements for assuring the priority of the assignments, but if it does not, then the depositor will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which in the opinion of counsel recording is not required to protect the trustee's interest in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans."
(Prospectus at 53.)

(e)   "The depositor . . . will cause the mortgage loans delivered to the trustee on the closing date to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-13 — S-14.)

(f)   "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2005-HYB6, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date."  (Prospectus Supplement at S-70.)

(g)   "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller or a transferor, as the case may be." (Prospectus Supplement at S-70.)

# SCHEDULE 5

## SCHEDULE 5 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

  (a)      **Dealer**: Countrywide Securities Corporation

  (b)      **Issuing entity and securitization**: Alternative Loan Trust 2005-58 issued Mortgage Pass-Through Certificates, Series 2005-58, which was a securitization in October 2005 of 1,235 loans.

  (c)      **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Senior/Super Senior/Floating) in this securitization, in tranche A-1, for which the Bank paid $350,000,000.00 in principal plus accrued interest of $0.00. The Bank received the certificates on October 28, 2005.

  (d)      **CUSIP**: 12668awh4

  (e)      **Ratings of the certificate(s) at the time of the Bank's purchase**:
  (i)      Moody's: Aaa
  (ii)     S&P: AAA

  (f)      **Ratings of the certificate(s) as of November 30, 2010**:
  (i)      Moody's: Caa3
  (ii)     S&P: CCC

  (g)      **SEC's URL of prospectus and prospectus supplement for this securitization**:
          http://sec.gov/Archives/edgar/data/1269518/000089109205002107/e22685_424b5.txt

**Item 21**      **Details About the Parties**

  (a)      **Dealer**: Countrywide Securities Corporation

  (b)      **Originator(s)**: Countrywide Home Loans, Inc.

  (c)      **Sponsor/Seller**: Countrywide Home Loans, Inc.

  (d)      **Depositor**: CWALT, Inc.

(e)    **Trustee**: The Bank of New York

(f)    **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**    **Untrue or Misleading Statements About General Underwriting Standards**

(a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus at 23.)

(b)    "All of the Mortgage Loans will have been originated or acquired by Countrywide Home Loans, Inc. ('*Countrywide Home Loans*') in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-36.)

(c)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-36.)

**Item 77**    **Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 23.)

(b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." (Prospectus Supplement at S-36.)

(c)    "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower.  In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-37.)

(d)    "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%."  (Prospectus Supplement at S-38.)

(e)    "Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively."  (Prospectus Supplement at S-40.)

**Item 81        Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-37.)

**Item 87        Untrue or Misleading Statements About Quality Control**

(a)    "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker.  In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker.  In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards.  Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans.  The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-36.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)    "In determining the adequacy of the mortgaged property as collateral, an appraisal may be made of each property considered for financing. In instances where an appraisal is required, the appraiser is required to inspect the property and verify that it is in good repair and that

construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."  (Prospectus at 23.)

(b)     "Except with respect to the Statistical Mortgage Loans originated pursuant to its Streamlined Documentation Program whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect."  (Prospectus Supplement at S-37.)

**Item 163     Untrue or Misleading Statements About LTVs**

(a)     (For data charts, see Prospectus Supplement at S-26.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

        (i)     "As of the Statistical Calculation Date, the weighted average original Loan-to-Value Ratio of the Statistical Mortgage Loans was approximately 75.27%." (Prospectus Supplement at S-26 n.1.)

(c)     "No Mortgage Loan will have a Loan-to-Value Ratio at origination of more than 95.00%."  (Prospectus Supplement at S-21.)

(d)     "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-

Value Ratio may not exceed 100%." (Prospectus Supplement at S-37.)

(e)    "Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000." (Prospectus Supplement at S-38.)

(f)    "Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000." (Prospectus Supplement at S-39.)

(g)    "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac." (Prospectus Supplement at S-21.)

**Item 177    Untrue or Misleading Statements About Use of the Properties**

(a)    (For data charts, see Prospectus Supplement at S-28.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

   (i)     1,125 (or 91.09%) of the 1,235 Statistical Mortgage Loans were for primary residences.  Those 1,125 loans represented 90.23% of the aggregate Stated Principal Balance of the Statistical Mortgage Loans as of the Statistical Calculation Date.  (Prospectus Supplement at S-28.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "It is a condition to the issuance of the certificates of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (Prospectus at 94.)

(b)     "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Aaa by Moody's Investors Service, Inc. ('MOODY'S')."  (Prospectus Supplement at S-80.)

**Item 181     Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "Ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with the certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any."  (Prospectus at 94.)

(b)     "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which

the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-80.)

(c)  "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-80.)

## Item 195   Untrue or Misleading Statements About Effective Securitization

(a)  "The depositor will cause the mortgage loans comprising each mortgage pool to be assigned to the trustee named in the related prospectus supplement for the benefit of the certificateholders of the related series." (Prospectus at 14.)

(b)  "Assignment of the Mortgage Loans. At the time of issuance of the certificates of a series, the depositor will cause the mortgage loans comprising the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the certificates to the depositor in exchange for the mortgage loans." (Prospectus at 44.)

(c)  "In addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan
          • the mortgage note endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost,
          • the mortgage, deed of trust or similar instrument with evidence of recording indicated on it (except for any mortgage

not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the recording office or some other arrangement will be provided for),
• an assignment of the mortgage to the trustee in recordable form and
• any other security documents specified in the related prospectus supplement or the related pooling and servicing agreement."

(Prospectus at 44.)

(d)     "The applicable prospectus supplement may provide other arrangements for assuring the priority of the assignments, but if it does not, then the depositor will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which in the opinion of counsel recording is not required to protect the trustee's interest in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans."
(Prospectus at 44.)

(e)     "The depositor . . . will cause the mortgage loans to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-19.)

(f)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Closing Date Mortgage Loan and all right, title and interest in and to all other assets included in Alternative Loan Trust 2005-58, including all principal and interest received on or with respect to the Closing Date Mortgage Loans, but not any principal and interest due on or before the initial cut-off date, and amounts on deposit in the Supplemental Loan Account and the Capitalized Interest Account on the closing date."  (Prospectus Supplement at S-33.)

(g)     "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a

custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Closing Date Mortgage Loans, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date and not later than twenty days after the relevant Supplemental Transfer Date (as defined below) with respect to up to 90% of the Supplemental Mortgage Loans conveyed on such Supplemental Transfer Date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller or a transferor, as the case may be." (Prospectus Supplement at S-33.)

# SCHEDULE 6

## SCHEDULE 6 TO THE COMPLAINT

**Item 20**       **Details About the Securitization**

(a)   **Dealer**: Countrywide Securities Corporation

(b)   **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2005-HYB10 issued Mortgage Pass-Through Certificates, Series 2005-HYB10, which was a securitization in December 2005 of 2,943 loans divided into 5 loan groups.

(c)   **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Super Senior Certificates (Super Senior/Variable Pass-Through Rate) in this securitization, in tranche 3-A-1A, for which the Bank paid $150,000,000.00 in principal plus accrued interest of $204,078.75.  The Bank received the certificates on December 29, 2005.  Tranche 3-A-1A contains loans in Loan Group 3.

(d)   **CUSIP**: 126694vm7

(e)   **Ratings of the certificate(s) at the time of the Bank's purchase**:
      (i)     Moody's: Aaa
      (ii)    S&P: AAA

(f)   **Ratings of the certificate(s) as of November 30, 2010**:
      (i)     Moody's: Caa3
      (ii)    S&P: CCC

(g)   **SEC's URL of prospectus and prospectus supplement for this securitization**:
      http://sec.gov/Archives/edgar/data/906410/000112528205006810/b410845_424b5.txt

**Item 21**       **Details About the Parties**

(a)   **Dealer**: Countrywide Securities Corporation

(b)   **Originator(s)**:
      (i)     Countrywide Home Loans, Inc.

      (ii)    National City Mortgage Co.
      (iii)   Ohio Savings Bank

(c)    **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)    **Depositor**: CWMBS, Inc.

(e)    **Trustee**: The Bank of New York

(f)    **Master Servicer**: Countrywide Home Loans Servicing LP

## Item 75    Untrue or Misleading Statements About General Underwriting Standards

(a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus at 27.)

(b)    "Approximately 9.28%, 86.08%, 64.40%, 88.27% and 74.83% of the Mortgage Loans in loan groups 1, 2, 3, 4 and 5, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-77.)

(c)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-78.)

(d)    "Approximately 28.65%, 3.37%, 15.63% and 2.79% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated in the ordinary course of business by National City Mortgage Co. ('NATIONAL CITY') generally in accordance with the underwriting guidelines described in this

prospectus supplement (referred to in this Prospectus Supplement as 'NATIONAL CITY'S UNDERWRITING GUIDELINES')." (Prospectus Supplement at S-81.)

(e)     "The National City underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations."  (Prospectus Supplement at S-81.)

(f)     "Approximately 30.12%, 5.17% and 5.64% of the Mortgage Loans in loan groups 1, 3 and 4, respectively, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated in the ordinary course of business by Ohio Savings Bank ('OSB') generally in accordance with the underwriting guidelines described below."  (Prospectus Supplement at S-82.)

(g)     "The OSB underwriting guidelines and product guidelines for loans sold to Countrywide generally follow standard Fannie Mae Guidelines, and are designed to evaluate the borrower's ability to repay the loan, their prior credit history, and availability of funds required for closing and cash reserves, as well as to evaluate the acceptability of the property to be mortgaged as collateral." (Prospectus Supplement at S-83.)

(h)     "The Mortgage Loans that will be transferred to the trust fund other than those originated or acquired by Countrywide Home Loans, National City and OSB have been originated or acquired in accordance with the procedures set forth in the prospectus under 'Mortgage Loan Program – Underwriting Process.'"  (Prospectus Supplement at S-84.)

**Item 77     Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)     "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly

obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 27.)

(b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'DEBT-TO-INCOME' ratios) are within acceptable limits."  (Prospectus Supplement at S-78.)

(c)    "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-78.)

(d)    "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-79.)

(e)    "In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, National City generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income. Such ratios vary depending on a number of underwriting

criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis."  (Prospectus Supplement at S-82.)

(f)    "OSB makes extensive use of the Fannie Mae automated underwriting product, Desktop Underwriter ('DU'), to evaluate a borrower's loan request. OSB may rely exclusively on the recommendation of the DU findings report in making credit decisions and just follow the recommendations of the DU evaluation. However, depending on the type of loan requested, the borrower's circumstances and the anticipated investor for a loan, OSB may apply its underwriting guidelines in conjunction with, and as a modification to, the DU recommendation or, in some circumstances, may require a traditional underwriting without the use of DU."  (Prospectus Supplement at S-83.)

(g)    "The underwriter will evaluate the intent and willingness of a borrower to repay the mortgage loan in a timely manner. In general, intent is evaluated based on past credit performance and the prospective borrower's equity."  (Prospectus Supplement at S-83.)

## Item 81    Untrue or Misleading Statements About Exceptions to Underwriting Standards

(a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-78.)

(b)    "Exceptions to the underwriting standards are permitted where compensating factors are present."  (Prospectus Supplement at S-81 (National City's underwriting standards).)

(c)    "OSB may consider a loan to have met its guidelines where specific criteria are not met if, after evaluation of all of the information available, acceptable compensating factors exist."  (Prospectus Supplement at S-83.)

(d)    "The use of OSB's underwriting and product guidelines does not imply that each specific criterion was satisfied individually. OSB will consider a mortgage loan to be originated in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan

is in substantial compliance with OSB's guidelines. Even if one or more specific criteria included in the guidelines were not satisfied, if other factors compensated for the standards that were not satisfied, the mortgage loan may be considered to be in substantial compliance with OSB's underwriting and product guidelines." (Prospectus Supplement at S-83.)

**Item 87        Untrue or Misleading Statements About Quality Control**

(a)     "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself." (Prospectus Supplement at S-78.)

**Item 142       Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the mortgaged property as collateral, an appraisal may be made of each property considered for financing. In instances where an appraisal is required, the appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on

the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."  (Prospectus at 27.)

(b)     "Except with respect to the Mortgage Loans originated pursuant to its Streamlined Documentation Program and 0.23% and 0.18% of the Mortgage Loans in loan groups 3 and 4, respectively, in each case by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure Mortgage Loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect."  (Prospectus Supplement at S-79.)

(c)     "Each National City mortgaged property has been appraised by a qualified independent appraiser. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used."  (Prospectus Supplement at S-82.)

(d)     "With respect to loans sold to Countrywide, in order to determine the marketability of a property, an independent property valuation must

be obtained from a licensed appraiser. OSB's underwriting guidelines require that the value of the mortgaged property being financed, as indicated by the independent valuation, currently supports and is anticipated to support in the future the outstanding loan balance and provides sufficient value to mitigate the effects of adverse shifts in real estate values, although there can be no assurance that such value will support the outstanding loan balance in the future. Generally, for loans of $1,000,000 or more, two appraisals may be required from two different appraisers." (Prospectus Supplement at S-83—S-84.)

**Item 163     Untrue or Misleading Statements About LTVs**

(a)     (For data charts regarding Loan Group 3, see Prospectus Supplement at S-46.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

      (i)     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 3 was approximately 75.02%." (Prospectus Supplement at S-46 n.1.)

(c)     "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100.00%." (Prospectus Supplement at S-18.)

(d)     "Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%." (Prospectus Supplement at S-78.)

(e)     "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for

mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000." (Prospectus Supplement at S-79.)

(f)     "With respect to purchase money or rate/term refinance loans secured by single-family and two-family residences, loan- to-value ratios at origination of up to 95% for mortgage loans with original principal balances of up to $400,000 and up to 85% for mortgage loans secured by three-to-four family, primary residences with original principal balances of up to $300,000 are generally allowed. Mortgage loans with principal balances exceeding $1,000,000 ('super jumbos') are allowed if the loan is secured by the borrower's primary residence. The loan-to- value ratio for super jumbos generally may not exceed 70% when subordinate financing exists. If the loan is not subject to subordinate financing, the LTV generally may not exceed 80%." (Prospectus Supplement at S-81 (National City's underwriting standards).)

(g)     "OSB may also provide secondary financing to a borrower contemporaneously with the origination of the first mortgage loan. In such instances, OSB's underwriting and product guidelines applied to the first mortgage loan request are based on the combined loan-to-value ratio." (Prospectus Supplement at S-84.)

(h)     "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% is covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac." (Prospectus Supplement at S-18.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts regarding Loan Group 3, see Prospectus Supplement at S-48.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

    (i)     1,006 (or 80.48%) of the 1,250 Mortgage Loans in Loan Group 3 were for primary residences.  Those 1,006 loans

represented 86.61% of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 3 as of the cut-off date.  (Prospectus Supplement at S-48.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

(a)      "It is a condition to the issuance of the certificates of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (Prospectus at 109.)

(b)      "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Aaa by Moody's Investors Service, Inc. ('MOODY'S')."  (Prospectus Supplement at S-124.)

**Item 181      Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)      "Ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with the certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any."  (Prospectus at 109.)

(b)      "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-124.)

(c)      "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the

Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-125.)

**Item 195      Untrue or Misleading Statements About Effective Securitization**

(a)     "The depositor will cause the mortgage loans comprising each mortgage pool to be assigned to the trustee named in the related prospectus supplement for the benefit of the certificateholders of the related series."  (Prospectus at 17.)

(b)     "Assignment of the Mortgage Loans. At the time of issuance of the certificates of a series, the depositor will cause the mortgage loans comprising the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the certificates to the depositor in exchange for the mortgage loans."  (Prospectus at 53.)

(c)     "In addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan
> • the mortgage note endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost,
> • the mortgage, deed of trust or similar instrument with evidence of recording indicated on it (except for any mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the recording office or some other arrangement will be provided for),

> • an assignment of the mortgage to the trustee in recordable form and
> • any other security documents specified in the related prospectus supplement or the related pooling and servicing agreement."

(Prospectus at 53.)

(d)　"The applicable prospectus supplement may provide other arrangements for assuring the priority of the assignments, but if it does not, then the depositor will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which in the opinion of counsel recording is not required to protect the trustee's interest in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans." (Prospectus at 53.)

(e)　"The depositor . . . will cause the mortgage loans delivered to the trustee on the closing date to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-14.)

(f)　"Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2005-HYB10, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date."  (Prospectus Supplement at S-76.)

(g)　"In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument,

an assignment in recordable form of the mortgage or a copy of such assignment and, if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller or a transferor, as the case may be." (Prospectus Supplement at S-76.)

# SCHEDULE 7

## SCHEDULE 7 TO THE COMPLAINT

**Item 20**    **Details About the Securitization**

(a)    **Dealer**: Countrywide Securities Corporation

(b)    **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2006-HYB2 issued Mortgage Pass-Through Certificates, Series 2006-HYB2, which was a securitization in February 2006 of 1,728 loans divided into 4 loan groups.

(c)    **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Super Senior/Variable Pass-Through Rate) in this securitization, in tranche 2-A-1A, for which the Bank paid $75,548,000.00 in principal plus accrued interest of $312,621.40.  The Bank received the certificates on February 28, 2006.  Tranche 2-A-1A contains loans in Loan Group 2.

(d)    **CUSIP**: 126694c97

(e)    **Ratings of the certificate(s) at the time of the Bank's purchase**:
(i)     Moody's: Aaa
(ii)    S&P: AAA

(f)    **Ratings of the certificate(s) as of November 30, 2010**:
(i)     Moody's: Caa3
(ii)    S&P: CCC

(g)    **SEC's URL of prospectus and prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/906410/000089109206000477/e23351_424b5.txt

**Item 21**    **Details About the Parties**

(a)    **Dealer**: Countrywide Securities Corporation

(b)    **Originator(s)**:
(i)     Countrywide Home Loans, Inc.

      (ii)    American Home Mortgage Corp.

      (iii)   Alliance Bancorp

      (iv)   Ohio Savings Bank

(c)    **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)    **Depositor**: CWMBS, Inc.

(e)    **Trustee**: The Bank of New York

(f)    **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**    **Untrue or Misleading Statements About General Underwriting**

(a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus at 25.)

(b)    "The Mortgage Loans that will be transferred to the issuing entity other than those originated or acquired by Countrywide Home Loans, American Home Mortgage Corp. and Alliance Bancorp have been originated or acquired in accordance with the procedures set forth in the prospectus under 'Mortgage Loan Program - Underwriting Process.'" (Prospectus Supplement at S-87.)

(c)    "Approximately 40.86%, 44.04%, 45.70% and 59.80% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-87.)

(d)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-88.)

(e)     "The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems." (Prospectus Supplement at S-91 (American Home's underwriting standards).)

(f)     "American Home's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are 'non-conforming' in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac." (Prospectus Supplement at S-92.)

(g)     "American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-92.)

**Item 77     Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)     "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and

other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 26.)

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits."  (Prospectus Supplement at S-88.)

(c)     "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-88.)

(d)     "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-89.)

(e)     "In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the

Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility." (Prospectus Supplement at S-92—S-93.)

## Item 81    Untrue or Misleading Statements About Exceptions to Underwriting Standards

(a)   "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." (Prospectus Supplement at S-88.)

(b)   "Exceptions to the underwriting standards may be permitted where compensating factors are present. . . . Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision." (Prospectus Supplement at S-92.)

(c)   "American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages 'common sense' underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." (Prospectus Supplement at S-93.)

**Item 87**      **Untrue or Misleading Statements About Quality Control**

(a)      "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-88.)

**Item 142**      **Untrue or Misleading Statements About Appraisals**

(a)      "In determining the adequacy of the mortgaged property as collateral, an appraisal may be made of each property considered for financing. Except as described in the prospectus supplement, an appraiser is generally required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."  (Prospectus at 26.)

(b)      "Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model,

Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-89.)

(c)     "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter." (Prospectus Supplement at S-93.)

(d)     "A full appraisal is required on all properties, with an additional review appraisal or second appraisal." (Prospectus Supplement at S-94 (Alliance Bancorp's underwriting guidelines).)

## Item 163     Untrue or Misleading Statements About LTVs

(a)     (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement at S-35.  For data charts regarding Loan Group 2, see Prospectus Supplement at S-58.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

(i) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 73.73%."  (Prospectus Supplement at S-35 n.1.)

(ii) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 2 was approximately 73.23%."  (Prospectus Supplement at S-58 n.1; *see also* Prospectus Supplement at S-4.)

(c) "Each seller's underwriting standards will generally permit loans with loan-to-value ratios at origination of up to 100% depending on the loan program, type and use of the property, creditworthiness of the borrower and debt-to-income ratio. If so specified in the related prospectus supplement, a seller's underwriting criteria may permit loans with loan-to-value ratios at origination in excess of 100%." (Prospectus at 26.)

(d) "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100.00%."  (Prospectus Supplement at S-28.)

(e) "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (*i.e.*, first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%."  (Prospectus Supplement at S-89.)

(f) "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-89.)

(g)   "With this underwriting criteria, [Alliance Bancorp] sets maximum loan-to-value ratios and combined loan-to-value ratios ('CLTVs'). For all of its documentation programs, except the 'super no doc' program, the maximum loan-to-value ratio is 95% and the maximum CLTV is 100% for owner occupied properties. For the 'super no doc' program, the maximum loan-to-value ratio is 80% and the maximum CLTV is 90% for owner occupied properties."  (Prospectus Supplement at S-94.)

(h)   "[Alliance Bancorp] may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%."  (Prospectus Supplement at S-95.)

(i)   "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% is covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-28—S-29.)

(j)   "[F]or all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac."  (Prospectus Supplement at S-93.)

(k)   "All loans over 80% loan-to-value ratio will have primary mortgage insurance provided by an approved provider of mortgage insurance." (Prospectus Supplement at 94 (Alliance Bancorp's underwriting standards).)

**Item 177    Untrue or Misleading Statements About Use of the Properties**

(a)   (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement at S-37.  For data charts regarding Loan Group 2, see Prospectus Supplement at S-60.)

(b)   In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

(i)     1,210 (or 70.02%) of the 1,728 Mortgage Loans in aggregate were for primary residences.  Those 1,210 loans represented 79.21% of the Stated Principal Balance of the Mortgage Loans in aggregate as of the cut-off date. (Prospectus Supplement at S-37.)

(ii)    729 (or 68.07%) of the 1,071 Mortgage Loans in Loan Group 2 were for primary residences.  Those 729 loans represented 77.74% of the Stated Principal Balance of the Mortgage Loans in Loan Group 2 as of the cut-off date. (Prospectus Supplement at S-60.)

**Item 180    Untrue or Misleading Statements About Earned Ratings**

(a)    "It is a condition to the issuance of the certificates of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (Prospectus at 103.)

(b)    "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Aaa by Moody's Investors Service, Inc. ('Moody's')."  (Prospectus Supplement at S-144.)

**Item 181    Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)    "Ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with the certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any."  (Prospectus at 103.)

(b)    "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and

legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-144.)

(c)     "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-144.)

## Item 195    Untrue or Misleading Statements About Effective Securitization

(a)     "The depositor will cause the mortgage loans comprising each mortgage pool to be assigned to the trustee named in the related prospectus supplement for the benefit of the certificateholders of the related series." (Prospectus at 17.)

(b)     "Assignment of the Mortgage Loans. At the time of issuance of the certificates of a series, the depositor will cause the mortgage loans comprising the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the certificates to the depositor in exchange for the mortgage loans." (Prospectus at 50.)

(c)     "In addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan:
          • the mortgage note endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,

&bull; the mortgage, deed of trust or similar instrument with evidence of recording indicated on it (except for any mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the recording office or some other arrangement will be provided for),

&bull; an assignment of the mortgage to the trustee in recordable form and

&bull; any other security documents specified in the related prospectus supplement or the related pooling and servicing agreement."

(Prospectus at 50-51.)

(d)     "The applicable prospectus supplement may provide other arrangements for assuring the priority of the assignments, but if it does not, then the depositor, the seller or the trustee, as specified in the related pooling and servicing agreement, will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which in the opinion of counsel recording is not required to protect the trustee's or the certificateholders' interest." (Prospectus at 51.)

(e)     "The depositor . . . and will cause the Mortgage Loans to be assigned to the trustee for the benefit of the holders of the certificates." (Prospectus Supplement at S-25.)

(f)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2006-HYB2, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date." (Prospectus Supplement at S-86.)

(g)     "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among

other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument, an assignment in recordable form of the mortgage or a copy of such assignment, the original or a copy of the title policy with respect to the related mortgaged property, and if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller." (Prospectus Supplement at S-86.)

EXHIBIT A
Page 246

# SCHEDULE 8

# SCHEDULE 8 TO THE COMPLAINT

**Item 20**     **Details About the Securitization**

(a)    **Dealer**: Countrywide Securities Corporation

(b)    **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2006-HYB3 issued Mortgage Pass-Through Certificates, Series 2006-HYB3, which was a securitization in April 2006 of 2,311 loans divided into 4 loan groups.

(c)    **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Super Senior/Variable Pass-Through Rate) in this securitization, in tranches 3-A-1B and 4-A-1A.  The Bank paid $151,000,000.00 in principal plus accrued interest of $662,673.31 for certificates in tranche 3-A-1B.  The Bank purchased certificates in tranche 4-A-1A in two separate transactions, first paying $147,592,151.41 in principal plus accrued interest of $663,853.50, and next paying $45,599,531.25 in principal plus accrued interest of $204,750.00.  The Bank received all the certificates on April 28, 2006.  Tranche 3-A-1B contains loans in Loan Group 3, and tranche 4-A-1A contains loans in Loan Group 4.

(d)    **CUSIP**: 1266944f2 (tranche 3-A-1B) and 1266944j4 (tranche 4-A-1A)

(e)    **Ratings of the certificate(s) at the time of the Bank's purchase**:
   (i)    Moody's: Aaa for both tranches 3-A-1B (1266944f2) and 4-A-1A (1266944j4)
   (ii)   S&P: AAA for both tranches 3-A-1B (1266944f2) and 4-A-1A (1266944j4)

(f)    **Ratings of the certificate(s) as of November 30, 2010**:
   (i)    Moody's: Ca and Caa3, respectively, for tranches 3-A-1B (1266944f2) and 4-A-1A (1266944j4)
   (ii)   S&P: CCC for both tranches 3-A-1B (1266944f2) and 4-A-1A (1266944j4)

(g)    **SEC's URL of prospectus and prospectus supplement for this securitization**:

http://sec.gov/Archives/edgar/data/906410/000089109206001145/e23804_424b5.txt

**Item 21**      **Details About the Parties**

(a)      **Dealer**: Countrywide Securities Corporation

(b)      **Originator(s)**:
   (i)      Countrywide Home Loans, Inc.
   (ii)     American Home Mortgage Corp.
   (iii)    Ohio Savings Bank ("OSB")
   (iv)    Provident Funding Associates LP

(c)      **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)      **Depositor**: CWMBS, Inc.

(e)      **Trustee**: The Bank of New York

(f)      **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**      **Untrue or Misleading Statements About General Underwriting Standards**

(a)      "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral."  (Prospectus at 25.)

(b)      "The Mortgage Loans that will be transferred to the issuing entity other than those originated or acquired by Countrywide Home Loans, Ohio Savings Bank and American Home Mortgage Corp. have been originated or acquired in accordance with the procedures set forth in the prospectus under 'Mortgage Loan Program— Underwriting Standards.'"  (Prospectus Supplement at S-97.)

(c)      "Approximately 29.40%, 54.08%, 72.13% and 71.80% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide

Home Loans in accordance with its credit, appraisal and underwriting standards. . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-97.)

(d)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-98.)

(e)     "The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems." (Prospectus Supplement at S-101.)

(f)     "American Home's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are 'non-conforming' in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac." (Prospectus Supplement at S-101.)

(g)     "American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-102.)

(h)     "The OSB underwriting guidelines and product guidelines for loans sold to Countrywide Home Loans, Inc. generally follow standard

Fannie Mae Guidelines, and are designed to evaluate the borrower's ability to repay the loan, their prior credit history, and availability of funds required for closing and cash reserves, as well as to evaluate the acceptability of the property to be mortgaged as collateral." (Prospectus Supplement at S-104.)

**Item 77   Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)   "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 25.)

(b)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits."  (Prospectus Supplement at S-98.)

(c)   "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-98.)

(d)     "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-99.)

(e)     "In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility."  (Prospectus Supplement at S-102—S-103.)

(f)     "The underwriter will evaluate the intent and willingness of a borrower to repay the mortgage loan in a timely manner. In general, intent is evaluated based on past credit performance and the prospective borrower's equity. The prospective borrower's past regard for such obligations, and the source and amount of the down payment are also evaluated. OSB utilizes credit scores provided by credit reporting agencies to assist in the analysis of an applicant's credit history. Under appropriate circumstances, OSB may also consider a

private mortgage or rent payment history, in addition to the applicant's credit history and credit scoring as maintained at credit reporting agencies." (Prospectus Supplement at S-104—S-105.)

**Item 81      Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-98.)

(b)     "Exceptions to the underwriting standards may be permitted where compensating factors are present. . . . Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision."  (Prospectus Supplement at S-102.)

(c)     "American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages 'common sense' underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception."  (Prospectus Supplement at S-103.)

(d)     "OSB may consider a loan to have met its guidelines where specific criteria are not met if, under evaluation of all of the information available, acceptable compensating factors exist." (Prospectus Supplement at S-104.)

(e)     "The use of OSB's underwriting and product guidelines does not imply that each specific criterion was satisfied individually. OSB will consider a mortgage loan to be originated in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with OSB's guidelines. Even if one or more specific criteria included in the guidelines were not satisfied, if other factors compensated for the standards that were not satisfied, the mortgage loan may be considered to be in substantial compliance with

OSB's underwriting and product guidelines."  (Prospectus Supplement at S-104.)

**Item 87     Untrue or Misleading Statements About Quality Control**

(a)     "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-98.)

**Item 142     Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the property to be used as collateral, an appraisal may be made of each property considered for financing. Except as described in the prospectus supplement, an appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 25.)

(b)  "Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-99.)

(c)  "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter." (Prospectus Supplement at S-103.)

(d)  "With respect to loans sold to Countrywide Home Loans, Inc., in order to determine the marketability of a property, generally an independent property valuation must be obtained from a licensed appraiser. OSB's underwriting guidelines require that the value of the mortgaged property being financed, as indicated by the independent valuation, currently supports and is anticipated to support in the future the outstanding loan balance and provides sufficient value to mitigate the effects of adverse shifts in real estate values, although there can be no assurance that such value will support the outstanding loan balance

in the future. . . . Generally, for loans of $1,000,000 or more, two appraisals may be required from two different appraisers." (Prospectus Supplement at S-105.)

**Item 163    Untrue or Misleading Statements About LTVs**

(a)    (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement at S-36.  For data charts regarding Loan Group 3, see Prospectus Supplement at S-75.  For data charts regarding Loan Group 4, see Prospectus Supplement at S-87.)

(b)    In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

(i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 75.33%."  (Prospectus Supplement at S-36 n.1.)

(ii)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 3 was approximately 77.03%."  (Prospectus Supplement at S-75 n.1.)

(iii)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 4 was approximately 72.65%."  (Prospectus Supplement at S-87 n.1.)

(c)    "Each seller's underwriting standards will generally permit loans with loan-to-value ratios at origination of up to 100% depending on the loan program, type and use of the property, creditworthiness of the borrower and debt-to-income ratio. If so specified in the related prospectus supplement, a seller's underwriting criteria may permit loans with loan-to-value ratios at origination in excess of 100%." (Prospectus at 25.)

(d)    "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100.00%."  (Prospectus Supplement at S-29.)

(e)    "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan,

subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%." (Prospectus Supplement at S-99.)

(f)    "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000." (Prospectus Supplement at S-99.)

(g)    "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac." (Prospectus Supplement at S-29.)

(h)    "[F]or all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac." (Prospectus Supplement at S-103.)

**Item 177    Untrue or Misleading Statements About Use of the Properties**

(a)    (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement at S-38.  For data charts regarding Loan Group 3, see Prospectus Supplement at S-77.  For data charts regarding Loan Group 4, see Prospectus Supplement at S-89.)

(b)    In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

(i)    1,816 (or 78.58%) of the 2,311 Mortgage Loans in aggregate were for primary residences.  Those 1,816 loans represented 84.13% of the Stated Principal Balance

of the Mortgage Loans in aggregate as of the cut-off date. (Prospectus Supplement at S-38.)

(ii) 612 (or 74.00%) of the 827 Mortgage Loans in Loan Group 3 were for primary residences.  Those 612 loans represented 80.60% of the Stated Principal Balance of the Mortgage Loans in Loan Group 3 as of the cut-off date. (Prospectus Supplement at S-77.)

(iii) 445 (or 81.06%) of the 549 Mortgage Loans in Loan Group 4 were for primary residences.  Those 445 loans represented 87.08% of the Stated Principal Balance of the Mortgage Loans in Loan Group 4 as of the cut-off date. (Prospectus Supplement at S-89.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a 'Rating Agency') specified in the related prospectus supplement." (Prospectus at 105.)

(b)     "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Aaa by Moody's Investors Service, Inc. ('Moody's')."  (Prospectus Supplement at S-163.)

**Item 181     Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement."  (Prospectus at 105.)

(b)     "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the

agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-163.)

(c)    "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-163.)

## Item 195    Untrue or Misleading Statements About Effective Securitization

(a)    "The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series." (Prospectus at 12.)

(b)    "Assignment of the Loans. At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. In the case of a series with both notes and certificates, the trust will pledge these assets to the trustee for the benefit of the holders of the notes. The trustee (or trust, in the case of a series with both notes and certificates) will, concurrently with the assignment, deliver the related securities to the depositor in exchange for the loans." (Prospectus at 52.)

(c)     "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or multifamily loan,

> • the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,
>
> • the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),
>
> • an assignment of the Mortgage to the trustee, which assignment will be in recordable form in the case of a Mortgage assignment, and
>
> • any other security documents, including those relating to any senior interests in the Property, as may be specified in the related prospectus supplement or the related Pooling and Servicing Agreement or Sale and Servicing Agreement."

(Prospectus at 52.)

(d)     "The applicable prospectus supplement may provide other arrangements for assuring  the priority of assignments, but if it does not, the seller, the depositor or the trustee, as specified in the related Pooling and Servicing Agreement or Sale and Servicing Agreement, will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which, in the opinion of counsel acceptable to the trustee, the recording is not required to protect the trustee's or the certificateholder's interest."  (Prospectus at 52-53.)

(e)     "CWMBS, Inc. (the 'depositor') . . . will cause the Mortgage Loans to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-26.)

(f)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey

without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2006-HYB3, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date." (Prospectus Supplement at S-96.)

(g)    "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument, an assignment in recordable form of the mortgage or a copy of such assignment, the original or a copy of the title policy with respect to the related mortgaged property, and if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty  days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller." (Prospectus Supplement at S-96.)

