# EXHIBIT 12

ORIGINAL

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

Aegis Mortgage Corporation Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5285
New York, NY 10150-5285

| In Re: | Chapter 11 |
|---|---|
| Aegis Corporation, et al. | Case No. 07-11119 (BLS) |
| Debtors. | Jointly Administered |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| **Aegis Funding Corporation** | **07-11122** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)

**COUNTRYWIDE HOME LOANS, INC.**
**Attn: John Guerry, Senior VP**
**5220 Las Virgenes Road, MS AC-11**
**Calabasas, California 91302**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - District of Delaware
Aegis Mortgage Corporation, Et Al.
07-11119 (BLS)
0000001277

Telephone number: Direct Dial: 818-871-6069
Email Address: John_Guerry@Countrywide.Com

Account or other number by which creditor identifies debtor:

Check here if this claim ☐ replaces ☐ amends a previously filed claim, dated:_____

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other   **See Exhibit A** (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Last Four Digits of your SS#: ___ ___ ___ ___
Unpaid compensation for services performed

from _____ to _____
       (date)         (date)

**2. Date debt was incurred:**
**September 28, 1995**

**3. If court judgment, date obtained:**
**N/A**

**4. Total Amount of Claim at Time Case Filed:** $ **undetermined** + **undetermined** + **undetermined** = Not less than **10,000,000.00**
(unsecured nonpriority)   (secured)   (unsecured priority)   (Total)
                                                      **See Exhibit A**

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☒ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle
☒ Other **Mortgages**

Value of Collateral: $ **Unknown**

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ **Unknown**

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____

Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)( ).

**6. Unsecured Nonpriority Claim:** $ **Unknown**
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.

DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10.** Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

**FILED / RECEIVED**

**FEB - 1 2008**

**EPIQ BANKRUPTCY SOLUTIONS, LLC**

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| **Jan. 30, 2008** | **JOHN GUERRY, SVP** [signature] |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

EXHIBIT 12
1

**EXHIBIT A**
**ADDENDUM TO PROOF OF CLAIM**

**General Statements Applicable to Proof of Claim**

This Proof of Claim is limited to the prepetition claims of Countrywide Home Loans, Inc. (including all of its affiliates, divisions, subsidiaries and operating entities) ("CHL"), against the estate of Aegis Funding Corporation ("Aegis"), which arose as set forth below. CHL may also hold postpetition claims against the Debtor's estates and reserves the right to amend or otherwise supplement this Proof of Claim or to take any other action in connection therewith.

1.   CHL specifically reserves its right to file a claim or request for payment pursuant to Section 503(b) or Section 507(a) of the Bankruptcy Code, and generally to make requests for payment of administrative expenses.

2.   In executing and filing this Proof of Claim (this "Claim"), CHL does not waive any right to any security held by it or for its benefit or any right to claim specific assets or any right of setoff, recoupment, counterclaim or similar right that CHL has or may have against debtor Aegis, its affiliates, or any other person or persons, and expressly reserves such rights.

3.   As of the date of this Claim, the automatic stay under Section 362 of the Bankruptcy Code has prevented CHL from realizing upon the value of its collateral.

4.   CHL has not, nor may it be deemed to have, waived any right of election under Section 1111(b) of the Bankruptcy Code, but hereby reserves all of its rights and remedies thereunder.

5.   Nothing in this Claim constitutes a waiver of any rights of CHL or an election of remedies with respect to the matters described in this Claim or with respect to CHL's rights to assert claims against non-debtors, whether such claims against non-debtors arise under, arise in or are related to Aegis's Chapter 11 proceedings.

6.   CHL reserves the right to amend and/or supplement this Claim in any respect including the right to assert this Claim against affiliates of Aegis whether or not such affiliates are also debtors in these proceedings.

7.   All relevant documents, not otherwise attached hereto as Exhibits, will be made available upon request by the Bankruptcy Court, Aegis or any other party-in-interest entitled to receive such documents.

8.   CHL reserves the right to object to the Bankruptcy Court's subject matter jurisdiction.

1

EXHIBIT 12
2

9.     This Claim shall serve as a claim against affiliates of Aegis whether or not such affiliates are also debtors in these proceedings, as and to the extent such affiliates are individually, jointly and/or severally liable to CHL on this Claim.

**Introduction**

CHL and AHM are parties to the Mortgage Loan Purchase and Interim Servicing Agreement dated June 20, 2002, including all amendments (the "2002 Agreement"), pursuant to which CHL agreed to purchase from time to time, certain mortgage loans identified in the related Purchase Confirmations (as that term is defined in the 2002 Agreement), including all servicing rights relating thereto.  A true and correct copy of the 2002 Agreement (inclusive of some amendments) is attached to this Claim as Exhibit B.

CHL and Aegis are parties to the Loan Purchase Agreement dated September 28, 1995 (together with all amendments and addenda, the "Loan Purchase Agreement"), pursuant to which CHL agreed to purchase certain eligible mortgage loans (together with the servicing of such mortgage loans) from Aegis.  A true and correct copy of the Loan Purchase Agreement (exclusive of all amendments and addenda) is attached to this Claim as Exhibit C.

Pursuant to the Purchase Agreements and the Loan Purchase Agreement, Aegis is obligated to repurchase loans sold by Aegis to CHL under the Purchase Agreements and the Loan Purchase Agreement under certain identified circumstances (such repurchase obligations, the "Repurchase Obligations").

Pursuant to the Purchase Agreements and the Loan Purchase Agreement, Aegis is obligated to indemnify and hold CHL harmless against all costs, damages, losses and claims incurred by CHL in connection with Aegis's breach of its representations, warranties and obligations under the Purchase Agreements and the Loan Purchase Agreement (such indemnification and hold harmless obligations, the "Indemnification Obligations").

Aegis executed a number of powers of attorney in favor of CHL, permitting CHL to take certain actions including note endorsements and security assignments.  True and correct samples of the powers of attorney are attached hereto as Exhibit D.

CHL and Aegis are also parties to the Early Purchase Program Addendum to Loan Purchase Agreement dated March 20, 2001 (together with all amendments, the "EPP Addendum"), pursuant to which CHL supplemented the Loan Purchase Agreement to establish a program for the early purchase (i.e., prior to Aegis' delivery of certain mortgage loan documents) by CHL of certain eligible loans from Aegis.  True and correct copies of EPP Addendum and its amendments are attached to this Claim as Exhibit E.

**Claims**

Pursuant to this Claim, CHL asserts any and all claims, rights or remedies CHL may have, either directly or indirectly, against Aegis, arising as a matter of law or equity, based upon, relating to, or arising under or on account of any and all unpaid amounts owed by Aegis to CHL, including under the Purchase Agreements and the Loan Purchase Agreement, as of the Petition Date and thereafter, including, without limitation, attorneys' fees, expenses and costs.

This Claim is, and is filed as, a claim in an amount that will not be less than $10,000,000 and a claim in an amount yet to be determined for additional liabilities, losses, damages, fees, costs and other amounts and claims payable under the Purchase Agreements and the Loan Purchase Agreement.  This Claim is, and is filed as, a secured claim to the extent that the value of the collateral securing this Claim and, to the extent that such collateral is insufficient to satisfy this Claim, as an unsecured Claim.

The amount of this Claim is comprised of the following:

A.      A substantial portion of the Repurchase Obligations and Indemnification Obligations under the Purchase Agreements and the Loan Purchase Agreement for which CHL believes Aegis will ultimately be liable to CHL have not been formally calculated and/or asserted by CHL or may otherwise be contingent and/or unliquidated.  These amounts include early payment default, premium recapture, shortage of remittances due, and other loan representation and warranty breaches, such as inadequate verification of employment, unverified or misrepresentation of employment, insufficient mortgage/housing rating, undisclosed liabilities, unsupported income and other credit or underwriting criteria that are unable to be determined or confirmed.  Currently, CHL asserts that not less than $10,000,000 in Repurchase Obligations are currently owed by Aegis to CHL (a detailed calculation of which shall be provided upon request).  CHL reserves all rights to amend this Claim to assert additional Repurchase Obligations and Indemnification Obligations, which CHL believes will exceed $10 million.

B.      The amount of fees, costs and other amounts payable to CHL under the Purchase Agreements and the Loan Purchase Agreement is currently estimated to be $50,000, or possibly significantly greater.  A detailed calculation of these fees and costs shall be provided upon request.

C.      In addition to the foregoing, CHL reserves its right to assert unsecured priority claims under Sections 503(b) and 507(a)(2) of the Bankruptcy Code for all liabilities, losses or damages related to Aegis's failure to properly segregate and remit to CHL all payments received by Aegis or otherwise payable to CHL on account of loans CHL previously purchased from Aegis under the Purchase Agreements and the Loan Purchase Agreement (such payments, the "CHL Payments").  CHL asserts that the CHL Payments constitute the property of CHL and do not constitute (and have never constituted) the property of Aegis or its bankruptcy estate.

In addition to the foregoing, if Aegis rejects the Purchase Agreements and the Loan Purchase Agreement pursuant to Section 365 of the Bankruptcy Code, CHL reserves its right to assert additional claims against Aegis for all actual and reasonably foreseeable consequential damages arising under, on account of and/or relating to such rejection.

## Collateral

The Purchase Agreements, the Loan Purchase Agreement and the EPP Addendum provide that CHL is entitled to setoff, including by withdrawal or debit of funds of Aegis deposited or held in the "Over/Under Account" identified in the Loan Purchase Agreement (the "Over/Under Account"), any amounts owed by CHL to Aegis against any amounts owed by Aegis to CHL under the Purchase Agreements, the Loan Purchase Agreement, the EPP Addendum or any other agreement between Aegis and CHL.

CHL asserts all contractual, statutory and common law rights of setoff with respect to property of Aegis held or owing by CHL (or any of its affiliates) to or for the account of Aegis, including, without limitation, all of Aegis's funds in the Over/Under Account and any and all amounts payable by CHL to or for the account of Aegis under the Purchase Agreements, the Loan Purchase Agreement or any other agreement between CHL and Aegis.

## Supplemental Amounts

CHL has credited indebtedness described herein with pre-petition receipts from the Debtor (if any). No postpetition payments have been made. Accordingly, the prepetition amount has not diminished since the Petition Date. The amount of the indebtedness changes on a daily basis depending on the amounts of the expenses, losses, attorneys' fees (if any) and interest thereon.

This Proof of Claim is made without prejudice to the filing by CHL of additional proofs of claim or amending the instant Proof of Claim with respect to any other indebtedness or liability of the Debtor to CHL, including without limitation, any additional claims for interest, fees, losses or expenses that may be allowed by law or by the pleadings and documents described above, and any claims which may have arisen after the filing of the Debtor's petition pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1). CHL further reserves the right to make such additional proofs of claim or amendments should it elect to do so in the future.

To the extent any portion of this Proof of Claim is allowable against the Debtor's estate as an administrative expense, CHL hereby asserts that such amounts should be so treated.

## MORTGAGE LOAN PURCHASE AGREEMENT

This Mortgage Loan Purchase Agreement is dated and effective as of June 20, 2002 (the "Agreement"), between Aegis Mortgage Corporation, having an address at 11111 Wilcrest Green, Suite 250, Houston, Texas 77042 (the "Seller"), and Countrywide Home Loans, Inc., having an address at 4500 Park Granada, Calabasas, California  91302 (the "Purchaser").

## R E C I T A L S

The Seller desires to sell and transfer to the Purchaser from time to time, and the Purchaser desires to purchase from the Seller from time to time, certain mortgage loans identified in a Purchase Confirmation (as defined below) executed by the Purchaser and the Seller, including all servicing rights relating thereto (as defined herein, the "Mortgage Loans"), upon such terms set forth below.

In consideration of the promises and the mutual agreements and undertakings set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I

### DEFINITIONS

Unless the context otherwise requires, all capitalized terms used herein shall have the meanings assigned to such terms in this Article I unless defined elsewhere herein.  Any capitalized term used or defined in a Purchase Confirmation that conflicts with the corresponding definition set forth herein shall supercede such term:

**Adjustable Rate Mortgage Loan**:  Any Mortgage Loan in which the related Mortgage Note contains a provision whereby the Mortgage Interest Rate is adjusted from time to time in accordance with the terms of such Mortgage Note.

**Agencies**:  Both Fannie Mae and Freddie Mac.

**Agreement**:   This Mortgage Loan Purchase Agreement, including all exhibits and supplements hereto, and all amendments hereof.

**Appraised Value**:   With respect to any Mortgage Loan, the value of the related Mortgaged Property based upon the lesser of (i) the appraisal made for the originator at the time of origination of the Mortgage Loan or (ii) the purchase price of the Mortgaged Property at the time of origination of the Mortgage Loan, provided, however, that in the case of a refinanced Mortgage Loan, such value is based solely upon the appraisal made at the time of origination of such refinanced Mortgage Loan.

**Assignment of Mortgage**:   An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

**Balloon Mortgage Loan**:  Any Mortgage Loan wherein the Mortgage Note matures prior to full amortization and requires a final and accelerated payment of principal.

**Business Day**:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the State of California, are authorized or obligated by law or executive order to be closed.

**Closing**:  The consummation of the sale and purchase of each Mortgage Loan Package.

**Closing Date**:  With respect to each sale and purchase of a Mortgage Loan Package as contemplated hereunder, the closing date on which the purchase and sale of the Mortgage Loans constituting a Mortgage Loan Package is consummated, as set forth in the related Trade Confirmation and Purchase Confirmation.

**Cut-off Date**:  With respect to each sale and purchase of a Mortgage Loan Package as contemplated hereunder, the cut-off date as set forth in the related Purchase Confirmation.

**Due Date**:  The day of the month on which a Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

**Fannie Mae**:  The Federal National Mortgage Association or any successor thereto.

**Fixed Rate Mortgage Loan**:  Any Mortgage Loan wherein the Mortgage Interest Rate set forth in the Mortgage Note is fixed for the term of such Mortgage Loan.

**Freddie Mac**:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

**Gross Margin**:  With respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which amount is added to the Index in accordance with the terms of the related Mortgage Note to determine the Mortgage Interest Rate for such Mortgage Loan.

**HMDA**:  The Home Mortgage Disclosure Act, as amended.

**HUD**:  The Department of Housing and Urban Development or any successor thereto.

**Index**:  With respect to each Adjustable Rate Mortgage Loan, the Index shall mean the rate per annum as set forth in the related Mortgage Loan Schedule with respect to each Segment.

**Initial Purchaser**:  Countrywide Home Loans, Inc.

**Interest Adjustment Date**:  With respect to each Adjustable Rate Mortgage Loan, the date on which an adjustment to the Mortgage Interest Rate on a Mortgage Note becomes effective.

**Interim Servicing Period**:  The period commencing with the related Closing Date and ending with the related Servicing Transfer Date.

**Lifetime Mortgage Interest Rate Cap**:  The absolute maximum Mortgage Interest Rate payable for an Adjustable Rate Mortgage Loan, above which the Mortgage Interest Rate shall not be adjusted, as provided in the related Mortgage Loan Schedule.

**Loan-to-Value Ratio** or **LTV**:  With respect to any Mortgage Loan, the ratio of the original outstanding principal amount to the Appraised Value of the Mortgage Loan.

**MERS**:  Mortgage Electronic Registration Systems, Inc. or any successor or assign thereto.

**MERS Mortgage Loan**:  Any Mortgage Loan registered with MERS on the MERS System.

**MERS System**:  The electronic system of recording transfers of mortgages maintained by MERS.

**Monthly Payment**:   The scheduled monthly payment of principal and interest on a Mortgage Loan.

**Mortgage**:   The mortgage, deed of trust or other such instrument securing a Mortgage Note, which creates a first or second lien, as delineated on the related Mortgage Loan Schedule, on an unsubordinated estate in fee simple in real property securing the Mortgage Note or a first or second lien, as delineated on the related Mortgage Loan Schedule, upon a leasehold estate of Mortgagor, as the case may be.

**Mortgage File**:   The file containing the Mortgage Loan Documents, all other documents in connection with the origination of a particular Mortgage Loan and all documents, files and other information reasonably necessary to service the Mortgage Loans.

**Mortgage Interest Rate**:   The annual rate at which interest accrues on any Mortgage Loan, exclusive of any primary mortgage insurance, as adjusted from time to time in accordance with the provisions of the related Mortgage Note, if applicable.

**Mortgage Loan**:   A mortgage loan identified in the Mortgage Loan Schedule which is sold pursuant to this Agreement, which Mortgage Loan includes without limitation the Mortgage Loan Documents, the Mortgage File, the Monthly Payments, Principal Prepayments, any related Escrow Accounts, the Servicing Rights and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.   Unless the context requires otherwise, any reference to the Mortgage Loans in this Agreement shall refer to the Mortgage Loans constituting the Mortgage Loan Package.

**Mortgage Loan Documents**:   The following documents pertaining to any Mortgage Loan:

(a)   The original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of _____" and signed in the name of the Seller by an authorized officer;

(b)   The original Assignment of Mortgage for each Mortgage Loan from the Seller to blank (except for Mortgage Loans registered with the MERS System);

(c)   The original Mortgage with evidence of recording thereon;

(d)   The originals of all intervening assignments of mortgage with evidence of recording thereon; and

(e)   The original mortgagee title insurance policy.

**Mortgage Loan Package**:   The Mortgage Loans sold to the Purchaser pursuant to a Purchase Confirmation and identified on a Mortgage Loan Schedule.

**Mortgage Loan Schedule**:   With respect to each Mortgage Loan Package, the schedule of Mortgage Loans included therein and made a part of the related Purchase Confirmation.

**Mortgage Note**:   The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

**Mortgaged Property**:   The real property securing repayment of the debt evidenced by a Mortgage Note.

**Mortgagor**:   The obligor on a Mortgage Note.

**Pass-Through Transfer**:  The sale or transfer of some or all of the Mortgage Loans to a trust to be formed as part of a publicly or privately traded, rated or unrated mortgage pass-through, pay-through or other mortgage-backed securities transaction.

**Periodic Mortgage Interest Rate Cap**:  With respect to each Adjustable Rate Mortgage Loan, the provision of a Mortgage Note which provides for an absolute maximum amount by which the Mortgage Interest Rate therein may increase or decrease on an Interest Adjustment Date above the Mortgage Interest Rate previously in effect, equal to the rate set forth in the related Mortgage Loan Schedule, as applicable.