EXHIBIT A
Page 262

# SCHEDULE 9

## SCHEDULE 9 TO THE COMPLAINT

**Item 20**     **Details About the Securitization**

(a)  **Dealer**: Countrywide Securities Corporation

(b)  **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2007-HYB1 issued Mortgage Pass-Through Certificates, Series 2007-HYB1, which was a securitization in January 2007 of 1,599 loans divided into 5 loan groups.

(c)  **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Super Senior/Variable Pass-Through Rate) in this securitization, in tranche 4-A-1, for which the Bank paid $51,211,828.13 in principal plus accrued interest of $240,316.03.  The Bank received the certificates on January 30, 2007.  Tranche 4-A-1 contains loans in Loan Group 4.

(d)  **CUSIP**: 22239eak2

(e)  **Ratings of the certificate(s) at the time of the Bank's purchase**:
     (i)   Moody's: Aaa
     (ii)  S&P: AAA

(f)  **Ratings of the certificate(s) as of November 30, 2010**:
     (i)   Moody's: Ca
     (ii)  S&P: CCC

(g)  **SEC's URL of prospectus and prospectus supplement for this securitization**:
     http://sec.gov/Archives/edgar/data/906410/000114420407004546/v06 3877_424b5.htm

**Item 21**     **Details About the Parties**

(a)  **Dealer**: Countrywide Securities Corporation

(b)  **Originator(s)**:
     (i)   Countrywide Home Loans, Inc.
     (ii)  GreenPoint Mortgage Funding, Inc.

(iii)   Decision One Mortgage Company

(c)   **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)   **Depositor**: CWMBS, Inc.

(e)   **Trustee**: The Bank of New York

(f)   **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**   **Untrue or Misleading Statements About General Underwriting**

(a)   "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral."  (Prospectus at 25.)

(b)   "The Mortgage Loans that will be transferred to the issuing entity other than those originated or acquired by Countrywide Home Loans and GreenPoint Mortgage Funding, Inc. have been originated or acquired in accordance with the procedures set forth in the prospectus under '*Loan Program—Underwriting Standards.*'"  (Prospectus Supplement at S-34.)

(c)   "Approximately 11.62%, 54.14%, 51.80%, 90.82% and 67.28% of the Mortgage Loans in loan groups 1, 2, 3, 4 and 5, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-35.)

(d)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-35.)

(e)     "Approximately 46.09%, 9.46%, 10.26%, and 0.24% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by GreenPoint Mortgage Funding, Inc. in accordance with its credit, appraisal and underwriting standards."  (Prospectus Supplement at S-38.)

(f)     "Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-39.)

(g)     "GreenPoint's underwriting guidelines are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-39.)

**Item 77     Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)     "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 25.)

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the '**debt-to-**

**income**' ratios) are within acceptable limits." (Prospectus Supplement at S-35.)

(c)     "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-35.)

(d)     "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-37.)

(e)     "In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios ('LTV'), and are determined on a loan-by-loan basis. The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's. Each mortgage loan has a required amount of reserves, with the minimum being three months of principal, interest, taxes and insurance for full documentation loans. Depending on the LTV and occupancy types, these reserve requirements may be increased to compensate for the additional risk." (Prospectus Supplement at S-39.)

(f)     "[Debt-to-income] ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's." (Prospectus Supplement at S-39 (GreenPoint's underwriting standards).)

**Item 81**     **Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-35.)

(b)     "Exceptions to the guidelines are permitted where compensating factors are present."  (Prospectus Supplement at S-39 (GreenPoint's underwriting standards).)

**Item 87**     **Untrue or Misleading Statements About Quality Control**

(a)     "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-35.)

(b)     "Periodically, the data used by GreenPoint to underwrite mortgage loans may be obtained by an approved loan correspondent. In those instances, the initial determination as to whether a mortgage loan

EXHIBIT A
Page 267

complies with GreenPoint's underwriting guidelines may be made by such loan correspondent. In addition, GreenPoint may acquire mortgage loans from approved correspondent lenders under a program pursuant to which GreenPoint delegates to the correspondent the obligation to underwrite the mortgage loans to GreenPoint's standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by GreenPoint before acquisition of the mortgage loan, and the correspondent represents to GreenPoint that its underwriting standards have been met. After purchasing mortgage loans under those circumstances, GreenPoint conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including GreenPoint's prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-40.)

## Item 142     Untrue or Misleading Statements About Appraisals

(a)      "In determining the adequacy of the property to be used as collateral, an appraisal may be made of each property considered for financing. Except as described in the prospectus supplement, an appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 25.)

(b)      "Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or

Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-36.)

(c)   "In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases, an analysis based on income generated by the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used. GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values." (Prospectus Supplement at S-40.)

## Item 163   Untrue or Misleading Statements About LTVs

(a)   (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement Annex A at A-4.  For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-40.)

(b)   In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

     (i)   "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 74.36%." (Prospectus Supplement Annex A at A-4 n.1.)

     (ii)   "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan

group 4 was approximately 73.31%." (Prospectus Supplement Annex A at A-40 n.1; *see also* Prospectus Supplement at S-5.)

(c)    "Each seller's underwriting standards will generally permit loans with loan-to-value ratios at origination of up to 100% depending on the loan program, type and use of the property, creditworthiness of the borrower and debt-to-income ratio. If so specified in the related prospectus supplement, a seller's underwriting criteria may permit loans with loan-to-value ratios at origination in excess of 100%." (Prospectus at 25.)

(d)    "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100%." (Prospectus Supplement at S-31.)

(e)    "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (*i.e.*, first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%." (Prospectus Supplement at S-36.)

(f)    "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000." (Prospectus Supplement at S-36.)

(g)    "GreenPoint may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the limitation that the combined Loan-to-Value Ratio may not exceed 100%." (Prospectus Supplement at S-41.)

(h)    "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary

mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-31.)

(i)     "Generally, each mortgage with an LTV at origination of greater than 80% is covered by a primary mortgage insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-41.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement Annex A at A-6.  For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-42.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

    (i)     1,248 (or 78.05%) of the 1,599 Mortgage Loans in aggregate were for primary residences.  Those 1,248 loans represented 81.15% of the Stated Principal Balance of the Mortgage Loans in aggregate as of the cut-off date. (Prospectus Supplement Annex A at A-6.)

    (ii)    159 (or 82.81%) of the 192 Mortgage Loans in Loan Group 4 were for primary residences.  Those 159 loans represented 82.97% of the Stated Principal Balance of the Mortgage Loans in Loan Group 4 as of the cut-off date. (Prospectus Supplement Annex A at A-42.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a 'Rating Agency') specified in the related prospectus supplement." (Prospectus at 109.)

(b)     "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill

Companies, Inc. ('**S&P**') and Aaa by Moody's Investors Service, Inc. ('**Moody's**')."  (Prospectus Supplement at S-96.)

**Item 181**    **Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)    "The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement."  (Prospectus at 109.)

(b)    "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-96.)

(c)    "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-96.)

**Item 195**    **Untrue or Misleading Statements About Effective Securitization**

(a)    "The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series."  (Prospectus at 12.)

(b)    "*Assignment of the Loans.* At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. In the case of a series with both notes and certificates, the trust will pledge these assets to the trustee for the benefit of the holders of the notes. The trustee (or trust, in the case of a series with both notes and certificates) will, concurrently with the assignment, deliver the related securities to the depositor in exchange for the loans."  (Prospectus at 54.)

(c)    "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or multifamily loan,
> • the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,
> • the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),
> • an assignment of the Mortgage to the trustee, which assignment will be in recordable form in the case of a Mortgage assignment, and
> • any other security documents, including those relating to any senior interests in the Property, as may be specified in the related prospectus supplement or the related Pooling and Servicing Agreement or Sale and Servicing Agreement."
(Prospectus at 54.)

(d)    "The applicable prospectus supplement may provide other arrangements for assuring the priority of assignments, but if it does

not, the seller, the depositor or the trustee, as specified in the related Pooling and Servicing Agreement or Sale and Servicing Agreement, will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which, in the opinion of counsel acceptable to the trustee, the recording is not required to protect the trustee's or the certificateholder's interest."  (Prospectus at 54.)

(e)     "CWMBS, Inc. (the '*depositor*') . . . will cause the Mortgage Loans to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-27.)

(f)     "Under the pooling and servicing agreement, the depositor will assign all of its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligations) to the trustee for the benefit of the certificateholders." (Prospectus Supplement at S-27.)

(g)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2007-HYB1, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date."  (Prospectus Supplement at S-33.)

(h)     "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument, an assignment in recordable form of the mortgage or a copy of such assignment, the original or a copy of the title policy with respect to the related mortgaged property, and if applicable, all recorded intervening

assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller. The Depositor expects that substantially all of the assignments will not be recorded based upon an opinion of counsel." (Prospectus Supplement at S-33.)

# SCHEDULE 10

## SCHEDULE 10 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)    **Dealer**: Countrywide Securities Corporation

(b)    **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2007-HYB2 issued Mortgage Pass-Through Certificates, Series 2007-HYB2, which was a securitization in March 2007 of 1,633 loans divided into 4 loan groups.

(c)    **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Super Senior/Variable Pass-Through Rate) in this securitization, in tranche 4-A-1, for which the Bank paid $162,992,595.47 in principal plus accrued interest of $728,182.99.  The Bank received the certificates on March 30, 2007.  Tranche 4-A-1 contains loans in Loan Group 4.

(d)    **CUSIP**: 125438aq4

(e)    **Ratings of the certificate(s) at the time of the Bank's purchase**:
    (i)      Moody's: Aaa
    (ii)     S&P: AAA

(f)    **Ratings of the certificate(s) as of November 30, 2010**:
    (i)      Moody's: Ca
    (ii)     S&P: CCC

(g)    **SEC's URL of prospectus and prospectus supplement for this securitization**:
    http://sec.gov/Archives/edgar/data/906410/000114420407016990/v07 0582_424b5.htm

**Item 21**      **Details About the Parties**

(a)    **Dealer**: Countrywide Securities Corporation

(b)    **Originator(s)**:
    (i)      Countrywide Home Loans, Inc.
    (ii)     DHI Mortgage Company, Ltd.

     (iii)   Home American Mortgage Corporation

     (iv)   Plaza Home Mortgage Incorporated

(c)    **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)    **Depositor**: CWMBS, Inc.

(e)    **Trustee**: The Bank of New York

(f)    **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**    **Untrue or Misleading Statements About General Underwriting**

(a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral."  (Prospectus at 25.)

(b)    "The Mortgage Loans that will be transferred to the issuing entity other than those originated or acquired by Countrywide Home Loans have been originated or acquired in accordance with the procedures set forth in the prospectus under '*Loan Program—Underwriting Standards*.'"  (Prospectus Supplement at S-34.)

(c)    "Approximately 100.00%, 52.28%, 40.86% and 85.45% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-34.)

(d)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-35.)

**Item 77      Untrue or Misleading Statements About Evaluation of Borrower Information**

(a) "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 25.)

(b) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the '*debt-to-income*' ratios) are within acceptable limits."  (Prospectus Supplement at S-35.)

(c) "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-35.)

(d) "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-36.)

**Item 81**        **Untrue or Misleading Statements About Exceptions to Underwriting Standards**

    (a)        "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-35.)

**Item 87**        **Untrue or Misleading Statements About Quality Control**

    (a)        "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-35.)

**Item 142**        **Untrue or Misleading Statements About Appraisals**

    (a)        "In determining the adequacy of the property to be used as collateral, an appraisal may be made of each property considered for financing. Except as described in the prospectus supplement, an appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been

completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 25.)

(b)    "Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-36.)

## Item 163    Untrue or Misleading Statements About LTVs

(a)    (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement Annex A at A-5.  For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-54.)

(b)    In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

        (i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 75.53%."  (Prospectus Supplement Annex A at A-5 n.1.)

        (ii)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 4 was approximately 72.30%."  (Prospectus Supplement Annex A at A-54 n.1; *see also* Prospectus Supplement at S-5.)

(c)     "Each seller's underwriting standards will generally permit loans with loan-to-value ratios at origination of up to 100% depending on the loan program, type and use of the property, creditworthiness of the borrower and debt-to-income ratio. If so specified in the related prospectus supplement, a seller's underwriting criteria may permit loans with loan-to-value ratios at origination in excess of 100%." (Prospectus at 25.)

(d)     "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100%."  (Prospectus Supplement at S-31.)

(e)     "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (*i.e.*, first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%."  (Prospectus Supplement at S-36.)

(f)     "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-36.)

(g)     "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-31.)

**Item 177    Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement Annex A at A-7.  For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-56.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

    (i)     1,226 (or 75.08%) of the 1,633 Mortgage Loans in aggregate were for primary residences.  Those 1,226 loans represented 79.47% of the Stated Principal Balance of the Mortgage Loans in aggregate as of the cut-off date. (Prospectus Supplement Annex A at A-7.)

    (ii)    294 (or 85.22%) of the 345 Mortgage Loans in Loan Group 4 were for primary residences.  Those 294 loans represented 85.96% of the Stated Principal Balance of the Mortgage Loans in Loan Group 4 as of the cut-off date. (Prospectus Supplement Annex A at A-56.)

## Item 180     Untrue or Misleading Statements About Earned Ratings

(a)     "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a 'Rating Agency') specified in the related prospectus supplement." (Prospectus at 109.)

(b)     "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('**S&P**') and Aaa by Moody's Investors Service, Inc. ('**Moody's**')."  (Prospectus Supplement at S-96.)

## Item 181     Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates

(a)     "The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement."  (Prospectus at 109.)

(b)  "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-96.)

(c)  "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-96.)

**Item 195   Untrue or Misleading Statements About Effective Securitization**

(a)  "The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series." (Prospectus at 12.)

(b)  "*Assignment of the Loans.* At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. In the case of a series with both notes and certificates, the trust will pledge these assets to the trustee for the benefit of the holders of the notes. The trustee (or trust, in the case of a series with both notes and certificates) will, concurrently with the assignment, deliver the related securities to the depositor in exchange for the loans." (Prospectus at 54.)

(c)    "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or multifamily loan,

> • the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,
>
> • the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),
>
> • an assignment of the Mortgage to the trustee, which assignment will be in recordable form in the case of a Mortgage assignment, and
>
> • any other security documents, including those relating to any senior interests in the Property, as may be specified in the related prospectus supplement or the related Pooling and Servicing Agreement or Sale and Servicing Agreement."

(Prospectus at 54.)

(d)    "The applicable prospectus supplement may provide other arrangements for assuring the priority of assignments, but if it does not, the seller, the depositor or the trustee, as specified in the related Pooling and Servicing Agreement or Sale and Servicing Agreement, will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which, in the opinion of counsel acceptable to the trustee, the recording is not required to protect the trustee's or the certificateholder's interest."  (Prospectus at 54.)

(e)    "[T]he depositor . . . will cause the Mortgage Loans to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-27.)

(f)     "Under the pooling and servicing agreement, the depositor will assign all of its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligations) to the trustee for the benefit of the certificateholders." (Prospectus Supplement at S-27.)

(g)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2007-HYB2, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date."  (Prospectus Supplement at S-33.)

(h)     "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument, an assignment in recordable form of the mortgage or a copy of such assignment, the original or a copy of the title policy with respect to the related mortgaged property, and if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any

EXHIBIT A
Page 286

successor to or creditor of the depositor or any seller. The depositor expects that substantially all of the assignments will not be recorded based upon an opinion of counsel."  (Prospectus Supplement at S-33.)

EXHIBIT A
Page 287

# SCHEDULE 11

## SCHEDULE 11 TO THE COMPLAINT

**Item 20**     **Details About the Securitization**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Issuing entity and securitization**: Alternative Loan Trust 2007-12T1 issued Mortgage Pass-Through Certificates, Series 2007-12T1, which was a securitization in April 2007 of 1,150 loans.

(c)     **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Class A Certificates (Senior/Fixed Pass-Through Rate/Exchangeable), in tranche A-16, for which the Bank paid $123,436,471.46 in principal plus accrued interest of $334,772.00.  The Bank received the certificates on May 18, 2007.

(d)     **CUSIP**: 02150lar8

(e)     **Ratings of the certificate(s) at the time of the Bank's purchase**:
        (i)     Moody's: Aaa
        (ii)    S&P: AAA
        (iii)   Fitch: AAA

(f)     **Ratings of the certificate(s) as of November 30, 2010**:
        (i)     Moody's: Caa3
        (ii)    S&P: CCC
        (iii)   Fitch: C

(g)     **SEC's URL of prospectus and prospectus supplement for this securitization**:
        http://sec.gov/Archives/edgar/data/1269518/000095012407002623/v29683b5e424b5.htm

**Item 21**     **Details About the Parties**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Originator(s)**: Countrywide Home Loans, Inc.

(c)     **Sponsor/Seller**: Countrywide Home Loans, Inc.

EXHIBIT A
Page 280

(d)   **Depositor**: CWALT, Inc.

(e)   **Trustee**: The Bank of New York

(f)   **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**   **Untrue or Misleading Statements About General Underwriting Standards**

(a)   "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral."  (Prospectus at 25.)

(b)   "All of the mortgage loans in the issuing entity will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting process. . . . Countrywide Home Loans' underwriting process are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-36.)

(c)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-37.)

**Item 77**   **Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)   "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 25.)

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits.  The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower.  In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-37.)

(c)     "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%."  (Prospectus Supplement at S-38.)

(d)     "Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively."  (Prospectus Supplement at S-40.)

**Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-37.)

**Item 87          Untrue or Misleading Statements About Quality Control**

(a)     "Periodically the data used by Countrywide Home Loans to complete
the underwriting analysis may be obtained by a third party,
particularly for mortgage loans originated through a loan
correspondent or mortgage broker.  In those instances, the initial
determination as to whether a mortgage loan complies with
Countrywide Home Loans' underwriting guidelines may be made by
an independent company hired to perform underwriting services on
behalf of Countrywide Home Loans, the loan correspondent or
mortgage broker.  In addition, Countrywide Home Loans may acquire
mortgage loans from approved correspondent lenders under a program
pursuant to which Countrywide Home Loans delegates to the
correspondent the obligation to underwrite the mortgage loans to
Countrywide Home Loans' standards.  Under these circumstances, the
underwriting of a mortgage loan may not have been reviewed by
Countrywide Home Loans before acquisition of the mortgage loan
and the correspondent represents that Countrywide Home Loans'
underwriting standards have been met.  After purchasing mortgage
loans under those circumstances, Countrywide Home Loans conducts
a quality control review of a sample of the mortgage loans.  The
number of loans reviewed in the quality control process varies based
on a variety of factors, including Countrywide Home Loans' prior
experience with the correspondent lender and the results of the quality
control review process itself."  (Prospectus Supplement at S-36 – S-
37.)

**Item 142          Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the property to be used as collateral,
an appraisal may be made of each property considered for financing.
Except as described in the prospectus supplement, an appraiser is
generally required to inspect the property, issue a report on its
condition and, if applicable, verify construction, if new, has been
completed.  The appraisal is generally based on the market value of
comparable homes, the estimated rental income (if considered
applicable by the appraiser) and the cost of replacing the home."
(Prospectus at 25.)

(b)     "Except with respect to mortgage loans originated pursuant to its
         Streamlined Documentation Program, whose values were confirmed
         with a Fannie Mae propriety automated valuation model, Countrywide
         Home Loans obtains appraisals from independent appraisers or
         appraisal services for properties that are to secure mortgage loans.
         The appraisers inspect and appraise the proposed mortgaged property
         and verify that the property is in acceptable condition.  Following
         each appraisal, the appraiser prepares a report which includes a
         market data analysis based on recent sales of comparable homes in the
         area and, when deemed appropriate, a replacement cost analysis based
         on the current cost of constructing a similar home.  All appraisals are
         required to conform to Fannie Mae or Freddie Mac appraisal
         standards then in effect."  (Prospectus Supplement at S-37 – S-38.)

## Item 163     Untrue or Misleading Statements About LTVs

(a)     (For data charts, see Prospectus Supplement Annex A at A-5.)

(b)     In the prospectus supplement, Countrywide Securities Corporation
         made the following statements about the LTVs of the mortgage loans
         in the collateral pool of this securitization:
         (i)     "As of the cut-off date, the weighted average original
                  Loan-to-Value Ratio of the Initial Mortgage Loans was
                  approximately 73.93%." (Prospectus Supplement Annex
                  A at A-5 n.1; *see also* Prospectus Supplement at S-5.)

(c)     "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination
         of more than 100.00%."  (Prospectus Supplement at S-31.)

(d)     "Countrywide Home Loans may provide secondary financing to a
         mortgagor contemporaneously with the origination of a mortgage
         loan, subject to the following limitations: the Loan-to-Value Ratio of
         the senior (i.e., first) lien may not exceed 80% and the combined
         Loan-to-Value Ratio may not exceed 100%."  (Prospectus
         Supplement at S-37.)

(e)     "Countrywide Home Loans' Standard Underwriting Guidelines for
         mortgage loans with non-conforming original principal balances
         generally allow Loan-to-Value Ratios at origination of up to 95% for
         purchase money or rate and term refinance mortgage loans with

original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000." (Prospectus Supplement at S-38.)

(f)     "Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000." (Prospectus Supplement at S-39.)

(g)     "Generally, each mortgage loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac." (Prospectus Supplement at S-31.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts, see Prospectus Supplement Annex A at A-8.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

      (i)     1,005 (or 87.39%) of the 1,150 Initial Mortgage Loans were for primary residences.  Those 1,005 loans represented 86.48% of the aggregate Stated Principal

Balance of the Initial Mortgage Loans as of the initial cut-off date.  (Prospectus Supplement Annex A at A-8.)

**Item 180    Untrue or Misleading Statements About Earned Ratings**

(a)    "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a 'Rating Agency') specified in the related prospectus supplement." (Prospectus at 109.)

(b)    "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement."  (Prospectus Supplement at S-106.)

**Item 181    Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)    "The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement."  (Prospectus at 109-110.)

(b)    "The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued.  Fitch's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-106.)

(c)    "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued.  Moody's

ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-106.)

(d)    "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-107.)

## Item 195    Untrue or Misleading Statements About Effective Securitization

(a)    "The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series." (Prospectus at 12.)

(b)    "*Assignment of the Loans*. At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. In the case of a series with both notes and certificates, the trust will pledge these assets to the trustee for the benefit of the holders of the notes. The trustee (or trust, in the case of a series with both notes and certificates) will, concurrently with the assignment, deliver the related securities to the depositor in exchange for the loans." (Prospectus at 54.)

(c)    "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or multifamily loan,

• the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,

• the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),

• an assignment of the Mortgage to the trustee, which assignment will be in recordable form in the case of a Mortgage assignment, and

• any other security documents, including those relating to any senior interests in the Property, as may be specified in the related prospectus supplement or the related Pooling and Servicing Agreement or Sale and Servicing Agreement."

(Prospectus at 54.)

(d)    "The applicable prospectus supplement may provide other arrangements for assuring the priority of assignments, but if it does not, the seller, the depositor or the trustee, as specified in the related Pooling and Servicing Agreement or Sale and Servicing Agreement, will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which, in the opinion of counsel acceptable to the trustee, the recording is not required to protect the trustee's or the certificateholder's interest."  (Prospectus at 54-55.)

(e)    "The depositor . . . will cause the mortgage loans to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-30.)

(f)    "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each mortgage loan and all right, title and interest in and to all other

assets included in Alternative Loan Trust 2007-12T1, including all principal and interest received on or with respect to the Closing Date Mortgage Loans, but not any principal and interest due on or before the initial cut-off date, and amounts on deposit in the Pre-funding Account and the Capitalized Interest Account on the closing date." (Prospectus Supplement at S-33.)

(g)     "In connection with the transfer and assignment of a mortgage loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things,

> • the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost;
> • the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument;
> • an assignment in recordable form of the mortgage or a copy of such assignment;
> • the original or a copy of the title policy with respect to the related mortgaged property; and
> • if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor)."

(Prospectus Supplement at S-33.)

(h)     "With respect to up to 50% of the Closing Date Mortgage Loans, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date, and not later than twenty days after the relevant Supplemental Transfer Date (as defined below) with respect up to 90% of the Supplemental Mortgage Loans (as defined below) conveyed on such Supplemental Transfer Date. Assignments of the mortgage loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where in the opinion of counsel

recording is not required to protect the trustee's interests in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller or a transferor, as the case may be. The depositor expects that substantially all of the assignments will not be recorded based on an opinion of counsel." (Prospectus Supplement at S-33.)

# SCHEDULE 12

# SCHEDULE 12 TO THE COMPLAINT

**Item 20**     **Details About the Securitization**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2007-17 issued Mortgage Pass-Through Certificates, Series 2007-17, which was a securitization in August 2007 of 1,289 loans divided into 4 loan groups.

(c)     **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Senior/Fixed Pass-Through Rate/Super Senior) in this securitization, in tranche 4-A-1, for which the Bank paid $65,716,540.63 in principal plus accrued interest of $308,394.86.  The Bank received the certificates on August 30, 2007.  Tranche 4-A-1 contains loans in Loan Group 4.

(d)     **CUSIP**: 12544kam5

(e)     **Ratings of the certificate(s) at the time of the Bank's purchase**:
(i)     Fitch: AAA
(ii)    S&P: AAA

(f)     **Ratings of the certificate(s) as of November 30, 2010**:
(i)     Fitch: AAA/*-
(ii)    S&P: BB

(g)     **SEC's URL of prospectus and prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/906410/000136231007002076/c71129e424b5.htm

**Item 21**     **Details About the Parties**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Originator(s)**:
(i)     Countrywide Home Loans, Inc.

(c)   **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)   **Depositor**: CWMBS, Inc.

(e)   **Trustee**: The Bank of New York

(f)   **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75   Untrue or Misleading Statements About General Underwriting**

(a)   "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral."  (Prospectus at 25.)

(b)   "All of the mortgage loans in the issuing entity will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-44.)

(c)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-45.)

**Item 77   Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)   "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 25.)

(b)  "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-45.)

(c)  "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively." (Prospectus Supplement at S-46.)

**Item 81    Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)  "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-45.)

**Item 87    Untrue or Misleading Statements About Quality Control**

(a)  "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan

correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-45.)

**Item 142     Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the property to be used as collateral, an appraisal may be made of each property considered for financing. Except as described in the prospectus supplement, an appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 25.)

(b)     "Generally, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans, except with respect to selected borrowers that are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans where, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. The appraisers inspect and

appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-46.)

**Item 163    Untrue or Misleading Statements About LTVs**

(a)    (For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-27.)

(b)    In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

    (i)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 4 was approximately 67.44%." (Prospectus Supplement Annex A at A-27 n.1; *see also* Prospectus Supplement at S-7.)

(c)    "Each seller's underwriting standards will generally permit loans with loan-to-value ratios at origination of up to 100% depending on the loan program, type and use of the property, creditworthiness of the borrower and debt-to-income ratio. If so specified in the related prospectus supplement, a seller's underwriting criteria may permit loans with loan-to-value ratios at origination in excess of 100%." (Prospectus at 25.)

(d)    "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination or on the closing date of more than 100%." (Prospectus Supplement at S-38.)

(e)    "Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined

Loan-to-Value Ratio may not exceed 100%." (Prospectus Supplement at S-45.)

(f)   "Countrywide Home Loans' underwriting guidelines generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000, and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' underwriting guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000." (Prospectus Supplement at S-46.)

(g)   "Generally, each mortgage loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac." (Prospectus Supplement at S-38.)

## Item 177   Untrue or Misleading Statements About Use of the Properties

(a)   (For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-31.)

(b)   In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

　　　(i)   97 (or 87.39%) of the 111 Initial Mortgage Loans in Loan Group 4 were for primary residences. Those 97 loans represented 88.87% of the aggregate Stated Principal Balance of the Initial Mortgage Loans in Loan Group 4 as of the initial cut-off date. (Prospectus Supplement Annex A at A-31.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

(a)    "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a 'Rating Agency') specified in the related prospectus supplement." (Prospectus at 108.)

(b)    "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement."  (Prospectus Supplement at S-115.)

**Item 181      Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)    "The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement."  (Prospectus at 108.)

(b)    "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-115.)

(c)    "The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Fitch's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on

the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-115.)

**Item 195**     **Untrue or Misleading Statements About Effective Securitization**

(a)     "The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series."  (Prospectus at 12.)

(b)     "*Assignment of the Loans.* At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. In the case of a series with both notes and certificates, the trust will pledge these assets to the trustee for the benefit of the holders of the notes. The trustee (or trust, in the case of a series with both notes and certificates) will, concurrently with the assignment, deliver the related securities to the depositor in exchange for the loans."  (Prospectus at 53.)

(c)     "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or multifamily loan,
> • the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,
> • the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),

> • an assignment of the Mortgage to the trustee, which
> assignment will be in recordable form in the case of a Mortgage
> assignment, and
> • any other security documents, including those relating to any
> senior interests in the Property, as may be specified in the
> related prospectus supplement or the related Pooling and
> Servicing Agreement or Sale and Servicing Agreement."

(Prospectus at 53-54.)

(d)     "The applicable prospectus supplement may provide other
arrangements for assuring the priority of assignments, but if it does
not, the seller, the depositor or the trustee, as specified in the related
Pooling and Servicing Agreement or Sale and Servicing Agreement,
will promptly cause the assignments of the related loans to be
recorded in the appropriate public office for real property records,
except in states in which, in the opinion of counsel acceptable to the
trustee, the recording is not required to protect the trustee's or the
certificateholder's interest."  (Prospectus at 54.)

(e)     "The depositor . . . will cause the mortgage loans to be assigned to the
trustee for the benefit of the holders of the certificates."  (Prospectus
Supplement at S-36.)

(f)     "Under the pooling and servicing agreement, the depositor will assign
all its right, title and interest in the representations, warranties and
covenants (including the sellers' repurchase or substitution obligation)
to the trustee for the benefit of the certificateholders."  (Prospectus
Supplement at S-36.)

(g)     "Pursuant to the pooling and servicing agreement, on the closing date,
the depositor will sell, transfer, assign, set over and otherwise convey
without recourse to the trustee in trust for the benefit of the
certificateholders all right, title and interest of the depositor in and to
and each Group 1 Closing Date Mortgage Loan and each Group 2
Closing Date Mortgage Loan and each mortgage loan in loan group 3
and loan group 4 and all right, title and interest in and to all other
assets included in CHL Mortgage Pass-Through Trust 2007-17,
including all principal and interest received on or with respect to the
Closing Date Mortgage Loans, but not any principal and interest due
on or before the initial cut-off date, and amounts on deposit in the Pre-

funding Account and the Capitalized Interest Account on the closing
date." (Prospectus Supplement at S-40.)

(h)      "In connection with the transfer and assignment of a mortgage loan,
the depositor will deliver or cause to be delivered to the trustee, or a
custodian for the trustee, the mortgage file, which contains among
other things,

> •   the original mortgage note (and any modification or
> amendment to it) endorsed in blank without recourse, except
> that the depositor may deliver or cause to be delivered a lost
> note affidavit in lieu of any original mortgage note that has
> been lost;
> •   the original instrument creating a first lien on the related
> mortgaged property with evidence of recording indicated
> thereon or a copy of such instrument;
> •   an assignment in recordable form of the mortgage or a copy
> of such assignment;
> •   the original or a copy of the title policy with respect to the
> related mortgaged property; and
> •   if applicable, all recorded intervening assignments of the
> mortgage or copies thereof and any riders or modifications to
> the mortgage note and mortgage or copies thereof (except for
> any documents not returned from the public recording office,
> which will be delivered to the trustee as soon as the same is
> available to the depositor)."

(Prospectus Supplement at S-40.)

(i)      "With respect to up to 50% of the mortgage loans in each loan group
delivered on the closing date, the depositor may deliver all or a
portion of each related mortgage file to the trustee not later than thirty
days after the closing date and not later than twenty days after the
relevant Supplemental Transfer Date (as defined below) with respect
to up to 90% of the Supplemental Mortgage Loans (as defined below)
in each loan group conveyed on such Supplemental Transfer Date.
Assignments of the mortgage loans to the trustee (or its nominee) will
be recorded in the appropriate public office for real property records,
except in states where, in the opinion of counsel, recording is not
required to protect the trustee's interests in the mortgage loan against
the claim of any subsequent transferee or any successor to or creditor
of the depositor or any seller or a transferor, as the case may be. The

depositor expects that substantially all of the assignments will not be recorded based on an opinion of counsel."  (Prospectus Supplement at S-41.)

# SCHEDULE 13

## SCHEDULE 13 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)   **Dealer**: Countrywide Securities Corporation

(b)   **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2005-J2 issued Mortgage Pass-Through Certificates, Series 2005-J2, which was a securitization in June 2005 of 1,527 loans divided into 3 loan groups.

(c)   **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Senior/Floating Rate/Planned Balance) in this securitization, in tranche 2-A-1, for which the Bank paid $48,688,470.26 in principal plus accrued interest of $204,071.00.  The Bank received the certificates on August 21, 2007.  Tranche 2-A-1 contains loans in Loan Group 2.

(d)   **CUSIP**: 12669gu25

(e)   **Ratings of the certificate(s) at the time of the Bank's purchase**:
      (i)     Moody's: Aaa
      (ii)    Fitch: AAA

(f)   **Ratings of the certificate(s) as of November 30, 2010**:
      (i)     Moody's: B3
      (ii)    Fitch: CCC

(g)   **SEC's URL of prospectus and prospectus supplement for this securitization**:
      http://sec.gov/Archives/edgar/data/906410/000119312505136440/d424b5.htm

**Item 21**      **Details About the Parties**

(a)   **Dealer**: Countrywide Securities Corporation

(b)   **Originator(s)**:
      (i)     Countrywide Home Loans, Inc.
      (ii)    Flagstar Bank, F.S.B.

EXHIBIT A
Page 313

      (iii)   ABN AMRO Mortgage Group, Inc.

(c)    **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)    **Depositor**: CWMBS, Inc.

(e)    **Trustee**: The Bank of New York

(f)    **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**    **Untrue or Misleading Statements About General Underwriting Standards**

(a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus at 27.)

(b)    "Approximately 39.74% and 87.70% of the initial mortgage loans in loan group 2 and loan group 3, respectively, in each case by aggregate Stated Principal Balance of the mortgage loans in the related loan group as of the initial cut-off date, were originated by Countrywide Home Loans, Inc. ('Countrywide Home Loans') or acquired by Countrywide Home Loans from correspondent lenders using Countrywide Home Loans' underwriting guidelines." (Prospectus Supplement at S-48.)

(c)    "A portion of the mortgage loans in the trust fund consists of seasoned collateral previously originated or acquired by Countywide Home Loans in accordance with credit, appraisal and underwriting standards acceptable to Countrywide Home Loans. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-48.)

(d)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-49.)