**Premium Recapture Percentage**:  With respect to the repurchase of any Mortgage Loan, that percentage determined in accordance with the following:  If repurchase request is made during the first month from the Closing Date, the Premium Recapture Percentage shall be one hundred percent (100%) and prorated thereafter over a twelve (12) month period; provided however, the Premium Recapture Percentage shall be one hundred percent (100%) for any Mortgage Loan repurchase based on a breach of the payment default protection provisions delineated in Section 3.2(b) or Section 3.6.

**Principal Prepayment**:  Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any prepayment penalty or premium thereon, which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

**Purchase Confirmation**:  Those certain purchase confirmations substantially in the form of Exhibit E hereto, executed by the Seller and the Purchaser in connection with the purchase and sale of each Mortgage Loan Package, which sets forth the terms relating thereto including a description of the related Mortgage Loans (including the Mortgage Loan Schedule), the Purchase Price for such Mortgage Loans, the Closing Date, the Cut-off Date and the Servicing Transfer Date.

**Purchase Price**:  The purchase price to be paid by the Purchaser for the Mortgage Loans (including the Servicing Rights relating thereto) which, unless otherwise specified in the Purchase Confirmation, shall equal the product of (a) the Purchase Price Percentage, times (b) the Stated Principal Balance of the Mortgage Loans.

**Purchase Price Percentage**:  The purchase price percentage set forth in the Purchase Confirmation.

**Purchase Proceeds**:  The purchase proceeds to be paid by the Purchaser for the Mortgage Loans constituting each Mortgage Loan Package, as set forth in a funding schedule in the form of Exhibit B hereto.

**Purchaser**:  Any entity which purchases the Mortgage Loans pursuant to this Agreement or its successor in interest or any successor or assign to the Purchaser under this Agreement as herein provided.  Unless the context requires otherwise, all references to "Purchaser" in this Agreement shall be deemed to include such Purchaser's successors in interest, assignees or designees.

**Qualified Insurer**:  An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance.

**Reconstitution Agreements**:  Any of the agreement or agreements entered into by the Purchaser and/or certain third parties, and if necessary the Seller, on the Reconstitution Date or Dates with respect to any or all of the Mortgage Loans conveyed hereunder, in connection with a Whole Loan Transfer or a Pass-Through Transfer as set forth in Section 4.3.

**Reconstitution Date**:  The date or dates on which any or all of the Mortgage Loans purchased pursuant to this Agreement shall be reconstituted as part of a Whole Loan Transfer or a Pass-

Through Transfer pursuant to <u>Section 4.3</u>.

**Repurchase Price**: With respect to any Mortgage Loan, a price equal to the sum of (a) the product of (i) the unpaid principal balance of the Mortgage Loan at the time of repurchase, and (ii) the greater of par or the Premium Recapture Percentage (subject to any adjustments as contemplated in the Transaction Documents, if any), plus (b) interest on such unpaid principal balance at the Mortgage Interest Rate from the last date through which interest has been paid and distributed to the Purchaser to the date of repurchase, plus (c) any outstanding escrow advances and any outstanding servicing advances made by the Purchaser on account of the Mortgage Loan.

**Segment(s)**: One or more segments of Mortgage Loans (each, a "Segment") comprising the segment(s) of Mortgage Loans set forth in the related Mortgage Loan Schedule, whether individually or in the aggregate, as applicable.

**Servicing Rights**: With respect to each Mortgage Loan, any and all of the following: (a) all rights to service the Mortgage Loans; (b) any payments or monies payable or received for servicing the Mortgage Loans; (c) any late fees, assumption fees, penalties or similar payments with respect to the Mortgage Loans; (d) all agreements or documents creating, defining or evidencing any such Servicing Rights and all rights of the Seller thereunder, including, but not limited to, any clean-up calls and termination options; (e) Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto; (f) all accounts and other rights to payments related to any of the property described in this paragraph; (g) possession and use of any and all Mortgage Files pertaining to the Mortgage Loans or pertaining to the past, present, or prospective servicing of the Mortgage Loans; and (h) all rights, powers and privileges incident to any of the foregoing.

**Servicing Transfer Date**: With respect to each sale and purchase of Mortgage Loans as contemplated hereunder, the servicing transfer date as set forth in the related Purchase Confirmation, or such other date as the Purchaser may select upon reasonable notice to the Seller.

**Stated Principal Balance**: The unpaid principal balance of the Mortgage Loans at the Cut-off Date.

**Trade Confirmation**: A letter agreement executed by the Seller and the Purchaser prior to the applicable Closing Date confirming the general terms and conditions of a prospective transaction contemplated herein and identifying certain of the loan characteristics of the Mortgage Loans constituting the Mortgage Loan Package to be purchased hereunder.

**Transaction Documents**: With respect to any Mortgage Loan Package purchased by the Purchaser hereunder, the related Trade Confirmation, the related Purchase Confirmation and this Agreement.

**Whole Loan Transfer**: The sale or transfer by the Purchaser of some or all of the Mortgage Loans in a whole loan format.

## ARTICLE II

## SALE OF THE MORTGAGE LOANS

**Section 2.1    Agreement of Sale**. On each Closing Date, the Seller does hereby agree to sell, convey, transfer and assign to the Purchaser all right, title and interest in and to the Mortgage Loans, all in accordance with the terms and conditions set forth herein. The Seller confirms that its agreement to sell, convey, transfer and assign to Purchaser the Mortgage Loans as provided in this Agreement shall occur automatically each time it enters into a Purchase Confirmation with the Purchaser and accepts payment from the Purchaser as provided herein. On and after each Closing Date, the Seller shall hold the Mortgage Loan Documents and Mortgage Files in trust for the Purchaser and shall

act only in accordance with the terms of this Agreement and the Purchaser's instructions with respect thereto.

**Section 2.2    Payment of the Purchase Proceeds.**   On each Closing Date, the Purchaser shall pay to the Seller the Purchase Proceeds, by wire transfer in immediately available funds to the account designated by the Seller.   Upon completion of the wire transfer to the Seller's designated account, the Purchaser shall own the Mortgage Loans and the Servicing Rights, free and clear of any lien or encumbrance whatsoever.

**Section 2.3    Entitlement to Payment on the Mortgage Loans.**   The Purchaser shall be entitled to all collections and recoveries of principal and interest received or applied to any Mortgagor's account after each Cut-off Date.   All payments and remittances on the Mortgage Loans received by the Seller after the Closing Date and payable to the Purchaser shall be paid promptly to the Purchaser in accordance to the terms set forth in Article IV or Article V, as applicable.

**Section 2.4    Examination of Mortgage Loan Documents by the Purchaser.**   Prior to each Closing Date, the Purchaser shall have the right to review the Mortgage File and, based on its review, decline to purchase any Mortgage Loan which the Purchaser, in its sole discretion, determines not to be in compliance with each of the representations and warranties contemplated hereby or which is otherwise unsatisfactory to the Purchaser in its reasonable discretion.   It is expressly understood by the parties that the Purchaser is purchasing the Mortgage Loans for the express purpose of reselling such Mortgage Loans to a subsequent purchaser and, as such, the Purchaser's right to decline to purchase any of the Mortgage Loans as contemplated above may be directly influenced by the results of such subsequent purchaser's own due diligence on the Mortgage Loans.   The Seller agrees to deliver or make available to the Purchaser a complete Mortgage File for each Mortgage Loan on or before such date as may be reasonably requested by the Purchaser.   The fact that the Purchaser has conducted or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the Purchaser's right to demand repurchase or to avail itself of any other remedy available hereunder.   Notwithstanding anything contained herein to the contrary, should there be a material adverse change in the characteristics of the Mortgage Loans remaining after the exclusion or rejection of one or more Mortgage Loans by the Purchaser as contemplated above, the Purchaser may, in its sole discretion, elect not to purchase the remaining Mortgage Loans and the Purchaser shall have no liability therefor.

**Section 2.5    Delivery of Mortgage Loan Documents.**   At least two (2) Business Days prior to each Closing Date, the Seller shall deliver the Mortgage Loan Documents with respect to each Mortgage Loan to the Purchaser or a bonded third party custodian (the "Custodian") and, in the case of the latter, shall cause the Custodian to deliver to the Purchaser a custodian's certification pursuant to which the Custodian certifies to the Purchaser that (i) with respect to each Mortgage Loan, it has in its possession originals of each of the Mortgage Loan Documents, (ii) all of the Mortgage Loan Documents appear on their face to be genuine originals or copies, as applicable, and (iii) upon the Purchaser's wiring of the Purchase Proceeds to the Seller, that the Custodian shall hold the Mortgage Loan Documents with respect to each Mortgage Loan in trust for the Purchaser and will, subsequent thereto, act only in a manner consistent with the Purchaser's instructions with respect thereto.   In the event that any of the Mortgage Loan Documents set forth in clauses (c) through (e) of the definition of Mortgage Loan Documents in Article I have not been delivered to the Purchaser in the time specified above (the "Missing Documents") either because such Missing Documents have not been returned by the applicable public recording office with respect to items (c) and (d), or because the final original title policy has not yet been issued by the title company with respect to item (e), then the Seller shall deliver to the Purchaser certified true and correct copies of the same and shall further deliver the originals of any such Missing Documents promptly upon its receipt thereof, but in no event later than one hundred twenty (120) days from the related Closing Date.   Notwithstanding the foregoing, if the Seller's failure to deliver the Missing Documents is due solely to the failure of the applicable public recorder's office to return a Missing Document that was sent for recording, the Seller shall have an additional sixty (60) days to deliver the Missing Document; provided however, the Seller shall deliver any Missing Document within one hundred eighty (180) days of the related Closing Date.   If the Seller fails to deliver any of the Missing Documents

relating to a Mortgage Loan within the time specified above, the Seller shall, upon written request from the Purchaser, repurchase such Mortgage Loan in accordance with Section 3.3.

Section 2.6     Conditions to Closing.    The Purchaser's obligations hereunder with respect to any Mortgage Loan Package are subject to the fulfillment of the following conditions precedent. In the event that any of the conditions set forth below are not satisfied, the Purchaser shall not have any obligation to purchase any of the Mortgage Loans or to pay the Purchase Proceeds as contemplated hereunder.

(a)   Each of the representations and warranties made by the Seller hereunder shall be true and correct in all material respects as of the related Closing Date and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement.

(b)   The Seller shall have delivered to the Purchaser all of the Mortgage Loan Documents in accordance with Section 2.5 and a complete Mortgage File with respect to each Mortgage Loan.

(c)   Each of the terms and conditions set forth herein which are required to be satisfied on or before the related Closing Date shall have been satisfied unless waived by the prejudiced party(ies).

(d)   The Seller shall have delivered to the Purchaser on or before the related Closing Date the following documents:

(1)   an executed Agreement;

(2)   the Mortgage Loan Schedule, which shall include, without limitation, the Stated Principal Balance of each Mortgage Loan;

(3)   an executed Funding Schedule, in the form of Exhibit B hereto;

(4)   an executed Officer's Certificate, in the form of Exhibit C hereto;

(5)    an executed Authorized Signatories Agreement, in the form of Exhibit D hereto;

(6)   an executed Purchase Confirmation, in the form of Exhibit E hereto; and

(7)   such other documents related to the purchase and sale of the Mortgage Loans and the Servicing Rights as the Purchaser may reasonably request.

(e)   The documents specified in subsection (d)(1) and (d)(5) shall only be required with respect to the initial Closing Date unless the Purchaser subsequently requests the Seller to reexecute such documents.

Section 2.7     Record Title.    With respect to each Mortgage Loan, record title to each Mortgage and the related Mortgage Note shall be transferred by the Seller to the Purchaser. The Seller shall, at the option of the Purchaser, either (i) prepare and cause to be recorded the Assignment of Mortgage for each Mortgage Loan and shall, promptly upon its receipt of each original recorded Assignment of Mortgage from the applicable recording office, deliver the same to the Purchaser, (ii) prepare and deliver to the Purchaser an original Assignment of Mortgage either in blank, in either case, within the time and in the manner specified in Section 2.5, or (iii) with respect to any Mortgage Loan registered on the MERS System, cause the MERS System to reflect the Purchaser as the owner of the Mortgage Loan and the Servicing Rights related thereto. The Seller shall bear the cost and expense related to (A) providing all Assignments of Mortgages and endorsements of Mortgage Notes for any transfer of record title required hereunder with respect to the obligations of the Mortgage Notes and the underlying security interest related to each Mortgage Loan, (B) recording title of the Mortgage Loans including, but not limited to, recording fees and fees for title policy endorsements, and (C) causing the

MERS System to reflect the Purchaser as the owner of the Mortgage Loans.

## ARTICLE III

REPRESENTATIONS AND WARRANTIES

**Section 3.1     Representations and Warranties Respecting the Seller**.  The Seller represents, warrants and covenants to the Purchaser that, as of each Closing Date:

(a)  The Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and is qualified to transact business in and is in good standing under the laws of each state where a Mortgaged Property is located or is otherwise exempt under applicable law from such qualification or is otherwise not required under applicable law to effect such qualification and no demand for such qualification has been made upon the Seller by any state having jurisdiction and in any event the Seller is or will be in compliance with the laws of any such state to the extent necessary to insure the enforceability of each Mortgage Note and the sale of the Mortgage Loans and Servicing Rights as contemplated by this Agreement;

(b)  The Seller has the full power and authority to perform, and to enter into and consummate, all transactions contemplated by this Agreement.  The Seller has the full power and authority to hold each Mortgage Loan and to sell each Mortgage Loan and the Servicing Rights;

(c)  Neither the acquisition or origination of the Mortgage Loans by the Seller, the sale of the Mortgage Loans or the Servicing Rights to the Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's certificate of incorporation or bylaws or result in a material breach of any legal restriction or any agreement or instrument to which the Seller is now a party or by which it is bound, or constitute a material default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject;

(d)  The Seller is an approved seller/servicer for the Agencies, in good standing with each such agency, and is a mortgagee approved by the Secretary of HUD pursuant to sections 203 and 211 of the National Housing Act.  No event has occurred, including but not limited to, a change in insurance coverage, which would make the Seller unable to comply with Fannie Mae, Freddie Mac or HUD-eligibility requirements or which would require notification to the Agencies or HUD.  The Seller is a member of MERS in good standing, and has complied with the rules and procedures of MERS in connection with the Mortgage Loans registered with the MERS System;

(e)  The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(f)  Except as specifically disclosed to the Purchaser in writing prior to each related Closing Date, there is no action, suit, proceeding, investigation or litigation pending or, to the best of the Seller's knowledge, threatened, which either in any one instance or in the aggregate, if determined adversely to the Seller, would adversely affect the sale of the Mortgage Loans or the Servicing Rights to the Purchaser, or the Seller's ability to perform its obligations under this Agreement;

(g)  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of or compliance by the Seller with this Agreement or the terms of the Mortgage Loans, the delivery of the Mortgage Files to the Purchaser, the sale of the Mortgage Loans and the Servicing Rights to the Purchaser or the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Closing Date; and

(h) The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes, the Mortgages and/or the Servicing Rights by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect and applicable to this transaction.

**Section 3.2        Representations and Warranties Regarding Individual Mortgage Loans**.  With respect to each Mortgage Loan and unless otherwise indicated in the related Trade Confirmation and/or Purchase Confirmation, the Seller represents and warrants to the Purchaser that as of the related Closing Date:

(a)        The information set forth in the Mortgage Loan Schedule, the Transaction Documents and in each Mortgage File is complete, true and correct;

(b)        All payments required under the terms of the Mortgage Note to be made on or prior to the related Closing Date have been made; the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the Mortgaged Property subject to the Mortgage, directly or indirectly, for the payment of any amount required under the Mortgage Loan; and there has been no delinquency of thirty (30) days or more in any payment by the Mortgagor thereunder during the last twelve (12) months.  With respect to second lien Mortgage, all payments required to be made to the first lien holder have been made.  To the best of the Seller's knowledge, none of the Mortgagors is deceased.  No Mortgage Loan is subject to any pending litigation, foreclosure, bankruptcy, insolvency, or reorganization proceeding.  Notwithstanding the foregoing, with respect to any Mortgage Loan for which the Monthly Payment with a Due Date in the month of the related Closing Date has not been made, the Purchaser has nonetheless agreed to purchase such Mortgage Loan, provided, however, that if such Monthly Payment is not made by the respective Mortgagor within thirty (30) days of the related Due Date, whether directly to the Purchaser or to the Seller (in which case, the Seller shall promptly forward any such Monthly Payment to the Purchaser), the Seller shall be deemed to have breached this warranty and representation with respect to such Mortgage Loan and such breach shall further be deemed to materially and adversely affect the value of such Mortgage Loan and the Purchaser's interest therein, and the Seller shall, at the Purchaser's option and not later than ten (10) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price notwithstanding anything contained herein to the contrary.  Nothing contained in this Section 3.2(b) shall in any way limit any other rights of the Purchaser as provided hereunder;

(c)        There are no delinquent taxes, water charges, sewer rents, assessments, insurance premiums, leasehold payments, including assessments payable in future installments, or other outstanding charges affecting the related Mortgaged Property;

(d)        The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which are in the Mortgage File and have been or will be recorded, if necessary to protect the interests of the Purchaser, and which have been delivered to the Purchaser, all in accordance with this Agreement.  The substance of any such waiver, alteration or modification has been approved by the primary mortgage guaranty insurer, if any, and by the title insurer, to the extent required by the related policy, and its terms are reflected on the Mortgage Loan Schedule.  No Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the primary mortgage insurer, if any, and title insurer, to the extent required by the policy, and which assumption agreement is part of the Mortgage File and the terms of which are reflected in the Mortgage Loan Schedule, if executed prior to the related Closing Date;

(e)        The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(f)     All buildings upon, or comprising part of, the Mortgaged Property are insured by a Qualified Insurer against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located, and such insurer is licensed to do business in the state where the Mortgaged Property is located.  All such insurance policies (collectively, the "hazard insurance policy") contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee and all premiums thereon have been paid.  If upon origination of the Mortgage Loan, the Mortgaged Property was, or was subsequently deemed to be, in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available), which require under applicable law that a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration (or any successor thereto) be obtained, such flood insurance policy is in effect.  The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at Mortgagor's cost and expense and, on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at Mortgagor's cost and expense and to obtain reimbursement therefor from the Mortgagor.  Each Mortgage Loan has in place a fully-paid life of loan flood certification, assigned in care of the Purchaser, which provides for notification to the Purchaser of changes in designated flood areas which would affect such Mortgage Loan;