(e)    "A portion of the mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-52.)

(f)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-53.)

(g)    "Approximately 80.75% of the initial mortgage loans in loan group 1, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the initial cut-off date, were originated or acquired in the ordinary course of business by ABN AMRO Mortgage Group, Inc. ('ABN AMRO') generally in accordance with the underwriting guidelines described in this prospectus supplement (referred to in this prospectus supplement as 'ABN AMRO's Underwriting Standards')."  (Prospectus Supplement at S-58.)

(h)    "ABN AMRO's underwriting standards are intended to evaluate the prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgaged property as collateral."  (Prospectus Supplement at S-58.)

(i)    "ABN AMRO's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac."  (Prospectus Supplement at S-59.)

(j)    "Approximately 0.91% of the initial mortgage loans in loan group 1, approximately 29.96% of the initial mortgage loans in loan group 2 and approximately 4.24% of the initial mortgage loans in loan group 3, in each case by aggregate Stated Principal Balance of the initial mortgage loans in that loan group as of the initial cut-off date, were originated or acquired in the ordinary course of business by Flagstar Bank, F.S.B. ('Flagstar Bank') generally in accordance with the underwriting guidelines described in this prospectus supplement (the

'Flagstar Bank Underwriting Guidelines')." (Prospectus Supplement at S-59.)

(k) "The Flagstar Bank Underwriting Guidelines generally follow Fannie Mae's Desktop Underwriter guidelines for loans with an original principal balance of up to $650,000, and standard Fannie Mae guidelines for loans with an original principal balance of $650,001-$1,500,000, and are designed to evaluate the applicant's ability to repay the loan, their prior credit history, and availability of funds required for closing and cash reserves, as well as to evaluate the acceptability of the property to be mortgaged as collateral." (Prospectus Supplement at S-59.)

(l) "The mortgage loans that will be transferred to the trust fund, other than those originated by Countrywide Home Loans, Flagstar Bank, FSB or ABN AMRO Mortgage Group, Inc. or acquired by Countrywide Home Loans, Flagstar Bank, FSB or ABN AMRO Mortgage Group, Inc. from correspondent lenders or other third party originators who applied the related underwriting guidelines set forth above, have been originated or acquired in accordance with the procedures set forth in the prospectus under 'Mortgage Loan Program–Underwriting Process.'" (Prospectus Supplement at S-61.)

**Item 77**    **Untrue or Misleading Statements About Evaluation of Borrower Information**

(a) "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)." (Prospectus at 27.)

(b) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under such

standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within certain limits."  (Prospectus Supplement at S-49.)

(c)      "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-49.)

(d)      "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-50.)

(e)      "Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, such maximum permitted debt-to-income ratios are 33% and 38%, respectively." (Prospectus Supplement at S-51.)

(f)      "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the

ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-53.)

(g)     "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-55.)

(h)     "Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively." (Prospectus Supplement at S-57.)

(i)     "Flagstar Bank requires that the applicant's sources of income have the probability of continuing and are adequate to support the loan terms requested. The underwriter, assisted by Fannie Mae's Desktop Underwriter system for loans with an original principal balance of up to $650,000, will review the applicant's history of receiving stable income from employment or other verifiable sources, as well as evaluating the likelihood that the income will continue to be received in the foreseeable future. Emphasis is on the continuity of stable income, and a applicant who has changed jobs frequently, and has been able to earn consistent and predictable income may also be acceptable for underwriting approval." (Prospectus Supplement at S-60.)

(j)     "The underwriter will further review the application to evaluate whether the applicant has sufficient liquid assets available for down

payment, closing costs and cash reserves, if required."  (Prospectus Supplement at S-60 (Flagstar Bank's underwriting standards).)

(k)     "As an integral part of the underwriting review, the underwriter will evaluate the intent and willingness of an applicant to repay the mortgage loan in a timely manner, again assisted by Fannie Mae's Desktop Underwriter system for loans with an original principal balance of up to $650,000. In general, the intent is evaluated based on the applicant's past credit performance."  (Prospectus Supplement at S-60.)

**Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Certain exceptions to Countrywide Home Loans' underwriting guidelines are made in the event that compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-49.)

(b)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-53.)

(c)     "Flagstar Bank's use of standardized underwriting guidelines does not imply that each specific criterion was satisfied individually. Flagstar Bank will consider a mortgage loan to be originated in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with the Flagstar Bank Underwriting Guidelines. Even if one or more specific criteria included in the Flagstar Bank Underwriting Guidelines were not satisfied, if other factors compensated for the standards that were not satisfied, the mortgage loan may be considered to be in substantial compliance with the Flagstar Bank Underwriting Guidelines." (Prospectus Supplement at S-59.)

**Item 87     Untrue or Misleading Statements About Quality Control**

(a)     "In certain cases, including with respect to mortgage loans originated through a loan correspondent or mortgage broker, the data used by Countrywide Home Loans to complete the underwriting analysis may

be obtained by a third party. In such instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, under certain circumstances, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide prior to acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under such circumstances, Countrywide Home Loans conducts a quality control review of a sample of such mortgage loans."  (Prospectus Supplement at S-48.)

(b)     "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior

experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-53.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)      "In determining the adequacy of the mortgaged property as collateral, an appraisal may be made of each property considered for financing. In instances where an appraisal is required, the appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."  (Prospectus at 27.)

(b)      "Except with respect to its Streamlined Documentation Program (as further described below), Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. Such appraisers inspect and appraise the proposed mortgaged property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to FNMA or FHLMC appraisal standards then in effect. Every independent appraisal is reviewed by a Countrywide underwriter before the loan is approved."  (Prospectus Supplement at S-49.)

(c)      "Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to

conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-54.)

(d) "In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. The appraiser may be required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. Alternatively, the appraisal may be conducted by comparing values of similar properties in an automated system or electronic data base, inspecting the exterior of the property or another method described in the underwriting guide. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property. ABN AMRO expects that the underwriting standards will require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values." (Prospectus Supplement at S-59.)

(e) "In order to determine the marketability of a property, a property valuation must be obtained from a Flagstar Bank-approved appraiser for all loans. Generally, for loans greater than $650,000, two appraisals will be required from two different approved appraisers." (Prospectus Supplement at S-60.)

## Item 163    Untrue or Misleading Statements About LTVs

(a) (For data charts regarding Loan Group 2, see Prospectus Supplement at S-30.)

(b) In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

    (i)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the initial mortgage loans in loan group 2 was approximately 71.22%." (Prospectus Supplement at S-30 n.1.)

(c) "One initial mortgage loan had a Loan-to-Value Ratio at origination of more than 95.00%." (Prospectus Supplement at S-18.)

(d)     "Countrywide Home Loans' Standard Underwriting Guidelines
generally allow Loan-to-Value Ratios at origination of up to 95% for
purchase money or rate and term refinance mortgage loans, with
original principal balances of up to $300,000, up to 90% for mortgage
loans with original principal balances of up to $400,000, up to 85%
for mortgage loans with original principal balances of up to $500,000,
up to 80% for mortgage loans with original principal balances of up to
$650,000, up to 75% for mortgage loans with original principal
balances of up to $750,000 and up to 70% for mortgage loans with
original principal balances of up to $1,000,000."  (Prospectus
Supplement at S-50.)

(e)     "Countrywide Home Loans' Expanded Underwriting Guidelines
generally allow Loan-to-Value Ratios at origination of up to 95% for
purchase money or rate and term refinance mortgage loans with
original principal balances of up to $300,000, up to 90% for mortgage
loans with original principal balances of up to $400,000, up to 85%
for mortgage loans with original principal balances of up to $500,000,
up to 80% for mortgage loans with original principal balances of up to
$650,000, up to 70% for mortgage loans with original principal
balances of up to $750,000, up to 65% for mortgage loans with
original principal balances of up to $1,000,000 and up to 70% for
mortgage loans with original principal balances of up to $3,000,000."
(Prospectus Supplement at S-51.)

(f)     "Countrywide Home Loans may provide secondary financing to a
mortgagor contemporaneously with the origination of a mortgage
loan, subject to the following limitations: the Loan-to-Value Ratio of
the senior (i.e., first) lien may not exceed 80% and the combined
Loan-to-Value Ratio may not exceed 100%."  (Prospectus
Supplement at S-53.)

(g)     "Countrywide Home Loans' Standard Underwriting Guidelines for
mortgage loans with non-conforming original principal balances
generally allow Loan-to-Value Ratios at origination of up to 95% for
purchase money or rate and term refinance mortgage loans with
original principal balances of up to $400,000, up to 90% for mortgage
loans with original principal balances of up to $650,000, up to 75%
for mortgage loans with original principal balances of up to

$1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-55.)

(h)      "Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000."  (Prospectus Supplement at S-56.)

(i)      "The maximum loan-to-value ratio applicable to one- and two-family properties, low-rise condominium units and planned unit developments is 95% for purchase and rate/term refinances, and 80% for cash-out refinances."  (Prospectus Supplement at S-60 (Flagstar Bank's underwriting standards).)

(j)      "Under this program, Flagstar Bank may provide secondary financing to an applicant contemporaneously with the origination of the first mortgage loan but only if the first mortgage loan-to-value ratio does not exceed 90% and the combined loan-to-value (CLTV) ratio does not exceed 95% for one- and two-family properties, low-rise condominium units and planned unit developments for purchase and rate/term refinance transactions (80% LTV and 90% CLTV for cash-out refinance transactions)."  (Prospectus Supplement at S-60.)

(k)      "Generally, each initial mortgage loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-18.)

**Item 177      Untrue or Misleading Statements About Use of the Properties**

(a)      (For data charts regarding Loan Group 2, see Prospectus Supplement at S-33.)

(b)      In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

      (i)      310 (or 92.54%) of the 335 initial mortgage loans in Loan Group 2 were to be owner-occupied.  Those 310 loans represented 91.97% of the aggregate Stated Principal Balance of the initial mortgage loans in Loan Group 2 as of the initial cut-off date.  (Prospectus Supplement at S-33.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

(a)      "It is a condition to the issuance of the certificates of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (Prospectus at 111.)

(b)      "It is a condition to the issuance of the senior certificates that they be rated AAA by Fitch Ratings ('Fitch'). It is a condition to the issuance of the Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4, Class A-R, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class 2-A-5, Class 2-X, Class PO, Class 3-A-1, Class 3-A-2, Class 3-A-3, Class 3-A-4, Class 3-A-5, Class 3-A-6, Class 3-A-7, Class 3-A-8, Class 3-A-9, Class 3-A-10, Class 3-A-11, Class 3-A-12, Class 3-A-13, Class 3-A-14, Class 3-A-16 and Class 3-X Certificates that they be rated Aaa by Moody's Investors Service, Inc. ('Moody's')."  (Prospectus Supplement at S-119.)

**Item 181      Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)      "Ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of all distributions on the underlying

mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with the certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any."  (Prospectus at 111.)

(b)     "The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Fitch's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-119.)

(c)     "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-119.)

## Item 195     Untrue or Misleading Statements About Effective Securitization

(a)     "The depositor will cause the mortgage loans comprising each mortgage pool to be assigned to the trustee named in the related prospectus supplement for the benefit of the certificateholders of the related series."  (Prospectus at 17.)

(b)     "Assignment of the Mortgage Loans. At the time of issuance of the certificates of a series, the depositor will cause the mortgage loans comprising the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus

supplement. The trustee will, concurrently with the assignment, deliver the certificates to the depositor in exchange for the mortgage loans."  (Prospectus at 53.)

(c)     "In addition, the depositor will deliver or cause to be delivered to the trustee (or to the custodian) for each mortgage loan
> • the mortgage note endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost,
> • the mortgage, deed of trust or similar instrument with evidence of recording indicated on it (except for any mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the recording office or some other arrangement will be provided for),
> • an assignment of the mortgage to the trustee in recordable form and
> • any other security documents specified in the related prospectus supplement or the related pooling and servicing agreement."

(Prospectus at 53.)

(d)     "The applicable prospectus supplement may provide other arrangements for assuring the priority of the assignments, but if it does not, then the depositor will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which in the opinion of counsel recording is not required to protect the trustee's interest in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans."

(Prospectus at 53.)

(e)     "The depositor . . . will cause the mortgage loans to be assigned to the trustee for the benefit of the holders of the certificates."  (Prospectus Supplement at S-16.)

(f)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey

without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each mortgage loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2005-J2, including all principal and interest received on or with respect to the closing date mortgage loans, but not any principal and interest due on or before the initial cut-off date, and amounts on deposit in the Supplemental Loan Account and the Capitalized Interest Account on the closing date." (Prospectus Supplement at S-45.)

(g)     "In connection with the transfer and assignment of a mortgage loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage, the title policy with respect to the related mortgaged property and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Closing Date Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date and not later than twenty days after the relevant Supplemental Transfer Date (as defined below) with respect to up to 90% of the Supplemental Mortgage Loans in each loan group conveyed on such Supplemental Transfer Date. Assignments of the mortgage loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller." (Prospectus Supplement at S-45.)

# SCHEDULE 14

## SCHEDULE 14 TO THE COMPLAINT

**Item 20**     **Details About the Securitization**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2007-HY6 issued Mortgage Pass-Through Certificates, Series 2007-HY6, which was a securitization in September 2007 of 1,923 loans divided into 4 loan groups.

(c)     **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Super Senior/Variable Pass-Through Rate) in this securitization, in tranches 2-A-1, 3-A-1, and 4-A-1.  The Bank paid $97,032,908.13 in principal plus accrued interest of $437,584.46 for certificates in tranche 2-A-1. The Bank purchased certificates in tranche 3-A-1 in two separate transactions, first paying $334,581,250.00 in principal plus accrued interest of $1,510,209.23, and next paying $29,053,146.88 in principal plus accrued interest of $130,892.31.  The Bank paid $277,839,372.81 in principal plus accrued interest of $1,315,184.08 for certificates in tranche 4-A-1.  The Bank received all the certificates on September 28, 2007.  Tranche 2-A-1 contains loans in Loan Group 2, tranche 3-A-1 contains loans in Loan Group 3, and tranche 4-A-1 contains loans in Loan Group 4.

(d)     **CUSIP**: 17025mac0 (tranche 2-A-1), 17025mae6 (tranche 3-A-1), & 17025mag1 (tranche 4-A-1)

(e)     **Ratings of the certificate(s) at the time of the Bank's purchase**:
    (i)     Moody's: Aaa for tranches 2-A-1 (17025mac0), 3-A-1 (17025mae6), and 4-A-1 (17025mag1)
    (ii)     S&P: AAA for tranches 2-A-1 (17025mac0), 3-A-1 (17025mae6), and 4-A-1 (17025mag1)

(f)     **Ratings of the certificate(s) as of November 30, 2010**:
    (i)     Moody's: Caa3, Caa3, and Caa2, respectively, for tranches 2-A-1 (17025mac0), 3-A-1 (17025mae6), and 4-A-1 (17025mag1)
    (ii)     S&P: CCC for tranches 2-A-1 (17025mac0), 3-A-1 (17025mae6), and 4-A-1 (17025mag1)

(g)     **SEC's URL of prospectus and prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/906410/000114420407052414/v08
9134_424b5.htm

## Item 21     Details About the Parties

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Originator(s)**:
(i)     Countrywide Home Loans, Inc.

(c)     **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)     **Depositor**: CWMBS, Inc.

(e)     **Trustee**: The Bank of New York

(f)     **Master Servicer**: Countrywide Home Loans Servicing LP

## Item 75     Untrue or Misleading Statements About General Underwriting Standards

(a)     "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral." (Prospectus at 25.)

(b)     "The Mortgage Loans that will be transferred to the issuing entity other than those originated or acquired by Countrywide Home Loans have been originated or acquired in accordance with the procedures set forth in the prospectus under '*Loan Program—Underwriting Standards*.'" (Prospectus Supplement at S-35.)

(c)     "Approximately 95.81%, 91.45%, 100.00% and 98.11% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting

standards. . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." (Prospectus Supplement at S-35.)

(d)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-36.)

**Item 77    Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)." (Prospectus at 25.)

(b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the '***debt-to-income***' ratios) are within acceptable limits." (Prospectus Supplement at S-36.)

(c)    "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-

income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-36.)

(d)   "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt to income ratio based on the borrower's total monthly debt of up to 55%."  (Prospectus Supplement at S-37.)

## Item 81   Untrue or Misleading Statements About Exceptions to Underwriting Standards

(a)   "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-36.)

## Item 87   Untrue or Misleading Statements About Quality Control

(a)   "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-36.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the property to be used as collateral, an appraisal may be made of each property considered for financing. Except as described in the prospectus supplement, an appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 25.)

(b)     "Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-37.)

**Item 163      Untrue or Misleading Statements About LTVs**

(a)     (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement Annex A at A-5.  For data charts regarding Loan Group 2, see Prospectus Supplement Annex A at A-34.  For data charts regarding Loan Group 3, see Prospectus Supplement Annex A at A-46.  For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-60.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

(i) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 76.04%." (Prospectus Supplement Annex A at A-5 n.1.)

(ii) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 2 was approximately 76.74%." (Prospectus Supplement Annex A at A-34 n.1; *see also* Prospectus Supplement at S-4.)

(iii) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 3 was approximately 76.31%." (Prospectus Supplement Annex A at A-47 n.1; *see also* Prospectus Supplement at S-5.)

(iv) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 4 was approximately 74.97%." (Prospectus Supplement Annex A at A-60 n.1; *see also* Prospectus Supplement at S-5.)

(c) "Each seller's underwriting standards will generally permit loans with loan-to-value ratios at origination of up to 100% depending on the loan program, type and use of the property, creditworthiness of the borrower and debt-to-income ratio. If so specified in the related prospectus supplement, a seller's underwriting criteria may permit loans with loan-to-value ratios at origination in excess of 100%." (Prospectus at 25.)

(d) "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100%." (Prospectus Supplement at S-31.)

(e) "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (*i.e.*, first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 95%." (Prospectus Supplement at S-36.)

(f) "Countrywide Home Loans' underwriting guidelines for fixed period adjustable rate mortgage loans generally allow Loan to Value Ratios at origination of up to 95% for purchase money or rate and term

refinance mortgage loans with original principal balances of up to
$650,000, up to 80% for mortgage loans with original principal
balances of up to $2,000,000 and up to 70% for mortgage loans with
original principal balances of up to $3,000,000." (Prospectus
Supplement at S-37.)

(g)     "Generally, each Mortgage Loan with a Loan-to-Value Ratio at
        origination of greater than 80% will be covered by a primary
        mortgage guaranty insurance policy issued by a mortgage insurance
        company acceptable to Fannie Mae or Freddie Mac." (Prospectus
        Supplement at S-31.)

## Item 177     Untrue or Misleading Statements About Use of the Properties

(a)     (For data charts regarding the Mortgage Loans in aggregate, see
        Prospectus Supplement Annex A at A-8.  For data charts regarding
        Loan Group 2, see Prospectus Supplement Annex A at A-37.  For data
        charts regarding Loan Group 3, see Prospectus Supplement Annex A
        at A-50.  For data charts regarding Loan Group 4, see Prospectus
        Supplement Annex A at A-63.)

(b)     In the prospectus supplement, Countrywide Securities Corporation
        made the following statements about the Occupancy Types of the
        mortgage loans in the collateral pool of this securitization:

        (i)     1,792 (or 93.19%) of the 1,923 Mortgage Loans in
                aggregate were for primary residences.  Those 1,792
                loans represented 93.14% of the Stated Principal Balance
                of the Mortgage Loans in aggregate as of the cut-off date.
                (Prospectus Supplement Annex A at A-8.)

        (ii)    160 (or 86.49%) of the 185 Mortgage Loans in Loan
                Group 2 were for primary residences.  Those 160 loans
                represented 86.20% of the Stated Principal Balance of the
                Mortgage Loans in Loan Group 2 as of the cut-off date.
                (Prospectus Supplement Annex A at A-37.)

        (iii)   671 (or 94.11%) of the 713 Mortgage Loans in Loan
                Group 3 were for primary residences.  Those 671 loans
                represented 94.04% of the Stated Principal Balance of the
                Mortgage Loans in Loan Group 3 as of the cut-off date.
                (Prospectus Supplement Annex A at A-50.)

(iv)  480 (or 93.93%) of the 511 Mortgage Loans in Loan Group 4 were for primary residences.  Those 480 loans represented 94.04% of the Stated Principal Balance of the Mortgage Loans in Loan Group 4 as of the cut-off date. (Prospectus Supplement Annex A at A-63.)

**Item 180   Untrue or Misleading Statements About Earned Ratings**

(a)  "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a 'Rating Agency') specified in the related prospectus supplement." (Prospectus at 108.)

(b)  "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('***S&P***') and Aaa by Moody's Investors Service, Inc. ('***Moody's***')."  (Prospectus Supplement at S-90.)

**Item 181   Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)  "The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement."  (Prospectus at 108.)

(b)  "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-90.)

(c)     "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-90.)

**Item 195      Untrue or Misleading Statements About Effective Securitization**

(a)     "The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series." (Prospectus at 12.)

(b)     "*Assignment of the Loans.* At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. In the case of a series with both notes and certificates, the trust will pledge these assets to the trustee for the benefit of the holders of the notes. The trustee (or trust, in the case of a series with both notes and certificates) will, concurrently with the assignment, deliver the related securities to the depositor in exchange for the loans." (Prospectus at 53.)

(c)     "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or multifamily loan,
          • the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,

> • the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),
> • an assignment of the Mortgage to the trustee, which assignment will be in recordable form in the case of a Mortgage assignment, and
> • any other security documents, including those relating to any senior interests in the Property, as may be specified in the related prospectus supplement or the related Pooling and Servicing Agreement or Sale and Servicing Agreement."

(Prospectus at 53-54.)

(d)     "The applicable prospectus supplement may provide other arrangements for assuring the priority of assignments, but if it does not, the seller, the depositor or the trustee, as specified in the related Pooling and Servicing Agreement or Sale and Servicing Agreement, will promptly cause the assignments of the related loans to be recorded in the appropriate public office for real property records, except in states in which, in the opinion of counsel acceptable to the trustee, the recording is not required to protect the trustee's or the certificateholder's interest."  (Prospectus at 54.)

(e)     "The depositor . . . will cause the Mortgage Loans to be assigned to the trustee for the benefit of the holders of the certificates." (Prospectus Supplement at S-28.)

(f)     "Under the pooling and servicing agreement, the depositor will assign all of its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligations) to the trustee for the benefit of the certificateholders." (Prospectus Supplement at S-28.)

(g)     "Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to

each Mortgage Loan and all right, title and interest in and to all other assets included in CHL Mortgage Pass-Through Trust 2007-HY6, including all principal and interest received on or with respect to the Mortgage Loans, but not any principal and interest due on or before the cut-off date."  (Prospectus Supplement at S-33.)

(h)     "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument, an assignment in recordable form of the mortgage or a copy of such assignment, the original or a copy of the title policy with respect to the related mortgaged property, and if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller. The depositor expects that substantially all of the assignments will not be recorded based upon an opinion of counsel."  (Prospectus Supplement at S-33—S-34.)

# SCHEDULE 15

## SCHEDULE 15 TO THE COMPLAINT

**Item 20**     **Details About the Securitization**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2007-HY7 issued Mortgage Pass-Through Certificates, Series 2007-HY7, which was a securitization in October 2007 of 754 loans divided into 4 loan groups.

(c)     **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank Senior Certificates (Super Senior/Variable Pass-Through Rate/Exchangeable) in this securitization, in tranche A-1, for which the Bank paid $295,726,049.38 in principal plus accrued interest of $1,393,268.05. The Bank received the certificates on October 30, 2007.  The related loan groups for tranche A-1 are Loan Groups 2, 3, and 4.

(d)     **CUSIP**: 12544hay6

(e)     **Ratings of the certificate(s) at the time of the Bank's purchase**:
          (i)     Moody's: Aaa
          (ii)    S&P: AAA

(f)     **Ratings of the certificate(s) as of November 30, 2010**:
          (i)     Moody's: Caa3
          (ii)    S&P: CCC

(g)     **SEC's URL of prospectus and prospectus supplement for this securitization**:
          http://sec.gov/Archives/edgar/data/906410/000114420407057505/v09
          1818_424b5.htm

**Item 21**     **Details About the Parties**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Originator(s)**:
          (i)     Countrywide Home Loans, Inc.

    (c)    **Sponsor/Seller**: Countrywide Home Loans, Inc.

    (d)    **Depositor**: CWMBS, Inc.

    (e)    **Trustee**: The Bank of New York

    (f)    **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75**    **Untrue or Misleading Statements About General Underwriting**

    (a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral."  (Prospectus at 25.)

    (b)    "The Mortgage Loans that will be transferred to the issuing entity other than those originated or acquired by Countrywide Home Loans have been originated or acquired in accordance with the procedures set forth in the prospectus under '*Loan Program—Underwriting Standards*.'"  (Prospectus Supplement at S-39.)

    (c)    "Approximately 87.36%, 90.21%, 93.47% and 99.02% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards (the '***Countrywide Mortgage Loans***'). . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-40.)

    (d)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Propectus Supplement at S-40.)

**Item 77**     **Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)     "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 25.)

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the '***debt-to-income***' ratios) are within acceptable limits."  (Prospectus Supplement at S-40—S-41.)

(c)     "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-41.)

(d)     "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt to income ratio based on the borrower's total monthly debt of up to 55%."  (Prospectus Supplement at S-42.)

**Item 81**     **Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-41.)

**Item 87**     **Untrue or Misleading Statements About Quality Control**

(a)     "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-40.)

**Item 142**     **Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the property to be used as collateral, an appraisal may be made of each property considered for financing. Except as described in the prospectus supplement, an appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been

completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 25.)

(b)     "Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-41.)

## Item 163     Untrue or Misleading Statements About LTVs

(a)     (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement Annex A at A-5.  For data charts regarding Loan Group 2, see Prospectus Supplement Annex A at A-35.  For data charts regarding Loan Group 3, see Prospectus Supplement Annex A at A-50.  For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-64.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

        (i)     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 71.45%." (Prospectus Supplement Annex A at A-5 n.1.)

        (ii)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 2 was approximately 70.85%." (Prospectus

Supplement Annex A at A-35 n.1; *see also* Prospectus Supplement at S-4.)

(iii)   "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 3 was approximately 71.30%." (Prospectus Supplement Annex A at A-50 n.1; *see also* Prospectus Supplement at S-5.)

(iv)   "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 4 was approximately 72.40%." (Prospectus Supplement Annex A at A-64 n.1; *see also* Prospectus Supplement at S-5.)

(c)   "Each seller's underwriting standards will generally permit loans with loan-to-value ratios at origination of up to 100% depending on the loan program, type and use of the property, creditworthiness of the borrower and debt-to-income ratio. If so specified in the related prospectus supplement, a seller's underwriting criteria may permit loans with loan-to-value ratios at origination in excess of 100%." (Prospectus at 25.)

(d)   "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100%." (Prospectus Supplement at S-36.)

(e)   "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan to Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan to Value Ratio may not exceed 95%." (Prospectus Supplement at S-41.)

(f)   "Countrywide Home Loans' underwriting guidelines for fixed period adjustable rate mortgage loans generally allow Loan to Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $2,000,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000." (Prospectus Supplement at S-41.)

(g)    "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-36.)

## Item 177    Untrue or Misleading Statements About Use of the Properties

(a)    (For data charts regarding the Mortgage Loans in aggregate, see Prospectus Supplement Annex A at A-8.  For data charts regarding Loan Group 2, see Prospectus Supplement Annex A at A-38.  For data charts regarding Loan Group 3, see Prospectus Supplement Annex A at A-53.  For data charts regarding Loan Group 4, see Prospectus Supplement Annex A at A-67.)

(b)    In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

    (i)    697 (or 92.44%) of the 754 Mortgage Loans in aggregate were for primary residences.  Those 697 loans represented 92.11% of the Stated Principal Balance of the Mortgage Loans in aggregate as of the cut-off date.  (Prospectus Supplement Annex A at A-8.)

    (ii)    261 (or 93.21%) of the 280 Mortgage Loans in Loan Group 2 were for primary residences.  Those 261 loans represented 91.50% of the Stated Principal Balance of the Mortgage Loans in Loan Group 2 as of the cut-off date.  (Prospectus Supplement Annex A at A-38.)

    (iii)    210 (or 90.52%) of the 232 Mortgage Loans in Loan Group 3 were for primary residences.  Those 210 loans represented 90.61% of the Stated Principal Balance of the Mortgage Loans in Loan Group 3 as of the cut-off date.  (Prospectus Supplement Annex A at A-53.)

    (iv)    138 (or 91.39%) of the 151 Mortgage Loans in Loan Group 4 were for primary residences.  Those 480 loans represented 93.00% of the Stated Principal Balance of the Mortgage Loans in Loan Group 4 as of the cut-off date.  (Prospectus Supplement Annex A at A-67.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

    (a)    "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a 'Rating Agency') specified in the related prospectus supplement." (Prospectus at 108.)

    (b)    "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('**S&P**') and Aaa by Moody's Investors Service, Inc. ('**Moody's**')."  (Prospectus Supplement at S-105.)

**Item 181      Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

    (a)    "The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement."  (Prospectus at 108.)

    (b)    "The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-105.)

    (c)    "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including

any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (Prospectus Supplement at S-105—S-106.)

**Item 195      Untrue or Misleading Statements About Effective Securitization**

(a)      "The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series." (Prospectus at 12.)

(b)      "*Assignment of the Loans.* At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. In the case of a series with both notes and certificates, the trust will pledge these assets to the trustee for the benefit of the holders of the notes. The trustee (or trust, in the case of a series with both notes and certificates) will, concurrently with the assignment, deliver the related securities to the depositor in exchange for the loans." (Prospectus at 53.)

(c)      "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or multifamily loan,

     • the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,
     • the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),

> • an assignment of the Mortgage to the trustee, which
> assignment will be in recordable form in the case of a Mortgage
> assignment, and
> • any other security documents, including those relating to any
> senior interests in the Property, as may be specified in the
> related prospectus supplement or the related Pooling and
> Servicing Agreement or Sale and Servicing Agreement."

(Prospectus at 53-54.)

(d)     "The applicable prospectus supplement may provide other
        arrangements for assuring the priority of assignments, but if it does
        not, the seller, the depositor or the trustee, as specified in the related
        Pooling and Servicing Agreement or Sale and Servicing Agreement,
        will promptly cause the assignments of the related loans to be
        recorded in the appropriate public office for real property records,
        except in states in which, in the opinion of counsel acceptable to the
        trustee, the recording is not required to protect the trustee's or the
        certificateholder's interest."  (Prospectus at 54.)

(e)     "The depositor . . . will cause the Mortgage Loans to be assigned to
        the trustee for the benefit of the holders of the certificates."
        (Prospectus Supplement at S-32.)

(f)     "Under the pooling and servicing agreement, the depositor will assign
        all of its right, title and interest in the representations, warranties and
        covenants (including the sellers' repurchase or substitution
        obligations) to the trustee for the benefit of the certificateholders."
        (Prospectus Supplement at S-32.)

(g)     "Pursuant to the pooling and servicing agreement, on the closing date,
        the depositor will sell, transfer, assign, set over and otherwise convey
        without recourse to the trustee in trust for the benefit of the
        certificateholders all right, title and interest of the depositor in and to
        each Mortgage Loan and all right, title and interest in and to all other
        assets included in CHL Mortgage Pass-Through Trust 2007-HY7,
        including all principal and interest received on or with respect to the
        Mortgage Loans, but not any principal and interest due on or before
        the cut-off date."  (Prospectus Supplement at S-38.)

(h)     "In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things, the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost, the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument, an assignment in recordable form of the mortgage or a copy of such assignment, the original or a copy of the title policy with respect to the related mortgaged property, and if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller. The depositor expects that substantially all of the assignments will not be recorded based upon an opinion of counsel." (Prospectus Supplement at S-38.)

# SCHEDULE 16

## SCHEDULE 16 TO THE COMPLAINT

**Item 20**　　**Details About the Securitization**

    (a)　　**Dealer**: Countrywide Securities Corp.

    (b)　　**Description of the Trust**: First Horizon Mortgage Pass-Through Trust 2006-AR4 issued Mortgage Pass-Through Certificates, Series 2006-AR4, which was a securitization in December 2006 of 537 loans divided into three loan pools.

    (c)　　**Description of Purchase**: Countrywide Securities Corp. offered and sold to a super senior certificate in tranche II-A-1, for which the Bank paid $55,999,176.45 in principal plus accrued interest of $231,024.91. The Bank received the certificate on December 28, 2006.  Tranche II-A-1 contains loans in loan pool II.

    (d)　　**CUSIP**: 32053aae6

    (e)　　**Ratings of the certificate(s) at the time of the Bank's purchase**:
        (i)　　S&P:  AAA
        (ii)　　Fitch: AAA

    (f)　　**Ratings of the certificate(s) as of November 30, 2010**:
        (i)　　S&P:  CCC
        (ii)　　Fitch: A/*-

    (g)　　**SEC's URL of prospectus and the prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/1081915/000093041307000948/c46414_424b5.htm

**Item 21**　　**Details About the Parties**

    (a)　　**Dealer**: Countrywide Securities Corp.

    (b)　　**Originator(s)**: First Horizon Home Loan Corp.

    (c)　　**Sponsor/Seller**: First Horizon Home Loan Corp.

EXHIBIT A
Page 355

(d)   **Depositor**: First Horizon Asset Securities Inc.

(e)   **Trustee**: The Bank of New York

(f)   **Master Servicer**: First Horizon Home Loan Corp.

**Item 75**   **Untrue or Misleading Statements About General Underwriting Standards**

(a)   "The First Horizon Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations." (Prospectus Supplement at S-30.)

**Item 77**   **Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)   "In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, First Horizon generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income." (Prospectus Supplement at S-31.)

(b)   "After obtaining all applicable employment, credit and Property information, the related seller will use a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. The 'debt-to-income ratio' is the ratio of the borrower's total monthly payments to the borrower's gross monthly income. The maximum monthly debt-to-income ratio will vary depending upon a borrower's credit grade and loan program but will not generally exceed 55%. Variations in the monthly debt-to-income ratio limit will be permitted based on compensating factors to the extent specified in the related prospectus supplement." (Prospectus at 36-37.)

**Item 81**    **Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)    "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." (Prospectus Supplement at S-30.)

**Item 87**    **Untrue or Misleading Statements About Quality Control**

(a)    "First Horizon may perform only sample quality assurance reviews to determine whether the mortgage loans in any mortgage pool were underwritten in accordance with applicable standards." (Prospectus at 34.)

**Item 142**    **Untrue or Misleading Statements About Appraisals**

(a)    "In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property." (Prospectus at 35.)

(b)    "Each mortgaged property has been appraised by a qualified independent appraiser who is state licensed or certified. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and/or Freddie Mac. The requirements of Fannie Mae and Freddie Mac usually require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines." (Prospectus Supplement at S-32.)