(g)     Any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures including, without limitation, the Real Estate Settlement Procedures Act of 1974, as amended, consumer credit and privacy protection, equal credit opportunity or disclosure laws applicable to the Mortgage Loan have been complied with in all material respects;

(h)     The Mortgage has not been satisfied, canceled, subordinated, or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission;

(i)     The Mortgage is a valid, existing and enforceable first or second lien, as delineated on the related Mortgage Loan Schedule, on the Mortgaged Property, including all improvements on the Mortgaged Property, if any, subject only to (a) the lien of current real property taxes and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised Value (as defined in clause (i) of such definition) of the Mortgaged Property, (c) with respect to second lien Mortgages, a first lien secured by the related Mortgaged Property, and (d) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property. The Seller has full right to sell and assign the Mortgage to the Purchaser;

(j)     The Mortgage Note and the related Mortgage are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(k)     All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan transaction and to execute and deliver the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties;

(l)     The proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(m)     The Seller is the sole owner and holder of the Mortgage Loan and the related Servicing Rights and is the custodian of the related Escrow Account, if applicable.  The Mortgage Loan has neither been assigned nor pledged, and the Seller has good and marketable title thereto, and has full right to transfer and sell the Mortgage Loan and the related Servicing Rights to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Mortgage Loan and the related Servicing Rights to the Purchaser pursuant to the terms of this Agreement;

(n)     All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (a) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (b) (i) organized under the laws of such state, or (ii) qualified to do business in such state, or (iii) a federal savings and loan association or national bank having principal offices in such state, or (iv) not deemed to be doing business in such state under applicable law;

(o)     The Mortgage Loan is covered by an ALTA lender's title insurance policy acceptable to the Agencies, issued by a title insurer acceptable to the Agencies and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in (i)(a), (b), and (c) above) the Seller, its successors and assigns as to the first or second priority lien, as delineated on the related Mortgage Loan Schedule, of the Mortgage in the original principal amount of the Mortgage Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage Note and/or Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment.  Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein.  The Seller is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement.  No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

(p)     There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration;

(q)     There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to or equal with, the lien of the related Mortgage;

(r)     All improvements which were considered in determining the Appraised Value (as defined in clause (i) of said definition) of the related Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property;

(s)     Each Mortgage Loan was originated by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or mortgage banking company which is supervised and examined by a federal or state authority, or by a mortgage originator approved by the Secretary of Housing and Urban Development pursuant to Sections 2.03 and 2.11 of the National Housing Act;

(t)     The origination, servicing and collection practices with respect to each Mortgage Note and Mortgage since origination, have been conducted in all respects in accordance with the terms of

Mortgage Note and in compliance with all applicable laws and regulations and, unless otherwise required by law or a Fannie Mae or Freddie Mac standard, in accordance with the proper, prudent and customary practices in the mortgage origination and servicing business.  All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage Note.  Any interest required to be paid pursuant to state and local law has been properly paid and credited;

(u)    The Mortgaged Property is free of material damage and waste and there is no proceeding pending for the total or partial condemnation thereof;

(v)    The Mortgage and related Mortgage Note contains customary and enforceable provisions to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security intended to be provided thereby, including, (a) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (b) otherwise by judicial foreclosure.  There is no other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage.  The Mortgagor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Soldiers and Sailors Civil Relief Act of 1940;

(w)    The Mortgage Note is not and has not been secured by any collateral except the lien of the applicable Mortgage;

(x)    The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by an appraiser who meets the minimum requisite qualifications Financial Institutions Reform Recovery and Enforcement Act and the Uniform Standards of Professional Appraisal Practice then in effect, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to the Agencies, with such riders as are acceptable to the Agencies; such appraisal was conducted in compliance with all applicable laws and regulations and in accordance with the proper, prudent and customary practices in the appraisal business;

(y)    In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(z)    No Mortgage Loan contains a permanent or temporary "buydown" provision;

(aa)    The Mortgagor has received all disclosure materials required by applicable law with respect to the making of the Mortgage Loan;

(bb)    No Mortgage Loan was made in connection with (a) the construction or rehabilitation of a Mortgaged Property or (b) facilitating the trade-in or exchange of a Mortgaged Property;

(cc)    [Reserved];

(dd)    The Mortgaged Property is lawfully occupied under applicable law and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities;

(ee)    [Reserved];

(ff)    The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located; with respect to any

Mortgage Loan registered with the MERS System, such registration complies with the rules and procedures of MERS;

(gg)    Any future advances made to the Mortgagor prior to the related Closing Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first or second lien priority, as delineated on the related Mortgage Loan Schedule, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to the Agencies. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(hh)    If the Mortgaged Property is a condominium unit or a planned unit development, such condominium or planned unit development project meets the eligibility requirements of the Agencies;

(ii)    The Mortgage Note and Mortgage are on forms acceptable to either of the Agencies;

(jj)    The Mortgaged Property is located in the state indicated on the Mortgage Loan Schedule, and consists of a single parcel of real property, or multiple contiguous parcels of real property so long as there is one legal description, with a detached or attached single family residence erected thereon, or an individual condominium unit, or an individual townhome unit, or a 2-4 family dwelling or an individual unit in a planned unit development as defined by Fannie Mae, doublewide manufactured property;

(kk)    There are no circumstances or conditions with respect to the Mortgage, the Mortgage Property, the Mortgagor, the Mortgage File or the Mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan;

(ll)    The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(mm)    The Seller has no knowledge of any circumstances existing that could reasonably be expected to adversely affect the value or the marketability of any Mortgaged Property or Mortgage Loan or to cause the Mortgage Loans to prepay during any period materially faster or slower than the mortgage loans of similar characteristics originated by the Seller generally;

(nn)    Each Mortgage Loan is covered by a valid and transferable tax service contract with Transamerica, or such other vendor as may be reasonably acceptable to the Purchaser, which may be assigned without the payment of any fee by the Purchaser; or if the Mortgage Loan is not covered by a valid and transferable tax service contract, the Seller shall pay a specified amount per such Mortgage Loan as delineated in the Transaction Documents, which such amount shall be deducted from the related Purchase Proceeds;

(oo)    Each Mortgage Loan, other than a Balloon Mortgage Loan, requires monthly payments sufficient to fully amortize the original principal balance of the Mortgage Loan over the original term of the Mortgage Loan as set forth in the related Mortgage Note and each monthly payment is due on the first day of each month. No Mortgage Loan has negatively amortized nor shall any Mortgage Loan have any negative amortization after the related Closing Date. Except for any initial fixed term as indicated in the Mortgage Loan Schedule, the Mortgage Interest Rate for each Adjustable Rate Mortgage Loan adjusts semi-annually in accordance with the related Mortgage Note. With respect to each Adjustable Rate Mortgage Loan, on each Interest Adjustment Date, the Mortgage Interest Rate shall be

adjusted to equal the Index plus the Gross Margin (rounded up or down to the nearest 0.125%), subject to the Periodic Mortgage Interest Rate Cap and the Lifetime Mortgage Interest Rate Cap as set forth in the respective Mortgage Note and the Mortgage Loan Schedule.  Unless indicated in the Mortgage Loan Schedule otherwise, none of the Adjustable Rate Mortgage Loans contain a provision allowing the Mortgagor to convert the Mortgage Note from an adjustable rate mortgage loan to a Fixed Rate Mortgage Loan.  With respect to any Mortgage Loan which has been converted from an Adjustable Rate Mortgage Loan into a Fixed Rate Mortgage Loan, such conversion was done in strict accordance with the terms of the related Mortgage Note.   The principal and interest due on each Mortgage Loan is calculated pursuant to the standard amortization (30/360 day interest accrual) method;

(pp)     Each Mortgage Loan conforms to, and at the time of origination was underwritten in accordance with, the credit underwriting guidelines as indicated in the Trade Confirmation and/or Purchase Confirmation;

(qq)     As of the related Closing Date, the Seller shall have received neither actual nor constructive notice that either a Mortgage Loan will be paid in full (whether by virtue of a demand statement or otherwise) or that any Mortgagor has elected to convert the related Mortgage Loan into a Fixed Rate Mortgage Loan in accordance with the terms of the related Mortgage Note;

(rr)     No Mortgage Loan is subject to the requirements of Reg. Z, Section 226.32 of the Truth in Lending Act (12 C.F.R. Part 226.32);

(ss)     No Mortgage Loan contains provisions pursuant to which Monthly Payments are (a) paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor, or anyone on behalf of the Mortgagor or (b) paid by any source other than the Mortgagor or contains any other similar provisions which may constitute a "buydown" provision.  The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature; none of the Mortgage Loans is currently subject to a completion escrow and with respect to each Mortgage Loan which was subject to a completion escrow, all appropriate forms were delivered and are contained in the Mortgage File, including, without limitation, Agency Form 442.

(tt)     Each Mortgage Loan which is an "equity loan" within the meaning of Section 50(a)(6), Article XVI of the Texas Constitution is in full compliance with applicable Texas law and regulations;

(uu)     No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Seller or to the best of the Seller's knowledge any other person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan; no predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the borrower to repay and the extension of credit which has no apparent benefit to the borrower, were employed in the origination of the Mortgage Loan; and

(vv)     Any agreement with any servicer of the Mortgage Loans provides for the termination of the servicer on or prior to the related Servicing Transfer Date without the payment of any termination fee or other expense by the Purchaser.

**Section 3.3**     **Remedies for Breach of Representations and Warranties**.   The representations and warranties set forth in Sections 3.1 and 3.2 shall survive the sale of the Mortgage Loans to the Purchaser and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or failure to examine any Mortgage File.   Furthermore, the absence of the Seller in either the chain of title or endorsement shall in no way limit the Purchaser's recourse against the Seller as provided in this Section3.3 for a breach of one or more of the Seller's representations and warranties made herein.  With respect to the representations and warranties contained in Article III that are made to the best of the

Seller's knowledge, if it is discovered by either the Seller or the Purchaser that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, the Purchaser shall be entitled to all the remedies to which it would be entitled for a breach of representation or warranty, including, without limitation, the repurchase requirements contained herein, notwithstanding the Seller's lack of knowledge with respect to the inaccuracy at the time the representation or warranty was made.

Upon discovery by either the Seller or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of one or more of the Mortgage Loans or the Purchaser's interest therein, the party discovering such breach shall give prompt written notice to the other. The Seller shall have a period of ninety (90) days from the earlier of the discovery of a breach by the Seller or the receipt by the Seller of notice of a breach within which to correct or cure such breach. If any such breach cannot be corrected or cured within such ninety (90) day period, the Seller shall, at the Purchaser's option and not later than ninety (90) days after its discovery or its receipt of notice of such breach, repurchase such Mortgage Loan at the Repurchase Price. In the event that a breach shall involve any representation or warranty set forth in Section 3.1 and such breach (i) materially and adversely affects the value of the Mortgage Loans or the Purchaser's interest therein, and (ii) cannot be cured within ninety (90) days of the earlier of either discovery by or notice to the Seller of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Seller at the Repurchase Price. Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Section 3.3 shall be accomplished by wire transfer of immediately available funds on the repurchase date to an account designated by the Purchaser.

At the time of repurchase, the Purchaser and the Seller shall arrange for the reassignment of the repurchased Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Purchaser or its custodian relating to such Mortgage Loan. The Seller shall, simultaneously with such reassignment, give written notice to the Purchaser that such repurchase has taken place.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Sections 3.1 or 3.2 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Seller to the Purchaser, (ii) failure by the Seller to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Seller by the Purchaser for compliance with the relevant provisions of this Agreement.

The Purchaser agrees to indemnify and hold the Seller harmless from any liability, claim, loss or damage to the Seller directly resulting from the Purchaser's failure to observe and perform any or all of the Purchaser's duties, obligations, covenants, agreements ,warranties or representations contained in this Agreement and actions taken by the Purchaser or its designee after the Servicing Transfer Date related to the Mortgage Loans.

**Section 3.4**     **Indemnification of the Purchaser**.   In addition to the repurchase obligations set forth in Section 3.3, the Seller shall defend and indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, judgments and any related costs including, without limitation, reasonable and necessary legal fees, resulting from any claim, demand, defense or liability based upon or arising out of any act or omission on the part of the Seller in receiving, processing, funding or servicing any Mortgage Loan, or from any assertion based on, grounded upon or resulting from a breach or alleged breach of any of the Seller's representations and warranties contained in this Article III.  Without limiting in any way the repurchase obligations of the Seller set forth in Section 3.3 and indemnification obligations of the Seller set forth in this Section 3.4, the Purchaser shall have the right to offset from any amount it owes or is otherwise required to pay to the Seller hereunder or under any other agreement with the Seller any amount that the Seller owes or is otherwise required to pay to the Purchaser hereunder or under any other agreement with the Purchaser.  In addition to the obligations of the Seller set forth in this Article III, the Purchaser may pursue any and all remedies otherwise available at law or in equity, including, but not limited to, the right to seek damages.

Section 3.5     **Prepayment and Conversion Protection**.  In the event that any of the Mortgage Loans are (i) paid in full within twelve (12) months of the related Closing Date, or (ii) subject to a breach of the representation set forth in Section 3.2(qq), the Seller shall, with respect to each such Mortgage Loan, pay to the Purchaser the product of (a) the positive difference, if any, between the Purchase Price Percentage (subject to any adjustments as contemplated in the Transaction Documents) and 100%, times (b) the unpaid principal balance of such Mortgage Loan at the time such Mortgage Loan is paid in full (the "Premium Recapture Amount"); provided, however, the Premium Recapture Amount shall be amortized on a straight-line basis over the twelve (12) months following the related Closing Date and shall be subject to an off-set equal to any prepayment penalty permitted under the related Mortgage Note regardless of whether or not it is collected by the Purchaser.  In the event any Mortgage Loan is paid in full after the related Cut-off Date and on or prior to the related Closing Date, the Seller shall, in addition to the Premium Recapture Amount, pay the Purchaser the accrued interest paid by the Purchaser for such Mortgage Loan.  Nothing contained in this Section 3.5 shall in any way limit the rights of the Purchaser to all collections and recoveries of principal and interest received or applied to any Mortgagor's account and the Seller's obligation to remit the such recoveries of principal and interest to the Purchaser as provided in Section 2.3.

Section 3.6     **Payment Default Protection**.  If the first Monthly Payment with a Due Date subsequent to the related Closing Date is not made by the respective Mortgagor within thirty (30) days of the related Due Date, whether directly to the Purchaser or to the Seller (in which case, the Seller shall promptly forward any such Monthly Payment to the Purchaser), the Seller shall, at the Purchaser's option and not later than ten (10) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price.  The rights conferred to the Purchaser under this Section 3.6 shall be in addition to those rights conferred to the Purchaser under Section 3.2(b), the Trade Confirmation and/or the Purchase Confirmation.

**ARTICLE IV**

INTERIM SERVICING OF THE MORTGAGE LOANS

Section 4.1     **General**.  The Mortgage Loans will be purchased by the Purchaser and sold by the Seller on a servicing-released basis and the purchase of the Mortgage Loans by the Purchaser shall, for all purposes, include all Servicing Rights relating thereto. From the related Closing Date to the Servicing Transfer Date, the Seller shall interim service the Mortgage Loans in strict accordance with the terms of this Agreement and, to the extent not inconsistent herewith, the servicing standards of the Agencies.  Without limiting the generality of the foregoing, the Seller shall not take, or fail to take, any action which would result in the Purchaser's interest in the Mortgage Loans being adversely affected.  It is expressly understood by the Seller that, during the Interim Servicing Period, the Purchaser may either securitize the Mortgage Loans (whether into one or more Fannie Mae or Freddie Mac mortgage backed securities) with such securities to be issued during the Interim Servicing Period or market the Mortgage Loans for sale to a whole loan investor and, as such, the Seller agrees to comply with all reasonable requests of the Purchaser made prior to the related Servicing Transfer Date in order to effectuate the foregoing including, without limitation, any request for information or documentation in connection with any Mortgage Loan which the Purchaser deems is necessary to carry out the foregoing including, without limitation, all HMDA data required by the Agencies.

Section 4.2     **Reporting and Remittance**.  Within five (5) Business Days following the conclusion of each calendar month reporting and remittance cycle occurring during the Interim Servicing Period (each, a "Reporting Cycle"), if any, the Seller shall forward to the Purchaser with respect to the Mortgage Loans a full set of tapes and a trial balance as of the end of each such Reporting Cycle, which tapes and trial balance shall include information relating to all payment and other activity on the Mortgage Loans.  With respect to any payments of principal or interest (including all prepayments) received, or applied to any Mortgagor's account, by the Seller during the Interim Servicing Period (or prior to the Closing Date, if any such payments were not reflected in the calculation of the Purchase Proceeds), the Seller shall remit to the Purchaser all such payments of principal and interest on the Mortgage Loans no

later than the fifth (5th) day of the month following the conclusion of each Reporting Cycle and, with respect to the month in which the related Servicing Transfer Date occurs, no later than the fifth (5th) Business Day thereafter.

      **Section 4.3**    <u>**Whole Loan Transfers or Pass-Through Transfers**</u>.  The Seller and the Purchaser agree that with respect to some or all of the Mortgage Loans, the Purchaser may effect either one or more Whole Loan Transfers, and/or one or more Pass-Through Transfers.

      (a)    <u>Whole Loan Transfers</u>.  With respect to each Whole Loan Transfer entered into by the Purchaser, the Seller agrees:

      (i)    to cooperate reasonably with the Purchaser and any prospective purchaser with respect to all reasonable requests;

      (ii)    to execute or acknowledge, at the Purchaser's discretion, an assignment by the Purchaser to a successor purchaser of some or all of the Mortgage Loans, which Mortgage Loans will be assigned subject to the representations and warranties set forth in this Agreement; and

      (iii)    to restate on the Reconstitution Date, as of the related Closing Date, all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans and with respect to the Seller itself.

      (b)    <u>Pass Through Transfers</u>. The Purchaser and the Seller agree that in connection with the completion of a Pass-Through Transfer, the Seller shall:

      (i)    provide the Purchaser with a certificate of a duly appointed officer of Seller that restates on the Reconstitution Date, as of the related Closing Date, all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans and with respect to the Seller itself;

      (ii)    if the Seller is required to be a party to any of the Reconstitution Agreements, to execute any Reconstitution Agreement reasonably required to effectuate the foregoing;

      (iii)    provide to any master servicer or trustee, as applicable, and/or the Purchaser any and all publicly available information and appropriate verification of information which may be reasonably available to the Seller, whether through letters of its auditors and counsel or otherwise, as the Purchaser, trustee or a master servicer shall reasonable request as to the related Mortgage Loans; and

      (iv)    provide all other assistance reasonably requested by the Purchaser in connection with completion of the Pass-Through Transfer.