**Item 163      Untrue or Misleading Statements About LTVs**

(a)    (For data charts, see Prospectus Supplement Annex II at II-1 and Annex IV at IV-1.)

(b)    In the prospectus supplement, Countrywide Securities Corp. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

    (i)    The LTV ratios of the loans in the aggregate ranged from 20.40% to 95.00%.  (Prospectus Supplement S-7 – S-9.)

    (ii)    As of the initial cut-off date, the initial mortgage loans in the aggregate had a 71.87% weighted average original LTV ratio.  (Prospectus Supplement Annex IV at IV-1.)

    (iii)    The LTV ratios of the loans in pool II ranged from 37.50% to 95.00%.  (Prospectus Supplement at S-8.)

    (iv)    As of the initial cut-off date, the initial mortgage loans in pool II had a 70.92% weighted average original LTV ratio.  (Prospectus Supplement Annex II at II-1.)

(c)    "No mortgage loan has a loan-to-value ratio at origination of more than 95%."  (Prospectus Supplement at S-29.)

(d)    "Generally, each mortgage loan with a loan-to-value ratio at origination of greater than 80% is covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-29.)

(e)    "***Loan-to-Value Requirements***. With respect to purchase money or rate/term refinance loans secured by single family residences, loan-to-value ratios at origination of up to 95% for mortgage loans secured by single family, primary residences with original principal balances of up to $650,000. Mortgage loans with principal balances up to $4,000,000 ('super jumbos') are allowed if the loan is secured by the borrower's primary residence. The loan-to-value ratio for super jumbos generally may not exceed 70%. For cash out refinance loans, the maximum loan-to-value ratio generally is 95% and the maximum 'cash out' amount permitted is based in part on the original amount of the related mortgage loan."  (Prospectus Supplement at S-31.)

**Item 177      Untrue or Misleading Statements About Use of the Properties**

(a)      (For data charts, see Prospectus Supplement Annex II at II-2 and Annex IV at IV-2.)

(b)      In the prospectus supplement, Countrywide Securities Corp. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

      (i)      506 (or 94.23%) of the 537 initial mortgage loans in the aggregate were for primary residences.  Those 537 loans represented 94.59% of the total outstanding principal balance for the loans in the aggregate.  (Prospectus Supplement Annex IV at IV-2.)

      (ii)      78 (or 90.70%) of the 86 initial mortgage loans in pool II were for primary residences.  Those 78 loans represented 92.23% of the total outstanding principal balance for the loans in pool II.  (Prospectus Supplement Annex II at II-2.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

(a)      "The issuance of the offered certificates is conditioned on the certificates receiving the ratings from Fitch and S&P indicated under the heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement."  (Prospectus Supplement at S-12.)

(b)      "The issuance of the certificates is conditioned on the certificates receiving the ratings from Fitch and S&P indicated under the heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement."  (Prospectus Supplement at S-72.)

**Item 181      Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)      "The ratings assigned by Fitch and S&P to the mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Fitch and S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and

legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pools are adequate to make payments required by the certificates."  (Prospectus Supplement at S-72.)

**Item 195     Untrue or Misleading Statements About Effective Securitization**

(a)     "*Assignment of the Loans.* At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the related trustee, without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the securities to the depositor in exchange for the loans. Each loan will be identified in a schedule appearing as an exhibit to the related Agreement. This schedule will include information as to the outstanding principal balance of each loan after application of payments due on or before the cut-off date, as well as information regarding the Loan Rate or APR, the maturity of the loan, the Loan-to-Value Ratios or Combined Loan-to-Value Ratios, as applicable, at origination and certain other information."  (Prospectus at 65.)

(b)     "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or home equity loan,
          • the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost,
          • the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),
          • an assignment of the Mortgage either in blank or to the trustee, which assignment will be in recordable form in the case

of a Mortgage assignment, and any other security documents, including those relating to any senior interests in the Property, as may be specified in the related prospectus supplement or the related Agreement."

(Prospectus at 65.)

# SCHEDULE 17

## SCHEDULE 17 TO THE COMPLAINT

**Item 20**     **Details about the Securitization**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Issuing entity and securitization**:  Wells Fargo Mortgage Backed Securities 2006-8 issue Mortgage Pass-Through Certificates, Series 2006-8, which was a securitization in June 2006 of 2,373 mortgages. The mortgages were not divided into Loan Groups for this securitization.

(c)     **Description of purchase**: Countrywide Securities Corporation offered and sole to the Bank a Senior/Sequential Pay Certificate, in tranche A-3, for which the Bank paid $158,786,043.75 in principal plus accrued interest of $716,155.00.  The Bank received the certificates on June 30, 2006.

(d)     **CUSIP**:  94983SAE2

(e)     **Ratings of the certificate(s) at time of the Bank's purchase**:
        (i)     Moody's: Aaa
        (ii)    Fitch: AAA

(f)     **Ratings of the certificate(s) as of November 30, 2010:**
        (i)     Moody's: B3
        (ii)    Fitch: B

(g)     **SEC's URL of prospectus and prospectus supplement for this securitization**:
        http://sec.gov/Archives/edgar/data/1011663/000119312506139042/d4
        24b5.htm

**Item 21**     **Details About the Parties**

(a)     **Dealer**:  Countrywide Securities Corporation

(b)     **Originator(s)**:  Wells Fargo Bank or Affiliate

(c)     **Sponsor/Seller**:  Wells Fargo Bank, N.A.

(d)     **Depositor**:  Wells Fargo Asset Securities Corporation

(e)     **Trustee**: HSBC Bank USA, National Association

(f)     **Master Servicer**:  Wells Fargo Bank, N.A.

**Item 75     Untrue or Misleading Statements About General Underwriting Standards**

(a)     "The Trust for each Series of Certificates will include Mortgage Loans which have been underwritten in accordance with one or more of the following: (i) Wells Fargo Bank's 'general' underwriting standards, (ii) Wells Fargo Bank's '**retention program**,' (iii) the underwriting standards of a pool insurer and (iv) the underwriting standards of participants in Wells Fargo Bank's non-agency conduit program."  (Prospectus at 32.)

(b)      "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."  (Prospectus at 32.)

(c)     "Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein."  (Prospectus at 32.)

(d)     "Approximately 96.61% of the Mortgage Loans were generally originated in conformity with the underwriting standards described in the prospectus under the heading 'The Sponsor's Mortgage Loan Programs — Mortgage Loan Underwriting' (the '**Underwriting Standards**')."  (Prospectus Supplement at S-43.)

**Item 77     Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)      "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the

mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history."  (Prospectus at 32.)

(b)     "Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies. These scoring systems assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit and certain loan attributes. Such objective measures are then used to evaluate loan applications and assign each application a '**Mortgage Score**.'"  (Prospectus at 32.)

(c)     "The Mortgage Score is used to determine the type of underwriting process and which level of underwriter will review the loan file." (Prospectus at 33.)

(d)     (For debt-to-income data charts, see Prospectus Supplement Appendix A at A-1, A-5.)

(e)     "In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level.  Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying."  (Prospectus at 34.)

(f)     "Wells Fargo permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines such as documented excess funds in reserves after

closing, a history of making a similar sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income." (Prospectus at 34.)

(g)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Debt-to-Income Ratios of the Mortgage Loans in the collateral pool of this securitization:

(i)     The Mortgage Loans in this securitization had a range of Original Debt-to-Income Ratios of 4.50% to 73.53%. (Prospectus Supplement at Appendix A at A-1, A-5.)

(ii)    The Mortgage Loans in this securitization had a Weighted Average Original Total Debt-to-Income Ratio of 37.11%. (Prospectus Supplement at Appendix A at A-1.)

**Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's underwriting standards. To the extent that 20% or more of the aggregate principal balance of the Mortgage Loans in a Trust Estate are underwritten by a Correspondent whose underwriting standards vary materially from Wells Fargo Bank's underwriting standards, the applicable prospectus supplement will describe such underwriting standards for such Mortgage Loans." (Prospectus at 32.)

(b)     "With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process. Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein." (Prospectus at 32.)

(c)     "Approximately 3.39% of the Mortgage Loans were originated in conformity with the underwriting standards of certain third party originators, which may differ significantly from the Underwriting Standards."  (Prospectus Supplement at S-43.)

## Item 87     Untrue or Misleading Statements About Quality Control

(a)     "In order to qualify for participation in Wells Fargo Bank's mortgage loan purchase programs, lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines or the standards of a pool insurer and represent that each loan was underwritten in accordance with Wells Fargo Bank standards or the standards of a pool insurer and (v) utilize the services of qualified appraisers."  (Prospectus at 32.)

(b)     "The contractual arrangements with Correspondents may also involve the delegation of all underwriting functions to such Correspondents ('**Delegated Underwriting**'), which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondents' representations and, in the case of bulk purchase acquisitions from such Correspondents, Wells Fargo Bank's post-purchase reviews of samplings of mortgage loans acquired from such Correspondents regarding the Correspondents' compliance with Wells Fargo Bank's underwriting standards. In all instances, however, acceptance by Wells Fargo Bank is contingent upon the loans being found to satisfy Wells Fargo Bank's program standards or the standards of a pool insurer." (Prospectus at 32.)

(c)     "With respect to all mortgage loans underwritten by Wells Fargo Bank, Wells Fargo Bank's underwriting of a mortgage loan may be based on data obtained by parties other than Wells Fargo Bank that are involved at various stages in the mortgage origination or acquisition process. This typically occurs under circumstances in which loans are subject to an alternative approval process, as when Correspondents, certain mortgage brokers or similar entities that have

been approved by Wells Fargo Bank to process loans on its behalf, or independent contractors hired by Wells Fargo Bank to perform underwriting services on its behalf ('**contract underwriters**') make initial determinations as to the consistency of loans with Wells Fargo Bank underwriting guidelines. Wells Fargo Bank may also permit these third parties to utilize scoring systems in connection with their underwriting process. The underwriting of mortgage loans acquired by Wells Fargo Bank pursuant to a Delegated Underwriting arrangement with a Correspondent is not reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file. In addition, in order to be eligible to sell mortgage loans to Wells Fargo Bank pursuant to a Delegated Underwriting arrangement, the originator must meet certain requirements including, among other things, certain quality, operational and financial guidelines. See '—Acquisition of Mortgage Loans from Correspondents' above."  (Prospectus at 33.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)      (For data charts, see Prospectus Supplement Appendix A at A-5.)

(b)      "The appraisal of any Mortgaged Property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost."  (Prospectus at 35.)

(c)      In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Appraisals of the Mortgage Loans in the collateral pool of this securitization:
  (i)      100% of the initial Mortgage Loans received a "Full Appraisal."  (Prospectus Supplement at Appendix A at A-5.)

**Item 163      Untrue or Misleading Statements About LTVs**

(a)      (For data charts, see Prospectus Supplement Appendix A at A-1, A-4.)

(b)      "Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%. However, if so specified in the applicable prospectus supplement, Mortgage Loans that had Loan-to-

Value Ratios at origination in excess of 95% may be included in the related Trust Estate." (Prospectus at 34.)

(c)    In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Loan-to-Value Ratios of the Mortgage Loans in the collateral pool of this securitization:

    (i)    The Loan-to-Value Ratios of the initial Mortgage Loans ranged from 8.67% to 100%. (Prospectus Supplement at Appendix A at A-1, A-4.)

    (ii)    The initial Mortgage Loans had a Weighted Average Original Loan-to-Value Ratio of 70.17%. (Prospectus Supplement at Appendix A at A-1.)

    (iii)    Of the 2,373 initial Mortgage Loans, only 1, or .02% of the Aggregate Unpaid Principal Balance, Mortgage Loan with an Original Loan-to-Value Ratio greater than 80% was not covered by Primary Mortgage Insurance. (Prospectus Supplement at Appendix A at A-1.)

    (iv)    The initial Mortgage Loans with Original Principal Balances greater than $600,000 had a Weighted Average Original Loan-to-Value Ratio of 68.10%. (Prospectus Supplement at Appendix A at A-1.)

    (v)    The initial Mortgage Loans with Original Principal Balances greater than $600,000 had a Maximum Original Loan-to-Value Ratio of 90.00%. (Prospectus Supplement at A-1.)

## Item 177    Untrue or Misleading Statements About Use of the Properties

(a)    (For data charts, see Prospectus Supplement Appendix A at A-5.)

(b)    In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the Mortgage Loans in the collateral pool of this securitization:

    (i)    2,236 (or 94.23%) of the 2,373 initial Mortgage Loans were for Primary Residences. Those 2,236 loans represented 94.27% of the total outstanding principal balance for the Mortgage Loans. (Prospectus Supplement at Appendix A at A-5.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

(a)     "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table beginning on page S-6." (Prospectus Supplement at S-9.)

(b)     "It is a condition to the issuance of the Offered Certificates that each such class will have received at least the rating set forth in the table beginning on page S-6 from Fitch Ratings ('**Fitch**'), Moody's Investors Service Inc. ('**Moody's**') and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('**S&P**,' and together with Fitch and Moody's, the '**Rating Agencies**')." (Prospectus Supplement at S-57.)

(c)     "Certificates of any series will not be offered pursuant to this prospectus and a prospectus supplement unless each offered class is rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization." (Prospectus at 9.)

(d)     "It is a condition to the issuance of the certificates of a series offered by a prospectus supplement that the certificates be rated in one of the four highest rating categories by a nationally recognized statistical rating agency." (Prospectus at 12.)

(e)      "It is a condition to the issuance of the Certificates of any Series offered pursuant to this prospectus and a prospectus supplement that they be rated in one of the four highest categories by at least one nationally recognized statistical rating organization (a '**Rating Agency**')." (Prospectus at 129.)

**Item 181      Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "The ratings of Fitch on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which such certificateholders are entitled. Fitch's rating opinions address the structural and legal aspects associated with the certificates, including the nature of the underlying mortgage loans." (Prospectus Supplement at S-57.)

(b)     "The ratings of Moody's on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions of principal and interest to which such certificateholders are entitled. Moody's rating opinions address the structural, legal and issuer aspects associated with the certificates, including the nature of the underlying mortgage loans and the credit quality of the credit support provider, if any." (Prospectus Supplement at S-58.)

(c)     "The ratings of S&P on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of timely payments of interest and the ultimate return of principal. S&P's ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make payments required under the certificates." (Prospectus Supplement at S-58.)

**Item 195     Untrue or Misleading Statements About Effective Securitization**

(a)      "In connection with the conveyance of the Mortgage Loans to the Depositor, Wells Fargo Bank will (i) agree to deliver to the Depositor all of the documents which the Depositor is required to deliver to the Trustee or the custodian; (ii) make certain representations and warranties to the Depositor which will be the basis of certain of the Depositor's representations and warranties to the Trustee or assign the representations and warranties made by a Correspondent to the Sponsor; and (iii) agree to repurchase or substitute (or assign rights to a comparable agreement of a Correspondent) for any Mortgage Loan for which any document is not delivered or is found to be defective in any material respect, or which Mortgage Loan is discovered at any time not to be in conformance with any representation and warranty the Sponsor has made to the Depositor, if the Sponsor cannot deliver such document or cure such defect or breach within 60 days after notice thereof." (Prospectus at 78.)

(b)     "At the time of issuance of each Series of Certificates, the Mortgage Loans in the related Trust Estate will, pursuant to the applicable Pooling and Servicing Agreement, be assigned to the Trustee, together with all principal and interest received on or with respect to such

Mortgage Loans after the applicable Cut-Off Date other than principal and interest due and payable on or before such Cut-Off Date and interest attributable to the Fixed Retained Yield on such Mortgage Loans, if any. See 'Servicing of the Mortgage Loans—Fixed Retained Yield, Servicing Compensation and Payment of Expenses.' The Trustee or its agent will, concurrently with such assignment, authenticate and deliver the Certificates evidencing such Series to the Depositor in exchange for the Mortgage Loans. Each Mortgage Loan will be identified in a schedule delivered to the applicable Trustee or custodian. Each such schedule will include, among other things, the unpaid principal balance as of the close of business on the applicable Cut-Off Date, the maturity date and the Mortgage Interest Rate for each Mortgage Loan in the related Trust Estate." (Prospectus at 79.)

(c)     "In addition, with respect to each Mortgage Loan in a Trust Estate, the mortgage or other promissory note or a lost note affidavit executed by the applicable Servicer, any assumption, consolidation, modification or conversion to fixed interest rate agreement and, a mortgage assignment in recordable form (or other documents as are required under applicable law to create perfected security interest in the Mortgaged Property in favor of the Trustee) will be delivered to the Trustee or, if indicated in the applicable prospectus supplement, to a custodian, which may be the Sponsor. Unless otherwise required by the Rating Agencies, assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee (or a custodian indicated in the applicable prospectus supplement) in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan." (Prospectus at 79.)

# SCHEDULE 18

## SCHEDULE 18 TO THE COMPLAINT

**Item 20**     **Details about the Securitization**

(a)     **Dealer**: Countrywide Securities Corporation

(b)     **Issuing entity and securitization**: The Wells Fargo Mortgage Back Securities 2007-9 Trust issued Mortgage Pass-Through Certificates, Series 2007-9, which was a securitization in June 2007 of 1,252 mortgages divided into two Loan Groups.

(c)     **Description of purchase**: Countrywide Securities Corporation offered and sold to the Bank a Super Senior, Sequential Pay certificate in tranche I-A-1, for which the Bank paid $262,332,000.00 in principal plus accrued interest of $1,108,800.00.  The Bank received the certificates on June 28, 2007.  Tranche I-A-1 contains loans in Loan Group I.

(d)     **CUSIP**: 94986BAA4

(e)     **Ratings of the certificate(s) at time of the Bank's purchase**:
    (i)     Moody's: Aaa
    (ii)    Fitch: AAA

(f)     **Ratings of the certificate(s) as of November 30, 2010:**
    (i)     Moody's:     Ba2
    (ii)    Fitch:        AAA

(g)     **SEC's URL of prospectus and prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/1011663/000119312507145193/d424b5.htm

**Item 21**     **Details About the Parties**

(a)     **Dealer**:  Countrywide Securities Corporation

(b)     **Originator(s)**: Wells Fargo Bank, American Home Mortgage Corporation, MortgageIT, Inc., DB Structured Products, Inc., and CTX Mortgage Company, LLC

EXHIBIT A
Page 374

(c)　**Sponsor/Seller**: Wells Fargo Bank, N.A.

(d)　**Depositor**:  Wells Fargo Asset Securities Corporation

(e)　**Trustee**: HSBC Bank USA, National Association

(f)　**Master Servicer**: Wells Fargo Bank, N.A.

**Item 75**　**Untrue or Misleading Statements About General Underwriting Standards**

(a)　"The Trust for each Series of Certificates will include Mortgage Loans which have been underwritten in accordance with one or more of the following: (i) Wells Fargo Bank's 'general' underwriting standards, (ii) Wells Fargo Bank's **retention program**,' (iii) the underwriting standards of a pool insurer and (iv) the underwriting standards of participants in Wells Fargo Bank's non-agency conduit program."  (Prospectus at 33.)

(b)　"Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."  (Prospectus at 33.)

(c)　"Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein."  (Prospectus at 33.)

(d)　"All of the Group I Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date) and approximately 84.72% of the Group II Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date) were generally originated in conformity with the underwriting standards described in the prospectus under the heading 'The Sponsor's Mortgage Loan Programs — Mortgage Loan Underwriting' (the '**Underwriting Standards**')."  (Prospectus Supplement at S-50.)

**Item 77        Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)     "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history."  (Prospectus at 33.)

(b)     "Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies. These scoring systems assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit and certain loan attributes. Such objective measures are then used to evaluate loan applications and assign each application a '**Mortgage Score**.'"  (Prospectus at 33.)

(c)     "The Mortgage Score is used to determine the type of underwriting process and which level of underwriter will review the loan file."  (Prospectus at 33.)

(d)     (For debt-to-income data data charts, see Prospectus Supplement Appendix A at A-1, A-3, A-10, and A-14.)

(e)     "In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level."  (Prospectus at 34.)

(f)     "Wells Fargo permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines such as documented excess funds in reserves after closing, a history of making a similar sized monthly debt payment on

a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income." (Prospectus at 35.)

(g)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Debt-to-Income Ratios of the Mortgage Loans in the collateral pool of this securitization:

  (i)     The initial Mortgage Loans in the aggregate had a range of Original Debt-to-Income Ratios of 2.23% to 66.68%. (Prospectus Supplement at A-1, A-10.)

  (ii)    The initial Mortgage Loans in the aggregate had a Weighted Average Original Total Debt-to-Income Ratio of 35.31%. (Prospectus Supplement at A-1.)

  (iii)   The Mortgage Loans in Loan Group I had a range of Original Debt-to-Income Ratios of 15.45% to 66.68%. (Prospectus Supplement at Appendix A at A-3, A-14.)

  (iv)    The Mortgage Loans in Loan Group I had a Weighted Average Original Total Debt-to-Income Ratio of 38.36%. (Prospectus Supplement at Appendix A at A-3.)

**Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's underwriting standards. To the extent that 20% or more of the aggregate principal balance of the Mortgage Loans in a Trust Estate are underwritten by a Correspondent whose underwriting standards vary materially from Wells Fargo Bank's underwriting standards, the applicable prospectus supplement will describe such underwriting standards for such Mortgage Loans." (Prospectus at 32.)

(b)     "Approximately 0.28%, 0.50%, 0.27% and 14.23% of the Group II Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date) were originated in conformity with the underwriting standards of MortgageIT, Inc., DB Structured Products, Inc., CTX

Mortgage Company, LLC and American Home Mortgage Corporation, respectively. These underwriting standards may differ significantly from the Underwriting Standards and are less stringent than the Underwriting Standards in areas including reserve requirements, the number of financed properties, cash-out limits, documentation requirements, property type, escrow holdbacks, temporary buydowns and bankruptcy or foreclosure requirements for stated income products. In addition, such Mortgage Loans may be on Cooperatives located in regions where the Sponsor does not underwrite similar mortgage loans for Cooperatives." (Prospectus Supplement at S-51.)

**Item 87      Untrue or Misleading Statements About Quality Control**

(a)     "In order to qualify for participation in Wells Fargo Bank's mortgage loan purchase programs, lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines or the standards of a pool insurer and represent that each loan was underwritten in accordance with Wells Fargo Bank standards or the standards of a pool insurer and (v) utilize the services of qualified appraisers." (Prospectus at 32.)

(b)      "The contractual arrangements with Correspondents may also involve the delegation of all underwriting functions to such Correspondents ('**Delegated Underwriting'**), which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondents' representations and, in the case of bulk purchase acquisitions from such Correspondents, Wells Fargo Bank's post-purchase reviews of samplings of mortgage loans acquired from such Correspondents regarding the Correspondents' compliance with Wells Fargo Bank's underwriting standards. In all instances, however, acceptance by Wells Fargo Bank is contingent upon the loans being found to satisfy Wells Fargo Bank's program standards or the standards of a pool insurer." (Prospectus at 32.)

(c)   "With respect to all mortgage loans underwritten by Wells Fargo Bank, Wells Fargo Bank's underwriting of a mortgage loan may be based on data obtained by parties other than Wells Fargo Bank that are involved at various stages in the mortgage origination or acquisition process. This typically occurs under circumstances in which loans are subject to an alternative approval process, as when Correspondents, certain mortgage brokers or similar entities that have been approved by Wells Fargo Bank to process loans on its behalf, or independent contractors hired by Wells Fargo Bank to perform underwriting services on its behalf ('**contract underwriters**') make initial determinations as to the consistency of loans with Wells Fargo Bank underwriting guidelines. Wells Fargo Bank may also permit these third parties to utilize scoring systems in connection with their underwriting process. The underwriting of mortgage loans acquired by Wells Fargo Bank pursuant to a Delegated Underwriting arrangement with a Correspondent is not reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file. In addition, in order to be eligible to sell mortgage loans to Wells Fargo Bank pursuant to a Delegated Underwriting arrangement, the originator must meet certain requirements including, among other things, certain quality, operational and financial guidelines. See '—Acquisition of Mortgage Loans from Correspondents' above."  (Prospectus at 33-34.)

## Item 142   Untrue or Misleading Statements About Appraisals

(a)   (For data charts, see Prospectus Supplement Appendix A at A-10, A-14.)

(b)   "The appraisal of any Mortgaged Property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost."  (Prospectus at 35.)

(c)   In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Appraisals of the Mortgage Loans in the collateral pool of this securitization:

(i) 100% of the initial Mortgage Loans in the aggregate received a "Full Appraisal." (Prospectus Supplement at Appendix A at A-10.)

(ii) 100% of the initial Mortgage Loans in Loan Group I received a "Full Appraisal." (Prospectus Supplement at Appendix A at A-14.)

**Item 163   Untrue or Misleading Statements About LTVs**

(a) (For data charts, see Prospectus Supplement Appendix A at A-1, A-3.)

(b) "Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%. However, if so specified in the applicable prospectus supplement, Mortgage Loans that had Loan-to-Value Ratios at origination in excess of 95% may be included in the related Trust Estate." (Prospectus at 35.)

(c) In the prospectus supplement, Countrywide Securities Corporation made the following statements about the LTVs of the mortgage pool in this securitization:

(i) The Loan-to-Value Ratios of the initial Mortgage Loans in the aggregate ranged from 2.23% to 66.68%. (Prospectus Supplement at Appendix A at A-1.)

(ii) The initial Mortgage Loans in the aggregate had a Weighted Average Original Loan-to-Value Ratio of 35.31%. (Prospectus Supplement at Appendix A at A-1.)

(iii) The Loan-to-Value Ratios of the initial Mortgage Loans in Loan Group I ranged from 25.00% to 95.00%. (Prospectus Supplement at Appendix A at A-3.)

(iv) The initial Mortgage Loans in Loan Group I had a Weighted Average Original Loan-to-Value Ratio of 74.58%. (Prospectus Supplement at Appendix A at A-3.)

(v) 1,231 of the 1,252 initial Mortgage Loans in the aggregate that had an Original Loan-to-Value Ratio greater than 80% were covered by Primary Mortgage Insurance. (Prospectus Supplement at Appendix A at A-1.)

(vi) 630 of the 650 initial Mortgage Loans in Loan Group I that had an Original Loan-to-Value Ratio of greater than 80% were covered by Primary Mortgage Insurance. (Prospectus Supplement at Appendix A at A-3.)

(vii)   The initial Mortgage Loans in the aggregate that had Original Principal Balances greater than $600,000 had a Weighted Average Original Loan-to-Value Ratio of 69.34%.  (Prospectus Supplement at Appendix A at A-1.)

(viii)  The initial Mortgage Loans in Loan Group I that had Original Principal Balances greater than $600,000 had a Weighted Average Original Loan-to-Value Ratio of 73.63%.  (Prospectus Supplement at Appendix A at A-3.)

(ix)    The initial Mortgage Loans in the aggregate that had Original Principal Balances greater than $600,000 had a Maximum Original Loan-to-Value Ratio of 95.00%.  (Prospectus Supplement at Appendix A at A-1.)

(x)     The initial Mortgage Loans in Loan Group I that had Original Principal Balances greater than $600,000 had a Maximum Original Loan-to-Value Ratio of 95.00%.  (Prospectus Supplement at Appendix A at A-3.)

**Item 177   Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts, see Prospectus Supplement Appendix A at A-9 and A-13.)

(b)     In the prospectus supplement, Countrywide Securities Corporation made the following statements about the Occupancy Types of the Mortgage Loans in the collateral pool of this securitization:

(i)     1,193 (or 99.29%) of the 1,252 initial Mortgage Loans in the aggregate were for Primary Residences.  Those 1,193 loans represented 95.07% of the total outstanding principal balance for the loans in the aggregate.  (Prospectus Supplement at Appendix A at A-9.)

(ii)    All 650 (or 100%) of the Mortgage Loans in Loan Group I were for Primary Residences.  Those 650 loans represented 100% of the total outstanding principal balance for the loans in Loan Group I.  (Prospectus Supplement at Appendix A at A-13.)

**Item 180   Untrue or Misleading Statements About Earned Ratings**

(a)     "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table beginning on page S-6."  (Prospectus Supplement at S-9.)

(b) "It is a condition to the issuance of the Offered Certificates that each such class will have received at least the rating set forth in the table beginning on page S-6 from Fitch Ratings ('**Fitch**') and Moody's Investors Service Inc. ('**Moody's**,' and together with Fitch, the '**Rating Agencies**')."  (Prospectus Supplement at S-64.)

(c) "Certificates of any series will not be offered pursuant to this prospectus and a prospectus supplement unless each offered class is rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization."  (Prospectus at 9.)

(d) "It is a condition to the issuance of the certificates of a series offered by a prospectus supplement that the certificates be rated in one of the four highest rating categories by a nationally recognized statistical rating agency."  (Prospectus at 12.)

(e) "It is a condition to the issuance of the Certificates of any Series offered pursuant to this prospectus and a prospectus supplement that they be rated in one of the four highest categories by at least one nationally recognized statistical rating organization (a '**Rating Agency**')."  (Prospectus at 133.)

**Item 181    Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a) "The ratings of Fitch on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which such certificateholders are entitled. Fitch's rating opinions address the structural and legal aspects associated with the certificates, including the nature of the underlying mortgage loans."  (Prospectus Supplement at S-64.)

(b) "The ratings of Moody's on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions of principal and interest to which such certificateholders are entitled. Moody's rating opinions address the structural, legal and issuer aspects associated with the certificates, including the nature of

the underlying mortgage loans and the credit quality of the credit support provider, if any." (Prospectus Supplement at S-64.)

**Item 195**      **Untrue or Misleading Statements About Effective Securitization**

(a)      "In connection with the conveyance of the Mortgage Loans to the Depositor, Wells Fargo Bank will (i) agree to deliver to the Depositor all of the documents which the Depositor is required to deliver to the Trustee or the custodian; (ii) make certain representations and warranties to the Depositor which will be the basis of certain of the Depositor's representations and warranties to the Trustee or assign the representations and warranties made by a Correspondent to the Sponsor; and (iii) agree to repurchase or substitute (or assign rights to a comparable agreement of a Correspondent) for any Mortgage Loan for which any document is not delivered or is found to be defective in any material respect, or which Mortgage Loan is discovered at any time not to be in conformance with any representation and warranty the Sponsor has made to the Depositor, if the Sponsor cannot deliver such document or cure such defect or breach within 60 days after notice thereof." (Prospectus at 80.)

(b)      "At the time of issuance of each Series of Certificates, the Mortgage Loans in the related Trust Estate will, pursuant to the applicable Pooling and Servicing Agreement, be assigned to the Trustee, together with all principal and interest received on or with respect to such Mortgage Loans after the applicable Cut-Off Date other than principal and interest due and payable on or before such Cut-Off Date and interest attributable to the Fixed Retained Yield on such Mortgage Loans, if any. See 'Servicing of the Mortgage Loans—Fixed Retained Yield, Servicing Compensation and Payment of Expenses.' The Trustee or its agent will, concurrently with such assignment, authenticate and deliver the Certificates evidencing such Series to the Depositor in exchange for the Mortgage Loans. Each Mortgage Loan will be identified in a schedule delivered to the applicable Trustee or custodian. Each such schedule will include, among other things, the unpaid principal balance as of the close of business on the applicable Cut-Off Date, the maturity date and the Mortgage Interest Rate for each Mortgage Loan in the related Trust Estate." (Prospectus at 81.)

(c) "In addition, with respect to each Mortgage Loan in a Trust Estate, the mortgage or other promissory note or a lost note affidavit executed by the applicable Servicer, any assumption, consolidation, modification or conversion to fixed interest rate agreement and, a mortgage assignment in recordable form (or other documents as are required under applicable law to create perfected security interest in the Mortgaged Property in favor of the Trustee) will be delivered to the Trustee or, if indicated in the applicable prospectus supplement, to a custodian, which may be the Sponsor. Unless otherwise required by the Rating Agencies, assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee (or a custodian indicated in the applicable prospectus supplement) in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan."  (Prospectus at 81.)

# SCHEDULE 19

## SCHEDULE 19 TO THE COMPLAINT

**Item 20**     **Details About the Securitization**

(a)     **Dealer**: Bear, Stearns & Co. Inc.

(b)     **Description of the Trust**: Bear Stearns ARM Trust 2004-12 issued Mortgage Pass-Through Certificates, Series 2004-12, which was a securitization in December 2004 of 3,212 loans divided into four loan groups.

(c)     **Description of Purchase**: Bear, Stearns & Co. Inc. offered and sold to the Bank a senior certificate in tranche II-A-2, for which the Bank paid $250,000,000.00 in principal plus accrued interest of $847,825.67.  The Bank received the certificate on December 30, 2004.  Tranche II-A-2 contains loans in loan group II.

(d)     **CUSIP**: 07384m6k3

(e)     **Ratings of the certificate(s) at the time of the Bank's purchase**:
        (i)     Moody's:    Aaa
        (ii)    S&P:        AAA

(f)     **Ratings of the certificate(s) as of November 30, 2010**:
        (i)     Moody's:    A3/*-
        (ii)    S&P:        A-

(g)     **SEC's URL of prospectus and the prospectus supplement for this securitization**:
        http://sec.gov/Archives/edgar/data/1243106/000112528204006573/b403190_424b5.txt

**Item 21**     **Details About the Parties**

(a)     **Dealer**: Bear, Stearns & Co. Inc.

(b)     **Originator(s)**:
        (i)     American Mortgage Network, Inc. ("AmNet")
        (ii)    Countrywide Home Loans, Inc.
        (iii)   GMAC Mortgage Corp. ("GMACM")

(c)     **Sponsor/Seller**: EMC Mortgage Corp.

(d)     **Depositor**: Structured Asset Mortgage Investments II Inc.

(e)     **Trustee**: U.S. Bank N.A.

(f)     **Master Servicer**: Wells Fargo Bank, N.A.

**Item 75     Untrue or Misleading Statements About General Underwriting Standards**

(a)     "[AmNet] Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-35.)

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-37.)

(c)     "GMACM's underwriting standards include a set of specific criteria pursuant to which the underwriting evaluation is made. However, the application of GMACM's underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with such underwriting standards." (Prospectus Supplement at S-42.)

**Item 77     Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)     "The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of

origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations."  (Prospectus at 12.)

(b)     "In the case of all loans, once all applicable employment, credit and property information is received, a determination [by AmNet] generally is made as to whether the prospective borrower has sufficient monthly income available (a) to meet the borrower's monthly obligations on the proposed mortgage loan (determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property (such as property taxes and hazard insurance) and (b) to meet monthly housing expenses and other financial obligations and monthly living expenses." (Prospectus Supplement at S-36.)

(c)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits. . . . The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-37 – S-38.)

(d)     "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's

monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-39.)