      With respect to any Pass-Through Transfer, the Purchaser shall be entitled to include in any disclosure document any information provided by the Seller and the Seller acknowledges and agrees that the related investors will be permitted to rely on such information.  If the Purchaser determines that the Seller is required to be a party to any Reconstitution Agreement, the Seller shall execute such Reconstitution Agreement within a reasonable period of time, but in no event shall such time exceed ten (10) Business Days after mutual agreement between the Purchaser and the Seller as to the terms thereof.  In addition to the foregoing, the Seller acknowledges that the Purchaser may complete a Pass-Through Transfer on or prior to the Servicing Transfer Date.  In such event, the Seller agrees to undertake all reasonable, additional obligations as may become necessary to facilitate the Pass-Through Transfer, including, without limitation, the assumption of the obligation to act as "master servicer" for the period starting on the closing of the Pass-Through Transfer through and including the Servicing Transfer Date and the preparation, execution and approval of all documents and disclosures incident thereto.

(c)     Continuing Liabilities.  All of the Mortgage Loans, including those Mortgage Loans that are subject to a Pass-Through Transfer or a Whole Loan Transfer, shall continue to be subject to this Agreement, and with respect thereto, this Agreement shall remain in full force and effect.  In no event shall the Seller be relieved of its obligations set forth in Article III hereof.

## ARTICLE V

### TRANSFER OF SERVICING RIGHTS

**Section 5.1     Transfer of Servicing**.  The Seller agrees to act reasonably, in good faith and in accordance with all applicable laws and regulations and to do all things necessary to effect the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date including, without limitation, complying with all instructions provided by the Purchaser relating to the transfer of the Servicing Rights.

**Section 5.2     Obligations of the Seller Prior to the Servicing Transfer Date**. Without limiting the generality of Section 5.1, the Seller shall take, or cause to be taken, the following actions with respect to the Mortgage Loans prior to the related Servicing Transfer Date (or within such time as may otherwise be specified below) in order to effect the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date:

(a)     Preliminary Test Tape.  On or prior to the related Closing Date, the Seller shall forward to the Purchaser a preliminary test tape (including master file, escrow file, payee file, ARM master file, ARM history, all HMDA data required by the Agencies, etc.) containing all of the Mortgage Loans as of the date mutually agreed upon by the Seller and the Purchaser.  The preliminary test tape shall include all field descriptions and record layouts;

(b)     Notice to Hazard Insurers.  The Seller shall inform by written notice all hazard insurance companies and/or their agents of the transfer and request a change in the loss payee mortgage endorsement clause to the Purchaser's name.  The Seller shall provide the Purchaser with a copy of the notification letter and an officer's written certification that all hazard insurance companies have been notified by an identical letter;

(c)     [Reserved];

(d)     [Reserved];

(e)     Flood Certifications.  The Seller shall have obtained a life of loan, transferable flood certification contract for each Mortgage Loan and shall assign all such contracts to the Purchaser or, in the alternative, the Seller shall notify the Purchaser as to any Mortgage Loans for which it has not procured the flood certification referenced above and shall pay to the Purchaser a fee for each such Mortgage Loan equal to the fee that is customarily charged for each such contract, as determined by the Purchaser in its reasonable discretion;

(f)     Notice to Mortgagors.  The Seller shall, no later than fifteen (15) days prior to the related Servicing Transfer Date, inform in writing all Mortgagors of the change in servicer from the Seller to the Purchaser, all in accordance with applicable law.  The Seller shall obtain the Purchaser's approval of the form of such notifications prior to their mailing.  The Seller acknowledges that the Purchaser's review of this notice shall not be a review for statutory or regulatory compliance purposes, and that the Seller shall have the sole responsibility for such compliance.  The Seller shall provide the Purchaser with a copy of one notification letter and an officer's written certification that all Mortgagors have been notified by an identical letter;

EXHIBIT 12
23

(g)     Payment of Real Estate Taxes.  To the extent the Seller has knowledge, the Seller shall notify the Purchaser of all payments of all real estate taxes on the Mortgage Loans which (i) will be delinquent on or prior to the related Servicing Transfer Date, (ii) are required to be paid within thirty (30) days after the related Servicing Transfer Date to receive a discount, or (iii) will be delinquent within thirty (30) days after the related Servicing Transfer Date;

(h)     Payment of Insurance Premiums.  To the extent the Seller has knowledge, the Seller shall notify the Purchaser of all hazard and flood insurance premiums required to be paid prior to the Servicing Transfer Date or within thirty (30) days after the Servicing Transfer Date on all Mortgage Loans;

(i)     ARM Adjustments.  With respect to each Adjustable Rate Mortgage Loan whose index value for any Interest Adjustment Date is available on or prior to the related Servicing Transfer Date, the Seller shall make all such adjustments and shall inform the related Mortgagors of such adjustments;

(j)     Notice to Sub-servicers.  On or prior to the related Closing Date, the Seller shall inform by written notice all sub-servicers who perform servicing obligations with respect to the Mortgage Loans of the sale of the Mortgage Loans to the Purchaser and of the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date. The Seller shall provide the Purchaser with a copy of the notification letter and an officer's certification that all sub-servicers have been notified by an identical letter; and

(k)     Mortgage Loans in Litigation.  ·On or prior to the related Servicing Transfer Date, the Seller shall (i) deliver written notification to the Purchaser of any Mortgage Loan in litigation (including, without limitation, bankruptcy and foreclosure proceedings) as of the Servicing Transfer Date, including in such written notification the names and addresses of all parties involved in such litigation and all documents related to such litigation, (ii) if requested by the Purchaser, notify the clerk of the court and all counsel of record involved in such litigation that ownership of such Mortgage Loan has been transferred to the Purchaser, and (iii) if requested by the Purchaser, cooperate with the Purchaser and cause the filing of appropriate court documents to substitute the Purchaser's attorney for the Seller's attorney and remove the Seller as a party to the litigation and substitute the Purchaser as the real party in interest.

**Section 5.3     Obligations of the Seller after the Servicing Transfer Date.**  Without limiting the generality of <u>Section 5.1</u>, the Seller shall take, or cause to be taken, the following actions with respect to the Mortgage Loans within three (3) Business Days following the related Servicing Transfer Date (or within such time as may otherwise be specified below):

(a)     Tape.  The Seller shall furnish to the Purchaser all available computer or like records requested by the Purchaser reflecting the status of payments, balances and other pertinent information with respect to the Mortgage Loans as of the related Servicing Transfer Date (including, without limitation, (i) master file, (ii) escrow file, (iii) payee file, which includes comprehensive tax and insurance information identifying payee, payee address, next payment due date, next amount payable and policy number/parcel number, (iv) ARM master file, (v) ARM history, and (vi) all HMDA data required by the Agencies). Such records shall include magnetic tapes reflecting all computer files maintained on the Mortgage Loans and shall include hard copy trial balance reports as specifically requested by the Purchaser;

(b)     Mortgage File.  If the Seller has not already done so, the Seller shall have forwarded a complete Mortgage File with respect to each Mortgage Loan;

(c)     Accounting Reports.  The Seller shall furnish to the Purchaser copies of all accounting reports relating to the Mortgage Loans as of the related Servicing Transfer Date including, without limitation, a trial balance and reports of collections, delinquencies, prepaids, curtailments, escrow payments, escrow balances, partial payments, partial payment balances and other like information with respect to the Mortgage Loans;

(d)     Other Documentation.  The Seller shall provide the Purchaser any and all further documents reasonably required by the Purchaser in order to fully transfer to the Purchaser possession of all tangible evidence of the Servicing Rights and escrow, impound and trust funds transferred hereunder;

(e)     Transfer of Servicing Proceeds.  The Seller shall transfer to the Purchaser, by wire transfer to the account designated by the Purchaser, an amount equal to the sum of (i) all undistributed insurance loss draft funds, (ii) all unapplied funds received by the Seller, (iii) all buydown funds held by the Seller as of the related Servicing Transfer Date, and (iv) all other amounts held by the Seller with respect to the Mortgage Loans as of the related Servicing Transfer Date for which the Seller is not entitled to retain (collectively, the "Servicing Proceeds").  Within five (5) Business Days following the Purchaser's receipt of the Servicing Proceeds, the Seller and the Purchaser shall resolve any discrepancies between the Seller's accounting statement and the Purchaser's reconciliation with respect thereto.  No later than ten (10) Business Days following the related Servicing Transfer Date, the Seller or the Purchaser, as the case may be, shall transfer to the other, by wire transfer to the designated account, any amounts to which the other party is entitled; and

(f)     Mortgage Payments Received After Servicing Transfer Date.  The Seller shall promptly forward to the Purchaser any payment received by it after the related Servicing Transfer Date with respect to any of the Mortgage Loans, whether such payment is in the form of principal, interest, taxes, insurance, loss drafts, insurance refunds, etc., in the original form received, unless such payment has been received in cash or by the Seller's lock box facility, in which case the Seller shall forward such payment in a form acceptable to the Purchaser.  The Seller shall notify the Purchaser of the particulars of the payment, which notification shall set forth sufficient information to permit timely and appropriate processing of the payment by the Purchaser.

## ARTICLE VI

### MISCELLANEOUS

**Section 6.1     Notices**.  All demands, notices and communications required to be provided hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, postage prepaid, and return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i)     if to the Seller:

To the address and contact set forth in the related Purchase Confirmation.

(ii)    if to the Purchaser:

Countrywide Home Loans, Inc.
4500 Park Granada
Calabasas, California  91302
Attn:  Mr. Michael W. Schloessmann, Vice President

With copy to:  General Counsel

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

**Section 6.2     Intention of the Parties**.  Pursuant to this Agreement, the Purchaser is purchasing, and the Seller is selling the Mortgage Loans and not a debt instrument of the Seller or any

other security. Accordingly, the Seller and the Purchaser shall each treat the transaction for federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans and the Servicing Rights. The Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Loan Files to determine the characteristics of the Mortgage Loans which shall affect the federal income tax consequences of owning the Mortgage Loans and the Servicing Rights and the Seller shall cooperate with all reasonable requests made by the Purchaser in the course of such review.

Section 6.3      **Exhibits**.  The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 6.4      **General Interpretive Principles**.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)   the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)   accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)   references herein to "Sections," "Subsections," "Paragraphs," and other Subdivisions without reference to a document are to designated Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)   reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)   the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)   the term "include" or "including" shall mean without limitation by reason of enumeration.

Section 6.5      **Reproduction of Documents**.   This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 6.6      **Further Agreements**.   The Seller shall execute and deliver to the Purchaser and the Purchaser shall execute and deliver to the Seller such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 6.7      **Execution of Agreement**.   This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. This Agreement shall be deemed binding when executed by both the Purchaser and the Seller. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

**Section 6.8** **Successors and Assigns**.  This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective successors and assigns of the Seller and the successors and assigns of the Purchaser.  This Agreement shall not be assigned, pledged or hypothecated by the Seller without the consent of the Purchaser.  This Agreement may be assigned, pledged or hypothecated or otherwise transferred or encumbered by the Purchaser, in whole or part, without the consent of the Seller.  If the Purchaser assigns all of its rights as the Purchaser hereunder relating to some or all of the Mortgage Loans, the assignee of the Purchaser, upon notification to the Seller, will become the "Purchaser" hereunder with respect to such Mortgage Loans assigned hereby; provided however, the Purchaser shall not assign all of its rights as the Purchaser hereunder to more than three (3) parties with respect to any particular Mortgage Loan Package without the consent of the Seller.

**Section 6.9** **Severability Clause**.  Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any relevant jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

**Section 6.10** **Costs**.  The Purchaser shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys and expenses of its custodian.  All other costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans, including recording fees, fees for title policy endorsements and continuations and the Seller's attorney's fees, shall be paid by the Seller.

**Section 6.11** **Attorneys' Fees**.  If any claim, legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of a dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that claim, action or proceeding, in addition to any other relief to which such party may be entitled.

**Section 6.12** **Governing Law**.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of California applicable to agreements entered into and wholly performed within said jurisdiction.

**Section 6.13** **Survival**.  All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement.

**Section 6.14** **Conflicts between Transaction Documents**.  In the event of any conflict, inconsistency or ambiguity between the terms and conditions of this Agreement and either the Trade Confirmation or Purchase Confirmation, the terms of the Trade Confirmation or Purchase Confirmation, as the case may be, shall control.  In the event of any conflict, inconsistency or ambiguity between the terms and conditions of the Trade Confirmation and the Purchase Confirmation, the terms of the Purchase Confirmation shall control.

**Section 6.15** **Entire Agreement**.  This Agreement and the related Trade Confirmation and Purchase Confirmation constitute the entire understanding between the parties hereto with respect to each Mortgage Loan Package and supersede all prior or contemporaneous oral or written communications regarding same.  The Seller and the Purchaser understand and agree that no employee, agent or other representative of the Seller or the Purchaser has any authority to bind such party with regard to any statement, representation, warranty or other expression unless said statement, representation, warranty or other expression is specifically included within the express terms of this

Agreement or the related Trade Confirmation or Purchaser Confirmation. Neither this Agreement nor the Trade Confirmation nor the Purchase Confirmation shall be modified, amended or in any way altered except by an instrument in writing signed by both parties.

        **Section 6.16**   **Confidentiality**. The Seller and the Purchaser hereby acknowledge and agree that this Agreement shall be kept confidential and its contents will not be divulged to any party without the other party's consent except to the extent that it is appropriate for the Seller or the Purchaser to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies.

        **Section 6.17**   **No Solicitation**. From and after the related Closing Date, the Seller agrees that it will not take any action or cause any action to be taken by any of its employees, agents or affiliates, or by any independent contractors acting on the Seller's behalf, to solicit in any manner whatsoever any Mortgagor for any purpose, including, without limitation, to prepay or refinance a Mortgage Loan. It is understood and agreed by the Seller and the Purchaser that all rights and benefits relating to the solicitation of any Mortgagors shall be transferred to the Purchaser pursuant hereto on the Closing Date and the Seller shall take no action to undermine these rights and benefits. The Seller shall use its best efforts to prevent the sale of the name of any Mortgagor to any person or entity. Notwithstanding the foregoing, the following solicitations, if undertaken by the Seller shall not be prohibited under this Section 6.17: (i) solicitations that are directed to the general public at large, including, without limitation, mass mailings based on commercially acquired mailing lists and newspaper, radio, television and other mass media advertisements; and (ii) solicitations made as a part of a campaign directed to all mortgagors with mortgage loans meeting certain defined parameters (other than parameters relating to the Mortgagors or Mortgage Loans specifically).

(SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

**COUNTRYWIDE HOME LOANS, INC.,**
the Purchaser

By: _____
      Gregory Petroski
      Vice President

**AEGIS MORTGAGE CORPORATION,**
the Seller

By: _____
      Stuart D. Marvin
      Executive Vice President

**EXHIBIT A**

[RESERVED]

**EXHIBIT B**

FORM OF FUNDING SCHEDULE

**COUNTRYWIDE HOME LOANS, INC.**

**Funding Schedule**

_____

**Closing Date [_____]**

The Purchase Proceeds due to the Seller for the Mortgage Loans is calculated as follows:

| | | |
|---|---|---|
| 1) | Aggregate Principal Balance of Mortgage Loans as of [CUT-OFF DATE]: | $[AMOUNT] |
| 2) | Purchase Price Percentage: | [PERCENTAGE]% |
| 3) | Purchase Price Proceeds: | $[AMOUNT] |
| 4) | Accrued Interest @ [xxx]%: | $[AMOUNT] |
| 5) | Total Purchase Proceeds (Item 3 + Item 4): | $[AMOUNT] |

The Seller hereby instructs the Purchaser to wire the Purchase Proceeds to the account designated below on the date hereof:

[WIRE INSTRUCTIONS]

Agreed to and Accepted by:

_____                    COUNTRYWIDE HOME LOANS, INC.


By: _____                    By: _____
    Name:                                                          Name
    Title:                                                           Title:


CHL Internal       _____

               _____

               _____

               _____

**EXHIBIT C**

FORM OF OFFICER'S CERTIFICATE

I, _____, hereby certify that I am a duly elected _____ of _____, a _____ corporation (the "Seller"), and further certify on behalf of the Seller as follows:

1. Attached hereto are true and correct copies of the Certificate of Incorporation and Bylaws of the Seller as in full force and effect on the date hereof.

2. Each person who, as an officer or attorney-in-fact of the Seller, signed (a) the Mortgage Loan Purchase Agreement (the "Purchase Agreement") dated as of _____, by and between the Seller and Countrywide Home Loans, Inc., (b) the Purchase Confirmation (the "Purchase Confirmation") dated as of _____, by and between the Seller and Countrywide Home Loans, Inc., and (c) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of Mortgage Loans in accordance with the Purchase Agreement and/or Purchase Confirmation was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact.

3. Set forth below is the name, title and specimen signature of the person who has been duly elected and qualified to serve in the capacity set forth opposite his or her name:

| Name | Title | Signature |
|------|-------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

, and the signatures of such persons appearing on such documents are their genuine signatures.

4. All of the representations and warranties of the Seller contained in Article III of the Purchase Agreement and/or the Purchase Confirmation were true and correct in all material respects as of the related Closing Date of the Purchase Agreement and Purchase Confirmation.

5. The Seller has performed all of its duties and has satisfied all of the material conditions on its part to be performed or satisfied prior to the Closing Date pursuant to the Purchase Agreement and/or Purchase Confirmation.

All capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

Dated: _____, 200_        _____

By: _____

Its: _____

I, _____, Secretary of _____, hereby certify that _____ is a duly elected, qualified and acting _____ of _____ and that the signature appearing above is his or her genuine signature.

IN WITNESS WHEREOF, I have hereunto signed my name.
Dated: _____, 200_        _____

By: _____

Its: _____

## EXHIBIT D

### FORM OF AUTHORIZED SIGNATORIES AGREEMENT

This Authorized Signatories Agreement is dated and effective as of _____, 200_, between [SELLER], (the "Seller"), and Countrywide Home Loans, Inc. (the "Purchaser").