(e)    "Once all applicable employment, credit and property information is received, a determination [by GMACM] is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home (such as property taxes and hazard insurance) and other financial obligations and monthly living expenses." (Prospectus Supplement at S-41.)

## Item 81    Untrue or Misleading Statements About Exceptions to Underwriting Standards

(a)    "Exceptions to the Countrywide Underwriting Guidelines may be made if compensating factors are demonstrated by a prospective borrower." (Prospectus Supplement at S-38.)

(b)    "The underwriting standards set forth in the GMACM Underwriting Guide with respect to mortgage loans originated under the GMACM Non-Conforming Adjustable Rate Loan Program may be varied in appropriate cases." (Prospectus Supplement at S-42.)

## Item 87    Untrue or Misleading Statements About Quality Control

(a)    "The depositor will acquire mortgage loans utilizing re-underwriting criteria which it believes are appropriate, depending to some extent on the depositor's or its affiliates' prior experience with the Seller and the servicer, as well as the depositor's prior experience with a particular type of mortgage loan or with mortgage loans relating to mortgaged properties in a particular geographical region. A standard approach to re-underwriting is to compare loan file information and information that is represented to the depositor on a tape with respect to a percentage of the mortgage loans the depositor deems appropriate in the circumstances." (Prospectus at 12.)

(b)    "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan

correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with the Countrywide Underwriting Guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself." (Prospectus Supplement at S-37.)

## Item 142    Untrue or Misleading Statements About Appraisals

(a)    "In any case, the value of the property being financed, as indicated by the appraisal, must support, and support in the future, the outstanding loan balance. All appraisals by licensed appraisers are required to be on forms acceptable to Fannie Mae or Freddie Mac." (Prospectus at 13.)

(b)    "In determining the adequacy of the mortgaged property as collateral, an appraisal [requested by AmNet] is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in acceptable condition and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home. The value of the property being financed, as indicated by the appraisal, must be such that it currently supports the outstanding loan balance." (Prospectus Supplement at S-36.)

(c)    "Generally, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans, except with respect to selected borrowers that are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home."  (Prospectus Supplement at S-38 – S-39.)

(d)    "All appraisals [obtained by Countrywide] are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-39)

(e)    "In determining the adequacy of the mortgaged property as collateral, an appraisal may be required of each property considered for financing. Such appraisals may be performed by appraisers independent from or affiliated with GMACM or its affiliates." (Prospectus Supplement at S-41.)

## Item 163    Untrue or Misleading Statements About LTVs

(a)    (For data charts, see Prospectus Supplement Annex I at A-10 and A-35.)

(b)    In the prospectus supplement, Bear, Stearns & Co. Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

        (i)    The LTV ratios of the loans in the aggregate ranged from 0.00% to 100.00%.  (Prospectus Supplement Annex I at A-35.)

        (ii)    As of the initial cut-off date, the initial mortgage loans in the aggregate had a 75.15% weighted average original LTV ratio.  (Prospectus Supplement Annex I at A-35.)

(iii)    The LTV ratios of the loans in group II ranged from 0.00% to 100.00%.  (Prospectus Supplement Annex I at A-10.)

(iv)    As of the initial cut-off date, the initial mortgage loans in group II had a 75.24% weighted average original LTV ratio.  (Prospectus Supplement Annex I at A-10.)

(c)    "Countrywide Home Loans may provide secondary financing to a mortgagor simultaneously with the origination of a first mortgage loan, subject to the following limitations: The Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%."  (Prospectus Supplement at S-38.)

(d)    "The Countrywide Underwriting Guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-39.)

**Item 177    Untrue or Misleading Statements About Use of the Properties**

(a)    (For data charts, see Prospectus Supplement Annex I at A-12 and A-37.)

(b)    In the prospectus supplement, Bear, Stearns & Co. Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

(i)    2,691 (or 83.78%) of the 3,212 initial mortgage loans in the aggregate were for primary residences.  Those 2,691 loans represented 87.73% of the total outstanding principal balance for the loans in the aggregate. (Prospectus Supplement Annex I at A-37.)

(ii)    1,800 (or 81.48%) of the 2,209 initial mortgage loans in group II were for primary residences.  Those 1,800 loans

represented 86.14% of the total outstanding principal balance for the loans in group II.  (Prospectus Supplement Annex I at A-12.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "It is a condition to the issuance of the certificates that the offered certificates receive the following ratings from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which is referred to herein as S&P, and Moody's Investors Service, Inc., which is referred to herein as Moody's[.]"  (Prospectus Supplement at S-14.)

(b)     "It is a condition to the issuance of each class of Offered Certificates that it receives at least the ratings set forth below from S&P and Moody's."  (Prospectus Supplement at S-82.)

**Item 181     Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "The ratings of S&P and Moody's assigned to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which the certificateholders are entitled. The rating process addresses structural and legal aspects associated with the Offered Certificates, including the nature of the underlying mortgage loans."  (Prospectus Supplement at S-82.)

**Item 195     Untrue or Misleading Statements About Effective Securitization**

(a)     "At the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust. The mortgage loans in each of the Loan Groups will be identified in a schedule appearing as an exhibit to the Agreement with each Loan Group separately identified. Such schedule will include information as to the principal balance of each mortgage loan as of the Cut-off Date, as well as information including, among other things, the mortgage rate, the Net Rate, the Monthly Payment, the maturity date of each mortgage note and the Loan-to-Value Ratio."  (Prospectus Supplement at S-73.)

(b)    "At the time of issuance of a series of securities, the depositor will assign, or cause to be assigned, to the related trustee (or its nominee),without recourse, the mortgage loans or mortgage securities being included in the related trust fund, together with, all principal and interest received on or with respect to the mortgage loans or mortgage securities after the cut-off date, other than principal and interest due on or before the cut-off date. If specified in the related prospectus supplement, the depositor or any of its affiliates may retain an interest in the trust fund assets, if any, for itself or transfer the same to others. The trustee will, concurrently with the assignment, deliver the securities of the series to or at the direction of the depositor in exchange for the mortgage loans and/or mortgage securities in the related trust fund. Each mortgage loan will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement or servicing agreement. The schedule will include, among other things, information as to the principal balance of each mortgage loan in the related trust fund as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the Loan-to-Value Ratio at origination or modification (without regard to any secondary financing)."  (Prospectus at 34.)

(c)    "In addition, the depositor will, as to each mortgage loan, other than (1) mortgage loans underlying any mortgage securities and (2) Contracts, deliver, or cause to be delivered, to the related trustee (or to the custodian described below) the following documents:

        • the mortgage note endorsed, without recourse, either in blank or to the order of the trustee (or its nominee),

        • the mortgage with evidence of recording indicated on the mortgage (except for any mortgage not returned from the public recording office) or, in the case of a cooperative mortgage loan, on the related financing statement,

        • an assignment of the mortgage in blank or to the trustee (or its nominee) in recordable form (or, with respect to a cooperative mortgage loan, an assignment of the respective security agreements, any applicable UCC financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements),

> • any intervening assignments of the mortgage with evidence of recording on the assignment (except for any assignment not returned from the public recording office),
> • if applicable, any riders or modifications to the mortgage note and mortgage, o if the mortgage loan is secured by additional collateral, certain security and assignment documents relating to the pledge of the additional collateral, and o any other documents set forth in the related pooling and servicing agreement, mortgage loan purchase agreement or servicing agreement."

(Prospectus at 34-35.)

(d)  "As to each Contract, the depositor will deliver, or cause to be delivered, to the related trustee (or the custodian) the following documents:

> • the original Contract endorsed, without recourse, to the order of the trustee,
> • copies of documents and instruments related to the Contract and the security interest in the Manufactured Home securing the Contract, and
> • a blanket assignment to the trustee of all Contracts in the related trust fund and the related documents and instruments."

(Prospectus at 35-36.)

(e)  "The depositor will, as to each mortgage security included in a mortgage pool, deliver, or cause to be delivered, to the related trustee (or the custodian), either (i) cause an electronic transfer of that security or (ii) provide a physical certificate or note evidencing the mortgage security, registered in the name of the related trustee (or its nominee), or endorsed in blank or to the related trustee (or its nominee), or accompanied by transfer documents sufficient to effect a transfer to the trustee (or its nominee)."  (Prospectus at 36.)

# SCHEDULE 20

# SCHEDULE 20 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)      **Dealer**: J.P. Morgan Securities Inc.

(b)      **Description of the Trust**: Chase Mortgage Finance Trust Series 2005-A1 issued Multi-Class Mortgage Pass-Through Certificates, Series 2005-A1, which was a securitization in November 2005 of 3,068 loans divided into three loan pools.

(c)      **Description of Purchase**: Based on offering documents from J.P. Morgan Securities Inc., the Bank purchased a super senior certificate in tranche 3-A-1, for which the Bank paid $97,535,872.65 in principal plus accrued interest of $389,614.81.  The Bank received the certificate on February 28, 2006.  Tranche 3-A-1 contains loans in loan pool 3.

(d)      **CUSIP**: 16162wpj2

(e)      **Ratings of the certificate(s) at the time of the Bank's purchase**:
(i)      S&P:  AAA
(ii)      Fitch: AAA

(f)      **Ratings of the certificate(s) as of November 30, 2010**:
(i)      Fitch: BBB
(ii)      S&P:  CCC

(g)      **SEC's URL of prospectus and the prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/830379/000095011605003671/p409997_424b5.txt

**Item 21**      **Details About the Parties**

(a)      **Dealer**: J.P. Morgan Securities Inc.

(b)      **Originator(s)**: Chase Home Finance LLC ("CHF")

(c)      **Sponsor/Seller**: Chase Mortgage Finance Corp.

(d)  **Depositor**: Chase Mortgage Finance Corp.

(e)  **Trustee**: Wachovia Bank, N.A.

(f)  **Master Servicer**: JPMorgan Chase Bank, N.A.

**Item 75   Untrue or Misleading Statements About General Underwriting Standards**

(a)  "CHF's real estate lending process for one- to four-family residential mortgage loans follows procedures established to comply with applicable federal and state laws and regulations. CHF's underwriting standards are designed to evaluate a borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-64.)

(b)  "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. CHF believes that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans."  (Prospectus Supplement at S-64.)

**Item 77   Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)  "Once the necessary information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses."  (Prospectus Supplement at S-64.)

(b)  "For loans with a loan-to-value ratio of 80% or less, CHF's lending guidelines require that all current fixed obligations of the borrower (including mortgage payments based on CHF's mortgage rates at the time of the application and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income in the case of a borrower with income of under $75,000, 42% of the

borrower's gross income in the case of a borrower with income of between $75,000 and $150,000 and 44% of the borrower's gross income in the case of a borrower with income in excess of $150,000. For interest-only mortgage loans with a loan-to-value ratio between 80.01% and 90%, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) plus applicable real property taxes, any condominium common charges and hazard insurance, as well as all other monthly obligations (revolving debt, car payments, etc.), generally may not exceed 40% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score of 620-659, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 36% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score greater than or equal to 660, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 40% of the borrower's gross income. Other credit considerations may cause CHF to depart from these guidelines in certain cases." (Prospectus Supplement at S-64.)

**Item 81**  **Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)  "From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel of the CHF who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions." (Prospectus Supplement at S-65.)

**Item 87**  **Untrue or Misleading Statements About Quality Control**

not applicable

**Item 142    Untrue or Misleading Statements About Appraisals**

(a)    "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. CHF believes that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans."  (Prospectus Supplement at S-64.)

(b)    "CHF requires an appraisal (which in certain circumstances may be a confirmation of an existing appraisal) to be made of each property to be financed. The appraisal is conducted by an independent fee appraiser who visits the property and estimates its market value." (Prospectus Supplement at S-65.)

(c)    "The appraiser must personally inspect the property and will prepare a report which customarily includes a market data analysis based on recent sales of comparable homes and, when deemed applicable, a replacement cost analysis based on the current cost of constructing a similar home."  (Prospectus at 34.)

**Item 163    Untrue or Misleading Statements About LTVs**

(a)    (For data charts, see Prospectus Supplement at S-7, S-8, S-22, and S-48.)

(b)    In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:
    (i)    The LTV ratios of the loans in the aggregate ranged 11.29% to 95.00%.  (Prospectus Supplement at S-7.)
    (ii)    As of the initial cut-off date, the initial mortgage loans in the aggregate had a 68.57% weighted average original LTV ratio.  (Prospectus Supplement at S-7, S-22.)
    (iii)    The LTV ratios of the loans in pool 3 ranged from less than 21.12% to 95.00%.  (Prospectus Supplement at S-8.)
    (iv)    As of the initial cut-off date, the initial mortgage loans in pool 3 had a 68.96% weighted average original LTV ratio.  (Prospectus Supplement at S-8, S-48.)

(c)     "Except as otherwise specified in the Prospectus Supplement: no Mortgage Loan will have had a Loan-to-Value Ratio at origination in excess of 95% . . . ." (Prospectus at 23.)

(d)     "All of the Mortgage Loans having original loan-to-value ratios of greater than 80% are insured under Primary Mortgage Insurance Policies (as defined in the Prospectus)." (Prospectus Supplement at S-17.)

(e)     "Except as otherwise specified in the Prospectus Supplement: . . . each Mortgage Loan secured by a Single Family Property and having a Loan-to-Value Ratio in excess of 80% at origination will be covered by a primary mortgage insurance policy . . . ." (Prospectus at 23-24.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts, see Prospectus Supplement at S-25 and S-50.)

(b)     In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

    (i)     2,770 (or 90.29%) of the 3,068 initial mortgage loans in the aggregate were for primary residences. Those 2,770 loans represented 89.1% of the total outstanding principal balance for the loans in the aggregate. (Prospectus Supplement at S-25.)

    (ii)     464 (or 90.45%) of the 513 initial mortgage loans in pool 3 were for primary residences. Those 464 loans represented 88.9% of the total outstanding principal balance for the loans in the pool 3. (Prospectus Supplement at S-50.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "The certificates will have the original certificate principal balance, certificate rate and other features set forth in the table beginning on page S-4." (Prospectus Supplement at S-6.)

(b)     "The offered certificates are required to receive the ratings from Fitch and S&P indicated under the heading 'Expected Ratings' in the chart shown on page S-4 of this prospectus supplement."  (Prospectus Supplement at S-10.)

**Item 181      Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the Agreement. Such ratings take into consideration the credit quality of the related certificates, including any credit support providers, structural and legal aspects associated with such Offered Certificates, and to the extent to which the payment stream on the related Pool is adequate to make the payments required by such Offered Certificates."  (Prospectus Supplement at S-92.)

**Item 195      Untrue or Misleading Statements About Effective Securitization**

(a)     "At the time of issuance of each Series of Certificates, the Seller will cause the Mortgage Loans in the Trust Fund represented by that Series of Certificates to be assigned to the Trustee, together with all principal and interest due on or with respect to such Mortgage Loans, other than principal and interest due on or before the Cut-Off Date and Prepayments of principal received before the Cut-Off Date. The Trustee, concurrently with such assignment, will execute and deliver Certificates evidencing such Trust Fund to the Seller in exchange for the Mortgage Loans. Each Mortgage Loan will be identified in a schedule appearing as an exhibit to the Agreement for that Series (the 'MORTGAGE LOAN SCHEDULE'). The Mortgage Loan Schedule will include, as to each Mortgage Loan, information as to the outstanding principal balance as of the close of business on the Cut-Off Date, as well as information respecting the Mortgage Rate, the current scheduled monthly payment, the number of months remaining until the stated maturity date of each Note and the location of the related Mortgaged Property."  (Prospectus at 39.)

(b)     "In addition, the Seller will, as to each Mortgage Loan, deliver to the Trustee (i) the Note, endorsed to the order of the Trustee by the

holder/payee thereof without recourse; (ii) the 'buy-down' agreement (if applicable); (iii) a Mortgage and Mortgage assignment meeting the requirements of the Agreement; (iv) all Mortgage assignments from the original holder of the Mortgage Loan, through any subsequent transferees to the transferee to the Trustee; (v) the original lender's title insurance policy, or other evidence of title, or if a policy has not been issued, a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company; (vi) as to each Mortgage Loan, an original certificate of Primary Mortgage Insurance Policy (or copy certified to be true by the originator) to the extent required under the applicable requirements for the Mortgage Pool; and (vii) such other documents as may be described in the applicable Prospectus Supplement."  (Prospectus at 39.)

(c)     "The Seller will cause the Mortgage Loans to be assigned to the Trustee, together with the rights to all principal and interest due on or with respect to the Mortgage Loans after the Cut-off Date other than interest accrued on the Mortgage Loans prior to the Cut-off Date." (Prospectus Supplement at S-66.)

(d)     "In addition, the Seller will, as to each Mortgage Loan (other than a Co-op Loan), deliver or cause to be delivered to the Trustee the Mortgage Note (together with all amendments and modifications thereto) endorsed without recourse to the Trustee or its designee, the original or a certified copy of the mortgage (together with all amendments and modifications thereto) with evidence of recording indicated thereon and an original or certified copy of an assignment of the mortgage in recordable form."  (Prospectus Supplement at S-66.)

# SCHEDULE 21

# SCHEDULE 21 TO THE COMPLAINT

**Item 20**        **Details About the Securitization**

(a)    **Dealer**: J.P. Morgan Securities Inc.

(b)    **Description of the Trust**: J.P. Morgan Mortgage Trust 2005-A6 issued Mortgage Pass-Through Certificates, Series 2005-A6, which was a securitization in August 2005 of 2,442 loans divided into seven loan pools.

(c)    **Description of Purchase**: J.P. Morgan Securities Inc. offered and sold to the Bank a senior certificate in tranche 5-A-1, for which the Bank paid $83,119,603.44 in principal plus accrued interest of $382,793.41.  The Bank received the certificate on May 31, 2006. Tranche 5-A-1 contains loans in loan pool 5.

(d)    **CUSIP**: 466247ua9

(e)    **Ratings of the certificate(s) at the time of the Bank's purchase**:
       (i)    S&P:  AAA
       (ii)   Fitch: AAA

(f)    **Ratings of the certificate(s) as of November 30, 2010**:
       (i)    S&P:  B+
       (ii)   Fitch: BBB

(g)    **SEC's URL of prospectus and the prospectus supplement for this securitization**:
       http://sec.gov/Archives/edgar/data/1085309/000095013605005546/file001.htm

**Item 21**        **Details About the Parties**

(a)    **Dealer**: J.P. Morgan Securities Inc.

(b)    **Originator(s)**:
       (i)    PHH Mortgage Corp.
       (ii)   Chase Home Finance LLC ("CHF")
       (iii)  JPMorgan Chase Bank N.A.

      (iv)    CTX Mortgage Co., LLC

      (v)    Countrywide Home Loans, Inc.

(c)     **Sponsor/Seller**: J.P. Morgan Mortgage Acquisition Corp.

(d)     **Depositor**: J.P. Morgan Acceptance Corp. I

(e)     **Trustee**: Wachovia Bank, N.A.

(f)     **Master Servicer**: Wells Fargo Bank, N.A.

## Item 75     Untrue or Misleading Statements About General Underwriting Standards

(a)     "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." (Prospectus Supplement at S-26.)

(b)     "PHH's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made." (Prospectus Supplement at S-27.)

(c)     "CHF's underwriting standards are designed to evaluate a borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-32.)

(d)     "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. The Chase Originators believe that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans." (Prospectus Supplement at S-32.)

(e)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective

borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (Prospectus Supplement at S-34.)

**Item 77       Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)     "Once sufficient employment, credit and property information is obtained, the decision as to whether to approve the loan is based upon the applicant's income and credit history, the status of title to the mortgaged property, and the appraised value of the mortgaged property. PHH also reviews the level of an applicant's liquid assets as an indication of creditworthiness." (Prospectus Supplement at S-29.)

(b)     "In determining whether a prospective borrower has sufficient monthly income available [1] to meet the borrower's monthly obligation on the proposed mortgage loan, and [2] to meet monthly housing expenses and other financial obligations including the borrower's monthly obligations on the proposed mortgage loan, PHH generally applies debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly gross income. From time to time, PHH makes loans where these ratios are exceeded. In those instances, PHH's underwriters typically look at compensating factors such as the liquidity of the mortgagor and the stability of the real estate market where the property is located." (Prospectus Supplement at S-29.)

(c)     "Once the necessary information is received, a determination is made [by CHF] as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses." (Prospectus Supplement at S-32.)

(d)     "For loans with a loan-to-value ratio of 80% or less, CHF's lending guidelines require that all current fixed obligations of the borrower (including mortgage payments based on CHF's mortgage rates at the time of the application and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income in the

case of a borrower with income of under $75,000, 42% of the borrower's gross income in the case of a borrower with income of between $75,000 and $150,000 and 44% of the borrower's gross income in the case of a borrower with income in excess of $150,000. For interest-only mortgage loans with a loan-to-value ratio between 80.01% and 90%, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) plus applicable real property taxes, any condominium common charges and hazard insurance, as well as all other monthly obligations (revolving debt, car payments, etc.), generally may not exceed 40% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score of 620-659, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 36% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score greater than or equal to 660, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 40% of the borrower's gross income. Other credit considerations may cause CHF to depart from these guidelines in certain cases."  (Prospectus Supplement at S-32.)

(e)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits. . . . The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have

sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-34.)

(f)     "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." (Prospectus Supplement at S-35.)

## Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards

(a)     "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-27.)

(b)     "From time to time, exceptions to PHH's underwriting policies may be made. Such exceptions may be made only on a loan-by-loan basis at the discretion of PHH. Exceptions are made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, employment stability and the stability of the real estate market where the property is located."  (Prospectus Supplement at S-31.)

(c)     "From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel of the Chase Originators who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-33.)

(d)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-34.)

**Item 87          Untrue or Misleading Statements About Quality Control**

(a)      "Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself." (Prospectus Supplement at S-34.)

**Item 142        Untrue or Misleading Statements About Appraisals**

(a)      "In determining the adequacy of the property as collateral for a first lien mortgage loan, a Fannie Mae/Freddie Mac conforming appraisal of the property is performed by an independent appraiser selected by PHH, except as noted below."  (Prospectus Supplement at S-28.)

(b)      "The appraiser [selected by PHH] is required to inspect the property and verify that it is in good condition and that construction or renovation, if new, has been completed. The appraisal report indicates a value for the property and provides information concerning marketability, the neighborhood, the property site, interior and exterior improvements, and the condition of the property." (Prospectus Supplement at S-28.)

(c)      "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. The Chase Originators believe that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans."  (Prospectus Supplement at S-32.)

(d)      "CHF requires an appraisal (which in certain circumstances may be a confirmation of an existing appraisal) to be made of each property to be financed. The appraisal is conducted by an independent fee appraiser who visits the property and estimates its market value." (Prospectus Supplement at S-33.)

(e) "Generally, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans, except with respect to selected borrowers that are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home." (Prospectus Supplement at S-35.)

(f) "All appraisals [obtained by Countrywide] are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-35.)

## Item 163    Untrue or Misleading Statements About LTVs

(a) (For data charts, see Prospectus Supplement Annex A at A-3 and A-33.)

(b) In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

    (i) The LTV ratios of the loans in aggregate pool I (pools 1-6) ranged from 0.01% to 100.00%. (Prospectus Supplement Annex A at A-3.)

    (ii) As of the initial cut-off date, the initial mortgage loans in aggregate pool I (pools 1-6) had a 68.19% weighted average original LTV ratio. (Prospectus Supplement at S-21; Prospectus Supplement Annex A at A-3.)

    (iii) The LTV ratios of the loans in pool 5 ranged from 10.01% to 100.00%. (Prospectus Supplement Annex A at A-33.)

    (iv) As of the initial cut-off date, the initial mortgage loans in pool 5 had a 64.66% weighted average original LTV

ratio.  (Prospectus Supplement at S-23; Prospectus Supplement Annex A at A-33.)

(c)     "[N]o Mortgage Loan in Aggregate Pool I [pools 1-6] had a Loan-to-Value Ratio at origination exceeding 100.00%."  (Prospectus Supplement at S-21.)

(d)     "[N]o Pool 5 Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%."  (Prospectus Supplement at S-23.)

(e)     "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%. Countrywide Home Loans' underwriting guidelines do not prohibit or otherwise restrict a borrower from obtaining secondary financing from lenders other than Countrywide Home Loans, whether at origination of the mortgage loan or thereafter."  (Prospectus Supplement at S-34.)

(f)     "Countrywide Home Loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."  (Prospectus Supplement at S-35.)

(g)     "All of the Mortgage Loans in Aggregate Pool I with Effective Loan-to-Value Ratios greater than 80% at origination that were not secured by a security interest in additional collateral or not supported by a third-party guarantee were covered by a primary mortgage insurance policy."  (Prospectus Supplement at S-19.)

**Item 177**    **Untrue or Misleading Statements About Use of the Properties**

(a)    (For data charts, see Prospectus Supplement Annex A at A-6 and A-36.)

(b)    In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

    (i)    1,791 (or 90.14%) of the 1,987 initial mortgage loans in aggregate pool I (pools 1-6) were for primary residences. Those 1,791 loans represented 89.62% of the total outstanding principal balance for the loans in the aggregate. (Prospectus Supplement Annex A at A-6.)

    (ii)    432 (or 89.81%) of the 481 initial mortgage loans in pool 5 were for primary residences. Those 432 loans represented 89.96% of the total outstanding principal balance for the loans in pool 5. (Prospectus Supplement Annex A at A-36.)

**Item 180**    **Untrue or Misleading Statements About Earned Ratings**

(a)    "The certificates offered by this prospectus supplement will initially have ratings at least as high as the ratings specified on page S-1 from Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc. and Fitch Ratings." (Prospectus Supplement at S-10.)

(b)    "It is a condition of the issuance of the Offered Certificates that they be rated as indicated on page S-1 by each of the Rating Agencies, as applicable." (Prospectus Supplement at S-68.)

**Item 181**    **Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)    "The ratings assigned to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such

certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates." (Prospectus Supplement at S-68.)

## Item 195    Untrue or Misleading Statements About Effective Securitization

(a)     "Assignment of the Loans. At the time of issuance of the securities of a series, and except as otherwise specified in the related prospectus supplement, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee, without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to those loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the securities to the depositor in exchange for the loans." (Prospectus at 60.)

(b)     "If specified in the related prospectus supplement, within the time period specified in that prospectus supplement, the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things: (1) the mortgage note or contract endorsed without recourse in blank or to the order of the trustee; (2) the mortgage, deed of trust or similar instrument with evidence of recording indicated on the mortgage, deed of trust or similar instrument, except for any mortgage not returned from the public recording office, in which case the depositor or seller will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the applicable recording office; (3) an assignment of the mortgage to the trustee, which assignment will be in recordable form in the case of a mortgage assignment; and (4) the other security documents, including those relating to any senior interests in the property, as may be specified in the related prospectus supplement or the related agreement." (Prospectus at 61.)

(c)     "[O]n the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights

under the Assignment Agreements (including the right to enforce the Originators' purchase obligations). . . . .

In connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian the Mortgage File."  (Prospectus Supplement at S-25.)

(d)     "MORTGAGE FILE [is defined as] [t]he Mortgage Note, the Mortgage with evidence of recording indicated thereon, an assignment in recordable form of the Mortgage, all recorded intervening assignments of the Mortgage and any modifications to such Mortgage Note and Mortgage (except for any such documents other than Mortgage Notes not available on the Closing Date, which will be delivered to the Trustee or the Custodian as soon as the same is available to the Depositor.)"  (Prospectus Supplement at S-78.)

# SCHEDULE 22

## SCHEDULE 22 TO THE COMPLAINT

**Item 20     Details About the Securitization**

(a)   **Dealer**: J.P. Morgan Securities Inc.

(b)   **Description of the Trust**: J.P. Morgan Mortgage Trust 2006-A3
        issued Mortgage Pass-Through Certificates, Series 2006-A3, which
        was a securitization in April 2006 of 3,302 loans divided into seven
        loan pools.

(c)   **Description of Purchase**: J.P. Morgan Securities Inc. offered and
        sold to the Bank a super senior certificate in tranche 4-A-1, for which
        the Bank paid $81,876,174.13 in principal plus accrued interest of
        $293,092.49.  The Bank received the certificate on June 23, 2006.
        Tranche 4-A-1 contains loans in loan pool 4.

(d)   **CUSIP**: 46628kan0

(e)   **Ratings of the certificate(s) at the time of the Bank's purchase**:
        (i)     Moody's:    Aaa
        (ii)    Fitch:         AAA

(f)   **Ratings of the certificate(s) as of November 30, 2010**:
        (i)     Moody's:    Caa1
        (ii)    Fitch:         CC

(g)   **SEC's URL of prospectus and the prospectus supplement for this
        securitization**:
        It does not appear that a prospectus or prospectus supplement for this
        securitization is available on the SEC website.  The Bank has a copy
        in its files and has used that copy to prepare this schedule.  If the
        Court or any defendant needs a copy, the Bank can provide an
        electronic or hard copy.

**Item 21     Details About the Parties**

(a)   **Dealer**: J.P. Morgan Securities Inc.

(b)   **Originator(s)**:

    (i)  Chase Home Finance LLC ("CHF")

    (ii)  PHH Mortgage Corp.

  (c)  **Sponsor/Seller**: J.P. Morgan Mortgage Acquisition Corp.

  (d)  **Depositor**: J.P. Morgan Acceptance Corp. I

  (e)  **Trustee**: U.S. Bank, N.A.

  (f)  **Master Servicer**: Wells Fargo Bank, N.A.

**Item 75**  **Untrue or Misleading Statements About General Underwriting Standards**

  (a)  "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." (Prospectus Supplement at S-33.)

  (b)  "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. CHF believes that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans." (Prospectus Supplement at S-35.)

**Item 77**  **Untrue or Misleading Statements About Evaluation of Borrower Information**

  (a)  "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet the monthly payments on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." (Prospectus Supplement at S-33.)

(b)   "Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination."  (Prospectus Supplement at S-33.)

(c)   "Once the necessary information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses." (Prospectus Supplement at S-35.)

(d)   "For loans with a loan-to-value ratio of 80% or less, CHF's lending guidelines require that all current fixed obligations of the borrower (including mortgage payments based on CHF's mortgage rates at the time of the application and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income in the case of a borrower with income of under $75,000, 42% of the borrower's gross income in the case of a borrower with income of between $75,000 and $150,000 and 44% of the borrower's gross income in the case of a borrower with income in excess of $150,000. For interest-only mortgage loans with a loan-to-value ratio between 80.01% and 90%, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) plus applicable real property taxes, any condominium common charges and hazard insurance, as well as all other monthly obligations (revolving debt, car payments, etc.), generally may not exceed 40% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score of 620-659, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 36% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score greater than or equal to 660, CHF's lending guidelines require that the mortgage

payments (based on CHF's mortgage rates at the time of application) may not exceed 40% of the borrower's gross income. Other credit considerations may cause CHF to depart from these guidelines in certain cases."  (Prospectus Supplement at S-35.)

**Item 81**     **Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-34.)

(b)     "From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel of the CHF who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-36.)

**Item 87**     **Untrue or Misleading Statements About Quality Control**

not applicable

**Item 142**     **Untrue or Misleading Statements About Appraisals**

(a)     "The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator."  (Prospectus Supplement at S-33.)

(b)     "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the

Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." (Prospectus Supplement at S-33.)

(c)    "Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with preestablished appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property." (Prospectus Supplement at S-33 – S-34.)

(d)    "CHF requires an appraisal (which in certain circumstances may be a confirmation of an existing appraisal) to be made of each property to be financed. The appraisal is conducted by an independent fee appraiser who visits the property and estimates its market value." (Prospectus Supplement at S-36.)

## Item 163    Untrue or Misleading Statements About LTVs

(a)    (For data charts, see Prospectus Supplement Annex A at A-2 and A-16.)

(b)    In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

        (i)    The LTV ratios of the loans in aggregate pool I (pools 1-5) ranged from 10.01% to 100.00%. (Prospectus Supplement Annex A at A-2.)

        (ii)    As of the initial cut-off date, the initial mortgage loans in aggregate pool I (pools 1-5) had a 72.19% weighted average original LTV ratio. (Prospectus Supplement Annex A at A-2.)

      (iii)    The LTV ratios of the loans in pool 4 ranged from 10.01% to 95.00%.  (Prospectus Supplement Annex A at A-16.)

      (iv)    As of the initial cut-off date, the initial mortgage loans in pool 4 had a 69.19% weighted average original LTV ratio.  (Prospectus Supplement Annex A at A-16.)

(c)      "No Mortgage Loan in Aggregate Pool I had a Loan-to-Value Ratio at origination of more than 100.00%."  (Prospectus Supplement at S-22.)

(d)      "[N]o Pool 5 Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 95.00%."  (Prospectus Supplement at S-28.)

(e)      "All of the Mortgage Loans in the Aggregate Pool I with Effective Loan-to-Value Ratios greater than 80% as of the cut-off date that were not secured by a security interest in additional collateral or not supported by a third-party guarantee were covered by a primary mortgage insurance policy."  (Prospectus Supplement at S-22.)

(f)      "Those PHH Mortgage Loans that have a Loan-to-Value Ratio generally in excess of 80% and are not covered by a primary mortgage insurance policy will be either (i) secured by a security interest in additional collateral (usually securities) owned by the borrower or (ii) supported by a third party guarantee (usually a parent of the borrower), which in turn is secured by a security interest in additional collateral (normally securities) or by a lien on residential real estate of the guarantor and/or supported by the right to draw on a home equity line of credit extended by PHH or another lender to the guarantor."  (Prospectus Supplement at S-23.)

## Item 177    Untrue or Misleading Statements About Use of the Properties

(a)      (For data charts, see Prospectus Supplement Annex A at A-4 and A-18.)

(b)      In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

      (i)    2,300 (or 90.84%) of the 2,532 initial mortgage loans in aggregate pool I (pools 1-5) were for primary residences.

Those 2,300 loans represented 91.01% of the total outstanding principal balance for the loans in the aggregate.  (Prospectus Supplement Annex A at A-4.)

(ii)    278 (or 81.29%) of the 342 initial mortgage loans in pool 4 were for primary residences.  Those 278 loans represented 83.91% of the total outstanding principal balance for the loans in pool 4.  (Prospectus Supplement Annex A at A-18.)

**Item 180      Untrue or Misleading Statements About Earned Ratings**

(a)     "The certificates offered by this prospectus supplement will initially have ratings at least as high as the ratings specified on page S-1 from Fitch, Inc., Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc. and Moody's Investors Service, Inc." (Prospectus Supplement at S-14.)

(b)     "It is a condition of the issuance of the Offered Certificates that they be rated as indicated on page S- 1 by each of the Rating Agencies, as applicable."  (Prospectus Supplement at S-73.)

**Item 181      Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "The ratings assigned to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related Certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates."  (Prospectus Supplement at S-73.)