### RECITALS

A. The Seller has sold, or proposes to sell from time to time, to the Purchaser certain mortgage loans including the servicing rights related thereto (the "Mortgage Loans") in accordance with terms and conditions of that certain Mortgage Loan Purchase Agreement dated [INSERT] by and between the Seller and the Purchaser (the "Purchase Agreement").

B. To facilitate the transfer and assignment of the Mortgage Loans from the Seller to the Purchaser under the Purchase Agreement, the Seller desires to appoint specific individuals employed by the Purchaser as authorized signatories (collectively, the "Authorized Signatories") pursuant to a certain Appointment of Authorized Signatories, the form of which is attached as Exhibit A hereto, for the sole and exclusive purposes of preparing and executing allonge note endorsements ("Endorsements") and/or preparing and executing mortgage assignments or beneficial interests in deeds of trust or similar instruments ("Assignments"), as applicable, with respect to the Mortgage Loans.

In consideration of the promises and the mutual agreements and undertakings set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The Seller hereby authorizes the Authorized Signatories to prepare and execute Endorsements and/or Assignments, as applicable, relating to the Mortgage Loans sold by the Seller to the Purchaser under the Purchase Agreement. Such authority shall include the authority to record and/or file such Endorsements and Assignments with all applicable governmental recording agencies and any private electronic systems, including, without limitation, the MERS® System.

2. The Purchaser agrees that the preparation and execution of the Endorsements and/or Assignments by the Authorized Signatories will be performed with due care.

3. Other than the authorization granted herein, the Purchaser agrees that the Authorized Signatories will take no other action in the name of the Seller.

4. The authority granted by the Seller to the Purchaser herein shall be in full force and effect and shall apply with respect to any Mortgage Loan sold by the Seller to the Purchaser under the Purchase Agreement.

5. The Seller will provide Purchaser with a Secretary's Certificate that authenticates that the Seller's Board of Directors has taken the necessary corporate action to allow the appointment of and grant the authorizations to the Authorized Signatories as permitted herein, which such corporate action shall be in the form of board resolution substantially in the form of Exhibit B attached hereto.

IN WITNESS WHEREOF, the parties have duly executed this Authorized Signatories Agreement as of the date first above written.

**[SELLER],**
the Seller

By: _____
     Name:
     Title:

**COUNTRYWIDE HOME LOANS, INC.,**
the Purchaser

By: _____

    Michael W. Schloessmann
    *Vice President*

**Exhibit A**
**To**
**Authorized Signatories Agreement**

FORM OF APPOINTMENT OF AUTHORIZED SIGNATORIES

Pursuant to the authority granted me by a vote of the Board of Directors of [SELLER] dated as of [DATE], I hereby appoint the individuals listed below for the sole and exclusive purpose of executing allonge note endorsements and/or executing mortgage assignments or beneficial interests in deeds of trust or similar instruments, as applicable, relating to mortgage loans sold, or to be sold, by [SELLER], as identified on Exhibit A of that certain Authorized Signatories Agreement dated as of [DATE], by and between [SELLER] and Countrywide Home Loans, Inc.

[SELLER],

By: _____
　　　Name:
　　　Title:

Dated: _____, 200_.

**AUTHORIZED SIGNATORIES:**

| | | | |
|---|---|---|---|
| Araxie Ganoumian | Richard L. Wilson | Beth Wilson | Laura Villasenor |
| Myleen Evangelista | Christy Dellutri | Robin Dolatowski | Yolanda Perez |
| Sandra Fennell | Tracy Schreiner | Margaret Hassett | Joe Tharpe |
| Amy Millet | Margaret McCoy | Heidi Smalley | Nicole Walden |
| Susan Hahn | Karen Workman | Amy Hamlin | Yolanda Diaz |
| Mercedes Judilla | Angeles Medina | Debra Terrill | William C. Buell VI |
| Michael W. Schloessmann | | | |

**Exhibit B**
**To**
**Authorized Signatories Agreement**

FORM OF UNANIMOUS WRITTEN CONSENT OF DIRECTORS

We the undersigned, being all of the directors currently in office of _____ (the "Company"), do hereby consent, pursuant to the provisions of the Company's articles of incorporation, by-laws and all other governing documents, to the taking of and adopting the following actions for and on behalf of the Company:

APPROVED: that each of the following persons, acting singly, be, and each hereby is, authorized and empowered to appoint assistant secretaries, assistant mortgage officers, assistant vice presidents, vice presidents or other authorized signatories, and their successors, on behalf of the Company for the sole and exclusive purposes of, and with authority expressly limited to, executing mortgage assignments of beneficial interests in deeds of trust or similar instruments, note endorsements or allonges and any other documents necessary to effect the sales of loans to Countrywide Home Loans, Inc. or its nominee or assignee:

_____ [Insert name of Company officer who is to sign Appointment of Authorized Signatories]

IN WITNESS WHEREOF, the undersigned have executed this unanimous written consent as of the _____ day of _____, 200__.

_____ [Insert signature line for each board member]

**EXHIBIT E**

FORM OF PURCHASE CONFIRMATION

[COUNTRYWIDE LETTERHEAD]

[DATE]

**[PURCHASER]**
[STREET ADDRESS]
[CITY, STATE AND ZIP]
Attn:  [CONTACT, TITLE]

Re:      Purchase Confirmation

Gentlemen and Ladies:

This purchase confirmation (the "Purchase Confirmation") between Countrywide Home Loans, Inc. (the "Purchaser") and [SELLER] (the "Seller") sets forth our agreement pursuant to which the Purchaser is purchasing, and the Seller is selling, on a servicing-released basis, those certain mortgage loans identified in Exhibit A hereto and more particularly described herein (the "Mortgage Loans").

The purchase, sale and servicing of the Mortgage Loans as contemplated herein shall be governed by that certain Mortgage Loan Purchase Agreement dated as of [DATE], between the Purchaser and the Seller (as amended herein and otherwise, the "Agreement").  By executing this Purchase Confirmation, each of the Purchaser and the Seller again makes, with respect to itself and each Mortgage Loan as of the related Closing Date or such other date as indicated in the Agreement, as applicable, all of the covenants, representations and warranties made by each such party in the Agreement, except as the same may be amended by this Purchase Confirmation.

All exhibits hereto are incorporated herein in their entirety.  In the event there exists any inconsistency between the Agreement and this Purchase Confirmation, the latter shall be controlling notwithstanding anything contained in the Agreement to the contrary.  All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

1.   Assignment and Conveyance of Mortgage Loans.  Upon the Purchaser's payment of the Purchase Proceeds in accordance with Section 2.2 of the Agreement, the Seller shall sell, transfer, assign and convey to the Purchaser all of the right, title and interest of the Seller in and to the Mortgage Loans, including the Servicing Rights relating thereto.

2.   Defined Terms.  As used in the Agreement, the following defined terms shall have meanings set forth below.

   a.   Closing Date:  [DATE].

   b.   Cut-off Date: [DATE].

   c.   Purchase Proceeds: With respect to [the Mortgage Loans] [each Mortgage Loan] [the Mortgage Loans in each Segment], and as set forth in Exhibit A hereto, the sum of (a) the product of (i) the Cut-off Date Balance of [such Mortgage Loan] [such Mortgage Loans] [such Segment], and (ii) the purchase price percentage set forth in Exhibit A hereto for such [Mortgage Loan] [Mortgage Loans] [Segment], and (b) [accrued interest owing to the Seller on the Stated Principal Balance of the Mortgage Loans at a rate equal to the weighted average Mortgage Interest Rate of such Mortgage Loans, from the Cut-off Date through the day prior to the Closing Date, inclusive.] [accrued interest owing to the Seller on the Stated Principal Balance of each Mortgage Loan at a

rate equal to the Mortgage Interest Rate of each such Mortgage Loan, from the date through which interest has last been paid (as of the Cut-off Date) through the day prior to the Closing Date, inclusive; provided, however, with respect to those Mortgage Loans for which interest has been paid through a date beyond the Closing Date, such accrued interest owing to Seller shall be reduced by the amount of interest accruing on the Stated Principal Balance of each such Mortgage Loan at a rate equal to the Mortgage Interest Rate of such Mortgage Loan, from the Closing Date to the day prior to the interest paid through date for such Mortgage Loan, inclusive.] [accrued interest owing to the Purchaser on the Mortgage Loans based on the scheduled principal balance as of the first day of the month preceding the Cut-off Date at a rate equal to the weighted average Mortgage Interest Rate of such Mortgage Loans, from the Closing Date through the thirtieth (30th) day of the month in which the Closing Date occurs, inclusive.]

   d.  <u>Servicing Transfer Date</u>:  [DATE].

3.  <u>Description of Mortgage Loans</u>:  Each Mortgage Loan complies with the specifications set forth below in all material respects.

   a.  Loan Type:   Each Mortgage Loan is a [Conventional] [Government] Mortgage Loan and a [Adjustable Rate] [Balloon] [Convertible] [Fixed Rate] Mortgage Loan.

   [b.  Index: On each Interest Adjustment Date, the applicable index rate shall be a rate per annum equal to [the weekly average yield on U.S. Treasury securities adjusted to a constant maturity of one year, as published by the Board of Governors of the Federal Reserve System in Statistical Release No. H.15] [the average of interbank offered rates for six-month U.S. dollar denominated deposits in the London market (LIBOR), as published [in the Wall Street Journal] [by Fannie Mae] [the 11th District Cost of Funds as made available by the Federal Home Loan Bank] [the weekly average yield on certificates of deposit adjusted to a constant maturity of six months as published by the Board of Governors of the Federal Reserve System in Statistical Release No. H.15 or a similar publication].

   c.  Lien Position:  Each Mortgage Loan is secured by a perfected [first] [second] lien Mortgage.

   d.  Underwriting Criteria: Each Mortgage Loan [was underwritten generally in accordance with the Seller's credit underwriting guidelines in effect at the time such Mortgage Loan was originated] [conforms to the Fannie Mae or Freddie Mac mortgage eligibility criteria and is eligible for sale to, and securitization by, Fannie Mae or Freddie Mac] [conforms in all material respects to the GNMA mortgage eligibility criteria and is eligible for sale and securitization into a GNMA mortgage-backed security] [at the time of origination was underwritten to guidelines which are consistent with an institutional investor-quality mortgage loan].

4.  <u>Additional Stipulations Regarding Mortgage Loan Package</u>.

   [a.  <u>Prepayment [and Conversion] Protection</u>.  In addition to the any rights afforded the Purchaser in the Agreement, in the event that any of the Mortgage Loans are (i) paid in full [or (ii) converted to a fixed-rate mortgage loan, in either case,] on or prior to [DATE], or [(iii)] subject to a breach of the representation set forth in <u>Section 3.2(qq) of the Agreement</u>, the Seller shall, with respect to each such Mortgage Loan, pay to the Purchaser the product of (a) the positive difference, if any, between the Purchase Price Percentage (subject to any buyup or buydown adjustments as contemplated [in the Trade Confirmation]) and 100%, times (b) the unpaid principal balance of such Mortgage Loan at the time such Mortgage Loan is paid in full [or converted, as applicable] (the "Premium Recapture Amount").  In the event any Mortgage Loan is paid in full after the Cut-off Date and on or prior to the Closing Date, the Seller shall, in addition to the Premium Recapture Amount, pay the Purchaser the Accrued Interest paid by the Purchaser for such Mortgage Loan.  Nothing contained in this <u>Section 3.5</u> shall in any way limit the rights of the Purchaser to all collections and recoveries of principal and interest received or applied to any Mortgagor's account and the Seller's obligation to remit the such recoveries of principal and

interest to the Purchaser as provided in <u>Section 2.3</u>.]

[b.   <u>Payment Default Protection</u>.   In addition to any rights afforded the Purchaser in the Agreement, if the [first Monthly Payment with a Due Date subsequent to the Closing Date][first Monthly Payment due under the Mortgage Note] is not received by the Purchaser, whether from the Mortgagor directly or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, [by the last day of the month in which such payment is due][within [INSERT] ([INSERT] days of its related Due Date], the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price.   The rights conferred to the Purchaser under this <u>Section 3.6</u> shall be in addition to those rights conferred to the Purchaser under <u>Section 3.2(b)</u>.]

[c.   <u>Missing and Deficient Documents</u>.   Pursuant to Section 2.5 of the Agreement, the Seller is required to deliver to the Purchaser the Mortgage Loan Documents at least two (2) Business Days prior to the Closing Date.   The Seller and the Purchaser acknowledge that as of the Closing Date, with respect to the Mortgage Loans identified in <u>Exhibit E</u> hereto, the Seller has not delivered the related Mortgage Loan Documents in accordance with Section 2.5 (the "Missing Documents") or, with respect to certain other Mortgage Loans also identified in <u>Exhibit E</u> hereto, certain Mortgage Loan Documents and/or Mortgage Files are deficient and/or incomplete for reasons detailed in <u>Exhibit E</u> (the "Deficient Documents").   [Pursuant to Section 2.4 of the Agreement, the Purchaser has the right, prior to the Closing Date, to review the Mortgage File and, based on its review, decline to purchase any Mortgage Loan which the Purchaser, in its sole discretion, determines not to be in compliance with each of the representations and warranties contained in the Agreement or which is otherwise unsatisfactory to the Purchaser in its reasonable discretion.   The Seller and the Purchaser acknowledge that as of the Closing Date, with respect to the Mortgage Loans identified in <u>Exhibit E</u> hereto, the Seller has not delivered the related Mortgage Files in accordance with Section 2.4 (the "Missing Mortgage Files"), and as a result, the Purchaser has been unable to complete its review of the affected Mortgage Loans prior to the Closing Date.

In consideration of the Purchaser's agreement to purchase the Mortgage Loans identified in <u>Exhibit E</u> hereto on the Closing Date notwithstanding the foregoing, the Seller shall, with respect to Mortgage Loans with Missing Documents, deliver such Missing Documents to the Purchaser [no later than [DATE]][within thirty (30) days of the Closing Date], and, with respect to Mortgage Loans with Deficient Documents, cure such Deficient Documents to the satisfaction of the Purchaser [no later than [DATE]][within thirty (30) days of the Closing Date][and, with respect to Missing Mortgage Files, deliver such Missing Mortgage Files to the Purchaser no later than [DATE]][within thirty (30) days of the Closing Date].   In the event that the Seller fails to comply with the requirements of the foregoing sentence, the Seller shall, upon written notice from the Purchaser, repurchase any such Mortgage Loan at the Repurchase Price within one (1) Business Day after the Seller's receipt of such written notice.   [In addition, with respect to Missing Mortgage Files that are delivered to the Purchaser within the time frame required herein, the Purchaser shall have the right to complete its review of the related Mortgage Loan as contemplated under Section 2.4 of the Agreement, and, if as a result of such review, the Purchaser determines that it would have declined to purchase such Mortgage Loan, the Seller shall, upon written notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price within one (1) Business Day after the Seller's receipt of such written notice.]   The fact that the Purchaser decides not to require the Seller to repurchase any such Mortgage Loan where the Seller may otherwise be required to repurchase such Mortgage Loan hereunder shall not affect the Purchaser's right to demand repurchase of such Mortgage Loan or to avail itself of any other rights and remedies available to it under the Agreement.   Nothing contained herein shall be deemed to waive any rights, remedies or privileges of the Purchaser including, without limitation, the remedies accorded the Purchaser under Sections 3.3 and 3.4.]

Kindly acknowledge your agreement to the terms of this Purchase Confirmation by signing in the appropriate space below and returning this Purchase Confirmation to the undersigned.   Telecopy signatures shall be deemed valid and binding to the same extent as the original.

**COUNTRYWIDE HOME LOANS, INC.**                    **[SELLER]**

By: _____          By: _____
    Michael W. Schloessmann                    Name:
    Vice President                                        Title:

**Exhibit A to Purchase Confirmation**

Mortgage Loans

(attached)

EXHIBIT 12
42

March 7, 2003

**Aegis Mortgage Corporation**
11111 Wilcrest Green, Suite 250
Houston, Texas 77042
Attn: Mr. Michael J. Cozzocrea, Vice President

Re:  **Purchase of $99.7 Million of Mortgage Loans from Aegis Mortgage Corporation
       (Deal No. 2003-03-021)**

Gentlemen and Ladies:

This trade confirmation ("Trade Confirmation") shall confirm the agreement between Countrywide Home Loans, Inc. (including permitted assigns, "Countrywide") and Aegis Mortgage Corporation ("Seller"), whereby Countrywide agrees to purchase, and Seller agrees to sell, those certain mortgage loans summarized in Exhibit A hereto and more particularly described herein, together with the servicing rights relating thereto (the "Servicing Rights" and, collectively, the "Mortgage Loans"), subject to the terms set forth herein, including, but not limited to, those trade stipulations set forth in Exhibit B hereto.

| | |
|---|---|
| Closing Date: | The purchase and sale of the Mortgage Loans shall be consummated on March 28, 2003 (the "Proposed Closing Date"), or such other date as may be mutually agreed upon by Countrywide and Seller (in either event, the date on which the consummation of the transaction contemplated herein, the "Closing Date"). |
| Commitment Amount: | The Mortgage Loans (including any comparable substitute loans) to be sold to Countrywide hereunder shall have an aggregate unpaid principal balance of $99,742,014 (the "Commitment Amount").  The Commitment Amount shall be subject to the satisfaction of each condition precedent set forth herein including, without limitation, Countrywide's right to reject certain of the Mortgage Loans pursuant to the terms herein. |
| Purchase Proceeds: | Countrywide shall pay to Seller on the Closing Date purchase proceeds equal to the sum of (a) the product of (i) the aggregate unpaid principal balance of the Mortgage Loans as of a date prior to the Closing Date as agreed to by the parties (the "Cut-off Date") and (ii) a purchase price percentage equal to 105.00%, subject to adjustment as contemplated herein (the "Purchase Price Percentage"), and (b) accrued interest from the date through which interest has last been paid as of the Cut-off Date through the day prior to the Closing Date, inclusive (the "Purchase Proceeds"). |
| | Notwithstanding the foregoing, in the event that there is a change in the characteristics of the Mortgage Loans actually purchased by Countrywide on the Closing Date from those loan characteristics represented by Seller in the bid file provided to Countrywide (a subset of which is summarized in Exhibit A hereto), then the Purchase Price Percentage shall be adjusted in accordance with the pricing model employed by Countrywide in its original calculation of said Purchase Price Percentage, holding all variables constant (other than the loan-level characteristics). |
| | Additionally, and without limiting the generality of the foregoing, if there otherwise exists a material adverse change in the population of the Mortgage Loans actually purchased by Countrywide on the Closing Date, |

EXHIBIT 12
43

Aegis Mortgage Corporation
March 7, 2003
Page 2

Countrywide may elect to re-negotiate with Seller the terms of this Trade Confirmation, including an adjustment to the Purchase Price Percentage.