**Item 195      Untrue or Misleading Statements About Effective Securitization**

(a)     "*Assignment of the Loans*. At the time of issuance of the securities of a series, and except as otherwise specified in the related prospectus supplement, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee, without recourse, together with

all principal and interest received by or on behalf of the depositor on or with respect to those loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the securities to the depositor in exchange for the loans. Each loan will be identified in a schedule appearing as an exhibit to the related agreement. The schedule will include information as to the outstanding principal balance of each loan after application of payments due on or before the cut-off date, as well as information regarding the loan interest rate, the maturity of the loan, the loan-to-value ratios or combined loan-to-value ratios, as applicable, at origination and other information." (Prospectus at 62.)

(b)     "Unless otherwise specified in the related prospectus supplement, within the time period specified in the related poololing [sic] and servicing agreement, the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things: (1) the mortgage note or contract endorsed without recourse in blank or to the order of the trustee; (2) the mortgage, deed of trust or similar instrument with evidence of recording indicated on the mortgage, deed of trust or similar instrument, except for any mortgage not returned from the public recording office, in which case the depositor or seller will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the applicable recording office; (3) an assignment of the mortgage to the trustee, which assignment will be in recordable form in the case of a mortgage assignment; and (4) the other security documents, including those relating to any senior interests in the property, as may be specified in the related prospectus supplement or the related agreement." (Prospectus at 62-63.)

(c)     "**Under the Assignment Agreements**, the Seller will sell the Mortgage Loans to the Depositor and the Depositor will sell the Mortgage Loans to the Issuing Entity. Pursuant to the Assignment Agreements, the Seller will transfer to the Depositor and the Depositor will transfer to the Trustee its rights under the Purchase and Servicing Agreements with respect to certain representations,

warranties and covenants made by the Originators relating to, among other things, certain characteristics of the Mortgage Loans." (Prospectus Supplement at S-30.)

(d)     "Pursuant to a Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)."  (Prospectus Supplement S-30 – S-31.)

# SCHEDULE 23

# SCHEDULE 23 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)      **Dealer**: J.P. Morgan Securities Inc.

(b)      **Description of the Trust**: J.P. Morgan Mortgage Trust 2006-A4 issued Mortgage Pass-Through Certificates, Series 2006-A4, which was a securitization in May 2006 of 2,120 loans divided into five loan pools.

(c)      **Description of Purchase**: J.P. Morgan Securities Inc. offered and sold to the Bank a super senior certificate in tranche 4-A-1, for which the Bank paid $98,808,593.80 in principal plus accrued interest of $483,833.33.  The Bank received the certificate on May 31, 2006. Tranche 4-A-1 contains loans in pool 4.

(d)      **CUSIP**: 46628laq1

(e)      **Ratings of the certificate(s) at the time of the Bank's purchase**:
        (i)      Moody's:    Aaa
        (ii)     Fitch:        AAA

(f)      **Ratings of the certificate(s) as of November 30, 2010**:
        (i)      Moody's:    Caa1
        (ii)     Fitch:        CCC

(g)      **SEC's URL of prospectus and the prospectus supplement for this securitization**:
        http://sec.gov/Archives/edgar/data/1085309/000112528206003090/b413485_424b5.txt

**Item 21**      **Details About the Parties**

(a)      **Dealer**: J.P. Morgan Securities Inc.

(b)      **Originator(s)**:
        (i)      Chase Home Finance LLC ("CHF") or JPMorgan Chase Bank, N.A.
        (ii)     Countrywide Home Loans, Inc.

(iii)   PHH Mortgage Corp.

(c)   **Sponsor/Seller**: J.P. Morgan Mortgage Acquisition Corp.

(d)   **Depositor**: J.P. Morgan Acceptance Corp. I

(e)   **Trustee**: U.S. Bank N.A.

(f)   **Master Servicer**: Wells Fargo Bank, N.A.

**Item 75**   **Untrue or Misleading Statements About General Underwriting Standards**

(a)   "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." (Prospectus Supplement at S-25.)

(b)   "The following is a description of the underwriting policies customarily employed by CHF with respect to residential mortgage loans which it originated during the period of origination of the Mortgage Loans. The Mortgage Loans originated by JPMorgan Chase Bank, National Association during such period were also originated using such underwriting policies."  (Prospectus Supplement at S-27.)

(c)   "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. CHF believes that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans."  (Prospectus Supplement at S-27.)

(d)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-30.)

(e)    "PHH Mortgage's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made." (Prospectus Supplement at S-37.)

**Item 77    Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)    "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet the monthly payments on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." (Prospectus Supplement at S-26.)

(b)    "Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination." (Prospectus Supplement at S-26.)

(c)    "Once the necessary information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses." (Prospectus Supplement at S-27.)

(d)    "For loans with a loan-to-value ratio of 80% or less, CHF's lending guidelines require that all current fixed obligations of the borrower (including mortgage payments based on CHF's mortgage rates at the time of the application and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income in the case of a borrower with income of under $75,000, 42% of the

borrower's gross income in the case of a borrower with income of between $75,000 and $150,000 and 44% of the borrower's gross income in the case of a borrower with income in excess of $150,000. For interest-only mortgage loans with a loan-to-value ratio between 80.01% and 90%, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) plus applicable real property taxes, any condominium common charges and hazard insurance, as well as all other monthly obligations (revolving debt, car payments, etc.), generally may not exceed 40% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score of 620-659, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 36% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score greater than or equal to 660, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 40% of the borrower's gross income. Other credit considerations may cause CHF to depart from these guidelines in certain cases." (Prospectus Supplement at S-27 – S-28.)

(e)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits. . . . The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-30.)

(f)    "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%."  (Prospectus Supplement at S-32.)

(g)    "Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively."  (Prospectus Supplement at S-34.)

(h)    "Once sufficient employment, credit and property information is obtained, the decision as to whether to approve the loan is based upon the applicant's income and credit history, the status of title to the mortgaged property, and the appraised value of the mortgaged property. PHH Mortgage also reviews the level of an applicant's liquid assets as an indication of creditworthiness."  (Prospectus Supplement at S-39.)

(i)    "In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and to meet monthly housing expenses and other financial obligations including the borrower's monthly obligations on the proposed mortgage loan, PHH Mortgage generally applies debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly gross income. Under certain programs, however, PHH Mortgage makes loans where these ratios are up to 60%."  (Prospectus Supplement at S-39.)

**Item 81    Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)    "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower

liquidity, employment and residential stability and local economic conditions." (Prospectus Supplement at S-26.)

(b)  "From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel of the CHF who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions." (Prospectus Supplement at S-28.)

(c)  "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." (Prospectus Supplement at S-30.)

(d)  "From time to time, exceptions to PHH Mortgage's underwriting policies may be made. Such exceptions are made on a loan-by-loan basis only at the discretion of PHH Mortgage's underwriters and may be made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, equity, employment and residential stability." (Prospectus Supplement at S-37.)

**Item 87      Untrue or Misleading Statements About Quality Control**

(a)  "Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself." (Prospectus Supplement at S-30.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)  "The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator." (Prospectus Supplement at S-26.)

(b)     "All appraisals conform to the Uniform Standards of Professional
        Appraisal Practice adopted by the Appraisal Standards Board of the
        Appraisal Foundation and must be on forms acceptable to Fannie Mae
        and/or Freddie Mac."  (Prospectus Supplement at S-26.)

(c)     "Appraisers may be staff appraisers employed by the originator or
        independent appraisers selected in accordance with pre-established
        appraisal procedure guidelines established by the originator. The
        appraisal procedure guidelines generally will have required the
        appraiser or an agent on its behalf to personally inspect the property
        and to verify whether the property was in good condition and that
        construction, if new, had been substantially completed. The appraisal
        generally will have been based upon a market data analysis of recent
        sales of comparable properties and, when deemed applicable, an
        analysis based on income generated from the property or a
        replacement cost analysis based on the current cost of constructing or
        purchasing a similar property."  (Prospectus Supplement at S-26.)

(d)     "CHF requires an appraisal (which in certain circumstances may be a
        confirmation of an existing appraisal) to be made of each property to
        be financed. The appraisal is conducted by an independent fee
        appraiser who visits the property and estimates its market value."
        (Prospectus Supplement at S-28.)

(e)     "Except with respect to the mortgage loans originated pursuant to its
        Streamlined Documentation Program, whose values were confirmed
        with a Fannie Mae proprietary automated valuation model,
        Countrywide Home Loans obtains appraisals from independent
        appraisers or appraisal services for properties that are to secure
        mortgage loans. The appraisers inspect and appraise the proposed
        mortgaged property and verify that the property is in acceptable
        condition. Following each appraisal, the appraiser prepares a report
        which includes a market data analysis based on recent sales of
        comparable homes in the area and, when deemed appropriate, a
        replacement cost analysis based on the current cost of constructing a
        similar home."  (Prospectus Supplement at S-31.)

(f)    "All appraisals [obtained by Countrywide] are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-31.)

(g)    "In determining the adequacy of the property as collateral for a first lien mortgage loan, a Fannie Mae/Freddie Mac conforming appraisal of the property is performed by an independent appraiser selected by PHH Mortgage, except as noted in this prospectus supplement." (Prospectus Supplement at S-38.)

(h)    "The appraiser is required to inspect the property and verify that it is in good condition and that construction or renovation, if new, has been completed. The appraisal report indicates a value for the property and provides information concerning marketability, the neighborhood, the property site, interior and exterior improvements, and the condition of the property." (Prospectus Supplement at S-38.)

## Item 163    Untrue or Misleading Statements About LTVs

(a)    (For data charts, see Prospectus Supplement Annex A at A-2 and A-15.)

(b)    In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

        (i)    The LTV ratios of the loans in the aggregate ranged from 10.01% to 100.00%. (Prospectus Supplement Annex A at A-2.)

        (ii)    As of the initial cut-off date, the initial mortgage loans in the aggregate had a 70.05% weighted average original LTV ratio. (Prospectus Supplement Annex A at A-2.)

        (iii)    The LTV ratios of the loans in pool 4 ranged from 10.01% to 100.00%. (Prospectus Supplement Annex A at A-15.)

        (iv)    As of the initial cut-off date, the initial mortgage loans in pool 4 had a 67.56% weighted average original LTV ratio. (Prospectus Supplement Annex A at A-15.)

(c)    "[N]o Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%." (Prospectus Supplement at S-20.)

(d)     "[N]o Pool 4 Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%." (Prospectus Supplement at S-22.)

(e)     "Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%. Countrywide Home Loans' underwriting guidelines do not prohibit or otherwise restrict a borrower from obtaining secondary financing from lenders other than Countrywide Home Loans, whether at origination of the mortgage loan or thereafter." (Prospectus Supplement at S-31.)

(f)     "Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000." (Prospectus Supplement at S-32.)

(g)     "Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000." (Prospectus Supplement at S-33.)

(h)     "All of the Mortgage Loans with Effective Loan-to-Value Ratios greater than 80% as of the cut-off date that were not secured by a security interest in additional collateral or not supported by a third-party guarantee were covered by a primary mortgage insurance policy."  (Prospectus Supplement at S-18.)

(i)     "Those PHH Mortgage Loans that have a Loan-to-Value Ratio generally in excess of 80% and are not covered by a primary mortgage insurance policy will be either (i) secured by a security interest in additional collateral (usually securities) owned by the borrower or (ii) supported by a third party guarantee (usually a parent of the borrower), which in turn is secured by a security interest in additional collateral (normally securities) or by a lien on residential real estate of the guarantor and/or supported by the right to draw on a home equity line of credit extended by PHH or another lender to the guarantor." (Prospectus Supplement at S-19.)

## Item 177   Untrue or Misleading Statements About Use of the Properties

(a)     (For data charts, see Prospectus Supplement Annex A at A-4 and A-17.)

(b)     In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

   (i)     1,904 (or 89.81%) of the 2,120 initial mortgage loans in the aggregate were for primary residences.  Those 1,904 loans represented 90.13% of the total outstanding principal balance for the loans in the aggregate. (Prospectus Supplement Annex A at A-4.)

   (ii)    581 (or 89.25%) of the 651 initial mortgage loans in pool 4 were for primary residences.  Those 581 loans represented 90.22% of the total outstanding principal balance for the loans in pool 4.  (Prospectus Supplement Annex A at A-17.)

**Item 180       Untrue or Misleading Statements About Earned Ratings**

(a)      "The certificates offered by this prospectus supplement will initially
have ratings at least as high as the ratings specified on page S-1 from
Fitch, Inc. and Moody's Investors Service, Inc."  (Prospectus
Supplement at S-11.)

(b)      "It is a condition of the issuance of the Offered Certificates that they
be rated as indicated on page S-1 by each of the Rating Agencies, as
applicable."  (Prospectus Supplement at S-80.)

**Item 181       Untrue or Misleading Statements About Rating Agencies'
Evaluation of the Certificates**

(a)      "The ratings assigned to mortgage pass through certificates address
the likelihood of the receipt of all payments on the mortgage loans by
the related Certificateholders under the agreements pursuant to which
such certificates are issued. Such ratings take into consideration the
credit quality of the related mortgage pool, including any credit
support providers, structural and legal aspects associated with such
certificates, and the extent to which the payment stream on the
mortgage pool is adequate to make the payments required by such
certificates."  (Prospectus Supplement at S-80.)

**Item 195       Untrue or Misleading Statements About Effective Securitization**

(a)      "Assignment of the Loans. At the time of issuance of the securities of
a series, and except as otherwise specified in the related prospectus
supplement, the depositor will cause the loans comprising the related
trust fund to be assigned to the trustee, without recourse, together with
all principal and interest received by or on behalf of the depositor on
or with respect to those loans after the cut-off date, other than
principal and interest due on or before the cut-off date and other than
any retained interest specified in the related prospectus supplement.
The trustee will, concurrently with the assignment, deliver the
securities to the depositor in exchange for the loans. Each loan will be
identified in a schedule appearing as an exhibit to the related
agreement. The schedule will include information as to the
outstanding principal balance of each loan after application of
payments due on or before the cut-off date, as well as information

regarding the loan interest rate, the maturity of the loan, the loan-to-value ratios or combined loan-to-value ratios, as applicable, at origination and other information."  (Prospectus at 62.)

(b)     "Unless otherwise specified in the related prospectus supplement, within the time period specified in the related poolooling [sic] and servicing agreement, the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things:

> (1) the mortgage note or contract endorsed without recourse in blank or to the order of the trustee;
> (2) the mortgage, deed of trust or similar instrument with evidence of recording indicated on the mortgage, deed of trust or similar instrument, except for any mortgage not returned from the public recording office, in which case the depositor or seller will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the applicable recording office;
> (3) an assignment of the mortgage to the trustee, which assignment will be in recordable form in the case of a mortgage assignment; and
> (4) the other security documents, including those relating to any senior interests in the property, as may be specified in the related prospectus supplement or the related agreement."

(Prospectus at 62-63.)

(c)     "Under the Assignment Agreements, the Seller will sell the Mortgage Loans to the Depositor and the Depositor will sell the Mortgage Loans to the Issuing Entity. Pursuant to the Assignment Agreements, the Seller will transfer to the Depositor and the Depositor will transfer to the Trustee its rights under the Purchase and Servicing Agreements with respect to certain representations, warranties and covenants made by the Originators relating to, among other things, certain characteristics of the Mortgage Loans."  (Prospectus Supplement at S-23.)

(d)    "Pursuant to a Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)."  (Prospectus Supplement at S-23.)

# SCHEDULE 24

## SCHEDULE 24 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

    (a)      **Dealer**: J.P. Morgan Securities Inc.

    (b)      **Description of the Trust**: J.P. Morgan Mortgage Trust 2006-A5 issued Mortgage Pass-Through Certificates, Series 2006-A5, which was a securitization in July 2006 of 2,894 loans divided into six loan pools.

    (c)      **Description of Purchase**: J.P. Morgan Securities Inc. offered and sold to the Bank senior certificates in tranche 4-A-1.  There were two transactions.  In one transaction, the Bank paid $11,046,315.00 in principal plus accrued interest of $55,370.00 on July 31, 2006.  In the other transaction, the Bank paid $298,406,250.00 in principal plus accrued interest of $1,500,000.00.  The Bank received the certificates on July 31, 2006.  Tranche 4-A-1 contains loans in loan pool 4.

    (d)      **CUSIP**: 46629cap2

    (e)      **Ratings of the certificate(s) at the time of the Bank's purchase**:
        (i)      Moody's:      Aaa
        (ii)     Fitch:          AAA

    (f)      **Ratings of the certificate(s) as of November 30, 2010**:
        (i)      Moody's:      Caa1
        (ii)     Fitch:          CCC

    (g)      **SEC's URL of prospectus and the prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/1085309/000112528206004397/b414106_424b5.txt

**Item 21**      **Details About the Parties**

    (a)      **Dealer**: J.P. Morgan Securities Inc.

    (b)      **Originator(s)**:

      (i)     Chase Home Finance LLC ("CHF") or JPMorgan Chase Bank, N.A.

      (ii)    PHH Mortgage Corp.

(c)    **Sponsor/Seller**: J.P. Morgan Mortgage Acquisition Corp.

(d)    **Depositor**: J.P. Morgan Acceptance Corp. I

(e)    **Trustee**: HSBC Bank USA, N.A.

(f)    **Master Servicer**: U.S. Bank N.A.

**Item 75    Untrue or Misleading Statements About General Underwriting Standards**

(a)    "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." (Prospectus Supplement at S-31.)

(b)    "The following is a description of the underwriting policies customarily employed by CHF with respect to residential mortgage loans which it originated during the period of origination of the Mortgage Loans. The Mortgage Loans originated by JPMorgan Chase Bank, National Association during such period were also originated using such underwriting policies." (Prospectus Supplement at S-32.)

(c)    "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. CHF believes that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans." (Prospectus Supplement at S-33.)

(d)    "PHH Mortgage's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made." (Prospectus Supplement at S-37.)

**Item 77      Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)    "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet the monthly payments on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."  (Prospectus Supplement at S-32.)

(b)    "Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination."  (Prospectus Supplement at S-32.)

(c)    "Once the necessary information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses."  (Prospectus Supplement at S-33.)

(d)    "For loans with a loan-to-value ratio of 80% or less, CHF's lending guidelines require that all current fixed obligations of the borrower (including mortgage payments based on CHF's mortgage rates at the time of the application and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income in the case of a borrower with income of under $75,000, 42% of the borrower's gross income in the case of a borrower with income of between $75,000 and $150,000 and 44% of the borrower's gross income in the case of a borrower with income in excess of $150,000. For interest-only mortgage loans with a loan-to-value ratio between 80.01% and 90%, CHF's lending guidelines require that the mortgage

payments (based on CHF's mortgage rates at the time of application) plus applicable real property taxes, any condominium common charges and hazard insurance, as well as all other monthly obligations (revolving debt, car payments, etc.), generally may not exceed 40% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score of 620-659, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 36% of the borrower's gross income. For amortizing adjustable rate mortgage loans with a loan-to-value ratio greater than 80.01% with a Minimum Credit Risk Score greater than or equal to 660, CHF's lending guidelines require that the mortgage payments (based on CHF's mortgage rates at the time of application) may not exceed 40% of the borrower's gross income. Other credit considerations may cause CHF to depart from these guidelines in certain cases." (Prospectus Supplement at S-33 – S-34.)

(e)     "Once sufficient employment, credit and property information is obtained, the decision as to whether to approve the loan is based upon the applicant's income and credit history, the status of title to the mortgaged property, and the appraised value of the mortgaged property. PHH Mortgage also reviews the level of an applicant's liquid assets as an indication of creditworthiness." (Prospectus Supplement at S-39.)

(f)     "In determining whether a prospective borrower has sufficient monthly income available
            • to meet the borrower's monthly obligation on the proposed mortgage loan and
            • to meet monthly housing expenses and other financial obligations including the borrower's monthly obligations on the proposed mortgage loan,
PHH Mortgage generally applies debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly gross income. Under certain programs, however, PHH Mortgage makes loans where these ratios are up to 60%." (Prospectus Supplement at S-39.)

**Item 81**       **Untrue or Misleading Statements About Exceptions to Underwriting Standards**

   (a)       "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-32.)

   (b)       "From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel of the CHF who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-34.)

   (c)       "From time to time, exceptions to PHH Mortgage's underwriting policies may be made. Such exceptions are made on a loan-by-loan basis only at the discretion of PHH Mortgage's underwriters and may be made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, equity, employment and residential stability."  (Prospectus Supplement at S-37.)

**Item 87**       **Untrue or Misleading Statements About Quality Control**

      not applicable

**Item 142**      **Untrue or Misleading Statements About Appraisals**

   (a)       "The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator."  (Prospectus Supplement at S-32.)

(b)    "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."  (Prospectus Supplement at S-32.)

(c)    "Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property."  (Prospectus Supplement at S-32.)

(d)    "CHF requires an appraisal (which in certain circumstances may be a confirmation of an existing appraisal) to be made of each property to be financed. The appraisal is conducted by an independent fee appraiser who visits the property and estimates its market value." (Prospectus Supplement at S-34.)

(e)    "In determining the adequacy of the property as collateral for a first lien mortgage loan, a Fannie Mae/Freddie Mac conforming appraisal of the property is performed by an independent appraiser selected by PHH Mortgage, except as noted in this prospectus supplement." (Prospectus Supplement at S-38.)

(f)    "The appraiser is required to inspect the property and verify that it is in good condition and that construction or renovation, if new, has been completed. The appraisal report indicates a value for the property and provides information concerning marketability, the neighborhood, the property site, interior and exterior improvements, and the condition of the property."  (Prospectus Supplement at S-38.)

**Item 163       Untrue or Misleading Statements About LTVs**

(a)      (For data charts, see Prospectus Supplement Annex A at A-2 and A-15.)

(b)      In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

      (i)      The LTV ratios of the loans in the aggregate ranged from 00.01% to 100.00%.  (Prospectus Supplement Annex A at A-2.)

      (ii)      As of the initial cut-off date, the initial mortgage loans in the aggregate had a 72.19% weighted average original LTV ratio.  (Prospectus Supplement Annex at A-2.)

      (iii)      The LTV ratios of the loans in pool 4 ranged from 00.01% to 95.00%.  (Prospectus Supplement Annex A at A-15.)

      (iv)      As of the initial cut-off date, the initial mortgage loans in pool 4 had a 67.51% weighted average original LTV ratio.  (Prospectus Supplement Annex A at A-15.)

(c)      "[N]o Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%."  (Prospectus Supplement at S-22.)

(d)      "[N]o Pool 4 Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%."  (Prospectus Supplement at S-26.)

(h)      "All of the Mortgage Loans with Effective Loan-to-Value Ratios greater than 80% as of the cut-off date that were not secured by a security interest in additional collateral or not supported by a third-party guarantee were covered by a primary mortgage insurance policy."  (Prospectus Supplement at S-20.)

(i)      "Those PHH Mortgage Loans that have a Loan-to-Value Ratio generally in excess of 80% and are not covered by a primary mortgage insurance policy will be either (i) secured by a security interest in additional collateral (usually securities) owned by the borrower or (ii) supported by a third party guarantee (usually a parent of the borrower), which in turn is secured by a security interest in additional collateral (normally securities) or by a lien on residential real estate of

the guarantor and/or supported by the right to draw on a home equity line of credit extended by PHH Mortgage or another lender to the guarantor."  (Prospectus Supplement at S-20.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts, see Prospectus Supplement Annex A at A-4 and A-17.)

(b)     In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

  (i)     2,626 (or 90.74%) of the 2,894 initial mortgage loans in the aggregate were for primary residences.  Those 2,626 loans represented 91.79% of the total outstanding principal balance for the loans in the aggregate.  (Prospectus Supplement Annex A at A-4.)

  (ii)    509 (or 88.68%) of the 574 initial mortgage loans in pool 4 were for primary residences.  Those 509 loans represented 88.76% of the total outstanding principal balance for the loans in pool 4.  (Prospectus Supplement Annex A at A-17.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "The certificates offered by this prospectus supplement will initially have ratings at least as high as the ratings specified on page S-1 from Fitch, Inc. and Moody's Investors Service, Inc."  (Prospectus Supplement at S-12.)

(b)     "It is a condition of the issuance of the Offered Certificates that they be rated as indicated on page S-1 by each of the Rating Agencies, as applicable."  (Prospectus Supplement at S-79.)

**Item 181     Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "The ratings assigned to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related Certificateholders under the agreements pursuant to which

such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates." (Prospectus Supplement at S-79.)

**Item 195      Untrue or Misleading Statements About Effective Securitization**

(a)     "Assignment of the Loans. At the time of issuance of the securities of a series, and except as otherwise specified in the related prospectus supplement, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee, without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to those loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the securities to the depositor in exchange for the loans. Each loan will be identified in a schedule appearing as an exhibit to the related agreement. The schedule will include information as to the outstanding principal balance of each loan after application of payments due on or before the cut-off date, as well as information regarding the loan interest rate, the maturity of the loan, the loan-to-value ratios or combined loan-to-value ratios, as applicable, at origination and other information." (Prospectus at 62.)

(b)     "Unless otherwise specified in the related prospectus supplement, within the time period specified in the related poololing [sic] and servicing agreement, the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things: (1) the mortgage note or contract endorsed without recourse in blank or to the order of the trustee; (2) the mortgage, deed of trust or similar instrument with evidence of recording indicated on the mortgage, deed of trust or similar instrument, except for any mortgage not returned from the public recording office, in which case the depositor or seller will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the

applicable recording office; (3) an assignment of the mortgage to the trustee, which assignment will be in recordable form in the case of a mortgage assignment; and (4) the other security documents, including those relating to any senior interests in the property, as may be specified in the related prospectus supplement or the related agreement." (Prospectus at 62-63.)

(c)     "Under the Assignment Agreements, the Seller will sell the Mortgage Loans to the Depositor and the Depositor will sell the Mortgage Loans to the Issuing Entity. Pursuant to the Assignment Agreements, the Seller will transfer to the Depositor and the Depositor will transfer to the Trustee its rights under the Purchase and Servicing Agreements with respect to certain representations, warranties and covenants made by the Originators relating to, among other things, certain characteristics of the Mortgage Loans." (Prospectus Supplement at S-29.)

(d)     "Pursuant to a Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)." (Prospectus Supplement at S-29.)

# SCHEDULE 25

## SCHEDULE 25 TO THE COMPLAINT

**Item 20**   **Details About the Securitization**

(a)   **Dealer**: J.P. Morgan Securities Inc.

(b)   **Description of the Trust**: J.P. Morgan Mortgage Trust 2007-A5 issued Mortgage Pass-Through Certificates, Series 2007-A5, which was a securitization in September 2007 of 1,595 loans divided into four loan pools.

(c)   **Description of Purchase**: J.P. Morgan Securities Inc. offered and sold to the Bank a super senior certificate in tranche 4-A-1, for which the Bank paid $297,803,057.26 in principal plus accrued interest of $1,333,235.02.  The Bank received the certificate on September 28, 2007.  Tranche 4-A-1 contains loans in loan pool 4.

(d)   **CUSIP**: 46632bap9

(e)   **Ratings of the certificate(s) at the time of the Bank's purchase**:
      (i)    S&P: AAA
      (ii)   Fitch: AAA

(f)   **Ratings of the certificate(s) as of November 30, 2010**:
      (i)    S&P: BB
      (ii)   Fitch: B

(g)   **SEC's URL of prospectus and the prospectus supplement for this securitization**:
      http://sec.gov/Archives/edgar/data/1412263/000116231807000801/m0803424b5.htm.  This copy of the prospectus and prospectus supplement available on the SEC's website does not contain page numbers, although it does contain a table of contents with page numbers.  The page numbers used in this schedule come from a copy that the Bank has in its files.  If the Court or any defendant needs a copy with page numbers, the Bank can provide an electronic or hard copy.

**Item 21**    **Details About the Parties**

    (a)    **Dealer**: J.P. Morgan Securities Inc.

    (b)    **Originator(s)**:
        (i)    Chase Home Finance LLC ("CHF")
        (ii)   PHH Mortgage Corp.

    (c)    **Sponsor/Seller**: J.P. Morgan Mortgage Acquisition Corp.

    (d)    **Depositor**: J.P. Morgan Acceptance Corp. I

    (e)    **Trustee**: HSBC Bank USA, N.A.

    (f)    **Master Servicer**: U.S. Bank N.A.

**Item 75**    **Untrue or Misleading Statements About General Underwriting Standards**

    (a)    "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." (Prospectus Supplement at S-31.)

    (b)    "Such Chase Originator Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. Therefore, each Chase Originator Mortgage Loan originated in such a manner should generally meet the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Chase Originator Mortgage Loans." (Prospectus Supplement at S-33.)

    (c)    "PHH Mortgage's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made." (Prospectus Supplement at S-37.)

**Item 77      Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)    "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."  (Prospectus Supplement at S-31.)

(b)    "Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination."  (Prospectus Supplement at S-31.)

(c)    "Once the necessary information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses."  (Prospectus Supplement at S-33.)

(d)    "For loans with a loan-to-value ratio of 80% or less, lending guidelines require that all current fixed obligations of the borrower (including mortgage payments based on mortgage rates at the time of the application and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income in the case of a borrower with income of under $75,000, 42% of the borrower's gross income in the case of a borrower with income of between $75,000 and $150,000 and 44% of the borrower's gross income in the case of a borrower with income in excess of $150,000. For interest-only mortgage loans with a loan-to-value ratio between 80.01% and 95%, lending guidelines require that the mortgage payments (based on

mortgage rates at the time of application) plus applicable real property taxes, any common charges (such as Home Owner's Association Fees or Co-op charges) and hazard insurance, as well as all other monthly debt obligations (revolving debt, car payments, etc.), generally may not exceed 40% of the borrower's gross income. For adjustable rate amortizing mortgage loans with a loan-to-value ratio greater than or equal to 80.01% with a Minimum Credit Risk Score of 620 - 660, lending guidelines require that all current fixed obligations of the borrower (including mortgage payments, based on mortgage rates at the time of application and other expenses related to the residence) generally may not exceed 36% of the borrower's gross income. For adjustable rate amortizing mortgage loans with a loan-to-value ratio greater than or equal to 80.01%, with a Minimum Credit Risk Score greater than 660, lending guidelines require that all current fixed obligations of the borrower (including mortgage payments, based on mortgage rates at the time of application, and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income. Other credit considerations may cause a departure from these guidelines in certain cases."  (Prospectus Supplement at S-33.)

(e)    "Once sufficient employment, credit and property information is obtained, the decision as to whether to approve the loan is based upon the applicant's income and credit history, the status of title to the mortgaged property, and the appraised value of the mortgaged property. PHH Mortgage also reviews the level of an applicant's liquid assets as an indication of creditworthiness."  (Prospectus Supplement at S-38.)

(f)    "In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and to meet monthly housing expenses and other financial obligations including the borrower's monthly obligations on the proposed mortgage loan, PHH Mortgage generally applies debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly gross income. Under certain programs, however, PHH Mortgage makes loans where these ratios are up to 60%."  (Prospectus Supplement at S-39.)

**Item 81      Untrue or Misleading Statements About Exceptions to Underwriting Standards**

   (a)   "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan by loan basis at the discretion of the lender's underwriter. Exceptions may be made after consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-32.)

   (b)   "From time to time, exceptions and/or variances to [Chase] underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-34.)

   (c)   "From time to time, exceptions to PHH Mortgage's underwriting policies may be made. Such exceptions are made on a loan-by-loan basis only at the discretion of PHH Mortgage's underwriters and may be made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, equity, employment and residential stability."  (Prospectus Supplement at S-37.)

**Item 87      Untrue or Misleading Statements About Quality Control**

   not applicable

**Item 142      Untrue or Misleading Statements About Appraisals**

   (a)   "The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator."  (Prospectus Supplement at S-32.)

(b)     "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."  (Prospectus Supplement at S-32.)

(c)     "Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with preestablished appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property."  (Prospectus Supplement at S-32.)

(d)     "An appraisal (which in certain circumstances may be a confirmation of an existing appraisal) is required for each property to be financed. The appraisal is conducted by an independent fee appraiser who estimates the mortgaged property's market value."  (Prospectus Supplement at S-34.)

## Item 163     Untrue or Misleading Statements About LTVs

(a)     (For data charts, see Prospectus Supplement Annex A at A-2 and A-14.)

(b)     In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

> (i)     The LTV ratios of the loans in the aggregate ranged from 00.01% to 100.00%.  (Prospectus Supplement Annex A at A-2.)
>
> (ii)    As of the initial cut-off date, the initial mortgage loans in the aggregate had a 70.11% weighted average original LTV ratio.  (Prospectus Supplement Annex at A-2.)

       (iii)    The LTV ratios of the loans in pool 4 ranged from 10.01% to 100.00%.  (Prospectus Supplement Annex A at A-14.)

       (iv)    As of the initial cut-off date, the initial mortgage loans in pool 4 had a 68.60% weighted average original LTV ratio.  (Prospectus Supplement Annex A at A-14.)

(c)      "[N]o Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%."  (Prospectus Supplement at S-24.)

(d)      "[N]o Pool 4 Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%."  (Prospectus Supplement at S-28.)

(e)      "All of the Mortgage Loans with Effective Loan-to-Value Ratios greater than 80.00% as of the cut-off date that were not secured by a security interest in additional collateral or not supported by a third-party guarantee were covered by a primary mortgage insurance policy."  (Prospectus Supplement at S-22.)

(f)      "Those PHH Mortgage Loans that have a Loan-to-Value Ratio generally in excess of 80% and are not covered by a primary mortgage insurance policy will be either (i) secured by a security interest in additional collateral (usually securities) owned by the borrower or (ii) supported by a third party guarantee (usually a parent of the borrower), which in turn is secured by a security interest in additional collateral (normally securities) or by a lien on residential real estate of the guarantor and/or supported by the right to draw on a home equity line of credit extended by PHH Mortgage or another lender to the guarantor."  (Prospectus Supplement at S-23.)

## Item 177    Untrue or Misleading Statements About Use of the Properties

(a)      (For data charts, see Prospectus Supplement Annex A at A-4 and A-15.)

(b)      In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

       (i)    1,431 (or 89.72%) of the 1,595 initial mortgage loans in the aggregate were for primary residences.  Those 1,595

loans represented 89.02% of the total outstanding principal balance for the loans in the aggregate. (Prospectus Supplement Annex A at A-4.)

(ii)    378 (or 88.11%) of the 429 initial mortgage loans in pool 4 were for primary residences.  Those 378 loans represented 86.68% of the total outstanding principal balance for the loans in the pool 4.  (Prospectus Supplement Annex A at A-15.)

**Item 180    Untrue or Misleading Statements About Earned Ratings**

(a)    "The certificates offered by this prospectus supplement will initially have ratings at least as high as the ratings specified on page S-1 from Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and Fitch, Inc."  (Prospectus Supplement at S-13.)

(b)    "It is a condition of the issuance of the Offered Certificates that they be rated as indicated on page S-1 by each of the Rating Agencies, as applicable."  (Prospectus Supplement at S-79.)