Premium Protection: Seller shall rebate to Countrywide the premium paid by Countrywide for any Mortgage Loan which is paid in full within twelve (12) months following the Closing Date; provided, however, that such premium recapture shall be amortized on a straight-line basis over such twelve (12) month period and be subject to an offset for any prepayment penalties permitted under the related mortgage note.

Payment Default: Seller shall repurchase any Mortgage Loan for which the first monthly payment with a due date subsequent to the Closing Date is not made by the related mortgagor within thirty (30) days of the related due date.

Product: Sub-prime, 1st lien and 2nd lien, fixed rate and adjustable rate mortgage loans as summarized in Exhibit A hereto.

Georgia Fair Lending Act: No Mortgage Loan is a "home loan" as defined in the Georgia Fair Lending Act.

Underwriting Criteria: Seller's sub-prime underwriting guidelines dated November 1, 2002 and matrices dated January 15, 2003, as provided by Seller to Countrywide via the email dated March 4, 2003, attached as Exhibit C hereto, subject to any additional restrictions set forth in Exhibit B.

Servicing Rights: Released.

Documentation: Mortgage Loan Purchase Agreement, dated June 20, 2002, by and between Countrywide and Seller, containing usual and customary representations, warranties and covenants that inure to the benefit of Countrywide for the life of the Mortgage Loans (the "Agreement"). To the extent that there is a conflict between the terms of the Agreement and this Trade Confirmation, the latter shall control.

Conditions: The purchase and sale of the Mortgage Loans from Seller to Countrywide shall be subject to the following conditions: (i) Countrywide's satisfactory completion of all matters related to its due diligence review of the Mortgage Loans, (ii) determination by Countrywide that the Mortgage Loans conform to the terms of this Trade Confirmation and are otherwise satisfactory to Countrywide in its sole discretion, (iii) determination by Countrywide that Seller's institutional credit standing supports the transaction contemplated herein (including any potential recourse on the Mortgage Loans) and (vi) the execution of such documentation as may be called for in the Agreement as well as any other documentation as may be reasonably required in connection with the transaction contemplated herein. In the event that any of the foregoing conditions are not satisfied in Countrywide's sole determination, Countrywide may elect not to consummate the purchase of the Mortgage Loans and shall have no liability therefore.

Assignability: This letter agreement, including all rights and obligations contained herein, may be assigned by Countrywide in whole or in part.

EXHIBIT 12
44

Aegis Mortgage Corporation
March 7, 2003
Page 3

Please acknowledge your agreement to the terms and conditions of this Trade Confirmation by signing in the appropriate space below and returning a copy of the same to the undersigned.  Telecopy signatures shall be deemed valid and binding to the same extent as the original.

Sincerely,                                          Agreed to and Accepted by:

**Countrywide Home Loans, Inc.**                    **Aegis Mortgage Corporation**


By: _____           By: _____
    William C. Buell VI                             Name:
    Vice President                                  Title:

EXHIBIT 12
45

**EXHIBIT A**

MORTGAGE LOAN SUMMARY

(attached)

EXHIBIT 12
46

**EXHIBIT B**

TRADE STIPULATIONS

(attached)

EXHIBIT 12
47

**EXHIBIT C**

SELLER'S UNDERWRITING MATRICES

(attached)

EXHIBIT 12
48

EXHIBIT 12
49

November 14, 2006

**Aegis Mortgage Corporation**
3250 Briar Park, Suite 400
Houston, Texas 77042
Attn: Ms. Karen Genneken, Senior Vice President

Re:   **Purchase of $51.8 Million of Mortgage Loans from Aegis Mortgage Corporation**
      **(Deal Numbers 2006-11-130 and 2006-11-131)**

Gentlemen and Ladies:

This trade confirmation ("Trade Confirmation") shall confirm the agreement between Countrywide Home Loans, Inc. (including permitted assigns, "Countrywide") and Aegis Mortgage Corporation ("Seller"), whereby Countrywide agrees to purchase, and Seller agrees to sell, certain mortgage loans as summarized in Exhibit A hereto and more particularly described herein, including the servicing rights relating thereto (the "Servicing Rights" and, collectively, the "Mortgage Loans"), subject to the terms set forth herein, including, but not limited to, those trade stipulations set forth in Exhibit B hereto.

|   |   |
|---|---|
| Closing Date: | The purchase and sale of the Mortgage Loans shall be consummated on December 13, 2006 (the "Proposed Closing Date"), or such other date as may be mutually agreed upon by Countrywide and Seller (in either event, the date on which the consummation of the transaction contemplated herein occurs, the "Closing Date"). |
| Commitment Amount: | The Mortgage Loans to be sold to Countrywide hereunder are comprised of two (2) distinct segments of Mortgage Loans (each, a "Segment"); each such Segment and the Mortgage Loans relating thereto are identified in Exhibit A and shall hereafter be referred to as Segments A and B Mortgage Loans, respectively.  The aggregate unpaid principal balance of the Mortgage Loans (including any comparable substitute mortgage loans) to be sold to Countrywide on the Closing Date shall be $3,307,262, plus or minus ten percent (10%) with respect to Segment A Mortgage Loans and $48,506,325, plus or minus ten percent (10%) with respect to Segment B Mortgage Loans (including such variances, each, a "Commitment Amount").  The Commitment Amounts shall be subject to the satisfaction of each condition precedent set forth herein including, without limitation, Countrywide's right to reject certain of the Mortgage Loans pursuant to the terms herein. |
| Purchase Proceeds: | Countrywide shall pay to Sellers on the Closing Date purchase proceeds equal to the sum of (a) the product of (i) the aggregate unpaid principal balance of the Segment A and B Mortgage Loans as of a date prior to the Closing Date as agreed to by the parties (the "Cut-off Date") and (ii) the related purchase price percentage as set forth in Exhibit A, in either case subject to adjustment as contemplated herein (each, a "Purchase Price Percentage"), and (b) accrued interest from the date through which interest has last been paid as of the Cut-off Date through the day prior to the Closing Date, inclusive (the "Purchase Proceeds").  Notwithstanding anything to the contrary contained herein, in the event that the Closing Date is a date subsequent to the Proposed Closing Date, and related to events caused by the Seller, the parties shall negotiate in good faith a reduction in the Purchase Proceeds to compensate Countrywide as a carry loss adjustment. |

EXHIBIT 12
50

Aegis Mortgage Corporation
November 14, 2006
Page 2

Notwithstanding the foregoing, in the event that there is a material change in the characteristics of the either the Segment A or B Mortgage Loans actually purchased by Countrywide on the Closing Date from those loan characteristics represented by Sellers in the related bid files (a subset of which is summarized in <u>Exhibit A</u>), then the related Purchase Price Percentage shall be adjusted in accordance with the pricing model employed by Countrywide in its original calculation of said related Purchase Price Percentage, holding all variables constant (other than the loan-level characteristics).

Additionally, and without limiting the generality of the foregoing, if there otherwise exists a material adverse change in the population of the Mortgage Loans actually purchased by Countrywide, then Countrywide may elect to re-negotiate with Seller the terms of this Trade Confirmation, including an adjustment to the Purchase Price Percentage.

**Pair-out Fee:** In the event that the aggregate unpaid principal balance of the Mortgage Loans actually purchased by Countrywide on the Closing Date is more than or less than the Commitment Amount, including (unless otherwise expressly set forth herein) the difference resulting from the failure to consummate the transaction contemplated hereby (such excess or shortfall of the Commitment Amount, the "Variance Amount"), Seller shall pay Countrywide a pair-out fee equal to the product of (a) the Variance Amount and (b) the greater of (i) 0.125%, or (ii) two times (2x) the positive difference, if any, between the bid-side price (expressed as a percentage) for the two-year U.S. Treasury note (4.8750% coupon/October 31, 2008 maturity) one day prior to the Closing Date and 100.2500%.

**Reimbursement of Due Diligence Expenses:** If more than twenty percent (20%) of the Mortgage Loans (by unpaid principal balance) is excluded from the purchase as a result of due diligence or otherwise, then the Purchase Proceeds shall be reduced to account for the incremental due diligence cost per loan incurred by Countrywide in excess of such twenty percent (20%).

**Premium Protection:** Seller shall rebate to Countrywide the premium paid by Countrywide for any Mortgage Loan which is paid in full within ninety (90) days following the Closing Date; provided, however, such premium recapture shall be subject to offset to the extent of any prepayment penalties due to Countrywide on the related Mortgage Loan.

**Early Payment Default:** Seller shall repurchase any Mortgage Loan for which the first monthly payment due Countrywide subsequent to the Closing Date is not received within thirty (30) days of the related due date.

**Product:** Sub-prime, 1st lien and 2nd lien, fixed and adjustable rate mortgage loans as summarized in <u>Exhibit A</u>.

**Underwriting Criteria:** Seller's subprime credit underwriting guidelines dated September 4, 2006, and subprime matrix dated September 11, 2006, as provided to Countrywide in the email dated October 31, 2006, attached as <u>Exhibit C</u> hereto, subject to any additional restrictions set forth in <u>Exhibit B</u>.

EXHIBIT 12
51

Aegis Mortgage Corporation
November 14, 2006
Page 3

| | |
|---|---|
| Compliance with the<br>FACT Act: | The sale or transfer of the Mortgage Loans by Seller complies with all applicable federal, state, and local laws, rules, and regulations governing such sale or transfer, including, without limitation, the Fair and Accurate Credit Transactions Act ("FACT Act") and the Fair Credit Reporting Act, each as may be amended from time to time, and Seller has not received any actual or constructive notice of any identity theft, fraud, or other misrepresentation in connection with any Mortgage Loans or any parties thereto. |
| Regulation AB: | The Purchase Agreement shall include, or Seller and Countrywide shall promptly negotiate in good faith for an amendment to the Purchase Agreement to include, provisions to facilitate compliance with Regulation AB substantially similar to the provisions adopted by the American Securitization Forum in its "Model Provisions: Regulation AB Compliance, Residential Mortgage Loan Purchase and Servicing Agreements" (the "Model Provisions").  The parties shall comply with their respective obligations under the Model Provisions pending negotiation of any amendment to the Purchase Agreement to facilitate compliance with Regulation AB. |
| Georgia Fair Lending Act: | No Mortgage Loan which is a "home loan" as defined in the Georgia Fair Lending Act (the "Act") was originated, brokered, solicited, processed, placed, negotiated, or offered on or after October 1, 2002, and prior to March 7, 2003, and no Mortgage Loan is a "high-cost home loan" as defined in the Act. |
| No "High-Cost Home Loans"<br>or "Covered Home Loans": | None of the Mortgage Loans are (a) subject to, covered by or in violation of the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), (b) classified as "high cost," "covered," "high risk home", "threshold," or "predatory" loans under any other applicable state, federal or local law, including any predatory or abusive lending laws (or similarly classified loans using different terminology under a law imposing heightened scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) or (c) in violation of any state or local law or ordinance similar to HOEPA.  In particular, no Mortgage Loan is a "high-cost home loan" as defined in i.) Part 41 of the General Regulations Banking Board of New York and Section 6-L of the New York State Banking Law, or ii.) Chapter 360.100 of the Kentucky Revised Statutes, or iii.) the Jersey Home Ownership Security Act of 2002, or iv.) the Arkansas Home Loan Protection Act, or v.) the Utah High Cost Home Loan Act, or vi.) the Massachusetts Regulations (Mass. Regs. Code tit. 209, §§ 32.01 et. seq. and §§ 40.01 et. seq.), and no Mortgage Loan is a "high cost home mortgage loan" as defined in the Massachusetts Predatory Home Loan Practices Act of 2004. |
| Servicing Rights: | Released. |
| Documentation: | Mortgage Loan Purchase Agreement, dated June 20, 2002, by and between Countrywide and Seller, as amended from time to time, containing usual and customary representations, warranties and covenants that inure to the benefit of Countrywide for the life of the Mortgage Loans (the "Agreement").  To the extent that there is a conflict |

EXHIBIT 12
52

Aegis Mortgage Corporation
November 14, 2006
Page 4

between the terms of the Agreement and this Trade Confirmation, the latter shall control.

Confidentiality:

The Seller and the Purchaser hereby acknowledge and agree that this Trade Confirmation shall be kept confidential and its contents will not be divulged to any party without the other party's consent except to the extent that it is appropriate for the Seller or the Purchaser to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies.   Notwithstanding the foregoing, the parties acknowledge and agree that Countrywide may disclose any information with respect to the Mortgage Loans to prospective purchasers and their representatives without the Seller's consent.

Conditions Precedent:

Countrywide's purchase of the Mortgage Loans on the Closing Date is expressly subject to (i) the determination by Countrywide that the information set forth herein (including Exhibit A and the data contained in the related bid files as provided by Seller) is accurate in all material respects, (ii) its satisfactory due diligence review of the Mortgage Loans, (iii) confirmation by Countrywide that the Mortgage Loans conform to the terms of this Trade Confirmation and are otherwise satisfactory in its sole discretion, (iv) the determination by Countrywide that Seller's institutional credit standing supports any potential recourse with regard to the transaction contemplated herein, (v) Countrywide's receipt from Seller of all requested information sought by the Home Mortgage Disclosure Act, as amended and (vi) the execution and/or delivery of any other documentation as may be reasonably required to consummate the subject transaction, including, but not limited to, such closing documentation as called for under the Agreement.  In the event that any of the foregoing conditions is not satisfied in Countrywide's sole determination, Countrywide may elect not to consummate the purchase of the Mortgage Loans and shall have no liability therefore.

Conditions Subsequent:

The mortgage file relating to each Mortgage Loan purchased by Countrywide shall be delivered to Countrywide or its designee, within two (2) business days following the Closing Date.

Assignability:

This letter agreement, including all rights and obligations contained herein, may be assigned by Countrywide in whole or in part.

Please acknowledge your agreement to the terms and conditions of this Trade Confirmation by signing in the appropriate space below and returning a copy of the same to the undersigned. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

Sincerely,

**Countrywide Home Loans, Inc.**

Agreed to and Accepted by:

**Aegis Mortgage Corporation**

By: _____
　　Jordan Cohen
　　Vice President

By: _____
　　Name:
　　Title:

EXHIBIT 12
53

**EXHIBIT A**

MORTGAGE LOAN SUMMARY

(attached)

EXHIBIT 12
54

**EXHIBIT B**

TRADE STIPULATIONS

(attached)

EXHIBIT 12
55

**EXHIBIT B**

SELLER'S UNDERWRITING GUIDELINES

(attached)

EXHIBIT 12
56

*124*

# Loan Purchase Agreement 1

This Agreement, dated as of September 28, 1995, is made by and between Countrywide Funding Corporation, a New York corporation ("Countrywide"), and Aegis Mortgage Corporation Oklahoma, a corporation ("Seller"), for mutual considerations set forth herein.

Countrywide agrees to purchase certain loans secured by real property, together with the servicing thereof (the "Loans"), from Seller under Countrywide's mortgage loan programs, and Seller agrees to sell to Countrywide certain such Loans pursuant to the terms and conditions set forth herein and in Countrywide's Correspondent Lending Division Loan Purchase Program Seller's Manual, as amended from time to time (the "Manual"). In connection therewith, the parties agree as follows:

1. **ELIGIBLE LOANS**
   A. Only those Loans fully complying with the standards for Conforming Conventional, Jumbo Conventional, Government and Second Mortgage Loan Programs set forth in the Mortgage Programs section of the Manual are eligible for purchase under this Agreement. Seller must be approved, qualified and/or licensed to originate such Loans.

   B. Seller shall fully underwrite each Loan prior to submission to Countrywide in accordance with **Underwriting Guidelines and Lending Requirements** sections of the Manual, or, if available, use a Countrywide-approved automated underwriting system for underwriting the Loan.

   C. Seller shall be responsible for assuring that Loans submitted to Countrywide comply with all terms and conditions of this Agreement and the Manual.

2. **COMMITMENT TO PURCHASE LOANS**
   The procedure pursuant to which Seller may commit to sell a Loan to Countrywide is detailed in the Loan Registration section of the Manual. For purposes of this Agreement, Countrywide and Seller define a best effort commitment to be a mandatory commitment if the Loan closes. Countrywide will confirm the conditions of the sale of the Loan to Countrywide by delivering a confirmation ("Commitment") to Seller which sets forth the terms of the transaction, including the price Countrywide will pay for each Loan, as determined pursuant to the Pricing standards set forth in the Manual (the "Purchase Price"). The terms of the Commitment, including the Purchase Price, shall be in effect for the period of time requested by Seller and approved by Countrywide (the "Commitment Period"). If Seller is approved by Countrywide to sell Loans to Countrywide on a bulk sale basis, Countrywide and Seller shall execute the Addendum to Loan Purchase Agreement (Bulk Sales) which shall be attached to and incorporated into this Agreement by reference.

3. **UNDERWRITING AND PROPERTY APPRAISAL**
   A. Countrywide shall have the right, but not the obligation, to underwrite any Loan submitted for purchase pursuant to this Agreement, or otherwise insure that any Loan submitted for purchase complies with all terms and conditions of this Agreement and the Manual; provided that neither the existence nor the exercise of this right shall affect in any way Seller's obligations hereunder, including without limitation, Seller's repurchase obligations under Section 7 hereof and Seller's hold harmless obligations under Section 9 hereof. The applicable procedures are set forth in the Prior Approval section of the Manual.

   B. Seller shall deliver to Countrywide an appraisal of the real estate security for each such Loan, signed by a qualified appraiser, as defined in the Manual, prior to Countrywide's approval to purchase such Loan.

4. **DELIVERY OF LOAN DOCUMENTATION**
   A Loan shall be deemed delivered to Countrywide if: (A) it is received by Countrywide within the Commitment Period; (B) it is in compliance with the requirements set forth in the **Delivery of Closed Loans and Funding Documentation** sections of the Manual; and (C) there are no outstanding conditions which would prevent Countrywide from funding the purchase of the Loan. Failure by Seller to deliver to Countrywide within 120 days from the date a Loan was purchased one or more of the original documents specified in the **Delivery of Closed Loans** section of the Manual shall result in assessment by Countrywide of a fee of $50 per month for each month, after the initial 120 day period, during which one or more of such documents is outstanding, i.e., has not been delivered to Countrywide for any period of time during the month. Such fee shall be $50 regardless of the number of such documents. Failure by Seller to deliver to Countrywide one or more of the original documents specified in the **Delivery of Closed Loans** section of the Manual within 270 days from the date the Loan was purchased by Countrywide shall obligate Seller to repurchase the Loan pursuant to the provisions of Section 7 of this Agreement.