**Item 181    Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)    "The ratings assigned to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related Certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates."  (Prospectus Supplement at S-79 – S-80.)

**Item 195    Untrue or Misleading Statements About Effective Securitization**

(a)    "*Assignment of the Loans*. At the time of issuance of the securities of a series, and except as otherwise specified in the related prospectus supplement, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee, without recourse, together with all principal and interest received by or on behalf of the depositor on

or with respect to those loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the securities to the depositor in exchange for the loans. Each loan will be identified in a schedule appearing as an exhibit to the related agreement. The schedule will include information as to the outstanding principal balance of each loan after application of payments due on or before the cut-off date, as well as information regarding the loan interest rate, the maturity of the loan, the loan-to-value ratios or combined loan-to-value ratios, as applicable, at origination and other information." (Prospectus at 62.)

(b)   "Unless otherwise specified in the related prospectus supplement, within the time period specified in the related poololing [sic] and servicing agreement, the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things: (1) the mortgage note or contract endorsed without recourse in blank or to the order of the trustee; (2) the mortgage, deed of trust or similar instrument with evidence of recording indicated on the mortgage, deed of trust or similar instrument, except for any mortgage not returned from the public recording office, in which case the depositor or seller will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the applicable recording office; (3) an assignment of the mortgage to the trustee, which assignment will be in recordable form in the case of a mortgage assignment; and (4) the other security documents, including those relating to any senior interests in the property, as may be specified in the related prospectus supplement or the related agreement." (Prospectus at 62-63.)

(c)   "Under the Assignment Agreements, the Seller will sell the Mortgage Loans to the Depositor and the Depositor will sell the Mortgage Loans to the Issuing Entity. Pursuant to the Assignment Agreements, the Seller will transfer to the Depositor and the Depositor will transfer to the Trustee its rights under the Purchase and Servicing Agreements with respect to certain representations, warranties and covenants made by the Originators relating to, among other things, certain

characteristics of the Mortgage Loans."  (Prospectus Supplement at S-29.)

(d)    "Pursuant to a Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)."  (Prospectus Supplement at S-29.)

# SCHEDULE 26

## SCHEDULE 26 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)      **Dealer**: J.P. Morgan Securities Inc.

(b)      **Description of the Trust**: J.P. Morgan Mortgage Trust 2008-R1 is a re-securitization.  A re-securitization takes interests from other securities and pools them together into a new security.

(c)      **Description of Purchase**: J.P. Morgan Securities offered and sold to the Bank a certificate in tranche 1-A-1 of J.P. Morgan Mortgage Trust 2008-R1, for which the Bank paid $337,761,875.00 in principal plus accrued interest of $1,472,187.50.  The Bank received the certificate on January 31, 2008.

Tranche 1-A-1 of J.P. Morgan Mortgage Trust 2008-R1 is supported by underlying certificates in tranche 2-A10 of Chase Mortgage Finance Trust Series 2007-A3.

Chase Mortgage Finance Trust Series 2007-A3 was a securitization in November 2007 of 970 loans divided into three loan groups.  Tranche 2-A10 of Chase Mortgage Finance Trust Series 2007-A3 contains loans in loan group 2.

(d)      **CUSIP**: 46632gaa1

(e)      **Ratings of the certificate(s) at the time of the Bank's purchase**:
  (i)      Fitch:         AAA
  (ii)     Moody's:    Aaa

(f)      **Ratings of the certificate(s) as of November 30, 2010**:
  (i)      Fitch:         B
  (ii)     Moody's:    B3/*-

(g)      **SEC's URL of prospectus and the prospectus supplement for Chase Mortgage Finance Trust Series 2007-A3**:
http://sec.gov/Archives/edgar/data/1418260/000089322007003875/w43254b5e424b5.htm.  The representations quoted in this schedule all come from the prospectus and prospectus supplement for Chase

Mortgage Finance Trust Series 2007-A3.  There is no prospectus for J.P. Morgan Mortgage Trust 2008-R1.

**Item 21**    **Details About the Parties**

(a)    **Dealer**: J.P. Morgan Securities, Inc.

(b)    **Originator(s)**: JPMorgan Chase Bank, N.A.

(c)    **Sponsor/Seller**: Chase Home Finance LLC

(d)    **Depositor**: Chase Mortgage Finance Corporation

(e)    **Trustee**: The Bank of New York Trust Company, N.A.

(f)    **Master Servicer**: JPMorgan Chase Bank, N.A.

**Item 75**    **Untrue or Misleading Statements About General Underwriting Standards**

(a)    "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. Therefore, each Mortgage Loan originated in such a manner should generally meet the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans."  (Prospectus Supplement at S-129.)

**Item 77**    **Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)    "Once the necessary information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses."  (Prospectus Supplement at S-129.)

(b)    "For loans with a loan-to-value ratio of 80% or less, lending guidelines require that all current fixed obligations of the borrower

(including mortgage payments based on mortgage rates at the time of the application and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income in the case of a borrower with income of under $75,000, 42% of the borrower's gross income in the case of a borrower with income of between $75,000 and $150,000 and 44% of the borrower's gross income in the case of a borrower with income in excess of $150,000. For interest-only mortgage loans with a loan-to-value ratio between 80.01% and 95%, lending guidelines require that the mortgage payments (based on mortgage rates at the time of application) plus applicable real property taxes, any common charges (such as Home Owner's Association Fees or Co-op charges) and hazard insurance, as well as all other monthly debt obligations (revolving debt, car payments, etc.), generally may not exceed 40% of the borrower's gross income. For adjustable rate amortizing mortgage loans with a loan-to-value ratio greater than or equal to 80.01%, with a Minimum Credit Risk Score of 620 – 660, lending guidelines require that all current fixed obligations of the borrower (including mortgage payments, based on mortgage rates at the time of application and other expenses related to the residence) generally may not exceed 36% of the borrower's gross income. For adjustable rate amortizing mortgage loans with a loan-to-value ratio greater than or equal to 80.01%, with a Minimum Credit Risk Score greater than or equal to 660, lending guidelines require that all current fixed obligations of the borrower (including mortgage payments, based on mortgage rates at the time of application, and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income.  Other credit considerations may cause a departure from these guidelines in certain cases."  (Prospectus Supplement at S-129 – S-130.)

**Item 81**   **Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)   "From time to time, exceptions and/or variances to underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after consideration of certain mitigating factors such as

borrower capacity, liquidity, employment and residential stability and local economic conditions." (Prospectus Supplement at S-130.)

**Item 87        Untrue or Misleading Statements About Quality Control**

not applicable

**Item 142       Untrue or Misleading Statements About Appraisals**

(a)     "The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. Therefore, each Mortgage Loan originated in such a manner should generally meet the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans." (Prospectus Supplement at S-129.)

(b)     "An appraisal (which in certain circumstances may be a confirmation of an existing appraisal) is required for each property to be financed. The appraisal is conducted by an independent fee appraiser who estimates the mortgaged property's market value." (Prospectus Supplement at S-130.)

**Item 163       Untrue or Misleading Statements About LTVs**

(a)     (For data charts, see Prospectus Supplement at S-19, S-42, and S-64.)

(b)     In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

(i)     The LTV ratios of the loans in the aggregate ranged from 7.60% to 95.00%. (Prospectus Supplement at S-19.)

(ii)    As of the initial cut-off date, the initial mortgage loans in the aggregate had a 68.50% weighted average original LTV ratio. (Prospectus Supplement at S-42.)

(iii)   The LTV ratios of the loans in group 2 ranged from 7.60% to 95.00%. (Prospectus Supplement at S-20.)

(iv)    As of the initial cut-off date, the initial mortgage loans in group 2 had a 68.83% weighted average original LTV ratio. (Prospectus Supplement at S-64.)

(c)     "All of the Mortgage Loans having original loan-to-value ratios of greater than 80% are insured under Primary Mortgage Insurance Policies (as defined in the prospectus) . . . ."  (Prospectus Supplement at S-37.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts, see Prospectus Supplement at S-46 and S-66.)

(b)     In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

   (i)     887 (or 91.44%) of the 970 initial mortgage loans in the aggregate were for primary residences.  Those 887 loans represented 90.3% of the total outstanding principal balance for the loans in the aggregate.  (Prospectus Supplement at S-46.)

   (ii)    504 (or 90.97%) of the 554 initial mortgage loans in group 2 were for primary residences.  Those 504 loans represented 90.4% of the total outstanding principal balance for the loans in group 2.  (Prospectus Supplement at S-66.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "The issuance of the offered certificates is conditioned on the certificates receiving the ratings from Moody's, Fitch and DBRS indicated under the heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement."  (Prospectus Supplement at S-23.)

(b)     "It is a condition of the issuance of the Offered Certificates that they be rated as indicated on page S-5 by Moody's ('**Moody's**'), DBRS, Inc. ('**DBRS, Inc.**') and/or Fitch ('**Fitch**' and, together with Moody's and DBRS, Inc., the '**Rating Agencies**'), as applicable."  (Prospectus Supplement at S-173.)

**Item 181**     **Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

(a)     "The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related Certificateholders under the Agreement. Such ratings take into consideration the credit quality of the related certificates, including any credit support providers, structural and legal aspects associated with such Offered Certificates, and to the extent to which the payment stream on the related Mortgage Group(s) is adequate to make the payments required by such Offered Certificates." (Prospectus Supplement at S-173.)

**Item 195**     **Untrue or Misleading Statements About Effective Securitization**

(a)     "The Depositor will cause the Mortgage Loans to be assigned to the Trustee, together with the rights to all principal and interest due on or with respect to the Mortgage Loans after the Cut-off Date other than interest accrued on the Mortgage Loans prior to the Cut-off Date. The Bank of New York Trust Company, N.A., as authenticating agent (in such capacity, the '**Authenticating Agent**'), will, concurrently with such assignment, authenticate and deliver the Certificates. Each Mortgage Loan will be identified in a schedule appearing as an exhibit to the Agreement (the '**Mortgage Loan Schedule**'). The Mortgage Loan Schedule will specify, among other things, with respect to each Mortgage Loan, the original principal balance and the unpaid principal balance as of the close of business on the Cut-off Date; the Monthly Payment; the months remaining to stated maturity of the Mortgage Note; and the Mortgage Rate."  (Prospectus Supplement at S-131.)

(b)     "In addition, the Depositor will, as to each Mortgage Loan (other than a Co-op Loan), deliver or cause to be delivered to the Custodian on behalf of the Trustee the Mortgage Note (together with all amendments and modifications thereto) endorsed in blank, the original or a certified copy of the mortgage (together with all amendments and modifications thereto) with evidence of recording indicated thereon and an original or certified copy of an assignment of the mortgage in recordable form. If the note or mortgage was signed utilizing a power of attorney, the original power of attorney is

required, or, if the original power of attorney has been delivered for recording in the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located, a copy of such power of attorney that was sent for recording is required." (Prospectus Supplement at S-131.)

(c)     "At the time of issuance of each Series of Certificates, the Depositor will cause the Mortgage Loans in the Trust Fund represented by that Series of Certificates to be assigned to the Trustee, together with all principal and interest due on or with respect to such Mortgage Loans, other than principal and interest due on or before the Cut-Off Date and Prepayments of principal received before the Cut-Off Date. The Trustee, concurrently with such assignment, will execute and deliver Certificates evidencing such Trust Fund to the Depositor in exchange for the Mortgage Loans. Each Mortgage Loan will be identified in a schedule appearing as an exhibit to the Agreement for that Series (the '**Mortgage Loan Schedule**'). The Mortgage Loan Schedule will include, as to each Mortgage Loan, information as to the outstanding principal balance as of the close of business on the Cut-Off Date, as well as information respecting the Mortgage Rate, the current scheduled monthly payment, the number of months remaining until the stated maturity date of each Note and the location of the related Mortgaged Property." (Prospectus at 39-40.)

(d)     "In addition, the Depositor will, as to each Mortgage Loan, deliver to the Trustee (i) the Note, endorsed to the order of the Trustee by the holder/payee thereof without recourse; (ii) the 'buy-down' agreement (if applicable); (iii) a Mortgage and Mortgage assignment meeting the requirements of the Agreement; (iv) all Mortgage assignments from the original holder of the Mortgage Loan, through any subsequent transferees to the transferee to the Trustee; (v) the original lender's title insurance policy, or other evidence of title, or if a policy has not been issued, a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company; (vi) as to each Mortgage Loan, an original certificate of Primary Mortgage Insurance Policy (or copy certified to be true by the originator) to the extent required under the applicable requirements for the Mortgage Pool; and (vii) such other documents as may be described in the applicable Prospectus Supplement." (Prospectus at 40.)

# SCHEDULE 27

## SCHEDULE 27 TO THE COMPLAINT

**Item 20**       **Details About the Securitization**

(a)     **Dealer**: J.P. Morgan Securities Inc.

(b)     **Description of the Trust**: J.P. Morgan Mortgage Trust 2008-R1 is a re-securitization.  A re-securitization takes interests from other securities and pools them together into a new security.

(c)     **Description of Purchase**: J.P. Morgan Securities offered and sold to the Bank a certificate in tranche 2-A-1 of J.P. Morgan Mortgage Trust 2008-R1, for which the Bank paid $133,900,250.00 in principal plus accrued interest of $583,625.00.  The Bank received the certificate on January 31, 2008.

Tranche 2-A-1 of J.P. Morgan Mortgage Trust 2008-R1 is supported by underlying certificates in tranches 3-A-10 and 3-A-11 of J.P. Morgan Mortgage Trust 2007-A6.

J.P. Morgan Mortgage Trust 2007-A6 was a securitization in November 2007 of 1,146 loans divided into four loan pools.  Tranches 3-A-10 and 3-A-11 of J.P. Morgan Mortgage Trust 2007-A6 contain loans in loan pool 3.

(d)     **CUSIP**: 46632gac7

(e)     **Ratings of the certificate(s) at the time of the Bank's purchase**:
    (i)     S&P:  AAA
    (ii)    Fitch: AAA

(f)     **Ratings of the certificate(s) as of November 30, 2010**:
    (i)     S&P:  CCC
    (ii)    Fitch: B

(g)     **SEC's URL of prospectus and the prospectus supplement for J.P. Morgan Mortgage Trust 2007-A6**:
http://sec.gov/Archives/edgar/data/1418261/000116231807000851/m 0852424b5.htm.  The representations quoted in this schedule all come from the prospectus and prospectus supplement for J.P. Morgan

Mortgage Trust 2007-A6.  There is no prospectus for J.P. Morgan Mortgage Trust 2008-R1.

This copy of the prospectus and prospectus supplement available on the SEC's website does not contain page numbers, although it does contain a table of contents with page numbers.  The page numbers used in this schedule come from a copy that the Bank has in its files. If the Court or any defendant needs a copy with page numbers, the Bank can provide an electronic or hard copy.

**Item 21**      **Details About the Parties**

(a)      **Dealer**: J.P. Morgan Securities, Inc.

(b)      **Originator(s)**:
         (i)      National City Mortgage
         (ii)     PHH Mortgage Corp.
         (iii)    Chase Home Finance LLC

(c)      **Sponsor/Seller**: J.P. Morgan Mortgage Acquisition Corp.

(d)      **Depositor**: J.P. Morgan Acceptance Corp. I

(e)      **Trustee**: HSBC Bank USA, N.A.

(f)      **Master Servicer**: U.S. Bank N.A.

**Item 75**      **Untrue or Misleading Statements About General Underwriting Standards**

(a)      "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." (Prospectus Supplement at S-34.)

(b)      "PHH Mortgage's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made."  (Prospectus Supplement at S-38.)

(c)     "National City Mortgage's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations."  (Prospectus Supplement at S-43.)

(d)     "Such Chase Originator Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. Therefore, each Chase Originator Mortgage Loan originated in such a manner should generally meet the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Chase Originator Mortgage Loans."  (Prospectus Supplement at S-46.)

**Item 77      Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)     "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."  (Prospectus Supplement at S-34.)

(b)     "In evaluating the applicant's ability and willingness to repay the proposed loan, PHH Mortgage reviews the applicant's credit history and outstanding debts, as reported on the credit report. . . .
               . . .
               Except as described below, PHH Mortgage also evaluates the applicant's income to determine its stability, probability of continuation, and adequacy to service the proposed PHH Mortgage debt payment."  (Prospectus Supplement at S-38.)

(c)     "In determining whether a prospective borrower has sufficient monthly income available

• to meet the borrower's monthly obligation on the proposed mortgage loan and

• to meet monthly housing expenses and other financial obligations including the borrower's monthly obligations on the proposed mortgage loan,

PHH Mortgage generally applies debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly gross income. Under certain programs, however, PHH Mortgage makes loans where these ratios are up to 60%."  (Prospectus Supplement at S-40.)

(d)     "In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, National City Mortgage generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income."  (Prospectus Supplement at S-44.)

(e)     "Once the necessary information is received, a determination [by Chase] is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses."  (Prospectus Supplement at S-46.)

(f)     "For loans with a loan-to-value ratio of 80% or less, [Chase] lending guidelines require that all current fixed obligations of the borrower (including mortgage payments based on mortgage rates at the time of the application and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income in the case of a borrower with income of under $75,000, 42% of the borrower's gross income in the case of a borrower with income of between $75,000 and $150,000 and 44% of the borrower's gross income in the case of a borrower with income in excess of $150,000. For interest-only mortgage loans with a loan-to-value ratio between 80.01% and 95%, lending guidelines require that the mortgage payments (based on mortgage rates at the time of application) plus applicable real property

taxes, any common charges (such as Home Owner's Association Fees or Co-op charges) and hazard insurance, as well as all other monthly debt obligations (revolving debt, car payments, etc.), generally may not exceed 40% of the borrower's gross income. For adjustable rate amortizing mortgage loans with a loan-to-value ratio greater than or equal to 80.01% with a Minimum Credit Risk Score of 620 - 660, lending guidelines require that all current fixed obligations of the borrower (including mortgage payments, based on mortgage rates at the time of application and other expenses related to the residence) generally may not exceed 36% of the borrower's gross income. For adjustable rate amortizing mortgage loans with a loan-to-value ratio greater than or equal to 80.01%, with a Minimum Credit Risk Score greater than 660, lending guidelines require that all current fixed obligations of the borrower (including mortgage payments, based on mortgage rates at the time of application, and other expenses related to the residence) generally may not exceed 40% of the borrower's gross income. Other credit considerations may cause a departure from these guidelines in certain cases."  (Prospectus Supplement at S-46.)

**Item 81    Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)    "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan by loan basis at the discretion of the lender's underwriter. Exceptions may be made after consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-35.)

(b)    "From time to time, exceptions to PHH Mortgage's underwriting policies may be made. Such exceptions are made on a loan-by-loan basis only at the discretion of PHH Mortgage's underwriters and may be made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, equity, employment and residential stability."  (Prospectus Supplement at S-38.)

(c)    "Exceptions to [National City Mortgage's] underwriting standards are permitted where compensating factors are present."  (Prospectus Supplement at S-43.)

(d)     "From time to time, exceptions and/or variances to [Chase] underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions."  (Prospectus Supplement at S-47.)

**Item 87        Untrue or Misleading Statements About Quality Control**

not applicable

**Item 142       Untrue or Misleading Statements About Appraisals**

(a)     "The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator."  (Prospectus Supplement at S-35.)

(b)     "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."  (Prospectus Supplement at S-35.)

(c)     "In determining the adequacy of the property as collateral for a first lien mortgage loan, a Fannie Mae/Freddie Mac conforming appraisal of the property is performed by an independent appraiser selected by PHH Mortgage, except as noted in this prospectus supplement. The appraiser is required to inspect the property and verify that it is in good condition and that construction or renovation, if new, has been completed. The appraisal report indicates a value for the property and provides information concerning marketability, the neighborhood, the property site, interior and exterior improvements, and the condition of the property."  (Prospectus Supplement at S-38.)

(d)     "Each mortgaged property securing a loan originated by National City Mortgage has been appraised by a qualified independent appraiser. All

appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines." (Prospectus Supplement at S-45.)

(e)     "An appraisal (which in certain circumstances may be a confirmation of an existing appraisal) is required [by Chase] for each property to be financed. The appraisal is conducted by an independent fee appraiser who estimates the mortgaged property's market value." (Prospectus Supplement at S-47.)

## Item 163     Untrue or Misleading Statements About LTVs

(a)     (For data charts, see Prospectus Supplement Annex A at A-2 and A-10.)

(b)     In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the LTV ratios of the mortgage loans in the collateral pool of this securitization:

(i)     The LTV ratios of the loans in the aggregate ranged from 20.01% to 100.00%. (Prospectus Supplement Annex at A-2.)

(ii)     As of the initial cut-off date, the initial mortgage loans in the aggregate had a 72.99% weighted average original LTV ratio. (Prospectus Supplement Annex at A-2.)

(iii)     The LTV ratios of the loans in pool 3 ranged from 20.01% to 100.00%. (Prospectus Supplement Annex at A-10.)

(iv)     As of the initial cut-off date, the initial mortgage loans in pool 3 had a 73.41% weighted average original LTV ratio. (Prospectus Supplement Annex at A-10.)

(c)     "[N]o Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%."  (Prospectus Supplement at S-27.)

(d)     "[N]o Pool 3 Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%."  (Prospectus Supplement at S-30.)

(e)     "The underwriting standards of PHH Mortgage for first lien mortgage loans generally allow loan-to-value ratios at origination of up to 95% for mortgage loans. However, certain programs allow mortgage loans that had loan-to-value ratios at origination of up to 100%." (Prospectus Supplement at S-40.)

(f)     "All of the Mortgage Loans with Effective Loan-to-Value Ratios greater than 80.00% as of the cut-off date that were not secured by a security interest in additional collateral or not supported by a third-party guarantee were covered by a primary mortgage insurance policy."  (Prospectus Supplement at S-25.)

(g)     "With respect to fully documented, non-conforming purchase money or rate/term refinance loans secured by single-family and two-family residences, loan- to-value ratios at origination of up to 95% for mortgage loans with original principal balances of up to $500,000 are generally allowed [by National City Mortgage].

  For cash out refinance loans, the maximum loan-to- value ratio generally is 90% and the maximum 'cash out' amount permitted is based in part on the original loan-to-value of the related mortgage loan and FICO score. Generally, for loan-to-values 50% or below there are no restrictions on cash out amounts. Less than fully-documented loans generally have lower loan-to-value and/or loan amount limits.

  Mortgage loans with principal balances exceeding $1,000,000 ('super jumbos') are allowed if the loan is secured by the borrower's primary residence or second home. The loan-to- value ratio for super jumbos generally may not exceed 75%."  (Prospectus Supplement at S-44.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts, see Prospectus Supplement Annex A at A-3 and A-11.)

(b)   In the prospectus supplement, J.P. Morgan Securities Inc. made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

    (i)   1,050 (or 91.62%) of the 1,146 initial mortgage loans in the aggregate were for primary residences.  Those 1,050 loans represented 90.93% of the total outstanding principal balance for the loans in the aggregate.  (Prospectus Supplement Annex A at A-3.)

    (ii)   221 (or 92.47%) of the 239 initial mortgage loans in pool 3 were for primary residences.  Those 221 loans represented 91.94% of the total outstanding principal balance for the loans in pool 3.  (Prospectus Supplement Annex A at A-11.)

## Item 180   Untrue or Misleading Statements About Earned Ratings

(a)   "The certificates offered by this prospectus supplement will initially have ratings at least as high as the ratings specified on page S-1 from Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and Fitch, Inc."  (Prospectus Supplement at S-16.)

(b)   "It is a condition of the issuance of the Offered Certificates that they be rated as indicated on page S-1 by each of the Rating Agencies, as applicable."  (Prospectus Supplement at S-93.)

## Item 181   Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates

(a)   "The ratings assigned to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related Certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates."  (Prospectus Supplement at S-93.)

**Item 195      Untrue or Misleading Statements About Effective Securitization**

(a)      "*Assignment of the Loans*.  At the time of issuance of the securities of a series, and except as otherwise specified in the related prospectus supplement, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee, without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to those loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest specified in the related prospectus supplement. The trustee will, concurrently with the assignment, deliver the securities to the depositor in exchange for the loans.  Each loan will be identified in a schedule appearing as an exhibit to the related agreement.  The schedule will include information as to the outstanding principal balance of each loan after application of payments due on or before the cut-off date, as well as information regarding the loan interest rate, the maturity of the loan, the loan-to-value ratios or combined loan-to-value ratios, as applicable, at origination and other information."  (Prospectus at 62.)

(b)      "Unless otherwise specified in the related prospectus supplement, within the time period specified in the related poololing [sic] and servicing agreement, the depositor, or the seller of the related loans to the depositor, will be required to deliver or cause to be delivered to the trustee or to the trustee's custodian as to each mortgage loan or home equity loan, among other things:

> (1) the mortgage note or contract endorsed without recourse in blank or to the order of the trustee;
> (2) the mortgage, deed of trust or similar instrument with evidence of recording indicated on the mortgage, deed of trust or similar instrument, except for any mortgage not returned from the public recording office, in which case the depositor or seller will deliver or cause to be delivered a copy of the mortgage together with a certificate that the original of the mortgage was delivered to the applicable recording office;
> (3) an assignment of the mortgage to the trustee, which assignment will be in recordable form in the case of a mortgage assignment; and

(4) the other security documents, including those relating to any senior interests in the property, as may be specified in the related prospectus supplement or the related agreement."

(Prospectus at 62-63.)

(c)     "Under the Assignment Agreements, the Seller will sell the Mortgage Loans to the Depositor and the Depositor will sell the Mortgage Loans to the Issuing Entity.  Pursuant to the Assignment Agreements, the Seller will transfer to the Depositor and the Depositor will transfer to the Trustee its rights under the Purchase and Servicing Agreements with respect to certain representations, warranties and covenants made by the Originators relating to, among other things, certain characteristics of the Mortgage Loans."  (Prospectus Supplement at S-32.)

(d)     "Pursuant to a Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations)."  (Prospectus Supplement at S-32.)

# SCHEDULE 28

# SCHEDULE 28 TO THE COMPLAINT

**Item 20**    **Details about the Securitization**

(a)    **Dealer**:  UBS Securities, LLC

(b)    **Issuing entity and securitization:**  Wells Fargo Mortgage Backed Securities 2006-AR14 Trust issued Mortgage Pass-Through Certificates, Series 2006-AR14, which was a securitization in September 2006 of 3,122 mortgages divided into three Loan Groups.

(c)    **Description of purchase**:  UBS Securities LLC offered and sold to the Bank a Super-Senior/Pass-Through Certificate, in tranche III-A-1, for which the Bank paid $150,257,812.50 in principal plus accrued interest of $700,000.00.  The Bank received the certificates on September 29, 2006.  Tranche III-A-1 contains loans in Loan Group III.

(d)    **CUSIP**:  94984MAR5

(e)    **Ratings of the certificate(s) at time of the Bank's purchase**:
(i)    Moody's: Aaa
(ii)    Fitch: AAA

(f)    **Ratings of the certificate(s) as of November 30, 2010:**
(i)    Moody's: B3
(ii)    Fitch: CCC

(g)    **SEC's URL of prospectus and prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/1011663/000119312506198668/d424b5.htm

**Item 21**    **Details About the Parties**

(a)    **Dealer**:  UBS Securities, LLC

(b)    **Originator(s)**:  Wells Fargo Bank or Affiliate

(c)    **Sponsor/Seller**:  Wells Fargo Bank, N.A.

(d) **Depositor**:   Wells Fargo Asset Securities Corporation

(e) **Trustee**:  HSBC Bank USA, National Association

(f) **Master Servicer**:  Wells Fargo Bank, N.A.

**Item 75      Untrue or Misleading Statements about General Underwriting Standards**

(a) "The Trust for each Series of Certificates will include Mortgage Loans which have been underwritten in accordance with one or more of the following: (i) Wells Fargo Bank's 'general' underwriting standards, (ii) Wells Fargo Bank's '**retention program**,' (iii) the underwriting standards of a pool insurer and (iv) the underwriting standards of participants in Wells Fargo Bank's non-agency conduit program."  (Prospectus at 32.)

(b) "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."  (Prospectus at 32.)

(c) "Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein."  (Prospectus at 32.)

(d) "Approximately 99.66% of the Crossed Group Mortgage Loans, approximately 99.62% of the Group I Mortgage Loans, all of the Group II Mortgage Loans and approximately 99.88% of the Group III Mortgage Loans (by aggregate unpaid principal balance as of the Cut-off Date) were generally originated in conformity with the underwriting standards described in the prospectus under the heading 'The Sponsor's Mortgage Loan Programs — Mortgage Loan Underwriting' (the '**Underwriting Standards**')."  (Prospectus Supplement at S-50.)

**Item 77**       **Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)       "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history."  (Prospectus at 32.)

(b)       "Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies. These scoring systems assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit and certain loan attributes. Such objective measures are then used to evaluate loan applications and assign each application a '**Mortgage Score**.'"  (Prospectus at 32.)

(c)       "The Mortgage Score is used to determine the type of underwriting process and which level of underwriter will review the loan file." (Prospectus at 33.)

(d)       (See debt-to-income data charts at A-1, A-8, A-16.)

(e)       "In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a

borrower's Mortgage Score and the type of loan for which the borrower is applying."  (Prospectus at 34.)

(f)     "Wells Fargo permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines such as documented excess funds in reserves after closing, a history of making a similar sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income."  (Prospectus at 34.)

(f)     In the prospectus supplement, UBS Securities LLC made the following statements about the Debt-to-Income Ratios of the Mortgage Loans in the collateral pool of this securitization:

  (i)     The aggregate Mortgage Loans in the Crossed Group, which includes Loan Groups I and III, had a range of Original Debt-to-Income Ratio of 2.4% to 68.69%.  (Prospectus Supplement at Appendix A at A-1 and A-8.)

  (ii)    The aggregate Mortgage Loans in the Crossed Group, which includes Loan Groups I and III, had a Weighted Average Original Total Debt-to-Income Ratio of 35.95%.  (Prospectus Supplement at Appendix A at A-1.)

  (iii)   The Mortgage Loans in Loan Group III had a range of Original Debt-to-Income Ratio of 13.95% to 63.50%.  (Prospectus Supplement at Appendix A at A-1 and A-16.)

  (iv)    The Mortgage Loans in Loan Group III had a Weighted Average Original Total Debt-to-Income Ratio of 36.93%. (Prospectus Supplement at Appendix A at A-1.)

**Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's underwriting standards. To the extent that 20% or more

of the aggregate principal balance of the Mortgage Loans in a Trust Estate are underwritten by a Correspondent whose underwriting standards vary materially from Wells Fargo Bank's underwriting standards, the applicable prospectus supplement will describe such underwriting standards for such Mortgage Loans."  (Prospectus at 32.)

(b)   "Approximately 0.34% of the Crossed Group Mortgage Loans, approximately 0.38% of the Group I Mortgage Loans, none of the Group II Mortgage Loans and approximately 0.12% of the Group III Mortgage Loans (by aggregate unpaid principal balance as of the Cut-off Date) were originated in conformity with the underwriting standards of certain third party originators, which may differ significantly from the Underwriting Standards and which are less stringent than the Underwriting Standards in areas including reserve requirements and cash-out limits."  (Prospectus Supplement at S-50.)

## Item 87        Untrue or Misleading Statements About Quality Control

(a)   "In order to qualify for participation in Wells Fargo Bank's mortgage loan purchase programs, lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines or the standards of a pool insurer and represent that each loan was underwritten in accordance with Wells Fargo Bank standards or the standards of a pool insurer and (v) utilize the services of qualified appraisers."  (Prospectus at 32.)

(b)   "The contractual arrangements with Correspondents may also involve the delegation of all underwriting functions to such Correspondents ('**Delegated Underwriting**'), which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondents' representations and, in the case of bulk purchase acquisitions from such Correspondents, Wells Fargo Bank's post-purchase reviews of samplings of mortgage loans acquired from such Correspondents regarding the Correspondents' compliance with Wells Fargo Bank's underwriting standards. In all instances, however, acceptance by Wells Fargo Bank is contingent upon the loans being found to satisfy Wells Fargo

Bank's program standards or the standards of a pool insurer."
(Prospectus at 32.)

(c)     "With respect to all mortgage loans underwritten by Wells Fargo
        Bank, Wells Fargo Bank's underwriting of a mortgage loan may be
        based on data obtained by parties other than Wells Fargo Bank that
        are involved at various stages in the mortgage origination or
        acquisition process. This typically occurs under circumstances in
        which loans are subject to an alternative approval process, as when
        Correspondents, certain mortgage brokers or similar entities that have
        been approved by Wells Fargo Bank to process loans on its behalf, or
        independent contractors hired by Wells Fargo Bank to perform
        underwriting services on its behalf ('**contract underwriters**') make
        initial determinations as to the consistency of loans with Wells Fargo
        Bank underwriting guidelines. Wells Fargo Bank may also permit
        these third parties to utilize scoring systems in connection with their
        underwriting process. The underwriting of mortgage loans acquired
        by Wells Fargo Bank pursuant to a Delegated Underwriting
        arrangement with a Correspondent is not reviewed prior to acquisition
        of the mortgage loan by Wells Fargo Bank although the mortgage
        loan file is reviewed by Wells Fargo Bank to confirm that certain
        documents are included in the file. In addition, in order to be eligible
        to sell mortgage loans to Wells Fargo Bank pursuant to a Delegated
        Underwriting arrangement, the originator must meet certain
        requirements including, among other things, certain quality,
        operational and financial guidelines. See '—Acquisition of Mortgage
        Loans from Correspondents' above."  (Prospectus at 33.)

**Item 142     Untrue or Misleading Statements About Appraisals**

(a)     (For data charts, see Prospectus Supplement Appendix A at A-5 and
        A-13.)

(b)     "The appraisal of any Mortgaged Property reflects the individual
        appraiser's judgment as to value, based on the market values of
        comparable homes sold within the recent past in comparable nearby
        locations and on the estimated replacement cost."  (Prospectus at 35.)

(c)     In the prospectus supplement, UBS Securities LLC made the following statements about the Appraisals of the Mortgage Loans in the collateral pool of this securitization:

    (i)     Of the Aggregate 1,885 Mortgage Loans in the "CROSSED GROUP" made up of Loan Groups I and III, 100% received a "Full Appraisal."  (Prospectus Supplement at Appendix A at A-5.)

    (ii)    Of the 259 Mortgage Loans in Loan Group III, 100% received a "Full Appraisal."  (Prospectus Supplement at Appendix A at A-13.)

**Item 163     Untrue or Misleading Statements About LTVs**

(a)     (For data charts, see Prospectus Supplement Appendix A at A-1, A-6, A-14.)

(b)     "Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%. However, if so specified in the applicable prospectus supplement, Mortgage Loans that had Loan-to-Value Ratios at origination in excess of 95% may be included in the related Trust Estate."  (Prospectus at 34.)