AEGIS MORTGAGE CORP (804-00124)
Amendment(s):
Receive Date: 10/19/95
Copy to Lender: 10/20/95



**Countrywide**
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation. All rights reserved. Countrywide is a registered service mark of Countrywide Credit Industries, Inc. (R8/95)

EXHIBIT 12
57

# *Loan Purchase Agreement 2*

5.  **PAYMENT OF PURCHASE PRICE AND SELLER'S WIRE INSTRUCTIONS**
    Countrywide shall, after receipt of a Loan documentation package which fully complies with the requirements of the Manual, deliver the Purchase Price (less any fees or discounts due to Countrywide) set forth in the applicable Commitment to Seller in accordance with Seller's wire instructions or in accordance with any bailee letter or trust receipt submitted with the Loan, as determined in the sole and absolute discretion of Countrywide.

6.  **SELLER'S OBLIGATIONS, REPRESENTATIONS AND WARRANTIES**
    A.  Seller represents and warrants to Countrywide as to each Loan offered for sale under this Agreement that as of the date of Countrywide's purchase of such Loan:

    (1) The Loan documents have been duly executed by the trustor/mortgagor, acknowledged and recorded; each Loan is valid and complies with all criteria contained in the Manual; the note and deed of trust/mortgage constitute the entire Agreement between the trustor/mortgagor and the beneficiary/mortgagee, and there is no verbal understanding or written modification which would affect the terms of the note or the deed of trust/mortgage except by written instrument delivered and expressly made known to the beneficiary/ mortgagee and recorded if recording is necessary to protect the interests of the beneficiary/mortgagee.

    (2) Seller is the sole owner of the Loan and has authority to sell, transfer and assign the same on the terms set forth herein and in the Manual. There has been no assignment, sale or hypothecation thereof by Seller, except the usual hypothecation of the documents in connection with Seller's normal banking transactions in the conduct of its business.

    (3) The full principal amount of the Loan has been advanced to the trustor/mortgagor, either by payment directly to such person or by payment made on such person's request or approval. The unpaid principal balance of the Loan is as represented by Seller. All costs, fees and expenses incurred in making, closing and recording the Loan have been paid. No part of the mortgaged property has been released from the lien of the Loan, the terms of the Loan have in no way been changed or modified, and the Loan is current and not in default.

    (4) Each Loan is a valid first lien or, if specifically approved by Countrywide, a valid second lien on the mortgaged property, and the mortgaged property is free and clear of all encumbrances and liens having priority over the lien of such Loan, except for the first lien, if applicable, and liens for real estate taxes and special assessments not yet due and payable and those exceptions allowed in connection with Government Loans and other exceptions set forth in the Manual.

    (5) The mortgaged property is free and clear of all mechanics' and materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such lien, nor is Seller aware of any facts which could give rise to any such lien.

    (6) Each Loan which Seller represents to be insured or guaranteed is, or will within 120 days from the date of delivery of such Loan to Countrywide be, so insured or guaranteed. No action has been taken or failed to have been taken which has resulted or will result in an exclusion from, denial of, or defense to, coverage under such insurance or guarantee; and all conditions within the control of Seller as to the validity of the insurance or guaranty as required by the National Housing Act of 1934 and the rules and regulations thereunder, or as required by the Servicemen's Readjustment Act of 1944 and the rules and regulations thereunder, or imposed by the mortgage insurance companies or other insurers have been properly satisfied, and said insurance or guaranty is valid and enforceable.

    (7) All federal and state laws, rules and regulations applicable to the mortgage Loans have been complied with, including but not limited to: the Real Estate Settlement Procedures Act, the Flood Disaster Protection Act, the Federal Consumer Credit Protection Act including the Truth-in-Lending and Equal Credit Opportunity Acts, and all applicable statutes or regulations governing fraud, lack of consideration, unconscionability, consumer credit transactions or interest charges.

    (8) No Loan is the subject of, and Seller is not aware of any facts which could give rise to, litigation which could affect Countrywide's ability to enforce the terms of the obligation or its rights under the mortgage documents.

    (9) There is in force for each Loan either (a) a paid-up title insurance policy on the Loan issued by a Countrywide approved title company in an amount at least equal to the outstanding principal balance of the Loan or (b) an attorney's mortgage lien opinion. (Negatively amortizing loans require additional coverage.)



**Countrywide**®
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc. (R8/95) __

EXHIBIT 12
58

# *Loan Purchase Agreement 3*

(10) There is in force for each Loan valid hazard insurance policy coverage and, where applicable, valid flood insurance policy coverage, and such coverages meet the requirements of Countrywide specified in the Manual.

(11) Seller will record the corporate assignment in the name of Countrywide Funding Corporation at the time the deed of trust/mortgage is recorded, and the assignment of the Loan from Seller to Countrywide shall be valid and enforceable.

(12) The borrower has no rights of rescission, set-offs, counter-claims or defenses to the note or deed of trust/mortgage securing the note arising from the acts and/or omissions of Seller.

(13) Seller has no knowledge that any improvement located on or being part of the mortgaged property is in violation of any applicable zoning law or regulation.

(14) All improvements included for the purpose of determining the appraised value of the mortgaged property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the mortgaged property.

(15) There is no proceeding pending for total or partial condemnation of any mortgaged property and said property is free of substantial damage (including, but not limited to, any damage by fire, earthquake, windstorm, vandalism or other casualty) and in good repair.

(16) Seller has no knowledge of any circumstances or conditions with respect to any Loan, mortgaged property, trustor/mortgagor or trustor's/mortgagor's credit standing that reasonably could be expected to cause private institutional investors to regard any Loan as an unacceptable investment, cause any Loan to become delinquent or adversely affect the value or marketability of the Loan.

(17) All documents submitted are genuine. All other representations as to each such Loan are true and correct and meet the requirements and specifications of all parts of this Agreement and the Manual.

B. Seller represents and warrants to Countrywide that as of the date first set forth above and as of the date of Countrywide's purchase of each Loan hereunder:

(1) Seller is duly organized, validly existing and in good standing under the laws of its state of incorporation and is qualified and/or licensed as necessary to transact business, including the originating and selling of mortgage loans, and is in good standing in each state where the property securing a Loan is located.

(2) Seller has the full power and authority to hold and sell each Loan; and neither the execution and delivery of this Agreement, nor the acquisition or origination of the Loans, nor the sale of the Loans, nor the consummation of the transactions contemplated herein, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with, or result in a breach of any term, condition or provision of, Seller's certificate of incorporation or by-laws, any license held by Seller or governing Seller's activities or any agreement to which Seller is a party or by which Seller is bound, or constitute a material default or result in an acceleration under any of the foregoing.

(3) No consent, approval, authorization or order of any court, governmental body or any other person or entity is required for the execution, delivery and performance by Seller of this Agreement, including but not limited to, the sale of the Loans to Countrywide.

(4) Neither Seller nor its agents know of any suit, action, arbitration or legal or administrative or other proceeding pending or threatened against Seller which would affect its ability to perform its obligations under this Agreement.

(5) Seller is not a party to, bound by or in breach or violation of any agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects, or may in the future materially and adversely affect, the ability of Seller to perform its obligations under this Agreement or the Manual, including, without limitation, Seller's repurchase and indemnification obligations pursuant to Sections 7, 8 and 9 of this Agreement.

## 7. SELLER'S REPURCHASE OBLIGATIONS

A. Seller shall repurchase any Loan sold to Countrywide pursuant to this Agreement within twenty business days of receipt of written notice from Countrywide of any of the following circumstances (the "Repurchase Obligation"):



Equal Housing Lender. ©1994 Countrywide Funding Corporation. All rights reserved. Countrywide is a registered service mark of Countrywide Credit Industries, Inc. (R9/95)

EXHIBIT 12
59

## *Loan Purchase Agreement 4*

(1) Seller fails to deliver to Countrywide within 270 days from the date each Loan was purchased the original documents specified in the Delivery of Closed Loans section of the Manual.

(2) Countrywide determines that there is any evidence of fraud in the origination of the Loan or in the sale of the Loan to Countrywide or that any matter in the mortgage loan file is not true and correct.

(3) If Countrywide determines the Loan is not eligible for GNMA, FNMA or FHLMC pool participation or whole loan purchase or purchase by a private investor, or, if Countrywide has sold such Loan in whole or in part to GNMA, FNMA, FHLMC or a private investor, and GNMA, FNMA, FHLMC or the private investor requires Countrywide to repurchase said interest or reimburse it for losses, or the mortgage insurer denies coverage on the Loan; provided that the reason for such ineligibility, repurchase, reimbursement or denial shall be due to a failure of the Loan to meet requirements specified in the Manual at the time of Countrywide's purchase of the Loan from Seller.

(4) If the first payment due Countrywide is not received by Countrywide, whether from the borrower directly or forwarded by Seller if the Borrower has submitted the payment to Seller, by the last day of the month in which it is due, and, in addition, at any time within the first twelve months after the Loan has been purchased by Countrywide, the Borrower is 90 days delinquent with respect to a monthly payment. For this purpose a Borrower shall be considered to be 90 days delinquent on a monthly payment if it is not received by Countrywide by the last day of the third month, regardless of the number of days in the month. For example, if the Borrower has not made his/her January payment by the last day of March, the Borrower shall be considered 90 days delinquent with respect to the January payment. Seller shall not have the right to advance funds for or on behalf of a Borrower for any delinquent payment or to otherwise make funds available to any Borrower to avoid or cure a default by the Borrower. A payment for which Countrywide deducted funds at the time it purchased the Loan from Seller shall not be considered the first payment due Countrywide.

(5) Seller fails to observe or perform or breaches in any material respect any of the representations, warranties or agreements contained in this Agreement or the Manual with respect to a particular Loan.

(6) With respect solely to VA Loans purchased by Countrywide pursuant to an Assignment of Trade Addendum to this Agreement or on a Direct Trade basis pursuant to a Direct Trade Addendum to this Agreement, if the Loan goes into foreclosure within 24 months from the date of sale of the Loan to Countrywide as to those Loans with full guarantees from the VA and 48 months from the date of sale of the Loan to Countrywide as to those Loans with partial guarantees from the VA and as to which the VA gives Countrywide a no-bid instruction in conjunction with the foreclosure sale on such Loan.

B. The option to request or accept repurchase of any Loan is at the sole discretion of Countrywide. Notwithstanding that a Seller may be obligated pursuant to the terms of this Section 7 to repurchase a Loan, if such Loan is in compliance with all requirements of this Agreement and the Manual at the time of its purchase by Countrywide and if there is no evidence of fraud or misrepresentation in connection with the Loan, Countrywide, in its sole discretion and on terms determined solely by Countrywide, may consider permitting Seller to indemnify Countrywide against all suits, costs, damages, losses, fees or claims, including without limitation reasonable attorneys' fees, which may be incurred by Countrywide in connection with such Loan. Such indemnification shall be substantially in the form of the applicable Indemnification Agreement, the provisions of which shall include, without limitation, the requirement that the Seller shall pay to Countrywide, at the time that the Indemnification Agreement is executed, the amount specified by Countrywide as the amount necessary to cover its projected and potential costs and losses, and including the service release premium paid by Countrywide to the Seller with respect to the Loan.

C. It is agreed by the parties that Seller's Repurchase Obligation with respect to a Loan shall not be obviated by the fact that the property securing the Loan has been foreclosed upon and said property has been acquired by Countrywide or a third party, it being understood that the term Repurchase Obligation encompasses within its meaning the repurchase of the property from Countrywide if Countrywide has acquired the property, or, if a third party has acquired the property, reimbursing Countrywide in the amount specified in Section 8.C. of this Agreement.

D. It is further agreed by the parties that if Countrywide has made demand on Seller to repurchase a Loan pursuant to Section 7 of this Agreement, Countrywide shall have the right to withhold any monies due Seller in connection with the Loan(s) subject to the Repurchase Obligation or any other Loans until the parties have agreed that the Repurchase Obligation is satisfied.



Equal Housing Lender. ©1994 Countrywide Funding Corporation. All rights reserved. Countrywide is a registered service mark of Countrywide Credit Industries, Inc. (R9/95).

EXHIBIT 12
60

## *Loan Purchase Agreement 5*

8.  **REPURCHASE PRICE**

   A.  The repurchase price for Loans subject to a Repurchase Obligation pursuant to Section 7 hereof shall be as follows:

   (1)  The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by Countrywide, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by Countrywide; plus

   (2)  All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the loan through and including the last day of the month in which the repurchase is made; plus

   (3)  All expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in enforcing Seller's obligation to repurchase such Loan; plus

   (4)  The original servicing release premium paid by Countrywide with respect to such Loan; plus

   (5)  Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; less

   (6)  Any proceeds of mortgage insurance with respect to the Loan collected by Countrywide.

   Upon any such repurchase of Loans by Seller, Countrywide shall endorse the promissory note (without recourse) and shall assign any security interest (without recourse and in recordable form) to Seller.

   B.  If the real property security for the Loan has been foreclosed upon and purchased by Countrywide at the foreclosure sale, then the repurchase price pursuant to Section 7 hereof, notwithstanding the amount of Countrywide's credit bid, shall be:

   (1)  The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by Countrywide, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by Countrywide; plus

   (2)  All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the loan through and including the last day of the month in which the foreclosure sale occurs; plus

   (3)  All costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in connection with the foreclosure and in enforcing Seller's Repurchase Obligations hereunder; plus

   (4)  The original servicing release premium paid by Countrywide with regard to such Loan; plus

   (5)  Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; plus

   (6)  Interest on the amounts set forth in paragraphs (1) through (5) above at the Loan rate from the end of the month in which the foreclosure sale occurred until and including the date of repurchase by Seller; less

   (7)  Any proceeds of mortgage insurance collected by Countrywide with respect to the Loan.

   Upon payment of the repurchase price, Countrywide shall transfer title to the property securing such Loan to Seller.

   C.  If the real property security for the Loan has been sold at foreclosure and purchased by a third party, the amount Seller shall pay Countrywide to fulfill its Repurchase Obligation pursuant to Section 7 of this Agreement shall be as follows:

   (1)  The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by Countrywide, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by Countrywide; plus

   (2)  All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the loan through and including the last day of the month in which the foreclosure sale occurs; plus

   (3)  All costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in enforcing Seller's Repurchase Obligations hereunder; plus

   (4)  The original servicing release premium paid by Countrywide with regard to such Loan; plus

 **Countrywide®**
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc. (R9/95)

EXHIBIT 12
61

# Loan Purchase Agreement 6

(5) Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; plus

(6) Interest on the amounts set forth in paragraphs (1) through (5) above at the Loan rate from the end of the month in which the foreclosure sale occurred until and including the date of repurchase by Seller; less

(7) The net proceeds of the foreclosure sale (sale price minus costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in connection with the foreclosure sale); less

(8) Any proceeds of mortgage insurance collected by Countrywide in connection with the Loan.

9. **HOLD HARMLESS**

A. Seller shall hold Countrywide harmless and shall indemnify Countrywide from and against any and all suits, costs, damages, losses, fees or claims, including without limitation reasonable attorney's fees ("Loss"), arising out of or in connection with any negligence, fraud or a material omission on the part of Seller in receiving, processing or funding any Loan committed to Countrywide for sale under Section 2 above, during the origination period and Commitment Period up to and including the date the Loan is purchased by Countrywide. Seller's obligation to Countrywide in this regard shall remain effective after Countrywide's purchase of the Loan if the Loss arose prior to purchase but was undetected at time of purchase. This paragraph shall not modify Seller's obligations contained elsewhere in this Agreement.

B. Seller shall also hold Countrywide harmless and shall indemnify Countrywide from and against any and all suits, costs, damages, fees or claims, including without limitation reasonable attorneys' fees, arising out of or in connection with any one or more of the items set forth in paragraphs (1) through (6) of Section 7 A. of this Agreement.

10. **NO SOLICITATION**

Loans sold to Countrywide cannot be solicited by Seller for refinance for a period of 12 months from the date the Loan is purchased by Countrywide. Borrowers requesting a refinance from Seller within the 12 month period must be referred to Countrywide or, provided the refinanced loan meets all Countrywide requirements as specified in the Manual, may be processed by the Seller and sold to Countrywide for a service release premium, if any, to be negotiated by the parties.

11. **PROHIBITION AGAINST USE OF NAME OR AFFILIATION**

Seller shall not hold itself out as a joint venturer, partner, representative, employee or agent of Countrywide. Nor shall it use Countrywide's name in any advertising or written or broadcast material without Countrywide's express prior written consent. This prohibition shall not prevent Seller from using any advertising media provided to it by Countrywide for use by Seller and containing any copyrighted Countrywide name or logo. Such copyrighted name or logo shall remain in place.

12. **TERMINATION – SUSPENSION**

A. This Agreement may be terminated as to future commitments for sale of Loans by either party at any time, but such termination shall not in any respect change or modify the obligation of Seller with respect to Loans already subject to a Commitment. The effective time of termination shall be the earlier of the time written notice is actually received by the other party or five days after written notice is posted in the United States Postal Service by the canceling party. Termination of this Agreement shall not in any way affect either Seller's or Countrywide's obligations, representations, warranties or indemnifications with respect to Loans already purchased by Countrywide; provided, however, that Countrywide may immediately terminate its obligations hereunder without notice and immediately return to Seller any Loans subject to a Commitment, and Seller shall accept such loans if Countrywide reasonably determines that there has been any deception, fraud, concealment or material misrepresentation by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with this Agreement or in connection with any Loan sold to Countrywide pursuant to this Agreement.

B. In addition to the termination rights set forth in Paragraph A. above, in the event that Countrywide believes in good faith that Seller has breached an obligation (including a Repurchase Obligation under Section 7), representation, warranty or covenant under the Agreement, or will be unable to fulfill any of its obligations under the Agreement or the Manual (including a Repurchase Obligation under Section 7), Countrywide may, in its sole and absolute discretion, suspend this Agreement as to future Commitments for the sale of Loans by Seller. Such suspension shall be effective immediately upon Seller's receiving written notice of same from Countrywide and shall last until Countrywide, in its sole discretion, determines to reactivate or terminate this Agreement.