(c)     In the prospectus supplement, UBS Securities LLC made the following statements about the LTVs of the mortgage pool in this securitization:

    (i)     The LTV ratios of the aggregate initial Mortgage Loans in the Crossed Group, made up of Loan Groups I and III, ranged from 12.95% to 95.00%.  (Prospectus Supplement at Appendix A at A-1, A-6.)

    (ii)    The aggregate initial Mortgage Loans in the Crossed Group, made up of Loan Groups I and III, had a Weighted Average Original Loan-to-Value Ratio of 70.03%.  (Prospectus Supplement at Appendix A at A-1.)

    (iii)   The LTV ratios of the initial Mortgage Loans in Loan Group III ranged from 14.33% to 95.00%.  (Prospectus Supplement at Appendix A at A-1, A-14.)

    (iv)    The initial Mortgage Loans in Loan Group III had a Weighted Average Original Loan-to-Value Ratio of 70.90%.  (Prospectus Supplement at Appendix A at A-1.)

(v)     Only 1, or only 0.20%, of the aggregate initial Mortgage Loans in the Crossed Group, which includes Loan Groups I and III, had an Original Loan-to-Value Ratio grater than 80% and was not covered by Primary Mortgage Insurance.  (Prospectus Supplement at Appendix A at A-1.)

(vi)    100% of the initial Mortgage Loans in Loan Group III that had an Original Loan-to-Value Ratio greater than 80% were covered by Primary Mortgage Insurance.  (Prospectus Supplement at Appendix A at A-1.)

(vii)   The aggregate initial Mortgage Loans in the Crossed Group, which includes Loan Groups I and III, that had Original Principal Balances greater than $600,000 had a Weighted Average Original Loan-to-Value Ratio of 68.31%.  (Prospectus Supplement at Appendix A at A-1.)

(viii)  The initial Mortgage Loans in Loan Group III that had Original Principal Balances great than $600,000 had a Weighted Average Original Loan-to-Value Ratio of 69.37%.  (Prospectus Supplement at Appendix A at A-1.)

(ix)    The Maximum Original Loan-to-Value Ratio of Mortgage Loans with Original Principal Balances greater than $600,000 of the aggregate Crossed Group, which includes Loan Groups I and III, was 92.20%.  (Prospectus Supplement at Appendix A at A-1.)

(x)     The Maximum Original Loan-to-Value Ratio of Mortgage Loans with Original Principal Balances greater than $600,000 of the Mortgage Loans in Loan Group III was 80.00%.  (Prospectus Supplement at Appendix A at A-1.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts, see Prospectus Supplement Appendix A at A-7, A-15.)

(b)     In the prospectus supplement, UBS Securities LLC made the following statements about the Occupancy Types of the Mortgage Loans in the collateral pool of this securitization:

(i)     1,572 (or 83.40%) of the 1,885 Mortgage Loans in the aggregate Crossed Group, which includes Loan Groups I and III, were for Primary Residences.  Those 1,572 loans represented 88.42% of the total outstanding principal balance

for the loans in the aggregate Crossed Group.  (Prospectus Supplement at Appendix A at A-7.)

(ii)  224 (or 86.49%) of the 259 Mortgage Loans in Loan Group III were for Primary Residences.  Those 224 loans represented 89.79% of the total outstanding principal balance for the loans in Loan Group III.  (Prospectus Supplement at Appendix A at A-15.)

## Item 180  Untrue or Misleading Statements About Earned Ratings

(a)  "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table beginning on page S-6."  (Prospectus Supplement at S-9.)

(b)  "It is a condition to the issuance of the Offered Certificates that each such class will have received at least the rating set forth in the table beginning on page S-6 from Fitch Ratings ('**Fitch**') and Moody's Investors Service, Inc. ('**Moody's**' and together with Fitch, the '**Rating Agencies**')."  (Prospectus Supplement at S-65.)

(c)  "Certificates of any series will not be offered pursuant to this prospectus and a prospectus supplement unless each offered class is rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization."  (Prospectus at 9-10.)

(d)  "It is a condition to the issuance of the certificates of a series offered by a prospectus supplement that the certificates be rated in one of the four highest rating categories by a nationally recognized statistical rating agency."  (Prospectus at 12.)

(e)  "It is a condition to the issuance of the Certificates of any Series offered pursuant to this prospectus and a prospectus supplement that they be rated in one of the four highest categories by at least one nationally recognized statistical rating organization (a '**Rating Agency**')."  (Prospectus at 129.)

**Item 181    Untrue or Misleading Statements About Rating Agencies'
Evaluation of the Certificates**

(a)     "The ratings of Fitch on mortgage pass-through certificates address
the likelihood of the receipt by certificateholders of all distributions to
which such certificateholders are entitled. Fitch's rating opinions
address the structural and legal aspects associated with the certificates,
including the nature of the underlying mortgage loans."  (Prospectus
Supplement at S-65.)

(b)     "The ratings of Moody's on mortgage pass-through certificates
address the likelihood of the receipt by certificateholders of all
distributions of principal and interest to which such certificateholders
are entitled. Moody's rating opinions address the structural, legal and
issuer aspects associated with the certificates, including the nature of
the underlying mortgage loans and the credit quality of the credit
support provider, if any."  (Prospectus Supplement at S-65.)

**Item 195    Untrue or Misleading Statements About Effective Securitization**

(a)     "In connection with the conveyance of the Mortgage Loans to the
Depositor, Wells Fargo Bank will (i) agree to deliver to the Depositor
all of the documents which the Depositor is required to deliver to the
Trustee or the custodian; (ii) make certain representations and
warranties to the Depositor which will be the basis of certain of the
Depositor's representations and warranties to the Trustee or assign the
representations and warranties made by a Correspondent to the
Sponsor; and (iii) agree to repurchase or substitute (or assign rights to
a comparable agreement of a Correspondent) for any Mortgage Loan
for which any document is not delivered or is found to be defective in
any material respect, or which Mortgage Loan is discovered at any
time not to be in conformance with any representation and warranty
the Sponsor has made to the Depositor, if the Sponsor cannot deliver
such document or cure such defect or breach within 60 days after
notice thereof."  (Prospectus at 78.)

(b)     "At the time of issuance of each Series of Certificates, the Mortgage
Loans in the related Trust Estate will, pursuant to the applicable
Pooling and Servicing Agreement, be assigned to the Trustee, together
with all principal and interest received on or with respect to such

Mortgage Loans after the applicable Cut-Off Date other than principal and interest due and payable on or before such Cut-Off Date and interest attributable to the Fixed Retained Yield on such Mortgage Loans, if any. See 'Servicing of the Mortgage Loans—Fixed Retained Yield, Servicing Compensation and Payment of Expenses.' The Trustee or its agent will, concurrently with such assignment, authenticate and deliver the Certificates evidencing such Series to the Depositor in exchange for the Mortgage Loans. Each Mortgage Loan will be identified in a schedule delivered to the applicable Trustee or custodian. Each such schedule will include, among other things, the unpaid principal balance as of the close of business on the applicable Cut-Off Date, the maturity date and the Mortgage Interest Rate for each Mortgage Loan in the related Trust Estate." (Prospectus at 79.)

(c)     "In addition, with respect to each Mortgage Loan in a Trust Estate, the mortgage or other promissory note or a lost note affidavit executed by the applicable Servicer, any assumption, consolidation, modification or conversion to fixed interest rate agreement and, a mortgage assignment in recordable form (or other documents as are required under applicable law to create perfected security interest in the Mortgaged Property in favor of the Trustee) will be delivered to the Trustee or, if indicated in the applicable prospectus supplement, to a custodian, which may be the Sponsor.  Unless otherwise required by the Rating Agencies, assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee (or a custodian indicated in the applicable prospectus supplement) in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan." (Prospectus at 79.)

# SCHEDULE 29

## SCHEDULE 29 TO THE COMPLAINT

**Item 20**      **Details about the Securitization**

   (a)      **Dealer**: UBS Securities LLC

   (b)      **Issuing entity and securitization**: Wells Fargo Mortgage Backed
Securities 2006-AR18 Trust issued Mortgage Pass-Through
Certificates, Series 2006-AR18, which was a securitization in October
2006 of 1,758 mortgages divided into two Loan Groups.

   (c)      **Description of purchase**: UBS Securities LLC offered and sold to the
Bank a Super-Senior/Pass-Through Certificate, in tranche II-A-1, for
which the Bank paid $194,468,088.60 in principal plus accrued
interest of $862,944.22.  The Bank received the certificates on
December 29, 2006.  Tranche II-A-1 contains loans in Loan Group II.

   (d)      **CUSIP**: 94984SAE1

   (e)      **Ratings of the certificate(s) at the time of the Bank's purchase**:
      (i)      Moody's: Aaa
      (ii)     Fitch: AAA

   (f)      **Ratings of the certificate(s) as of November 30, 2010:**
      (i)      Moody's: Caa2
      (ii)     Fitch: CCC

   (g)      **SEC's URL of prospectus and prospectus supplement for this
securitization**:
http://sec.gov/Archives/edgar/data/1011663/000119312506213572/d4
24b5.htm

**Item 21**      **Details About the Parties**

   (a)      **Dealer**:  UBS Securities LLC

   (b)      **Originator(s)**: Wells Fargo Bank or Affiliate

   (c)      **Sponsor/Seller**: Wells Fargo Bank, NA

EXHIBIT A
Page 495

    (d)    **Depositor**: Wells Fargo Asset Securities Corporation

    (e)    **Trustee**: HSBC Bank USA, National Association

    (f)    **Master Servicer**: Wells Fargo Bank, NA

**Item 75**    **Untrue or Misleading Statements About General Underwriting Standards**

    (a)    "The Trust for each Series of Certificates will include Mortgage Loans which have been underwritten in accordance with one or more of the following: (i) Wells Fargo Bank's 'general' underwriting standards, (ii) Wells Fargo Bank's '**retention program**,' (iii) the underwriting standards of a pool insurer and (iv) the underwriting standards of participants in Wells Fargo Bank's non-agency conduit program." (Prospectus at 32.)

    (b)    "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." (Prospectus at 32.)

    (c)    "Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein." (Prospectus at 32.)

    (d)    "Approximately 99.65% of the Group I Mortgage Loans and approximately 98.82% of the Group II Mortgage Loans (by aggregate unpaid principal balance as of the Cut-off Date) were generally originated in conformity with the underwriting standards described in the prospectus under the heading 'The Sponsor's Mortgage Loan Programs — Mortgage Loan Underwriting' (the '**Underwriting Standards**')." (Prospectus Supplement at S-46.)

**Item 77**    **Untrue or Misleading Statements About Evaluation of Borrower Information**

    (a)    "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the

mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history."  (Prospectus at 32.)

(b)     "Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies. These scoring systems assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit and certain loan attributes. Such objective measures are then used to evaluate loan applications and assign each application a '**Mortgage Score**.'"  (Prospectus at 32.)

(c)     "The Mortgage Score is used to determine the type of underwriting process and which level of underwriter will review the loan file." (Prospectus at 33.)

(d)     (For debt-to-income data charts, see Prospectus Supplement Appendix A at A-1 and A-10.)

(e)     "In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying."  (Prospectus at 34.)

(f)     "Wells Fargo permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines such as documented excess funds in reserves after

closing, a history of making a similar sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income." (Prospectus at 34.)

(g)     In the prospectus supplement, UBS Securities LLC made the following statements about the Debt-to-Income Ratios of the Mortgage Loans in the collateral pool of this securitization:

   (i)     The Mortgage Loans in Loan Group II had a range of Original Debt-to-Income Ratios of 3.76%-69.80%. (Prospectus Supplement A at Appendix A at A-1 and A-10.)

   (ii)    The Mortgage Loans in Loan Group II had a Weighted Average Original Total Debt-to-Income Ratio of 36.88%. (Prospectus Supplement at Appendix A at A-1.)

**Item 81     Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)     "Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's underwriting standards. To the extent that 20% or more of the aggregate principal balance of the Mortgage Loans in a Trust Estate are underwritten by a Correspondent whose underwriting standards vary materially from Wells Fargo Bank's underwriting standards, the applicable prospectus supplement will describe such underwriting standards for such Mortgage Loans." (Prospectus at 32.)

(b)     "In certain instances, exceptions to the Underwriting Standards may have been granted by Wells Fargo Bank. Exceptions to the Underwriting Standards consist of approximately 0.17% of the Group I Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date) that were secured by Mortgaged Properties that were the primary residence of the mortgagor with either a loan-to-value ratio exception or a principal balance exception." (Prospectus Supplement at S-46.)

(c)    "Approximately 0.35% of the Group I Mortgage Loans and 1.18% of the Group II Mortgage Loans (by aggregate unpaid principal balance as of the Cut-off Date) were originated in conformity with the underwriting standards of certain third party originators, which may differ significantly from the Underwriting Standards and which are less stringent than the Underwriting Standards in areas including reserve requirements and cash-out limits.

In addition, such Mortgage Loans may have different interest rate caps and margins than Mortgage Loans underwritten pursuant to the Underwriting Standards and those classified as rate/term refinance may be used to pay off tax liens or to buy out the interest of a divorced spouse in the Mortgaged Property."  (Prospectus Supplement at S-46 – S-47.)

## Item 87    Untrue or Misleading Statements About Quality Control

(a)    "In order to qualify for participation in Wells Fargo Bank's mortgage loan purchase programs, lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines or the standards of a pool insurer and represent that each loan was underwritten in accordance with Wells Fargo Bank standards or the standards of a pool insurer and (v) utilize the services of qualified appraisers."  (Prospectus at 32.)

(b)    "The contractual arrangements with Correspondents may also involve the delegation of all underwriting functions to such Correspondents ('**Delegated Underwriting**'), which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondents' representations and, in the case of bulk purchase acquisitions from such Correspondents, Wells Fargo Bank's post-purchase reviews of samplings of mortgage loans acquired from such Correspondents regarding the Correspondents' compliance with Wells Fargo Bank's underwriting standards. In all instances, however, acceptance by Wells Fargo Bank is contingent upon the loans being found to satisfy Wells Fargo Bank's program standards or the standards of a pool insurer." (Prospectus at 32.)

(c)     "With respect to all mortgage loans underwritten by Wells Fargo Bank, Wells Fargo Bank's underwriting of a mortgage loan may be based on data obtained by parties other than Wells Fargo Bank that are involved at various stages in the mortgage origination or acquisition process. This typically occurs under circumstances in which loans are subject to an alternative approval process, as when Correspondents, certain mortgage brokers or similar entities that have been approved by Wells Fargo Bank to process loans on its behalf, or independent contractors hired by Wells Fargo Bank to perform underwriting services on its behalf ('**contract underwriters**') make initial determinations as to the consistency of loans with Wells Fargo Bank underwriting guidelines. Wells Fargo Bank may also permit these third parties to utilize scoring systems in connection with their underwriting process. The underwriting of mortgage loans acquired by Wells Fargo Bank pursuant to a Delegated Underwriting arrangement with a Correspondent is not reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file. In addition, in order to be eligible to sell mortgage loans to Wells Fargo Bank pursuant to a Delegated Underwriting arrangement, the originator must meet certain requirements including, among other things, certain quality, operational and financial guidelines. See '—Acquisition of Mortgage Loans from Correspondents' above."  (Prospectus at 33.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)     (For data charts, see Prospectus Supplement Appendix A at A-7.)

(b)     "The appraisal of any Mortgaged Property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost."  (Prospectus at 35.)

(c)     In the prospectus supplement, UBS Securities LLC made the following statements about the Appraisals of the Mortgage Loans in the collateral pool of this securitization:

       (i)     100% of the initial Mortgage Loans in aggregate received a "Full Appraisal." (Prospectus Supplement at Appendix A at A-3, A-7.)

## Item 163    Untrue or Misleading Statements About LTVs

(a)    (For data charts, see Prospectus Supplement Appendix A at A-8.)

(b)    "Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%. However, if so specified in the applicable prospectus supplement, Mortgage Loans that had Loan-to-Value Ratios at origination in excess of 95% may be included in the related Trust Estate." (Prospectus at 34.)

(c)    In the prospectus supplement, UBS Securities LLC made the following statements about the LTVs of the Mortgage Loans in the collateral pool of this securitization:

       (i)     The Loan-to-Value Ratios of the initial Mortgage Loans in Loan Group II ranged from 15%-100%. (Prospectus Supplement at Appendix A at A-1.)

       (ii)    The initial Mortgage Loans in Loan Group II had a Weighted Average Original Loan-to-Value Ratio of 72.91%. (Prospectus Supplement at Appendix A at A-1.)

       (iii)   Of the 628 initial Mortgage Loans in Loan Group II, only 1 with an Original Loan-to-Value Ratio greater than 80% was not covered by Primary Mortgage Insurance. (Prospectus Supplement at Appendix A at A-1.)

       (iv)   The initial Mortgage Loans in Loan Group II that had Original Principal Balances greater than $600,000 had a Weighted Average Original Loan-to-Value Ratio of 71.37%. (Prospectus Supplement at Appendix A at A-1.)

       (v)    The initial Mortgage Loans in Loan Group II that had Original Principal Balances greater than $600,000 had a Maximum Original Loan-to-Value Ratio of 100.00%. (Prospectus Supplement at Appendix A at A-1.)

## Item 177    Untrue or Misleading Statements About Use of the Properties

(a)    (For data charts, see Prospectus Supplement Appendix A at A-9.)

    (b)    In the prospectus supplement, UBS Securities LLC made the following statements about the Occupancy Types of the Mortgage Loans in the collateral pool of this securitization:

        (i)    591 (or 94.11%) of the 628 initial Mortgage Loans in Loan Group II were for primary residences.  Those 591 loans represented 93.90% of the total outstanding principal balance for the loans in Loan Group II.  (Prospectus Supplement Appendix A at A-9).

## Item 180    Untrue or Misleading Statements About Earned Ratings

    (a)    "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table beginning on page S-6."  (Prospectus Supplement at S-9.)

    (b)    "It is a condition to the issuance of the Offered Certificates that each such class will have received at least the rating set forth in the table beginning on page S-6 from Fitch Ratings ('**Fitch**') and Moody's Investors Service, Inc. ('**Moody's**' and together with Fitch, the '**Rating Agencies**')."  (Prospectus Supplement at S-60.)

    (c)    "Certificates of any series will not be offered pursuant to this prospectus and a prospectus supplement unless each offered class is rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization."  (Prospectus at 9.)

    (d)    "It is a condition to the issuance of the certificates of a series offered by a prospectus supplement that the certificates be rated in one of the four highest rating categories by a nationally recognized statistical rating agency."  (Prospectus at 12.)

    (e)    "It is a condition to the issuance of the Certificates of any Series offered pursuant to this prospectus and a prospectus supplement that they be rated in one of the four highest categories by at least one nationally recognized statistical rating organization (a '**Rating Agency**')."  (Prospectus at 133.)

**Item 181**     **Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates**

    (a)    "The ratings of Fitch on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which such certificateholders are entitled. Fitch's rating opinions address the structural and legal aspects associated with the certificates, including the nature of the underlying mortgage loans." (Prospectus Supplement at S-60.)

    (b)    "The ratings of Moody's on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions of principal and interest to which such certificateholders are entitled. Moody's rating opinions address the structural, legal and issuer aspects associated with the certificates, including the nature of the underlying mortgage loans and the credit quality of the credit support provider, if any." (Prospectus Supplement at S-61.)

**Item 195**     **Untrue or Misleading Statements About Effective Securitization**

    (a)    "In connection with the conveyance of the Mortgage Loans to the Depositor, Wells Fargo Bank will (i) agree to deliver to the Depositor all of the documents which the Depositor is required to deliver to the Trustee or the custodian; (ii) make certain representations and warranties to the Depositor which will be the basis of certain of the Depositor's representations and warranties to the Trustee or assign the representations and warranties made by a Correspondent to the Sponsor; and (iii) agree to repurchase or substitute (or assign rights to a comparable agreement of a Correspondent) for any Mortgage Loan for which any document is not delivered or is found to be defective in any material respect, or which Mortgage Loan is discovered at any time not to be in conformance with any representation and warranty the Sponsor has made to the Depositor, if the Sponsor cannot deliver such document or cure such defect or breach within 60 days after notice thereof." (Prospectus at 80.)

    (b)    "At the time of issuance of each Series of Certificates, the Mortgage Loans in the related Trust Estate will, pursuant to the applicable Pooling and Servicing Agreement, be assigned to the Trustee, together with all principal and interest received on or with respect to such

Mortgage Loans after the applicable Cut-Off Date other than principal and interest due and payable on or before such Cut-Off Date and interest attributable to the Fixed Retained Yield on such Mortgage Loans, if any. See 'Servicing of the Mortgage Loans—Fixed Retained Yield, Servicing Compensation and Payment of Expenses.' The Trustee or its agent will, concurrently with such assignment, authenticate and deliver the Certificates evidencing such Series to the Depositor in exchange for the Mortgage Loans. Each Mortgage Loan will be identified in a schedule delivered to the applicable Trustee or custodian. Each such schedule will include, among other things, the unpaid principal balance as of the close of business on the applicable Cut-Off Date, the maturity date and the Mortgage Interest Rate for each Mortgage Loan in the related Trust Estate."  (Prospectus at 81.)

(c)    "In addition, with respect to each Mortgage Loan in a Trust Estate, the mortgage or other promissory note or a lost note affidavit executed by the applicable Servicer, any assumption, consolidation, modification or conversion to fixed interest rate agreement and, a mortgage assignment in recordable form (or other documents as are required under applicable law to create perfected security interest in the Mortgaged Property in favor of the Trustee) will be delivered to the Trustee or, if indicated in the applicable prospectus supplement, to a custodian, which may be the Sponsor. Unless otherwise required by the Rating Agencies, assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee (or a custodian indicated in the applicable prospectus supplement) in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan."  (Prospectus at 81.)

# SCHEDULE 30

# SCHEDULE 30 TO THE COMPLAINT

**Item 20**      **Details About the Securitization**

(a)   **Dealer**: UBS Securities LLC

(b)   **Issuing entity and securitization**: CHL Mortgage Pass-Through Trust 2007-HY1 issued Mortgage Pass-Through Certificates, Series 2007-HY1, which was a securitization in February 2007 of 618 loans divided into 2 loan groups.

(c)   **Description of purchase**: UBS Securities LLC offered and sold to the Bank Senior Certificates (Senior/Variable Pass-Through Rate/Super Senior) in this securitization, in tranche 2-A-1, for which the Bank paid $109,681,250.00 in principal plus accrued interest of $491,047.73.  The Bank received the certificates on February 28, 2007.  Tranche 2-A-1 contains loans in Loan Group 2.

(d)   **CUSIP**: 12544eac1

(e)   **Ratings of the certificate(s) at the time of the Bank's purchase**:
      (i)    Fitch: AAA
      (ii)   S&P: AAA

(f)   **Ratings of the certificate(s) as of November 30, 2010**:
      (i)    Fitch: C
      (ii)   S&P: CCC

(g)   **SEC's URL of prospectus and prospectus supplement for this securitization**:
      http://sec.gov/Archives/edgar/data/906410/000095013707003149/v27850b5e424b5.txt

**Item 21**      **Details About the Parties**

(a)   **Dealer**: UBS Securities LLC

(b)   **Originator(s)**:
      (i)    Countrywide Home Loans, Inc.

(c)   **Sponsor/Seller**: Countrywide Home Loans, Inc.

(d)   **Depositor**: CWMBS, Inc.

(e)   **Trustee**: The Bank of New York

(f)   **Master Servicer**: Countrywide Home Loans Servicing LP

**Item 75    Untrue or Misleading Statements About General Underwriting**

(a)   "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral."  (Prospectus at 25.)

(b)   "All of the Mortgage Loans in the issuing entity will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations."  (Prospectus Supplement at S-31.)

(c)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Prospectus Supplement at S-32.)

**Item 77    Untrue or Misleading Statements About Evaluation of Borrower Information**

(a)   "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  (Prospectus at 25.)

(b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (Prospectus Supplement at S-32.)

(c)    "Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively." (Prospectus Supplement at S-33.)

**Item 81    Untrue or Misleading Statements About Exceptions to Underwriting Standards**

(a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (Prospectus Supplement at S-32.)

**Item 87    Untrue or Misleading Statements About Quality Control**

(a)    "Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan

correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself."  (Prospectus Supplement at S-32.)

**Item 142      Untrue or Misleading Statements About Appraisals**

(a)     "In determining the adequacy of the property to be used as collateral, an appraisal may be made of each property considered for financing. Except as described in the prospectus supplement, an appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home." (Prospectus at 25.)

(b)     "Generally, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans, except with respect to selected borrowers that are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans where, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. The appraisers inspect and

appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." (Prospectus Supplement at S-33.)

**Item 163    Untrue or Misleading Statements About LTVs**

(a)    (For data charts regarding Loan Group 2, see Prospectus Supplement Annex A at A-10.)

(b)    In the prospectus supplement, UBS Securities LLC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization:

      (i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in Loan Group 2 is approximately 70.72%." (Prospectus Supplement Annex A at A-10 n.1; *see also* Prospectus Supplement at S-5.)

(c)    "Each seller's underwriting standards will generally permit loans with loan-to-value ratios at origination of up to 100% depending on the loan program, type and use of the property, creditworthiness of the borrower and debt-to-income ratio. If so specified in the related prospectus supplement, a seller's underwriting criteria may permit loans with loan-to-value ratios at origination in excess of 100%." (Prospectus at 25.)

(d)    "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100.00%." (Prospectus Supplement at S-28.)

(e)    "Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%." (Prospectus Supplement at S-32.)

(f)     "Countrywide Home Loans' underwriting guidelines generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000, and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' underwriting guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000."  (Prospectus Supplement at S-33.)

(g)     "Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac."  (Prospectus Supplement at S-28.)

**Item 177     Untrue or Misleading Statements About Use of the Properties**

(a)     (For data charts regarding Loan Group 2, see Prospectus Supplement Annex A at A-12.)

(b)     In the prospectus supplement, UBS Securities LLC made the following statements about the Occupancy Types of the mortgage loans in the collateral pool of this securitization:

        (i)     189 (or 94.97%) of the 199 Mortgage Loans in Loan Group 2 were for primary residences.  Those 189 loans represented 93.12% of the Stated Principal Balance of the Mortgage Loans in Loan Group 2 as of the cut-off date. (Prospectus Supplement Annex A at A-12.)

**Item 180     Untrue or Misleading Statements About Earned Ratings**

(a)     "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally

recognized statistical rating agency or agencies (each, a 'Rating Agency') specified in the related prospectus supplement." (Prospectus at 109.)

(b)     "It is a condition to the issuance of the senior certificates that they be rated AAA by Fitch Ratings ('Fitch') and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P')."  (Prospectus Supplement at S-81.)

## Item 181     Untrue or Misleading Statements About Rating Agencies' Evaluation of the Certificates

(a)     "The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement."  (Prospectus at 109.)

(b)     "The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-82.)

(c)     "The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Fitch's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."  (Prospectus Supplement at S-82.)

**Item 195    Untrue or Misleading Statements About Effective Securitization**

(a)    "The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series."  (Prospectus at 12.)

(b)    "Assignment of the Loans. At the time of issuance of the securities of a series, the depositor will cause the loans comprising the related trust fund to be assigned to the trustee (or trust, in the case of a series with both notes and certificates), without recourse, together with all principal and interest received by or on behalf of the depositor on or with respect to the loans after the cut-off date, other than principal and interest due on or before the cut-off date and other than any Retained Interest specified in the related prospectus supplement. In the case of a series with both notes and certificates, the trust will pledge these assets to the trustee for the benefit of the holders of the notes. The trustee (or trust, in the case of a series with both notes and certificates) will, concurrently with the assignment, deliver the related securities to the depositor in exchange for the loans."  (Prospectus at 54.)

(c)    "In addition, the depositor will also deliver or cause to be delivered to the trustee (or to the custodian) for each single family loan or multifamily loan,

    • the mortgage note or contract endorsed without recourse in blank or to the order of the trustee, except that the depositor may deliver or cause to be delivered a lost note affidavit together with a copy of the original note in lieu of any original mortgage note that has been lost,

    • the mortgage, deed of trust or similar instrument (a 'Mortgage') with evidence of recording indicated thereon (except for any Mortgage not returned from the public recording office, in which case the depositor will deliver or cause to be delivered a copy of the Mortgage together with a certificate that the original of the Mortgage was delivered to the recording office),

    • an assignment of the Mortgage to the trustee, which assignment will be in recordable form in the case of a Mortgage assignment, and

    • any other security documents, including those relating to any senior interests in the Property, as may be specified in the

related prospectus supplement or the related Pooling and
Servicing Agreement or Sale and Servicing Agreement."
(Prospectus at 54.)

(d)     "The applicable prospectus supplement may provide other
arrangements for assuring the priority of assignments, but if it does
not, the seller, the depositor or the trustee, as specified in the related
Pooling and Servicing Agreement or Sale and Servicing Agreement,
will promptly cause the assignments of the related loans to be
recorded in the appropriate public office for real property records,
except in states in which, in the opinion of counsel acceptable to the
trustee, the recording is not required to protect the trustee's or the
certificateholder's interest."  (Prospectus at 54-55.)

(e)     "CWMBS, Inc. (the 'DEPOSITOR') . . . will cause the Mortgage
Loans to be assigned to the trustee for the benefit of the holders of the
certificates."  (Prospectus Supplement at S-25.)

(f)     "Under the pooling and servicing agreement, the depositor will assign
all of its right, title and interest in the representations, warranties and
covenants (including the sellers' repurchase or substitution
obligations) to the trustee for the benefit of the certificateholders."
(Prospectus Supplement at S-26.)

(g)     "Pursuant to the pooling and servicing agreement, on the closing date,
the depositor will sell, transfer, assign, set over and otherwise convey
without recourse to the trustee in trust for the benefit of the
certificateholders all right, title and interest of the depositor in and to
each Mortgage Loan and all right, title and interest in and to all other
assets included in CHL Mortgage Pass-Through Trust 2007-HY1,
including all principal and interest received on or with respect to the
Mortgage Loans, but not any principal and interest due on or before
the cut-off date."  (Prospectus Supplement at S-30.)

(h)     "In connection with the transfer and assignment of each Mortgage
Loan, the depositor will deliver or cause to be delivered to the trustee,
or a custodian for the trustee, the mortgage file, which contains among
other things,
        •  the original mortgage note (and any modification or
           amendment to it) endorsed in blank without recourse, except

that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost;

•  the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument;

•  an assignment in recordable form of the mortgage or a copy of such assignment;

•  the original or a copy of the title policy with respect to the related mortgaged property; and

•  if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor)."

(Prospectus Supplement at S-30.)

(i)     "With respect to up to 50% of the Mortgage Loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the Mortgage Loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, recording is not required to protect the trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller. The Depositor expects that substantially all of the assignments will not be recorded based upon an opinion of counsel."  (Prospectus Supplement at S-30.)

**State Court of Fulton County**
**\*\*\*FILED\*\*\***
LexisNexis Transaction ID: 35909308
Date:  Feb 11 2011  4:58PM
Mark Harper, Clerk

# IN THE STATE COURT OF FULTON COUNTY
# STATE OF GEORGIA

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF ATLANTA, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF AMERICA HOME LOANS); COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE HOME LOANS, INC; BANK OF AMERICA CORPORATION (as successor to the COUNTRYWIDE Defendants); J.P. MORGAN SECURITIES, LLC (f/k/a J.P. MORGAN SECURITIES, INC. and BEAR STEARNS & CO., INC.); UBS SECURITIES, LLC; and JOHN DOE DEFENDANTS 1-50. | : Civil Action : File No. 11EV011779G : : : JURY TRIAL DEMANDED : : : : : : : |
| | : |
| Defendants. | |

## <u>NOTICE OF SERVICE OF DISCOVERY</u>

This Notice is to certify that on the 9th day of February, 2011, copies of the following documents were caused to be served in accordance with the Certificates of Service attached thereto:

1.     Plaintiff's Request for Documents to Clayton Holdings, LLC;

2.     Plaintiff's Request for Documents to Allonhill, LLC;

841694.1

3.      Plaintiff's Request for Documents to Fidelity National Information Services, Inc.;

4.      Plaintiff's Request for Documents to R.R. Donnelley & Sons Company; and

5.      Plaintiff's Request for Documents to Corelogic, Inc.


This 11th day of February, 2011.

                            Respectfully submitted,

                            /s/ Bret R. Hobson
                            H. Lamar Mixson
                            Georgia Bar No. 514012
                            *mixson@bmelaw.com*
                            David G.H. Brackett
                            Georgia Bar No. 068353
                            *brackett@bmelaw.com*
                            Ronan P. Doherty
                            Georgia Bar No. 224885
                            *doherty@bmelaw.com*
                            Bret R. Hobson
                            Georgia Bar No. 882520
                            *hobson@bmelaw.com*
                            Mary W. Pyrdum
                            Georgia Bar No. 940420
                            *pyrdum@bmelaw.com*
                            Naveen Ramachandrappa
                            Georgia Bar No. 422036
                            *ramachandrappa@bmelaw.com*

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia 30309
Tel:   (404) 881-4100
Fax:   (404) 881-4111
Attorneys for the Federal Home Loan Bank of Atlanta

841694.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of February, 2011, a true and correct

copy of the foregoing **NOTICE OF SERVICE OF DISCOVERY** was served via

U.S. mail to:

> **UBS Securities, LLC:**
> c/o Registered Agent
> Corporation Service Company
> 40 Technology Parkway South, No. 300
> Norcross, Georgia 30092
>
> **Countrywide Financial Corporation:**
> c/o Registered Agent
> CT Corporation System
> 818 W 7th Street
> Los Angeles, CA  90017
>
> **Bank of America Corporation:**
> c/o Registered Agent
> CT Corporation System
> 1201 Peachtree Street, N.E.
> Atlanta, Georgia 30361
>
> **Countrywide Home Loans:**
> c/o Registered Agent
> CT Corporation System
> 1201 Peachtree Street, N.E.
> Atlanta, Georgia 30361
>
> **JP Morgan Securities, LLC:**
> c/o Registered Agent
> CT Corporation System
> 1201 Peachtree Street, N.E.
> Atlanta, Georgia 30361

841694.1

**Countrywide Securities Corporation:**
c/o Registered Agent
CT Corporation System
818 W 7th St.
Los Angeles, CA 90017

c/o President
Countrywide Securities Corporation
301 South Kings Drive
Charlotte, NC 28204

c/o Registered Agent
Corporation Service Company
327 Hillsborough St
Raleigh, NC 27603

/s/ Bret R. Hobson
Bret R. Hobson
Georgia Bar No. 882520

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA  30309-3417
Tel.: (404) 881-4100
Fax: (404) 881-4111

841694.1