Equal Housing Lender, ©1994 Countrywide Funding Corporation. All rights reserved. Countrywide is a registered service mark of Countrywide Credit Industries, Inc. (R9/95).

EXHIBIT 12
62

# *Loan Purchase Agreement 7*

13. **EXHIBITS**

All exhibits attached hereto or material referred to in this Agreement, including the Manual, are incorporated by reference into this Agreement. To the extent there are differences between requirements as stated in the Manual and as stated in this Agreement, the provisions of this Agreement shall govern.

14. **ENTIRE AGREEMENT**

The entire agreement between the parties is contained in this Agreement and in the Manual and cannot be modified in any respect except by an amendment in writing signed by both parties. The invalidity of any portion of this Agreement shall in no way affect the balance thereof.

15. **ASSIGNMENT**

Seller may not assign its rights or delegate its duties or obligations under this Agreement without the prior written consent of Countrywide. This Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the parties hereto.

16. **ATTORNEYS' FEES AND EXPENSES-CHOICE OF LAW AND FORUM**

If any party hereto shall bring suit or other proceeding against the other as a result of any alleged breach or failure by the other party to fulfill or perform any covenants or obligations under this Agreement, then the prevailing party obtaining final judgment in such action shall be entitled to receive from the non-prevailing party reasonable attorneys' fees incurred by reason of such action and all costs of suit and preparation thereof at both trial and appellate levels. This Agreement shall be governed by and construed and enforced in accordance with applicable federal law and the laws of the State of California. In addition, any such suit or proceeding shall be brought in the federal or state courts located in Los Angeles County, California, which courts shall have sole and exclusive in personam, subject matter and other jurisdiction in connection with such suit or proceedings, and venue shall be appropriate for all purposes in such courts.

17. **NO REMEDY EXCLUSIVE-WAIVER**

No remedy under this Agreement is exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity.

Any forbearance by a party to this Agreement in exercising any right or remedy under this Agreement or otherwise afforded by applicable law shall not be a waiver or preclude the exercise of that or any other right or remedy.

18. **NOTICE**

Unless otherwise provided in this Agreement, all notices under this Agreement shall be in writing, deemed effective upon receipt and addressed as indicated below.

To: Countrywide Funding Corporation
Correspondent Lending Division
155 North Lake Avenue
Mail Stop No. 5-53
Pasadena, California 91101
Attention: Vice President of Production

To Lender/Seller:
Aegis Mortgage Corporation
2500 CityWest Blvd., Suite 1200
Houston, Texas 77042

Attn: Vice President of Secondary Marketing

**ACCEPTED BY:**

Seller: Aegis Mortgage Corporation

By: _Steve Hultg_ (Signature)

Name: Steven Hultquist

Title: Vice President of Secondary Mktg.

Dated: September 28, 1995

Countrywide Funding Corporation

By: _Dawn Brayton_ (Signature)

Name: Dawn Brayton

Title: Vice President

Dated: Oct. 19, 1995


**Countrywide**
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc. (R9/95)

EXHIBIT 12
63

EXHIBIT 12
64

804  K24  1159

## Addendum to Loan Purchase Agreement
## For Delegated Authority

### Application to become an approved delegated lender

THIS AGREEMENT made this __28th__ day of __Sept.__, 19 95 between COUNTRYWIDE FUNDING CORPORATION ("CFC") and __Aegis Mortgage Corporation__ ("Seller") is made with reference to the following facts:

A - CFC and Seller are parties to a Loan Purchase Agreement ("LPA") dated as of __September 28, 1995__

B - CFC and Seller desire to amend the LPA to permit Seller to participate in CFC's Delegated Authority Program.

NOW, THEREFORE, it is hereby agreed as follows:

1 - A new section 3.A. is hereby added to Section 3 as follows:

   A.(1) Provided that Seller has been duly approved by CFC as a Delegated Lender, which approval is evidenced by CFC's execution of this Agreement, CFC agrees to purchase conforming and non conforming loans generated by Seller, subject to the limitations specified as to loan products and Loan to Value ratios in the "Delegated Authority" Letter, without prior approval or underwriting review by CFC, except for CFC loan products which specifically require CFC prior approval.

   (2) Seller agrees to submit loans for purchase which conform in all respects to standards established for CFC's Correspondent Lending Division program. Seller also agrees to submit loans for purchase that contain all necessary documentation as outlined in the CFC Correspondent Lending Division Seller's Manual.

   (3) Notwithstanding that Seller has submitted a Loan pursuant to its approval as a Delegated Lender, CFC shall have the right, but not the obligation, to underwrite any Loan submitted for purchase pursuant to this Agreement, or otherwise insure, including by means of post purchase audit or otherwise, that any Loans submitted for purchase or purchased by CFC comply with all terms and conditions of this agreement and the Manual; provided that neither the existence nor the exercise of this right shall affect in any way Seller's obligations hereunder, including without limitation, Seller's repurchase obligations under Section 7 hereof and Seller's hold harmless obligations under Section 9 hereof.

   (4) Approval by CFC of Seller as a Delegated Lender is at the sole and absolute discretion of CFC. The conditions and terms of such approval and Seller's participation in the Delegated Authority program may be altered at any time and such approval may be terminated at any time for any reason by CFC. Such alteration or termination shall be effected by written notice from CFC to Seller, which may be delivered by telefacsimile, US Mail or any delivery service, and shall be effective as of the date specified in the notice.

2 - Existing Section 3.A. is hereby redesignated as Section 3.B. and existing section 3.B. is hereby redesignated as Section 3.C.

3 - The following language is hereby added as Section 6B (6):
   "Seller has, in full force and effect, an Errors and Omissions or fidelity bond insurance policy or policies in an amount sufficient to cover all loans sold to and serviced by CFC."

Except as specifically amended herein, the LPA shall remain in full force and effect.

Executed this __28th__ day of __September__ 19 95 at _____, _____.

Seller: __Aegis Mortgage Corporation__

By: _____   Title: __Vice President of Secondary Mktir__
   Steven Hultquist
Acknowledged: Countrywide Funding Corporation

By: _____   Date: __10-20-95__

By: _____   Date: _____

 **Countrywide**
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc. (2/95)

EXHIBIT 12
65

EXHIBIT 12
66

## *Addendum to Loan Purchase Agreement*

### MANDATORY COMMITMENTS (BULK SALES)

This Agreement (the "Addendum") constitutes an Addendum to that Loan Purchase Agreement dated September 28 , 199 9 by and between Countrywide Funding Corporation, a New York Corporation ("Countrywide"), and Aegis Mortgage Corporation a Oklahoma ("Seller") (the "Agreement"). This Addendum is for the purpose of setting forth the obligations of the Seller to Countrywide in accordance with Countrywide's mandatory commitment program, which is further described in the Seller's Manual. The terms and conditions of the Loan Purchase Agreement are incorporated herein by reference. This Addendum shall modify, amend, and form a part of the terms of the Agreement. All terms contained herein shall have the same meaning as in the Agreement, unless otherwise defined herein. In the event of any conflict between the terms and conditions of the Agreement and this Addendum as it pertains to the mandatory commitment program, the terms and conditions of this Addendum shall prevail.

**GENERAL**

Sellers may elect to deliver loans to Countrywide under the mandatory commitment program by entering into a mandatory delivery commitment (a "Commitment") to deliver a specified amount and type of loan on or before a specified date. Under the mandatory commitment program, the Seller shall be obligated to pay a mark-to-market pair-off fee if the Seller fails to deliver qualifying loans by the date specified in the Commitment (the "Commitment Expiration Date"), in the amount specified in the Commitment (the "Commitment Amount"), or otherwise under the terms provided in the applicable Commitment.

**I.  PAIR-OFF ASSESSMENT**

Pair-off fees shall be assessed as of the dates and times (the "Pair-Off Assessment Date") provided for:

(a)  as of the date and time that the Seller notifies Countrywide of its election for a reduction of any portion of the Commitment Amount; or

(b)  as of the date and time that the Seller notifies Countrywide of its election for a program substitution as described in the Seller's Manual for any portion of the mandatory commitment (such substitution to be treated as a reduction of the Commitment Amount); or

(c)  as of the close of the Commitment Expiration Date if qualifying loan files are not delivered by seller in an amount equal to the Commitment Amount, less the allowable delivery variance provided for in the Commitment;  or

(d)  as of the close of business on such date subsequent to the Commitment Expiration Date that Countrywide determines that a loan delivered by the Commitment Expiration Date was not eligible for purchase.

**II.  PAIR-OFF CALCULATION AND PAYMENT OF PAIR-OFF FEES**

The pair-off fee shall be assessed and calculated as provided:

(a)  A pair-off fee shall be assessed should the Seller notify Countrywide of its election to pair-off all or a portion of the Commitment Amount prior to the Commitment Expiration Date pursuant to the provisions of paragraphs I (a) and I (b) above. In such event, the Commitment shall be amended to require Seller to deliver, and for Countrywide to purchase, the original Commitment Amount reduced by the amount paired-off by Seller (the "Amended Commitment Amount") with all other terms of the Commitment remaining unchanged. Any such amount which Seller elects to pair-off shall hereinafter be referred to as the "Amount Paired-Off By Seller."

(b)  A pair-off fee shall be assessed should Seller fail to deliver qualifying loans by the Commitment Expiration Date with an aggregate principal balance equal to the Commitment Amount or the Amended Commitment Amount as applicable, less the allowable delivery variance provided for in the Commitment. Any such shortfall in the delivery of qualifying loans by the Commitment Expiration Date shall be hereinafter referred to as the "Delivery Shortfall Amount."

(c)  The pair-off fee to be assessed on Amounts Paired-Off by Seller and Delivery Shortfall Amounts shall be calculated by multiplying the Amount Paired-Off by Seller or Delivery Shortfall Amount, as applicable, by a percentage equal to the sum of .125% (the "Administrative Fee"), plus the positive price difference, if any,



Countrywide
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc. (8/94)

EXHIBIT 12
67

## Addendum to Loan Purchase Agreement

## MANDATORY COMMITMENTS (BULK SALES)

between the percentage price posted by Countrywide as of the Pair-Off Assessment Date (on the loans which were the subject of the Commitment), and the percentage price to have been paid by Countrywide pursuant to the Commitment. Countrywide's posted percentage price on the Pair-Off Assessment Date shall be determined as follows:

    i.   If the Pair-Off Assessment Date is the Commitment Expiration Date, or a subsequent date, pursuant to paragraph I (c) and (d) above, the posted percentage price to be used shall be that percentage price posted by Countrywide applicable to the earliest delivery option available on such Pair-Off Assessment Date (e.g., the price for a mandatory 2 day delivery).

    ii.   If the Pair-Off Assessment Date is earlier than the Commitment Expiration Date pursuant to paragraphs I (a) or I (b), then the posted price to be used shall be the posted mandatory delivery price applicable to the delivery period option which expires closest to, but not after the Commitment Expiration Date. For example, if the Pair-Off Assessment Date is 40 days prior to the Commitment Expiration Date, the posted price to be used for the pair-off fee calculation shall be Countrywide's 29 day mandatory delivery price on the Pair-Off Assessment Date. (For purposes of this example, available mandatory delivery periods are: 2, 7, 15, 29, 45, 60 and 75 days.)

(d)    Notwithstanding the provisions of paragraph II (c) above, the administrative fee shall be a minimum of $100.

(e)    The pair-off fees assessed hereunder shall be due and payable within five (5) business days after the Pair-Off Assessment Date. In addition to Countrywide's other remedies, if pair-off fees are not paid within this time period, Seller agrees that Countrywide shall be entitled to net and offset such fees against other amounts owed by Countrywide to Seller.

**AUTHORIZED AGENTS**

The following person(s) have been authorized by appropriate resolution of Seller to execute this Addendum and all documents necessary and appropriate to bind Seller pursuant to the terms of this Addendum. Countrywide may rely on any instructions received from such person(s) and the same shall be fully binding on Seller until such time as Countrywide shall receive written instructions revoking the authority of such person to bind Seller to any future transactions.

1. D. Richard Thompson, Managing Director
2. Steven Hultquist, Vice President of Secondary Marketing
3. _____
4. _____

COUNTRYWIDE FUNDING CORP. ("BUYER")

BY: _____

TITLE: ____Vice President____

DATE: ____Oct. 19, 1995____

("SELLER") Aegis Mortgage Corporation

BY: _____

TITLE: Vice President of Secondary Marketing

DATE: September 28, 1995

**Countrywide**
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc. (8/94)

EXHIBIT 12

EXHIBIT 12
69

Feb-17-99  09:32am  From-                                    +2143463602        T-389  P.02/03  F-633

# Addendum to Loan Purchase Agreement - Subprime

This Addendum is made this **17** day of **February** , 19**99** between

Countrywide Home Loans, Inc., ("Countrywide") and **Aegis Mtg Corp.** ("Seller")

to the Loan Purchase Agreement ("LPA") dated as of _____.

**1. Definitions.** The terms "Subprime Loan", "Mortgage Loan Schedule", "Commitment", "Commitment Letter", "Pool Commitment", "Spot Commitment" and "Closing Date" shall have the meanings set forth therefor in the "Guide" (as defined below)

**2. Commitment to Purchase Loans.** The following is hereby added at the end of the first sentence of Section 2: "except that for the purposes of Subprime Loans, the procedure pursuant to which Seller may commit to sell a Subprime Loan to Countrywide is detailed in the Subprime section of the Guide."

**3. Representations and Warranties.**

A   Section 6.A(7) is amended and restated in its entirety as follows  All federal and state laws, rules and regulations applicable to the Loan for its applicable Loan Type have been complied with, including but not limited to, the Real Estate Settlement Procedures Act, the Flood Disaster Protection Act, the Federal Consumer Credit Protection Act including the Truth-in-Lending and Equal Credit Opportunity Acts, the Federal Fair Housing Act, the Home Ownership and Equity Protection Act of 1994 and all applicable federal and state statutes or regulations governing fraud, lack of consideration, unconscionability, consumer credit transactions, consumer protection, interest or other charges, licensing and mortgage insurance"

B   Section 6.B(1) is amended and restated in its entirety as follows. "Seller is duly organized, validly existing and in good standing under the laws of its state of incorporation and is qualified and/or licensed as necessary to transact business, including the originating and selling of each Loan, including without limitation, with rates of interest, loan type and other terms provided in the Loan documents, and is in good standing in each state where property securing a Loan is located"

C   Section 6.A(18) is added as follows "For each Subprime Loan, all information regarding such Subprime Loan in the Confirmation therefor and the Mortgage Loan Schedule attached to such Confirmation  is true and correct."

**4. Purchase Limitation.** The obligation to purchase any Subprime Loans identified in a Confirmation does not extended to any Loans that would violate any representation and warranty by Seller contained in the LPA.

**5. Purchase Price.** The purchase price of each Subprime Loan shall be calculated by multiplying the unpaid principal balance of each Subprime Loan (as adjusted for the borrower's next payment) on the Closing Date by its applicable purchase price percentage calculated in accordance with the rate sheet at the time of purchase for "Spot Commitments, or as stated in the Commitment letter for "Pool" Commitments (the **"Purchase Price"**). If a borrower's payment is due 15 days or earlier after the Closing Date (an "Early Payment"), the portion of such payment attributable to principal shall be deducted from the unpaid principal balance for calculating the Purchase Price  Seller shall then retain borrower's Early Payment when made. The purchase proceeds paid by Countrywide to Seller shall consist of the Purchase Price plus accrued interest as of the Closing Date and less (i) any positive escrow balances, and (ii) any amounts actually owed and paid by Seller for Mortgage Loan tax service contracts and flood certification determinations which are transferable and transferred to Countrywide on the Closing Date  Without limitation on Countrywide's other rights herein, the Purchase Price is subject to change if it is determined that the loan characteristics of the Subprime Loan to be purchased differ from the characteristics represented on the Mortgage Loan Schedule.

**6. Premium Recapture.** Should any Borrower prepay a Subprime Loan during the twelve month period following Countrywide's purchase of the loan  Seller shall reimburse Countrywide, upon demand, some or all of the purchase price premium above par paid by Countrywide. The reimbursement shall be calculated using the following formula for "Spot" commitments and "Pool" commitments unless stated otherwise in the "Pool" commitment letter.

| Purchase Price Premium Paid by Countrywide | x | 12 minus the number of months expired since the date of purchase / 12 | | Prepay Penalty | = | Premium Refund |

**7  Repurchase Price.** For the purposes of determining the repurchase price of a Subprime Loan, Sections 8.A(4), 8 B(4) and 8 C(4) are deleted, and  Sections 8.A(1), 8.B(1) and 8 C(1) are amended and restated in their entirety as follows: "The repurchase price shall be the original Purchase Price (as defined in this Addendum), less principal reduction made since the Closing Date "

**Countrywide**
CORRESPONDENT LENDING

**8. Seller's Guide.** All references to "Countrywide's Correspondent Lender Division Loan Purchase Program Seller's Manual" or "Manual" throughout the LPA are replaced with "Countrywide's Correspondent Lending Seller's Guide" or "Guide", respectfully. Seller acknowledges receipt of the Guide, which may be amended, modified or supplemented from time to time by Countrywide, in its sole and absolute discretion, which amendments, modifications or supplements shall be effective upon Countrywide's sending the same to Seller.

**9. Brokers.** Neither party has employed or otherwise engaged, nor shall employ, or otherwise engage, any broker or finder in connection with the negotiation or execution of the LPA, this Addendum or any Commitment, nor with respect to the transactions contemplated by this Addendum, in such a manner as to give rise to any claim, against any party, for any brokerage commission, finder's fee or similar payment. Each party shall indemnify and defend the other party for any claims for brokerage commission, finder's fee or similar payment based upon statements or agreements alleged to have been made by the indemnifying party.

**10. LPA Terms.** All provisions of the LPA shall be applicable and remain valid, binding and in full force and effect, except as specifically modified herein.

The parties hereto do hereby agree to the foregoing as of the date above first written.

SELLER:                                              COUNTRYWIDE:

_Aegis Mortgage Corporation_                         COUNTRYWIDE HOME LOANS, INC.

a _Oklahoma_                                         A NEW YORK CORPORATION

By: _Mao Bruma_                                      By: _____
      SIGNATURE                                            SIGNATURE

Name: _MICHAEL L. Keanemer_                          Name: _____

Title: _CFO_                                         Title: _____

Countrywide
CORRESPONDENT LENDING